# Appendix A



STATE OF WASHINGTON
━ OFFICE OF GOVERNOR JAY INSLEE ━

## PROCLAMATION BY THE GOVERNOR
## AMENDING PROCLAMATION 20-05, et seq.

### 21-14

### COVID-19 VACCINATION REQUIREMENT

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout Washington State as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations and our health care system, I have subsequently issued several amendatory proclamations, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations, including issuance of Proclamations 20-25, et seq., which limit Washingtonians' ability to participate in certain activities unless certain conditions are met; and

**WHEREAS,** during early stages of the COVID-19 pandemic, health professionals and epidemiological modeling experts indicated that the spread of COVID-19, if left unchecked, threatened to overwhelm portions of Washington's public and private health-care system; and

**WHEREAS,** to protect some of our most vulnerable populations – persons in health care facilities, long-term care facilities (which includes nursing homes), and similar congregate care facilities – and to protect our health and congregate care systems themselves, I issued several proclamations imposing heightened protections on workers, residents and visitors in those facilities; and

**WHEREAS,** although COVID-19 continues as an ongoing and present threat in Washington State, the measures we have taken together as Washingtonians over the past 18 months, including the willingness of most Washingtonians to take advantage of the remarkable, life-saving vaccines being administered throughout the state, have made a difference and have altered the course of the pandemic in fundamental ways; and

# A1

**WHEREAS,** after months of improving COVID-19 epidemiological conditions in Washington State, the emergence of highly contagious COVID-19 variants, including the "delta variant" that is at least twice as transmissible as the virus that emerged in late 2019, coupled with the continued significant numbers of unvaccinated people, have caused COVID-19 cases and hospitalizations to rise sharply among unvaccinated populations and have resulted in breakthrough infections in some fully vaccinated individuals; and

**WHEREAS,** COVID-19 vaccines are effective in reducing infection and serious disease, widespread vaccination is the primary means we have as a state to protect everyone, including persons who cannot be vaccinated for medical reasons, youth who are not eligible to receive a vaccine, immunocompromised individuals, and vulnerable persons including persons in health care facilities, long-term care facilities and other congregate care facilities from COVID-19 infections; and

**WHEREAS,** widespread vaccination is also the primary means we have as a state to protect our health care system, to avoid the return of stringent public health measures, and to put the pandemic behind us; and

**WHEREAS,** COVID-19 vaccinations have been available in Washington State from December 2020 to the present, and since April 15, 2021, all Washingtonians over the age of 16 have been eligible to receive free COVID-19 vaccinations from a wide variety of providers at many locations; and

**WHEREAS,** as of August 4, 2021, nearly 4.4 million Washingtonians, about 70% of those eligible and 58% of the total population, had initiated their vaccine series, leaving 2.1 million eligible Washingtonians who were unvaccinated; and

**WHEREAS,** according to the CDC, as of August 1, 2021, approximately 67% of staff in Washington state nursing homes were fully vaccinated; and

**WHEREAS,** healthcare workers face COVID-19 exposures in a variety of healthcare settings, with those involving direct patient care likely at higher risk; and

**WHEREAS,** COVID-19 vaccines are safe and effective. COVID-19 vaccines were evaluated in clinical trials involving tens of thousands of participants and met the U.S. Food & Drug Administration's rigorous scientific standards for safety, effectiveness, and manufacturing quality needed to support emergency use authorization; and, to date, more than 346 million doses of COVID-19 vaccines have been given in the United States with 8.2 million of those doses administered in Washington, and serious safety problems and long-term side effects are rare; and

**WHEREAS,** on July 6, 2021, the Office of Legal Counsel of the United State Department of Justice issued a legal opinion stating that federal and state governments were not prohibited by federal law

from imposing vaccination mandates, even when the only vaccines available are those authorized under U.S. Food and Drug Administration Emergency Use Authorizations; and

**WHEREAS,** on July 26, 2021, approximately 60 medical groups, including the American Medical Association, the American College of Physicians, the American Academy of Pediatrics, the American Academy of Family Physicians, the American Nurses Association, the American Academy of Physician Assistants, the Association of Professionals in Infection Control and Epidemiology, the American Public Health Association, the Infectious Diseases Society of America LeadingAge, the National Hispanic Medical Association, the National Medical Association, and the Society of Infectious Disease Pharmacists, issued a memorandum supporting mandatory, universal vaccination of all public and private health care and long-term care workers, noting that such a requirement is the "fulfillment of the ethical commitment of all health care workers to put patients as well as residents of long-term care facilities first and take all steps necessary to ensure their health and well-being"; and on August 2, 2021, the Washington State Society of Post-Acute and Long-Term Care Medicine submitted a letter in support of the above noted July 26, 2021 memorandum; and

**WHEREAS,** on July 15, 2021, the American College of Obstetricians and Gynecologists, together with the Society for Maternal-Fetal Medicine, posted a formal opinion stating that medical professionals have an ethical obligation to be vaccinated against COVID-19 to prevent the spread of harmful infectious diseases, and that women who are or may become pregnant should be vaccinated against COVID-19; and

**WHEREAS,** it is the duty of every employer to protect the health and safety of employees by establishing and maintaining a healthy and safe work environment and by requiring all employees to comply with health and safety measures; and

**WHEREAS**, state employees live in and provide services to the public in every county in our state, and many interact with the public on a regular basis, and they all interact with some portion of the community at large to varying degrees before and/or after state work hours; and

**WHEREAS,** to further our individual and collective duty to reduce the spread of COVID-19 in our communities, I am requiring all employees, on-site independent contractors, volunteers, goods and services providers, and appointees of designated state agencies to be fully vaccinated against COVID-19 on or before October 18, 2021; and

**WHEREAS,** the worldwide COVID-19 pandemic and its persistence in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

3    **A3**

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the state Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people; and

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05, as amended, remains in effect, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), and (3), I hereby prohibit, subject to the conditions, exceptions, and circumstances set forth below, the following activities:

1. <u>Prohibitions</u>.  This order prohibits the following:

   a. Any Worker from engaging in work for a State Agency after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19;
   b. Any State Agency from permitting any Worker to engage in work for the agency after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19 and provided proof thereof to the agency;
   c. Any Health Care Provider from failing to be fully vaccinated against COVID-19 after October 18, 2021; and
   d. Any individual or entity that operates a Health Care Setting from permitting a Health Care Provider to engage in work for the individual or entity as an employee, contractor, or volunteer after October 18, 2021 if the Health Care Provider has not been fully vaccinated against COVID-19 and provided proof thereof to the individual or entity. Providers who do not work in a Health Care Setting must provide proof of vaccination to the operator of the facility in which the Provider works, if any, or, if requested, to a lawful authority. A lawful authority includes, but is not limited to, law enforcement, local health jurisdictions, and the state Department of Health.

2. <u>Exemptions from Vaccine Requirement</u>.

   a. Health Care Providers and Workers for State Agencies are not required to get vaccinated against COVID-19 if they are entitled under the Americans With Disabilities Act (ADA), Title VII of the Civil Rights Act of 1964 (Title VII), the Washington Law Against Discrimination (WLAD), or any other applicable law to a disability-related reasonable accommodation or a sincerely held religious belief accommodation to the requirements of this order. Nothing herein precludes individuals or entities for which Health Care Providers work as employees, contractors, or volunteers and State Agencies from providing disability-related reasonable accommodations and religious accommodations to the requirements of this order as required by the laws noted above. As provided in the ADA, Title VII, and the WLAD, individuals or entities for which Health Care Providers work as

employees, contractors, or volunteers and State Agencies are not required to provide such accommodations if they would cause undue hardship.

 b. To the extent permitted by law, before providing a disability-related reasonable accommodation to the requirements of this order, individuals or entities for which Health Care Providers work as employees, contractors, or volunteers and State Agencies must obtain from the individual requesting the accommodation documentation from an appropriate health care or rehabilitation professional authorized to practice in the State of Washington stating that the individual has a disability that necessitates an accommodation and the probable duration of the need for the accommodation.

 c. To the extent permitted by law, before providing a sincerely held religious belief accommodation to the requirements of this Order, individuals or entities for which Health Care Providers work as employees, contractors, or volunteers and State Agencies must document that the request for an accommodation has been made and the document must include a statement regarding the way in which the requirements of this order conflict with the religious observance, practice, or belief of the individual.

3. <u>Acceptable Proof of Full Vaccination Against COVID-19</u>: Where required above, Workers for State Agencies and Health Care Providers must provide proof of full vaccination against COVID-19 by providing one of the following:
 a. CDC COVID-19 Vaccination Record Card or photo of the card;
 b. Documentation of vaccination from a health care provider or electronic health record; or
 c. State immunization information system record.
Personal attestation is not an acceptable form of verification of COVID-19 vaccination.

4. <u>Public and Private Entities and Employers May Exceed These Requirements</u>:  Nothing in this order prohibits individuals or entities employing or using the services of Health Care Providers and State Agencies from implementing requirements that exceed the requirements of this Order.

5. <u>Definitions</u>.
 a. "Worker":
  • For purposes of this order, "worker" includes:
   ▪ A person engaged to work as an employee, independent contractor, service provider, volunteer, or through any other formal or informal agreement to provide goods or services, whether compensated or uncompensated, but does not include a visitor or patron;
   ▪ The director, secretary, or other executive officer of a State Agency;
   ▪ A person appointed to serve on a board, commission, or similar body that is an executive cabinet agency listed at https://www.governor.wa.gov/office-governor/office/executive-cabinet or

a small cabinet agency listed at https://www.governor.wa.gov/office-governor/office/small-cabinet.
- The following exceptions apply to the definition of "worker":
  - Independent contractors, and any of their workers, are exempt from this order unless any provision of the contract to provide goods or services requires work to be performed in person and on site, regardless of frequency, whether other workers are present, or any contingent nature of that requirement.
  - For any State Agency that is listed as an agency under the authority of a board, council, or commission at https://ofm.wa.gov/sites/default/files/public/publications/2021_State_Org_Chart.pdf and that is not also listed as an executive cabinet agency at https://www.governor.wa.gov/office-governor/office/executive-cabinet or a small cabinet agency at https://www.governor.wa.gov/office-governor/office/small-cabinet, only the State Agency's compensated employees are "workers" subject to the requirements of this proclamation.

b. "Health Care Provider" includes:
- Individuals with credentials listed in the Healthcare Professional Credentialing Requirements list;
- Individuals who are permitted by law to provide health care services in a professional capacity without holding a credential;
- Long-term care workers unless specifically excluded in this order; and
- Workers in any Health Care Setting, as defined herein.

"Health Care Provider" does not include, for purposes of this order:
- Individual providers, as defined in RCW 74.39A.240;
- Providers of personal care in a person's home, such as home care, home health or hospice care;
- Providers who are not actively practicing or providing services; and
- Providers who provide services only at one or more of the settings that are expressly excluded from the list of Health Care Settings under this order.

c. "Health Care Setting" is any public or private setting that is primarily used for the delivery of in-person health care services to people, except as specifically exempted below. If located at a facility that is primarily used for the delivery of health-care services, such as a hospital, then the entire facility is a Health Care Setting. If located at a facility that is primarily used for another purpose, such as a pharmacy within a grocery store, school nurse's office, or vaccination clinic within a business establishment, the Health Care Setting includes only the areas that are primarily used for the delivery of health care and the areas regularly occupied by Health Care Providers and people seeking care, but not the other areas of the facility.

"Health Care Setting" includes, but is not limited to:
- Acute care facilities, including, but not limited to, hospitals;
- Long-term acute care facilities;
- Inpatient rehabilitation facilities;
- Inpatient behavioral health facilities, including, but not limited to, evaluation and treatment facilities, residential treatment facilities, secure detox facilities;
- Residential long-term care facilities, including, but not limited to, nursing homes, assisted living facilities, adult family homes, settings where certified community residential services and supports are provided, and enhanced services facilities;
- Mobile clinics or other vehicles where health care is delivered;
- Outpatient facilities, including, but not limited to, dialysis centers, physician offices, and behavioral health facilities (including offices of psychiatrists, mental health counselors, and substance use disorder professionals);
- Dental and dental specialty facilities;
- Pharmacies (not including the retail areas);
- Massage therapy offices (this includes designated areas where massage is administered within non-health care settings like spas and wellness/fitness centers);
- Chiropractic offices;
- Midwifery practices and stand-alone birth centers;
- Isolation and/or quarantine facilities;
- Ambulatory surgical facilities;
- Urgent care centers; and
- Hospice care centers.

"Health Care Setting" does not include:
- Settings where sports and spectator events or other gatherings are held (including when credentialed athletic trainers are providing care to players), other than areas primarily used for the delivery of health care services, such as designated first aid areas (which are Health Care Settings);
- Department of Children, Youth & Families (DCYF)-licensed foster homes that do not primarily provide health care services;
- Research facilities where no health care is delivered to people;
- Veterinary health care settings;
- Animal control agencies; and
- Non-profit humane societies.

d.  "State Agency" includes:
- Every agency listed at https://www.governor.wa.gov/office-governor/office/executive-cabinet;
- Every agency listed at https://www.governor.wa.gov/office-governor/office/small-cabinet; and

7  **A7**

- Every agency under the authority of a board, council, or commission listed at https://ofm.wa.gov/sites/default/files/public/publications/2021_State_Org_Ch art.pdf except the State Board for Community and Technical Colleges and the governing boards of four-year institutions of higher education.

  e.  "Fully Vaccinated against COVID-19": A person is fully vaccinated against COVID-19 two weeks after they have received the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA (e.g., Pfizer-BioNTech or Moderna) or two weeks after they have received a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA (e.g., Johnson & Johnson (J&J)/Janssen.

**ADDITIONALLY**, the specific prohibitions in this Proclamation are severable and do not apply to the extent that compliance with a prohibition would violate (1) any U.S. or Washington constitutional provision; (2) federal statutes or regulations; (3) any conditions that apply to the state's receipt of federal funding; (4) state statutes; or (5) applicable orders from any court of competent jurisdiction.

**ADDITIONALLY**, nothing in this Proclamation limits otherwise applicable requirements related to personal protective equipment, personnel training, and infection control policies and procedures.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required facial coverings, social distancing and other protective measures while engaging in this phased reopening, I may be forced to reinstate the prohibitions established in earlier proclamations.

This order is effective immediately.  Unless extended or amended, upon expiration or termination of this amendatory proclamation the provisions of Proclamation 20-25, et seq., will continue to be in

effect until the state of emergency, issued on February 29, 2020, pursuant to Proclamation 20-05, is rescinded.

Signed and sealed with the official seal of the state of Washington on this 9th day of August, A.D., Two Thousand and Twenty-One at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State

# Appendix  **B**



April 24, 2020

To:    Manufacturers of Face Masks;
       Health Care Personnel;
       Hospital Purchasing Departments and Distributors; and
       Any Other Stakeholders.

On April 18, 2020, in response to concerns relating to insufficient supply and availability of face masks,[1,2] the U.S. Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) authorizing the use of face masks for use by members of the general public, including health care personnel (HCP)[3] in healthcare settings as personal protective equipment (PPE), to cover their noses and mouths, in accordance with Centers for Disease Control and Prevention (CDC) recommendations, to prevent the spread of the virus called severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) during the Coronavirus Disease 2019 (COVID-19) pandemic, pursuant to section 564 of the Federal, Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 360bbb-3).

On February 4, 2020, pursuant to Section 564(b)(1)(C) the Act, the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States

---

[1] A face mask is a device, with or without a face shield, that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. It includes cloth face coverings as a subset. It may be for single or multiple uses, and if for multiple uses it may be laundered or cleaned. There are many products marketed in the United States as "face masks" that offer a range of protection against potential health hazards. Face masks are regulated by FDA when they meet the definition of a "device" under section 201(h) of the Act. Generally, face masks fall within this definition when they are intended for a medical purpose. Face masks are regulated under 21 CFR 878.4040 as Class I 510(k)-exempt devices (non-surgical masks).
[2] Surgical masks are not covered within the scope of this authorization. Surgical masks are masks that cover the user's nose and mouth and provide a physical barrier to fluids and particulate materials and are regulated under 21 CFR 878.4040 as class II devices requiring premarket notification. Additionally, these masks meet certain fluid barrier protection standards and Class I or Class II flammability tests. More information on the distinction is provided in FDA guidance, titled "Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency" available at https://www.fda.gov/media/136449/download.
[3] HCP refers to all paid and unpaid persons serving in healthcare settings who have the potential for direct or indirect exposure to patients or infectious materials, including body substances (e.g., blood, tissue, and specific body fluids); contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air. These HCP include, but are not limited to, emergency medical service personnel, nurses, nursing assistants, physicians, technicians, therapists, phlebotomists, pharmacists, dentists and dental hygienists, students and trainees, contractual staff not employed by the healthcare facility, and persons not directly involved in patient care, but who could be exposed to infectious agents that can be transmitted in the healthcare setting (e.g., clerical, dietary, environmental services, laundry, security, engineering and facilities management, administrative, billing, and volunteer personnel).

**B1**

Page 2

citizens living abroad, and that involves the virus that causes COVID-19.[4]  Pursuant to Section 564 of the Act, and on the basis of such determination, the Secretary of HHS then declared on March 24, 2020, that circumstances exist justifying the authorization of emergency use of medical devices, including alternative products used as medical devices, due to shortages during the COVID-19 pandemic, subject to the terms of any authorization issued under that section.[5]

On April 24, 2020 in response to questions and concerns that have been received by FDA since issuance of the April 18, 2020 letter of authorization and having concluded that revising the April 18, 2020 EUA is appropriate to protect the public health or safety under section 564(g)(2)(c) of the Act (21 U.S.C. § 360bbb-3(g)(2)(c)), FDA is reissuing the April 18, 2020 letter in its entirety with amendments[6] incorporated. Specifically, FDA is clarifying through this re-issued letter that facemasks, including cloth face coverings, are authorized to be used by HCP only as source control[7,8] in accordance with CDC recommendations under this EUA.[9]  As stated in the April 18 letter, face masks are authorized for use by the general public to cover their noses and mouths, in accordance with CDC recommendations.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of face masks for use in accordance with CDC recommendations, as described in the Scope of Authorization (Section II) and pursuant to the Conditions of Authorization (Section IV) of this letter.

For the most current CDC recommendations on the use of face masks by the general public during COVID-19, please visit CDC's webpage:  Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission For the most recent recommendations on use of face masks by HCPs in a healthcare setting, see: Strategies to Optimize the Supply of PPE and Equipment.

## I.    Criteria for Issuance of Authorization

I have concluded that the emergency use of face masks in accordance with CDC recommendations as source control as described in the Scope of Authorization (Section II) to

---

[4] U.S. Department of Health and Human Services, Determination of a Public Health Emergency and Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3. 85 FR 7316 (February 7, 2020)

[5] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 17335 (March 27, 2020).

[6] The amendments to the April 18, 2020 letter clarify that the eligible facemasks are to be used for source control only, and are not personal protective equipment, meaning they are not a substitute for filtering face piece respirators or for surgical face masks. This reissued EUA does not change any aspects of the April 18, 2020 letter with respect to the use of face masks by the general public.

[7] Source control refers to the use of a facemask or cloth face covering over the mouth and nose to contain that individual's respiratory secretions to help prevent transmission from infected individuals who may or may not have symptoms of COVID-19.

[8] https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html

[9] In addition, health care employers should refer to standards of the Occupational Safety and Health Administration (OSHA) that apply to PPE to protect workers and infectious disease hazards. *See* 29 CFR 1910 subpart I.

**B2**

Page 3

help prevent spread of the virus during the COVID-19 pandemic meets the criteria for issuance of an authorization under Section 564(c) of the Act, because I have concluded that:

1. SARS-CoV-2, the virus that causes COVID-19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

2. Based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized face masks may be effective as source control to help prevent the spread of SARS-CoV-2 by infected individuals who may or may not have symptoms of COVID-19 during the COVID-19 pandemic, and that the known and potential benefits of face masks, when used in accordance with the scope of this authorization (Section II), outweigh the known and potential risks of such product; and

3. There is no adequate, approved, and available alternative to the emergency use of face masks for source control by the general public and for HCPs to help prevent the spread of the virus due to face mask shortages during the COVID-19 pandemic.[10,11]

## II. Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited to the use of face masks, including cloth face coverings, as source control for use by members of the general public, as well as HCP in healthcare settings, to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of the SARS-CoV-2 during the COVID-19 pandemic. The facemasks are not intended to be used by HCPs as PPE, meaning they are neither substitutable for respiratory protective devices such as filtering face piece respirators, nor for surgical face masks. This use is consistent with face masks regulated as Class I 510(k)-exempt face masks under 21 CFR 878.4040.

**Authorized Face Masks**

Face masks are authorized under this EUA when they are intended for use as source control, by members of the general public as well as HCPs in healthcare settings, to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic. Authorized face masks must meet the following requirements:

1. The product is labeled accurately to describe the product as a face mask and includes a list of the body contacting materials (which does not include any drugs or biologics);

---

[10] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

[11] Providing authorization for the introduction into interstate commerce of face masks by manufacturers that do not customarily engage in the manufacture of medical devices helps meet the needs of the healthcare system. In addition, increased availability of face masks helps meet the needs for source control for the general population, reserving FDA-cleared surgical masks and FDA-cleared or -authorized N95 and N95 equivalent Face Filtering Respirators for use by HCP. Providing HCP who are on the forefront of the COVID-19 response with sufficient PPE is necessary in order to help prevent HCP exposure to pathogenic biologic airborne particulates during the COVID-19 pandemic.

**B3**

Page 4

2. The product is labeled accurately so that it does not claim to be intended for use as a surgical mask or to provide liquid barrier protection;
3. The product labeling includes recommendations against use in a clinical setting where the infection risk level through inhalation exposure is high;
4. The product is not labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction;
5. The product is not labeled as a respiratory protective device, and therefore should not be used for particulate filtration; and
6. The product is not labeled for use in high risk aerosol generating procedures.[12]

Manufacturers of face masks that are used as described above and meet the above requirements (i.e., are within this section (the Scope of Authorization, Section II)) do not need to take any action, other than complying with the Conditions of Authorization (Section IV) to be authorized under this EUA. FDA's posting and public announcement of this EUA at https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization, serves as face mask manufacturers' notification of authorization.

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of face masks as described within this section (the Scope of Authorization, Section II), outweigh the known and potential risks of such products.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that face masks may be effective as described within this section (the Scope of Authorization, Section II) of this letter, pursuant to Section 564(c)(2)(A) of the Act.

FDA has reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I of this letter, and concludes that face masks (as described in this section, the Scope of Authorization, Section II), meet the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of face masks must be consistent with, and may not exceed, the terms of this letter, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section IV).  Subject to the terms and conditions of this EUA and under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), face masks, as source control, are authorized for use by members of the general public, as well as HCPs in healthcare settings, to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic.

---

[12] Examples of aerosol generating procedures in healthcare settings may be found at https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-faq.html

**B4**

Page 5

## III. Waiver of Certain FDA Requirements

Pursuant to Section 564(e)(3) of the Act, with respect to the emergency use of a product for which an authorization under this section is issued, FDA may waive or limit, to the extent appropriate given the circumstances of the emergency, requirements regarding good manufacturing practice otherwise applicable to the manufacture, processing, packing, or holding of products subject to regulations under this Act, including such requirements established under sections 520(f)(1). FDA grants that waiver, including the quality system requirements under 21 CFR Part 820 and labeling requirements under the FD&C Act and FDA regulations, including unique device identification requirements in 21 CFR Part 830 and 21 CFR 801.20, except that face masks must include the labeling elements specified in the Conditions of Authorization (Section IV).

## IV. Conditions of Authorization

Pursuant to Section 564(e) of the Act, I am establishing the following conditions to this authorization:

### Manufacturers and Distributors of Authorized Products[13]

   A.  Manufacturers and Distributors will make face masks available with labeling that includes a description of the product as a face mask, including a list of the body contacting materials (which does not include any drugs or biologics).

   B.  Manufacturers and Distributors of authorized products shall not label the product: 1) as a surgical mask, to provide liquid barrier protection; 2) for use in a clinical setting where the infection risk level through inhalation exposure is high; 3) for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses; 4) as a respiratory protective device; or 5) for high risk aerosol-generating procedures.

   C.  Manufacturers must make the required labeling available to each end user or end user facility (each hospital) in hard copy or in an alternative format (e.g., electronic labeling on the manufacturer's website).  Instructions on how to access the labeling if provided in an alternative format must be available to each end user or end user facility.

   D.  Manufacturers and Distributors will include instructions for recommended cleaning and/or disinfection materials and processes, if applicable, for their authorized product(s). Manufacturers must provide these instructions, if applicable, to each end user or end user facility (e.g., each hospital) in hard copy or in an alternative format (e.g., electronic instructions). Instructions on how to access the labeling if provided in an alternative format must be available to each end user or end user facility.

---

[13] The requirements under 21 CFR Part 806 (Reports of Corrections and Removals) and 21 CFR Part 807 (Registration and Listing) do not apply to products authorized under an EUA. As such, compliance with these regulations are not required under this EUA.

**B5**

Page 6

E.  Manufacturers will have a process in place for reporting adverse events of which they
    become aware to FDA under 21 CFR Part 803. Adverse events of which the
    manufacturer becomes aware will be reported to FDA. See FDA's webpage "Medical
    Device Reporting (MDR): How to Report Medical Device Problems"[14] for reporting
    requirements and procedures.[15]

F.  Manufacturers and distributors will ensure that any records associated with this EUA
    are maintained until otherwise notified by FDA. Such records will be made available
    to FDA for inspection upon request.

G.  Through a process of inventory control, manufacturers and distributors will maintain
    records of the entities to which they distribute the face masks and the numbers of
    each such product they distribute.

H.  Manufacturers and distributors are authorized to make available additional
    information relating to the emergency use of the product that is consistent with, and
    does not exceed, the terms of this letter of authorization.

**Conditions Related to Advertising and Promotion**

I.  All printed matter, including advertising and promotional materials, relating to the
    use of the authorized face mask shall be consistent with the labeling elements listed in
    Section II of this EUA, as well as the terms set forth in this EUA and the applicable
    requirements set forth in the Act and FDA regulations.

J.  No printed matter, including advertising or promotional materials, relating to the use
    of the authorized face mask may represent or suggest that such product is safe or
    effective for the prevention or treatment of patients during the COVID-19 pandemic.

K.  All advertising and promotional descriptive printed matter relating to the use of the
    product shall clearly and conspicuously state that

    • The product has not been FDA cleared or approved

    • The product has been authorized by FDA under an EUA for use as source
      control by the general public as well as by HCP in healthcare settings as to
      help prevent the spread of infection or illness during the COVID-19
      pandemic.

    • This product is authorized only for the duration of the declaration that
      circumstances exist justifying the authorization of the emergency use of
      medical devices, including alternative products used as medical devices,

---

[14] FDA guidance, titled "Medical Device Reporting (MDR): How to Report Medical Device Problems" is available
at https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-mdr-how-report-medical-device-problems.
[15] Also refer to FDA guidance, titled "Postmarketing Adverse Event Reporting for Medical Products and Dietary
Supplements During a Pandemic" available at https://www.fda.gov/media/72498/download.

**B6**

Page 7

during the COVID-19 outbreak, under section 564(b)(1) of the Act, 21 U.S.C.
§ 360bbb-3(b)(1) unless the authorization is terminated or revoked sooner.

**V. Duration of Authorization**

This EUA will be effective until the declaration that circumstances exist justifying this
authorization is terminated under Section 564(b)(2) of the Act or the EUA is revoked under
Section 564(g) of the Act.

Sincerely,

  /S/

_____

RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

**B7**

# Appendix **C**

**kurt benshoof <kurtbenshoof@gmail.com>**                  Mon, Feb 3, 8:07 PM
to Santiago, Adam, Courtney, urve, bgage702

Happy Tuesday!

Mr. Villanueva, this email constitutes Co-plaintiff Kurt Benshoof's ("Benshoof")
good faith effort to confer with you prior to the filing of motion for joinder and
supplemental pleading, pursuant to Fed.R.Civ.P. 19(a)(1)(A) and Fed.R.Civ.P. 15(d) to
include you, attorney Blair M. Russ ("Russ"), and Ms. Jessica R. Owen ("Owen"), as a
co-defendants.

As you have been previously served notice of, Russ and Owen conspired to commit
fraud upon the court in KCSC No. 22-2-15958-8 SEA (Dkt. #86-3,  ¶¶185-280) to obtain
the Order Restricting Abusive Litigation by Kurt Benshoof ("ORAL"), and thereby violate
Benshoof's right to petition for redress on behalf of himself and his minor son,
A.R.W.  For reasons of your own, or those you work for, you have chosen to become a
co-conspirator and accessory after-the-fact to their fraud.

Because your statements reveal your clear intention to use the fraudulent ORAL to deny
Benshoof's right to petition for redress, and this right is clearly established, there are
grounds for bringing a First Amendment claim against you under 42
U.S.C.  §1983.  Because Russ and Owen set in motion a series of events by which they
could reasonably expect that one or more attorneys working in the King County Office of
the Prosecuting Attorney would use the ORAL to deny my right to petition for redress,
they will be named as co-defendants.

In *Hernandez v. Skinner*, 969 F.3d 930, 941-42 (9th Cir. 2020), the Ninth Circuit
discussed, for the first time, the minimum level of involvement needed for § 1983 liability
under the integral-participant doctrine.  An actor may be deemed to have caused a
constitutional violation under the "integral-participant doctrine," "only if (1) the defendant
knew about and acquiesced in the constitutionally defective conduct as part of a
common plan with those whose conduct constituted the violation, or (2) the defendant
set in motion a series of acts by others which the defendant knew or reasonably should
have known would cause others to inflict the constitutional injury." *Peck v. Montoya*, 51
F.4th 877, 891 (9th Cir. 2022).

Since you and Mr. Asher have both cited *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), you
cannot claim ignorance of the fact that the U.S. Supreme Court held:

A "well-pleaded, non-conclusory factual allegation of parallel behavior [will] determine
whether it gave rise to a "plausible suggestion of conspiracy." Id., at 565–566, 127 S.Ct.
1955. Acknowledging that parallel conduct was consistent with an unlawful agreement,
the Court nevertheless concluded that it did not plausibly suggest an illicit accord
because it was not only compatible with, but indeed was more likely explained by,
lawful, unchoreographed free-market behavior."
*Ashcroft v. Iqbal,* 556 U.S. 662, 680 (2009)

# C1

As you are an attorney, you are surely aware that malicious intent is not a required element for a cause of action under 42 U.S.C. §1983. Furthermore, because "parallel conduct" is "consistent with an unlawful agreement" Plaintiffs need not plead more than circumstantial evidence to survive a Fed.R.Civ.P. 12(b) motion:

"The existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide… The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment. "It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473 (1962)."
*Adickes v. Kress Co*., 398 U.S. 144, 176 (1970)

Additionally, your harassing threats to corruptly persuade Benshoof to dismiss his claims and your corrupt persuasions to the Court---intended to prevent Benshoof and others from testifying at trial by using the fraudulent ORAL as the misleading conduct in your witness tampering---constitute a violation of 18 U.S.C. §1962(c) by violating § 1512:

**(b)**Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
**(1)**
influence, delay, or prevent the testimony of any person in an official proceeding;

**(d)**Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—
**(1)**
attending or testifying in an official proceeding;

You, Russ, and Owen will be named under 42 U.S.C. § 1985 for your conspiracy to use the ORAL to violate Benshoof's right to petition for redress.

Lastly, you will be named under 42 U.S.C. § 1986 for neglecting to prevent further violations of the First Amendment against Benshoof.

In other words, your attempts to bully Benshoof and to deceive the court require Benshoof to ensure due process and the equal protection of the law for all by holding you accountable for your malfeasance, pursuant to the tenets of his faith. ***#FAFO***

# C2

In Truth & Spirit,
Reverend Kurt Benshoof

**C3**

# Appendix  **D**



kurt benshoof <kurtbenshoof@gmail.com>                    Mar 6, 2024,
                                                          11:18 AM
to jainsworth-taylor, mking, tladwig,

Happy Wednesday!

I contacted your office last year regarding the violations of state and federal law which I and my former fiance, Briana, ("Plaintiffs") were subjected to over the span of seven months between September 2020 and April 2021.

If my memory is correct, it was Julie who called me.  As I told her at the time, I very much appreciated the courtesy and respect of the phone call.

During the phone call, Julie asserted that the City of Shoreline was not responsible for any violations of Plaintiffs' rights and the Civil Rights Act of 1964.  The reasoning given was that the King County Sheriff's Office is contracted by the City of Shoreline.

Well, Plaintiffs download the ***Interlocal Agreement Between King County and the City of Shoreline Relating to Law Enforcement Services***, and read through it.

The City of Shoreline ***policy*** says one thing, yet the ***practices*** that Briana---an African American woman---and I were subjected to were worse than anything she has ever encountered in the Southern states.

[Non Discrimination | City of Shoreline (shorelinewa.gov)](#)

"The City of Shoreline recognizes and upholds the rights of individuals to be treated fairly and to live their lives with dignity and respect and free from discrimination or targeting because of their immigration status, faith, race, national origin, sexual orientation, gender or gender identity, age, ability, ethnicity, housing status, economic status, or other social status. In 2017, the Shoreline City Council unanimously adopted Resolution 401 declaring the City of Shoreline to be an inviting, equitable, and safe community for all. The City Council passed this resolution as a way to restate the practices and policies of the City and the values that the Shoreline community has supported.

The City is committed to ensuring that Shoreline remains a welcoming, inclusive, and safe community for all who live, work and visit here. The City will continue to work, in cooperation with our community partners, to ensure our services and programs are accessible and open to all individuals."

From the City of Shoreline website, it appears that the City of Shoreline "will continue to ensure Shoreline officers are trained" properly, paid for by the City of Shoreline.

[Policies and Accountability | City of Shoreline (shorelinewa.gov)](#)

# D1

"Shoreline officers additionally go through eight hours of implicit bias training intended to make them aware of how to counter their own implicit biases and not let those biases impact their policing. The Shoreline Police command staff will continue to ensure Shoreline officers are trained in crisis intervention, de-escalation techniques, and implicit bias. The Shoreline City Council has supported these efforts through additional training funds."

The discrimination that we were subjected to was not an isolated incident: it was the policy, practice or widespread customs of Defendants.  It went on for **seven months.**  I was repeatedly physically assaulted, I received death threats from customers while store employees watched.  Briana and I were shocked to return to our vehicle after one shopping trip, discovering to our horror that employees had laid forty to fifty shopping carts on their sides on the ground, surrounding our vehicle.  Employees did everything but hang a noose from a lamp post.

For **seven months** Shoreline PD allowed, enabled, and facilitated this harassment, these threats, and these assaults.  I will, however, personally commend Captain Ryan Abbot as a paragon of law enforcement integrity and ethical conduct.  We could use more officers like him.  It was Capt. Abbot who finally put a stop to this after he contacted him in April 2021.

Town & Country Markets has refused to even apologize, or return any of my phone calls.

As Plaintiffs' 3-year statute of limitation is nearing expiration, this email is to inform City of Shoreline that we will be filing suit in U.S. District Court for the Western District of Washington by 4:30pm Monday March 11, 2024, unless a tentative resolution of our claims is obtained by 12:00pm Monday March 11, 2024.

Plaintiffs have hours of video evidence of our claims.

Plaintiffs already have a lawsuit against the City of Seattle, Puget Consumers Co-Op, and other stores.  WAWD No. 2:23-cv-1392-JNW First Amended Complaint (Dkt. #47)

You may wish to contact the City of Seattle lead attorney on this case, Dallas LePierre.  His email is dallas.lepierre@seattle.gov, and his telephone is (206) 386-1041.  Mr. LePierre can surely give your office his professional opinion of my legal acumen, integrity, and dedication to ensuring that violations of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment are dedicated passions of mine.

My suggestion would be for your office to contact the corporate offices of Town & Country Markets.  Plaintiffs' claims can be resolved fairly and amicably for all parties, so long as there is *prompt,* sincere and forthright action.  It would be most efficient for all parties if your office brings Town & Country to the negotiation table.

# D2

Attached is Plaintiffs' First Amended Complaint.  Plaintiffs will not be providing anyone an advance "negotiations" copy of our lawsuit naming City of Shoreline, Town & Country Markets, William C. Akers, Evan Fagan, etc.

If tentative resolution cannot be reached in a timely manner, Defendants will be served summons and complaint.

My cell phone is: (206) 460-4202.

Have a nice day.


In Truth & Spirit,
Reverend Kurt Benshoof

**D3**

# Appendix  **E**

**Judge Melinda J. Young**
King County Superior Court Department 6
516 3rd Avenue Seattle, WA 98104
**Bailiff, Jennifer McBeth**

**FILED**
KING COUNTY WASHINGTON

SEP 06 2024

SEA
SUPERIOR COURT CLERK


**King County**
Superior Court

Urve Maggitti
58 E Swedesford Road
Malvern, PA 19355

State of Washington v. Benshoof | 24-1-02680-7 SEA

To Whom it May Concern:

The court is in receipt of the enclosed Petition for Writ of Habeas Corpus and attached check for $5.00 made payable to King County Superior Court. These are being returned to you at the direction of Judge Young. Mr. Benshoof is representing himself. He is welcome to present any motions on his own behalf to the court by filing them in normal course. Only a licensed attorney who is representing Mr. Benshoof, or a defendant who is representing himself, may file a petition or motion with the court. Someone who files legal motions on behalf of another person may be committing the crime of Unauthorized Practice of Law, even if it is with the other person's permission. Regardless, we cannot accept the check for $5.00.

A copy of this letter will be given to the assigned prosecutor, Ms. Brennan, and to Mr. Benshoof. It will also be filed in the court file for the record.

Best regards,

Jennifer McBeth

enclosures

# E1

**King County Superior Court:**
**516 Third Avenue, Room C-203, Seattle, WA 98104**
**Melinda Young   melinda.young@kingcounty.gov**

## Petition for Writ of Habeas Corpus

# IN RE: KURT BENSHOOF

Comes now the undersigned URVE MAGGITTI (herein "Applicant"), on behalf of Kurt Benshoof ("Petitioner"), applying for a writ of habeas corpus from this Honorable Court, and asking that it be issued without delay, as contemplated by Wash. Rev. Code § 7.36, and per the concurrent guarantees of Wash. Const. Art. I § 13, and of US Const. Art. I, Sec. 9 Cl. 2, stating in support:

1. Petitioner is currently being restrained in his liberty: he has been incarcerated without cause.

2. Our laws require that there **must** be a preliminary hearing to determine probable cause to bind over a suspect to a particular court as an accused, regarding a particular crime, **before** this kind of restraint. *Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854 (1975)

3. No magistrate or judicial officer held or purported to hold a probable cause determination hearing, as is absolutely and unambiguously required prior to restraint of Petitioner's liberty.

4. Various public officials, including Hon. Nicholas Straley ("Straley"), appear to have a vendetta or personal agenda to retaliate against Petitioner for having been a whistleblower previously.

5. Straley evidently has an extreme bias against Petitioner and conflict of interest.

6. Our constitutions guarantee that nobody will be deprived of their rights absent due process.

7. Straley appears to have intentionally circumvented due process to unduly harm Petitioner.

8. Applicant respectfully demands speedy relief and release from restraint of protected liberty.

9. According to RCW § 7.36, a petition that "must be granted" specifies the following.

**BY WHOM LIBERTY IS RESTRAINED, AND WHERE**

10. Sheriff Patricia Cole-Tindall ("Cole-Tindall") is physically confining Petitioner, without cause, in a King County, Washington jail.

**CAUSE OR PRETENSE**

11. There is no lawful cause. Evidently there is nothing more than pretense and ugly prejudice.

---

**E2**

12. According to the best of my knowledge and belief, Cole-Tindall would presume (or maintain a naked pretense of presuming) that due process has been followed, namely, that:

    1. there had already been a hearing and judicial determination finding probable cause, and

    2. there has already been a bail-setting hearing and judicial determination, and

    3. Petitioner is, for some good cause shown, not entitled to constitutional bail, and

    4. Petitioner has no ownership interest in any property within the county that could be put up as collateral, and

    5. cash bonds demanded were legitimate and not unconstitutionally "excessive", even if in an amount exceeding double the value of the judge's home, and even if the alleged crime is actually no crime, nothing more than a rumor of non-violent wrongdoing, and

    6. incarceration is the least-restrictive bail option that would secure Petitioner's court attendance and protect society from some yet-to-be-expressed danger by Petitioner, and

    7. there has already been a magisterial/judicial order, accordingly, notifying the appropriate court of probable cause and denial of bail, and

    8. as a result of this order, and based on admissible evidence that would have to have been gathered during a probable cause hearing, a district attorney or other individual authorized by law to represent the state had brought lawfully-sufficient primary pleadings for at least one criminal cause of action before the court, thus vesting it with jurisdiction, and thereby commencing at least one criminal court case to await the court's adjudication, and

    9. a judicial order of commitment exists to hold Petitioner in custody until such proceedings can be held, as speedily as possible.

13. According to the best of my knowledge and belief, there is no evidence to support any of those false presumptions, and the only criminal case, if any exists, arises from the "fruit of the poisoned tree": patently-inadmissible evidence obtained by forcible entry and an exhaustive fishing expedition carried out by those who used unnecessary violence and excessive force to execute a defective search warrant that was unconstitutionally issued, being **unsupported** by any statements of fact, which, if true, would enable a magistrate or judge to "find" **probable cause,** and being **devoid of particularity** as to what to search for and where to search for it.

**E3**

14. In other words, Straley's retaliatory simulation of due process can be the "cause or pretense".

## DETAILS OF THE ALLEGED ILLEGALITY OF CHALLENGED CONDUCT

15. On the contrary, there evidently has been

1. **no** assertion of ultimate facts in support of the essential elements for a probable cause determination by a magistrate or judge, let alone any hearing or "finding" of such facts and identification of any specific offense, of a criminal nature or any other,

2. **no** bail-setting hearing,

3. **no** consideration of Petitioner's constitutionally-protected right to bail,

4. **no** consideration of the least-restrictive bail options that would be effective to secure court attendance,

5. **no** thought given to the reasonableness of the cash bond demanded, and

6. **no** assertion of ultimate facts that, if true, could lead to a finding of Petitioner being either (a) a flight risk, or (b) a danger to society, and

7. **no** magisterial or judicial order finding probable cause and denying bail, and

8. **no** district attorney or grand jury has drawn up an information or indictment, which would have been based on the sworn complaints and other admissible evidence that would have been presented, and

9. **no** magisterial or judicial order of commitment.

16. For any one of these, and certainly for all of these, it is plain for all to see that due process has been abrogated and the restraint of Petitioner's liberty is unlawful.

17. Straley evidently issued a search warrant which clearly does not pass constitutional muster, as it was not supported by a sworn (or affirmed) statement of facts showing probable cause.

18. Petitioner's home was invaded by a heavily-armed SWAT team who shot all the windows and fired a number of gaseous weapons to release toxic gasses that caused significant and undue destruction and harm and danger of harm, not only to Petitioner but to his neighbors.

19. None of this violence was necessary. To date, nobody has been able to show any reason for it. Both state and federal constitutions prohibit such unjustified intrusion on Petitioner's rights.

20. The invaders seized a variety of Petitioner's effects not identified on any search warrant, as is also explicitly forbidden by state and federal constitutions.

# E4

21. Petitioner was incarcerated on or about 7/3/2024. No judicial commitment order exists. Such rights violations are utterly repugnant to both state and federal constitutions.

22. Straley is holding Petitioner to answer for a criminal offense arising after-the-fact, based on the patently-inadmissible evidence, if any, of an unconstitutional "fishing expedition"; prior to this, Straley had no sworn statements of fact in support of the issuance of a search warrant.

23. Straley issued a search warrant without particularity, to simply invade Petitioner's home and seize anything that might be later construed as evidence to some as-yet-unknown crime.

24. Straley is apparently attempting to conflate Petitioner's unlawful incarceration with the patently-inadmissible "fruit of the poisoned tree", evidence obtained during an illegal raid.

25. No legal support has been proffered to Petitioner for this seemingly-nonsensical deprivation of liberty which our constitutions guarantee cannot happen absent the due process of law.

26. Straley appears to be intent on presiding over his own imagined criminal cause of action against Petitioner, absent any accuser, based on .

27. Straley is now tampering with the official court record by causing the court clerk to refuse to allow the public to see the public records and court records that are exculpatory to Petitioner and damning to Straley, in that they could confirm the lawlessness of Straley's arbitrary and capricious actions against Petitioner. The longer Straley prevents access to the public, the more suspicious documents are mysteriously appearing as retroactive support for his crimes.

   1. First came the issuance of a defective search warrant, which had neither the lawfully-requisite support nor the lawfully-requisite particularity and specificity.

   2. Multiple people went physically to inspect the warrant after its execution, and all were denied.

   3. After multiple people were turned away empty-handed, suddenly a new document mysteriously appeared in the record, dated as if filed at the same time as the warrant it supports (or purports to support). But once again, we the people were denied access, not allowed to see it.

   4. Now there are two new documents that mysteriously appeared: one being an email allegedly authorizing something, and the other being an inventory/return document. And now, the whole case is marked as "SEALED", even though evidently nobody has moved the court to do so, and there has been no hearing on such a motion, if any, as to whether or not to seal any particular public records, for good cause [not] shown.

**E5**

## CONCLUSION

**28.** This Honorable Court is authorized to issue this writ, and has an administrative duty to do so.

> "Writs of habeas corpus **may** be granted by the **supreme court**, the **court of appeals**, or **superior court**, or by **any judge of such courts**, and upon application the writ **shall** be granted **without delay.**" Wash. Rev. Code § 7.36.040

**29.** It would be appropriate, right and just for this court or judge to also order the return of all of the items taken from Petitioner's home by the invading SWAT team, and to order destruction of all electronic copies or forensic images made.

> "The **court or judge** may make **any** temporary orders in the cause or disposition of the party during the progress of the proceedings **that justice may require**. The custody of any party restrained may be changed from one person to another, by order of the court or judge." Wash. Rev. Code § 7.36.220

**30.** Applicant notes that If such an order is not issued, Petitioner, even with his liberty restored, would still suffer further undue harm by the loss of his property, including computer(s), phone(s), and external drive(s). Serious and extreme privacy concerns are clearly implicated.

**31.** This Honorable Court should promptly issue "The Great Writ" (of habeas corpus) to Straley.

**32.** Petitioner respectfully requests that a courtesy copy of said writ be sent to Petitioner as well.

RESPECTFULLY PRESENTED

_September 3, 2024_

URVE MAGGITTI on behalf of Petitioner KURT ALDEN BENSHOOF

**E6**

### ACKNOWLEDGMENT
### AFFIDAVIT
### (Verification)

STATE OF PENNSYLVANIA  )
COUNTY OF CHESTER   )

I, Urve Maggitti, the undersigned Affiant hereto, do hereby declare under penalties of perjury under the laws of the Commonwealth of Pennsylvania and the United States of America, that the foregoing accounting of facts are true and correct to the best of my current knowledge and belief.

I am over the age of 18 years of age, am a resident of the Commonwealth of Pennsylvania, have personal knowledge of the matters of this affidavit, and am capable of making such affidavit.

Pursuant to 28 U.S. Code § 1746 (1) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _September 13_ /2024.

Signed: _____
            Urve Maggitti

Notary as JURAT CERTIFICATE

State of Pennsylvania _Chester County_

BEFORE ME personally appeared Urve Maggitti who, being by me first duly sworn, executed the foregoing in my presence and stated to me that the facts alleged therein are true and correct according to her own personal knowledge.

_____
Notary Public,

My commission expires: _Feb. 14th 2026_

> Commonwealth of Pennsylvania - Notary Seal
> CLAUDIA COTHREN - Notary Public
> Chester County
> My Commission Expires February 14, 2026
> Commission Number 1416185

Page 6 of 6

**E7**

**URVE MAGGITTI**
58 E SWEDESFORD RD UNIT 327
MALVERN PA 19355

130

3190/360
175

Pay to the
Order of    KING COUNTY SUPERIOR COURT    | $ 5.00

Date    August 26, 2020

Five dollars and 0 cents    Dollars

Photo
Safe
Deposit®
Date in bad.

America's Most Convenient Bank®

**TD Bank**

For    Habeas for Carl BERSHOF
HATAL INVESTIGATIVE BILLING

TD Bank, N.A.

AP

# Appendix  **F**

Court, Young <young.court@kingcounty.gov>                    Mon, Sep 9, 2024,
                                                                  8:10 AM

to Stephanie, David, Parisien, Suzanne, DJ A, urve, Leesa, me

The court is taking no action on the attached document.  Mr. Benshoof is representing himself.  Only a
licensed attorney who is representing Mr. Benshoof, or a defendant who is representing himself, may file
a petition or motion with the court.  Someone who files legal motions on behalf of another person may be
committing the crime of Unauthorized Practice of Law, even if it is with the other person's permission.

A copy of this email will be filed in the court file for the record.

**Jennifer McBeth**
Bailiff to Judge Melinda J. Young
King County Superior Court

# F1

ØŠÒÖ

ĠŒĠ ÁŮ ÒŮ ÆJ
SŒÕÁŎUWÞVŸ
ÙŴÚŌÜŒJÜÁŎUWÜŚÁŎŠÒÜS

ÔŒŮ Ò ÁÁ Ñ Ġ Ġ Ì ÁŮ Œ Œ

### IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
### IN AND FOR THE COUNTY OF KING

STATE OF WASHINGTON

                  Plaintiff,

      v.

KURT BENSHOOF

                  Defendant.

NO. 24-1-02680-7 SEA

<u>Correspondence</u> attached.

# F2

Judge Melinda J. Young
King County Superior Court
516 3rd Avenue Seattle, WA 98104
(206) 477-1361

## Court, Young

| | |
|---|---|
| **From:** | Court, Young |
| **Sent:** | Monday, September 9, 2024 8:10 AM |
| **To:** | 'urve maggitti'; Manion, Leesa; Brennan, Stephanie; Martin, David (PAO); Court, Parisien; Parisien, Suzanne; CustomerServiceEmail, DJA |
| **Cc:** | kurt benshoof |
| **Subject:** | RE: Kings County SUPERIOR COURT DEMAND FOR DISCOVERY |

The court is taking no action on the attached document. Mr. Benshoof is representing himself. Only a licensed attorney who is representing Mr. Benshoof, or a defendant who is representing himself, may file a petition or motion with the court. Someone who files legal motions on behalf of another person may be committing the crime of Unauthorized Practice of Law, even if it is with the other person's permission.

A copy of this email will be filed in the court file for the record.

**Jennifer McBeth**
Bailiff to Judge Melinda J. Young
King County Superior Court

**From:** urve maggitti <urve.maggitti@gmail.com>
**Sent:** Sunday, September 8, 2024 4:46 PM
**To:** Manion, Leesa <Leesa.Manion@kingcounty.gov>; Brennan, Stephanie <stephanie.brennan@kingcounty.gov>; Martin, David (PAO) <david.martin@kingcounty.gov>; Court, Young <young.court@kingcounty.gov>; Court, Parisien <parisien.court@kingcounty.gov>; Parisien, Suzanne <suzanne.parisien@kingcounty.gov>; CustomerServiceEmail, DJA <clerksofficecustomerservice@kingcounty.gov>
**Cc:** kurt benshoof <Kurtbenshoof@gmail.com>; urve maggitti <urve.maggitti@gmail.com>
**Subject:** Kings County SUPERIOR COURT DEMAND FOR DISCOVERY

[EXTERNAL Email Notice! ] External communication is important to us. Be cautious of phishing attempts. Do not click or open suspicious links or attachments.

### SUPERIOR COURT, KING COUNTY, WASHINGTON

STATE OF WASHINGTON
          "*Plaintiff*"           **CASE: 24-1-02680-7 SEA**

vs.

KURT BENSHOOF,
_____"*Defendant*"

TO: CLERK of the above-entitled court
TO: PROSECUTING ATTORNEY

### DEMAND FOR DISCOVERY

**F3**   1

Kurt Benshoof, alleged "defendant" pursuant to **CRR 4.7** and **LCRR 4.5 J** United States Constitution amendments 4, 5. 6 and 14th, the Washington Constitution Article 1, Section 22 defendant demands that the PROSECUTING ATTORNEY provide immediately the following discovery:

1. Certified Copy of the final order of Domestic Violence issued against Mr. Kurt Benshoof, including Proof of service of the same.

2. Certified Copy of the final Restraining Order(s) issued against Mr. Kurt Benshoof, including Proof of service of the same.

- See attached signed Verified Document-

**Court, Young**

| | |
|---|---|
| **From:** | Court, Young |
| **Sent:** | Monday, September 9, 2024 8:10 AM |
| **To:** | urve maggitti; Manion, Leesa; Brennan, Stephanie; Martin, David (PAO); Court, Parisien; Parisien, Suzanne; CustomerServiceEmail, DJA |
| **Cc:** | kurt benshoof |
| **Subject:** | RE: DEFENDANT'S NOTICE OF MOTION for FRANKS HEARING AND MOTION TO DISAMISS King County Superior Court |

The court is taking no action on the attached document. Mr. Benshoof is representing himself. Only a licensed attorney who is representing Mr. Benshoof, or a defendant who is representing himself, may file a petition or motion with the court. Someone who files legal motions on behalf of another person may be committing the crime of Unauthorized Practice of Law, even if it is with the other person's permission.

A copy of this email will be filed in the court file for the record.

**Jennifer McBeth**
Bailiff to Judge Melinda J. Young
King County Superior Court

**From:** urve maggitti <urve.maggitti@gmail.com>
**Sent:** Saturday, September 7, 2024 11:13 AM
**To:** Manion, Leesa <Leesa.Manion@kingcounty.gov>; Brennan, Stephanie <stephanie.brennan@kingcounty.gov>; Martin, David (PAO) <david.martin@kingcounty.gov>; Court, Young <young.court@kingcounty.gov>; Court, Parisien <parisien.court@kingcounty.gov>; Parisien, Suzanne <suzanne.parisien@kingcounty.gov>; CustomerServiceEmail, DJA <clerksofficecustomerservice@kingcounty.gov>
**Cc:** kurt benshoof <Kurtbenshoof@gmail.com>; urve maggitti <urve.maggitti@gmail.com>
**Subject:** DEFENDANT'S NOTICE OF MOTION for FRANKS HEARING AND MOTION TO DISAMISS King County Superior Court

[EXTERNAL Email Notice! ] External communication is important to us. Be cautious of phishing attempts. Do not click or open suspicious links or attachments.

## SUPERIOR COURT, KING COUNTY, WASHINGTON

STATE OF WASHINGTON
          *"Plaintiff"*        **CASE: 24-1-02680-7 SEA**

vs.
KURT BENSHOOF,
_____*"Defendant"*_____

TO: CLERK of the above-entitled court

TO: THE STATE OF WASHINGTON AND ITS PROSECUTING ATTORNEY:

# F5

## DEFENDANT'S NOTICE OF MOTION for "*FRANKS* HEARING" AND MOTION TO VOID WARRANT, SUPPRESS EVIDENCE, AND DISMISS CHARGES FOR LACK OF PROBABLE CAUSE

PLEASE TAKE NOTICE that Defendant hereby moves the Court to suppress all evidence collected and derived from the unlawful search and seizure of the Defendant's home; hold that the warrant was not supported by probable cause; that the Defendant's arrest was unlawful and to suppress any statements made by Defendant subsequent to his arrest.

### The Search Warrant was Not Supported by Probable Cause

- See attached signed Verified Document -

**F6**

### SUPERIOR COURT, KING COUNTY, WASHINGTON

STATE OF WASHINGTON
              *"Plaintiff"*                    **CASE: 24-1-02680-7 SEA**

vs.

KURT BENSHOOF,
_____*"Defendant"*

TO: CLERK of the above-entitled court
TO: PROSECUTING ATTORNEY

### DEMAND FOR DISCOVERY

Kurt Benshoof, alleged "defendant" pursuant to **CRR 4.7** and **LCRR 4.5 J** United States Constitution amendments 4, 5. 6 and 14th, the Washington Constitution Article 1, Section 22 defendant demands that the PROSECUTING ATTORNEY provide immediately the following discovery:

1. Certified Copy of the final order of Domestic Violence issued against Mr. Kurt Benshoof, including Proof of service of the same.

2. Certified Copy of the final Restraining Order(s) issued against Mr. Kurt Benshoof, including Proof of service of the same.

Respectfully Submitted by:

Signature:  for KURT BENSHOOF        Date:_ September 3, 2024_____
            /KURT BENSHOOF /

The foregoing statements of fact were typed up by the undersigned, upon Mr. Benshoof's request and to the best of the undersigned's understanding.[1]

Signature: _____    Date: _September 3, 2024_
            /URVE MAGGITTI /  urve.maggitti@gmail.com

_____

[1] See *Faretta v. California* and Section 35 of the **Judiciary Act of 1789, 1 Stat. 73, 92**

Page 1 of 4

**F7**

## AFFIDAVIT

"DEFENDANT'S REQUEST FOR DISCOVERY PURSUANT TO CrR 4.7" in CASE: 24-1-0268-7 SEA - is drafted/dictated over phone by Mr. Kurt A. Benshoof with assistance of Urve Maggitti, who upon Mr. Benshoof's request typed up this word document to be signed by Mr. Kurt Benshoof. [2]

Federal and State Constitutions require that criminal prosecutions conform to prevailing notions of fundamental fairness and that criminal defendants be given a meaningful opportunity to present a complete defense. *State v. Wittenbarger, 124 Wn.2d 467, 474–75, 880 P.2d 517 (1994)*.

Mr. Benshoof has been denied not only *meaningful opportunity* to present a *complete defense* in the malicious criminal prosecution and persecution brought against Mr. Benshoof, it is a FACT that Mr. Benshoof has been denied the most essential, elemental and basic resources to even attempt to present defense: access to pen, paper, computer, internet, email, and majority of the discovery. [3]

In 1975 in *Faretta v. California*, United States Supreme Court acknowledges an established historical fact: *"Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92, enacted by the First Congress and signed by President Washington one day before the Sixth Amendment \*813 was proposed, provided that 'in all the courts of the United States, the parties may plead and manage their own **causes personally or by the assistance of such counsel** . . . .' The right is currently codified in 28 U.S.C. s 1654."[4]*

The Court quoted from Section 35 of the **Judiciary Act of 1789, 1 Stat. 73, 92** which states as follows:

"SEC. 35. And be it further enacted, **That in all courts** of the United States**, the parties may plead and manage their own causes <u>personally</u> or by <u>assistance of such counsel or attorneys at law</u>**" [5]

**Judiciary Act of 1789** was passed before ratification of the Sixth Amendment in the Bill of Rights in 1791. The drafters of the Sixth Amendment had deliberately removed the word ***attorneys at law*** from the Sixth Amendment, and substantially amended the language to read: *"**right to have the Assistance of Counsel.**"*

Signature: _____     Date: _September 3, 2024_
/URVE MAGGITTI / urve.maggitti@gmail.com

---

[2] See *Faretta v. California* and Section 35 of the **Judiciary Act of 1789, 1 Stat. 73, 92**
[3] Mr. Benshoof was provided few photocopies of the incident reports, from the Seattle Police Department which responded to Jessica Owen's and Magalie Lerman's calls, and police reports of three visits to Mr. Benshoof's home.
[4] Faretta v. California, 422 U.S. 806, 812–13, 95 S. Ct. 2525, 2530, 45 L. Ed. 2d 562 (1975)
[5] "The Judiciary Act; September 24, 1789, 1 Stat. 73. An Act to Establish the Judicial Courts of the United States." "APPROVED , September 24, 1789." https://avalon.law.yale.edu/18th_century/judiciary_act.asp

**F8**

**ACKNOWLEDGMENT**

**AFFIDAVIT**

(Verification)

STATE OF PENNSYLVANIA  )

COUNTY OF CHESTER   )

I, Urve Maggitti, the undersigned Affiant hereto, do hereby declare under penalties of perjury under the laws of the Commonwealth of Pennsylvania and the United States of America, that the foregoing accounting of facts are true and correct to the best of my current knowledge and belief.

I am over the age of 18 years of age, am a resident of the Commonwealth of Pennsylvania, have personal knowledge of the matters of this affidavit, and am capable of making such affidavit.

Pursuant to 28 U.S. Code § 1746 (1) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _September 3_ /2024.

Signed: _____

Urve Maggitti

Notary as JURAT CERTIFICATE

State of Pennsylvania _Chester County_

BEFORE ME personally appeared Urve Maggitti who, being by me first duly sworn, executed the foregoing in my presence and stated to me that the facts alleged therein are true and correct according to her own personal knowledge.

Commonwealth of Pennsylvania - Notary Seal
CLAUDIA COTHREN - Notary Public
Chester County
My Commission Expires February 14, 2026
Commission Number ___ 35

Notary Public,

My commission expires: _Feb. 14th 2026_

Page 3 of 4

**F9**

## CERTIFICATE OF SERVICE

**1. Leesa Manion**, Prosecuting Attorney
CRIMINAL DIVISION W554, King County Courthouse, 516 Third Avenue Seattle, Washington 98104-2385
PHONE: (206) 477-3742, FAX (206) 205-6104,  **Leesa.Manion@kingcounty.gov**

**2. Stephanie R. Brennan,** WSBA No. 48979
Attorney(s) for the Plaintiff, State of Washington, Domestic Violence Unit, Seattle
W554 King County Courthouse, 516 Third Avenue, Seattle, WA 98104-2385
PHONE" (206) 296-9000, **stephanie.brennan@kingcounty.gov**

**3.  David Martin,** Senior Deputy Prosecutor/ Chair Domestic Violence Unit
King County Prosecuting Attorney's Office (PAO), King County Courthouse  516 Third Avenue, W400, Seattle, WA 98104
PHONE: 206-477-1200  **david.martin@kingcounty.gov**

**4. Hon. Melinda J. Young,** Chief, Criminal Judge - Superior Court
C/O King County Courthouse. 516 Third Ave Rm C-203, Seattle, WA 98104
Primary Phone:  206-477-1361  Email: **young.court@kingcounty.gov**
Bailiff: Jennifer McBeth (206) 477-1361

**5. Hon. Suzanne R. Parisien,**
c/o King County Superior Court, 16 Third Ave, C-203, Seattle, WA 98104
Phone: 206-477-1579
Email **parisien.court@kingcounty.gov, suzanne.parisien@kingcounty.gov**
**Bailiff: Julie Salle** Courtroom Number: W-355, Department: 42, Assignment: Criminal

**6. County Clerk**
516 3rd Ave, Rm E609, Seattle, WA 98104-2363
Phone: 206-296-9300,  **clerksofficecustomerservice@kingcounty.gov**

**7. Mr. Kurt Benshoof**
Home Address: 1716 N 128th Street, Seattle, Washington 98133,
Phone: (206) 460-4202, **kurtbenshoof@gmail.com**

CURRENTLY HELD AT: Maleng Regional Justice Center – Kent, Phone: 206-296-1234, Address: 620 W. James St., Kent, WA 98032, Mr. Kurt Benshoof, UPN# 10518097

**8. Urve Maggitti,** "next friend" and "assistance of counsel" [6] to Mr. Kurt Benshoof under as per Judiciary Act of 1789, 1 Stat. 73, 92.  **urve.maggitti@gmail.com**

*AS OF FRIDAY, September 6, 2024, MR. Benshoof WAS MOVED TO: KING COUNTY CORRECTIONAL FACILITY-Seattle 500 Fifth avenue, Seattle, WA 98104, Bush Eight, Lower Bravo 9/8/2024*

---

[6] *Faretta v. California,* 422 U.S. 806, 812–13, 95 S. Ct. 2525, 2530, 45 L. Ed. 2d 562 (1975)

# F10

# Appendix  G



**STATE OF WASHINGTON**

# DEPARTMENT OF HEALTH

*PO Box 47890 ● Olympia, Washington 98504-7890*
*Tel: 360-236-4030 ● 711 Washington Relay Service*

## ORDER OF THE SECRETARY OF HEALTH
## AMENDING ORDER 20-03

### 20-03.2

### Face Coverings - Statewide

**WHEREAS,** Washington State Governor Jay Inslee has issued Proclamation 20-05, subsequently amended and extended, proclaiming a statewide State of Emergency due to an outbreak of coronavirus disease 2019 (COVID-19) in the United States and community spread of COVID-19 in Washington State; and

**WHEREAS,** COVID-19 spreads mainly from person to person through respiratory droplets when infected people, many of whom do not exhibit COVID-19 symptoms, cough, sneeze, or talk, and evidence suggests that wearing a cloth face covering reduces an infected person's chance of spreading the infection to others and may protect uninfected persons from larger droplets from infected people around them; and

**WHEREAS,** the Washington State Department of Health, the United States Centers for Disease Control and Prevention (CDC), and the World Health Organization recommend that people wear cloth face coverings when they are gathered with non-household members or in public settings, given the substantial number of cases of COVID-19 infection, these precautions must be mandatory; and

**WHEREAS,** although many Washingtonians wear face coverings voluntarily when in public, requiring all Washingtonians to wear cloth face coverings in public, subject to certain exceptions, helps control and prevent the spread of COVID-19 in Washington State; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to constitute an emergency threatening the safety of the public health, demanding action by the Secretary of Health, and only a small number of Washington's local health officers have issued orders requiring the general public in their jurisdictions to wear cloth face coverings in public; and

**WHEREAS,** on June 24, 2020, Order of the Secretary of Health 20-03 was issued, directing every person in Washington State to wear a face covering when in any indoor or outdoor public setting, subject to certain exceptions; and

**WHEREAS,** on July 24, 2020, Order of the Secretary of Health 20-03.1 was issued, directing every person in Washington State to wear a face covering when outside of their dwelling unit, subject to certain exception; and

**G1**

**WHEREAS**, for the same reasons stated above, requiring people to wear face coverings when in a place where non-household members are present or generally accessible to non-household members will help control and prevent the spread of COVID-19 in Washington State; and

**WHEREAS**, it is scientifically appropriate to amend the face covering order to incorporate new CDC guidance recommending that fully vaccinated people need not wear face coverings, except in certain limited settings.

**NOW, THEREFORE**, I, Umair A. Shah, MD, MPH, Washington State Secretary of Health, as a result of the above-noted situation, and under RCW 43.70.130, RCW 70.05.070, WAC 246-100-036, and any other applicable authority, do hereby amend Orders 20-03 and 20-03.1 and order as follows:

<u>**General Face Covering Requirement**</u>

**Every person in Washington State must wear a face covering that covers their nose and mouth when they are in a place where people from outside their household are present or in a place that is generally accessible to people from outside their household, subject to the exceptions below and any face covering requirements and limitations on gatherings and activities imposed by the Governor or other legal authority.**

- If a person lives in a congregate living setting where they share living facilities with other residents, their household includes only the people who regularly reside in their bedroom. They must wear a face covering when they are outside their bedroom, including inside the building, subject to the exceptions below.
- Congregate living settings include, but are not limited to, fraternity, sorority, boarding, and other similar shared houses, dormitory buildings, nursing homes, assisted living facilities, adult family homes, other long-term care facilities, group care facilities, and other similar settings.
- Unless listed above, congregate living settings do not otherwise include houses, mobile homes, apartments, condominiums, hotel or motel rooms, supported living homes, state-operated living alternatives, state-owned psychiatric hospitals, or psychiatric residential treatment facilities.
- A bedroom includes any living space, bathroom, or facility attached to the bedroom that is not generally open to the other residents of the congregate living setting.

<u>**Exceptions to General Face Covering Requirement**</u>

**People are not required to wear face coverings in any of the following situations:**

- When outdoors, provided that a distance of at least six feet is maintained from people from outside their household;
- At a small gathering in a place not generally open to the public that is attended only by people fully vaccinated against COVID-19 and by unvaccinated people from a single household in which no one is at increased risk for severe illness from COVID-19;
- While engaged in the act of eating or drinking, subject to sector-specific limitations issued by the Governor when in public settings or the social at home gathering limits in the Healthy Washington plan, both accessible at https://www.governor.wa.gov/issues/issues/covid-19-resources/covid-19-reopening-guidance;

**G2**

- While showering, bathing, or engaging in other personal hygiene or grooming activities that require the removal of the face covering;
- When any party to a communication is deaf or hard of hearing and not wearing a face covering is essential to communication;
- While obtaining a service that requires temporary removal of the face covering;
- While sleeping;
- When necessary to confirm the person's identity;
- When federal or state law prohibits wearing a face covering or requires the removal of a face covering; or
- When unable to put on a face covering due to an emergency.

### People Exempt from General Face Covering Requirement

**The following people are exempt from the requirement to wear a face covering:**
- People who are fully vaccinated against COVID-19, except when in health care settings, correctional facilities, homeless shelters, or schools;
- Children younger than five years old; and
  - Children who are younger than two years old should never wear face coverings due to the risk of suffocation.
  - Children who are two, three, or four years old, with the assistance and close supervision of an adult, are strongly recommended to wear a face covering at all times in settings, like grocery stores or pharmacies, where it is likely that a distance of at least six feet cannot be maintained from non-household members and vulnerable people must go.
- People with a medical condition, mental health condition, developmental or cognitive condition, or disability that prevents wearing a face covering. This includes, but is not limited to, people with a medical condition for whom wearing a face covering could obstruct breathing or who are unconscious, incapacitated, or otherwise unable to remove a face covering without assistance.

### Additional Provisions

- Types of face coverings permitted
  - For purposes of this order, a face covering must:
    - Fit snugly against the sides of the face;
    - Completely cover the nose and mouth;
    - Be secured with ties, ear loops, elastic bands, or other equally effective method; and
    - Include at least one layer of tightly woven fabric without visible holes, although multiple layers are strongly recommended.
  - A face covering may also be a mask or face covering that provides a higher level of protection than a cloth face covering, such as a medical procedure/surgical mask, a KN95 mask, or an N95 mask.
  - Clear masks or cloth masks with a clear plastic panel may be used when interacting with people who are deaf or hard of hearing, young children or students learning to read, students learning a new language, people with disabilities, and people who need to see the proper shape of the mouth for making appropriate vowel sounds.
  - Children and staff in childcare facilities and K-12 public and private schools may use face shields with drapes or wraps as an alternative to cloth face coverings if authorized pursuant to an order of the Governor.

# G3

- A person is fully vaccinated against COVID-19 two weeks after they have received the second dose in a two-dose series (Pfizer-BioNTech or Moderna) or two weeks after they have received a single-dose vaccine (Johnson and Johnson (J&J)/Janssen).

- A person is at increased risk for severe illness from COVID-19 if they have any of the medical conditions identified by the CDC as making a person more likely to get severely ill from COVID-19. These conditions are currently listed on the following CDC website: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

- This order does not apply to persons who are incarcerated. Correctional facilities have specific guidance on the wearing of face coverings or masks for both incarcerated individuals and staff.

- Face covering requirements imposed by other public agencies or officials
  - Face covering requirements lawfully imposed by another public agency or official are to be followed if they are more protective than the requirements in this order. If they are less protective, then this order must be followed.
    - For example, this order allows fully vaccinated individuals to not wear face coverings, except when in health care settings, correctional facilities, homeless shelters, or schools. If a local health officer issues an order requiring people to wear face coverings in other settings not listed, then the local health officer's order must be followed.
  - Notwithstanding the foregoing, any face covering requirements imposed pursuant to an order of the Governor take precedence over this order.

This order shall take effect on May 15, 2021, and remain in effect until rescinded or superseded by a subsequent order of the Secretary of Health or until the Governor issues a proclamation declaring the termination of the State of Emergency declared by Proclamation 20-05, as amended and extended by subsequent amendatory proclamations, whichever is earlier.

Members of the public are required by law to comply with this order, and violators may be subject to enforcement action pursuant to RCW 43.70.130(7), RCW 70.05.120(4), and WAC 246-100-070(3).

Signed this 15th day of May, 2021.

Umair A. Shah, MD, MPH
Secretary of Health

**G4**

Page 4

# Appendix  **H**

Home  ›  Courts  ›  King County Superior Court  ›  Get Help & Information  ›  COVID-19 Court Operations

# Court Operations During the COVID-19 Pandemic

العربية          中文          Soomaali          Español          Tiếng Việt



## Is court open?

Yes, although we have modified some of our operations.  Courthouse locations are **here**.  Be sure to verify the location prior to coming to court as many hearings are offered remotely or in a different location than before.

## How will you keep everyone safe?

Please participate by phone or video if encouraged to do so by the judge, or your attorney, and you have the necessary equipment.  To make sure you receive instructions from the court, please update your contact information.  Email addresses for program staff, judges and their bailiffs are **here**.

If you do come to court, you will be required to wear a mask or facial covering.  The Court will have masks available for use free of charge.  You will not be required to wear a mask if:



- You need to keep your mouth and nose clear for medical or mental health reasons;
- You are a child aged two years of less;
- You need your mouth to be visible because you are deaf or hard of hearing or are communicating with someone who is deaf or hard of hearing; or
- A judge permits you to temporarily remove the mask so that you can be heard clearly in the courtroom.

The Court will be enforcing social distancing rules.  You may sit or stand only in designated spaces. Do not enter the courthouse if you are sick or in quarantine.

Courthouse personnel are sanitizing surfaces regularly. The Court will have hand sanitizer and disinfecting cleaning supplies available to you in all public areas, including courtrooms and jury spaces.

**H1**