

maintaining social distancing.

*Cohorting:* creating and restricting the interaction of cohorts, such as juries and possibly other court staff, will help to prevent the spread and possible impact to overall court proceedings in the event that a positive case of COVID-19 is identified in a court.

*Education and communication:* educational materials focusing on the use of facial coverings, social distancing, and hand sanitizer use, should be prominently and frequently displayed to promote and reinforce these new social norms. Educational materials will also build confidence among court staff members and court participants. The courts are advised to consult with the Governor's Office on developing and implementing a comprehensive outreach/marketing and communication plan to educate and inform all court participants.

*Face shields:* the use of face shields alone is currently viewed as serving no purpose or providing any protection from the transmission of COVID-19 in the courtroom work environment. Additional details can be found here:
https://content.govdelivery.com/accounts/WADLI/bulletins/29a9e76 .

*Hand hygiene:* the required use and availability of EPA approved hand sanitizer that contains at least 60% alcohol immediately upon entering court facilities is essential for reducing the spread of COVID-19 and other viruses. Common hand sanitizer dispensers should be conspicuously displayed, especially near common touch points such as elevators, doors, and counters. The ready availability of common hand sanitizer dispensers and tissue is recommended for good personal sneeze and cough hygiene.

*Masks:* use of KN-95, cloth or equivalent masks for jurors, front line office staff, and others is currently mandated in all business settings, regardless of physical distancing. KN95 masks provide a higher level of protection than cloth or surgical masks, yet do not require an L&I Respiratory Protection Plan. Mask use should be mandated for all individuals when indoors in congregant areas of a building and where social distancing cannot be strictly maintained.

**000001**

We only use cookies that are necessary for this site to function to provide you with the best experience. The controller of this site may choose to place supplementary cookies to support additional functionality such as support analytics, and has an obligation to disclose these cookies. Learn more in our Cookie Statement.

 

## What if a worker can't wear a mask? / ¿Qué hago si un trabajador no puede usar el cubre boca?:

Washington State Department of Labor & Industries sent this bulletin at 08/18/2020 06:00 AM PDT

Trouble viewing this email? View it in your browser.



# Did you know...

 **What if a worker can't wear a mask?**

## What is an approved accommodation alternative?



Provide the worker with a face shield with a
cloth barrier around the face and neck

Lni.wa.gov/Coronavirus

# What are the requirements for workers with medical and disability issues that

**000002**

# prevent the use of a cloth face covering or mask?

Face shields alone do not prevent the spread of COVID 19 and do not meet the face covering requirement. Employees with a medical or disability issue, who are requesting accommodation, must provide their employer with an accommodation statement from their medical professional specifying that a face covering or mask should not be worn due to their present health condition. Employers cannot just allow the employee to work without a mask with no other mitigations or accommodations.

Employers should assess any negative impacts that face coverings might have on employees with disabilities and make accommodations per the Americans with Disabilities Act (ADA). For example, workers communicating with people who are deaf or hard of hearing may need to temporarily unmask while staying at least 6 feet away or behind a physical barrier or wear an approved face shield closed with fabric around the contour of the face and neck in order to allow for lip reading.

Click to edit this placeholder text.

 Washington State Department of **Labor & Industries**

### ¿Qué hago si un trabajador no puede usar el cubre boca?

### ¿Existe alguna adaptación aprobada?



Una careta transparente de protección, con tela alrededor, que se ajuste al contorno de la cara y el cuello.

http://enespanol.lni.wa.gov/Spanish/Main/COVID19FaceCoveringsFAQ.asp

# ¿Cuáles son los requisitos para los trabajadores con problemas médicos y con discapacidad que impiden el uso de una mascarilla o protector facial de tela?

**000003**



STATE OF WASHINGTON
— OFFICE OF GOVERNOR JAY INSLEE —

**PROCLAMATION BY THE GOVERNOR**
**AMENDING PROCLAMATION 20-05, et seq.**

**21-14**

**COVID-19 VACCINATION REQUIREMENT**

**WHEREAS**, on February 29, 2020, I issued Proclamation 20-05, proclaiming a State of Emergency for all counties throughout Washington State as a result of the coronavirus disease 2019 (COVID-19) outbreak in the United States and confirmed person-to-person spread of COVID-19 in Washington State; and

**WHEREAS,** as a result of the continued worldwide spread of COVID-19, its significant progression in Washington State, and the high risk it poses to our most vulnerable populations and our health care system, I have subsequently issued several amendatory proclamations, exercising my emergency powers under RCW 43.06.220 by prohibiting certain activities and waiving and suspending specified laws and regulations, including issuance of Proclamations 20-25, et seq., which limit Washingtonians' ability to participate in certain activities unless certain conditions are met; and

**WHEREAS,** during early stages of the COVID-19 pandemic, health professionals and epidemiological modeling experts indicated that the spread of COVID-19, if left unchecked, threatened to overwhelm portions of Washington's public and private health-care system; and

**WHEREAS,** to protect some of our most vulnerable populations – persons in health care facilities, long-term care facilities (which includes nursing homes), and similar congregate care facilities – and to protect our health and congregate care systems themselves, I issued several proclamations imposing heightened protections on workers, residents and visitors in those facilities; and

**WHEREAS,** although COVID-19 continues as an ongoing and present threat in Washington State, the measures we have taken together as Washingtonians over the past 18 months, including the willingness of most Washingtonians to take advantage of the remarkable, life-saving vaccines being administered throughout the state, have made a difference and have altered the course of the pandemic in fundamental ways; and

**A1**

**000004**

**WHEREAS,** after months of improving COVID-19 epidemiological conditions in Washington State, the emergence of highly contagious COVID-19 variants, including the "delta variant" that is at least twice as transmissible as the virus that emerged in late 2019, coupled with the continued significant numbers of unvaccinated people, have caused COVID-19 cases and hospitalizations to rise sharply among unvaccinated populations and have resulted in breakthrough infections in some fully vaccinated individuals; and

**WHEREAS,** COVID-19 vaccines are effective in reducing infection and serious disease, widespread vaccination is the primary means we have as a state to protect everyone, including persons who cannot be vaccinated for medical reasons, youth who are not eligible to receive a vaccine, immunocompromised individuals, and vulnerable persons including persons in health care facilities, long-term care facilities and other congregate care facilities from COVID-19 infections; and

**WHEREAS,** widespread vaccination is also the primary means we have as a state to protect our health care system, to avoid the return of stringent public health measures, and to put the pandemic behind us; and

**WHEREAS,** COVID-19 vaccinations have been available in Washington State from December 2020 to the present, and since April 15, 2021, all Washingtonians over the age of 16 have been eligible to receive free COVID-19 vaccinations from a wide variety of providers at many locations; and

**WHEREAS,** as of August 4, 2021, nearly 4.4 million Washingtonians, about 70% of those eligible and 58% of the total population, had initiated their vaccine series, leaving 2.1 million eligible Washingtonians who were unvaccinated; and

**WHEREAS,** according to the CDC, as of August 1, 2021, approximately 67% of staff in Washington state nursing homes were fully vaccinated; and

**WHEREAS,** healthcare workers face COVID-19 exposures in a variety of healthcare settings, with those involving direct patient care likely at higher risk; and

**WHEREAS,** COVID-19 vaccines are safe and effective. COVID-19 vaccines were evaluated in clinical trials involving tens of thousands of participants and met the U.S. Food & Drug Administration's rigorous scientific standards for safety, effectiveness, and manufacturing quality needed to support emergency use authorization; and, to date, more than 346 million doses of COVID-19 vaccines have been given in the United States with 8.2 million of those doses administered in Washington, and serious safety problems and long-term side effects are rare; and

**WHEREAS,** on July 6, 2021, the Office of Legal Counsel of the United State Department of Justice issued a legal opinion stating that federal and state governments were not prohibited by federal law

2    **A2**
**000005**

from imposing vaccination mandates, even when the only vaccines available are those authorized under U.S. Food and Drug Administration Emergency Use Authorizations; and

**WHEREAS,** on July 26, 2021, approximately 60 medical groups, including the American Medical Association, the American College of Physicians, the American Academy of Pediatrics, the American Academy of Family Physicians, the American Nurses Association, the American Academy of Physician Assistants, the Association of Professionals in Infection Control and Epidemiology, the American Public Health Association, the Infectious Diseases Society of America LeadingAge, the National Hispanic Medical Association, the National Medical Association, and the Society of Infectious Disease Pharmacists, issued a memorandum supporting mandatory, universal vaccination of all public and private health care and long-term care workers, noting that such a requirement is the "fulfillment of the ethical commitment of all health care workers to put patients as well as residents of long-term care facilities first and take all steps necessary to ensure their health and well-being"; and on August 2, 2021, the Washington State Society of Post-Acute and Long-Term Care Medicine submitted a letter in support of the above noted July 26, 2021 memorandum; and

**WHEREAS,** on July 15, 2021, the American College of Obstetricians and Gynecologists, together with the Society for Maternal-Fetal Medicine, posted a formal opinion stating that medical professionals have an ethical obligation to be vaccinated against COVID-19 to prevent the spread of harmful infectious diseases, and that women who are or may become pregnant should be vaccinated against COVID-19; and

**WHEREAS,** it is the duty of every employer to protect the health and safety of employees by establishing and maintaining a healthy and safe work environment and by requiring all employees to comply with health and safety measures; and

**WHEREAS**, state employees live in and provide services to the public in every county in our state, and many interact with the public on a regular basis, and they all interact with some portion of the community at large to varying degrees before and/or after state work hours; and

**WHEREAS,** to further our individual and collective duty to reduce the spread of COVID-19 in our communities, I am requiring all employees, on-site independent contractors, volunteers, goods and services providers, and appointees of designated state agencies to be fully vaccinated against COVID-19 on or before October 18, 2021; and

**WHEREAS,** the worldwide COVID-19 pandemic and its persistence in Washington State continue to threaten the life and health of our people as well as the economy of Washington State, and remain a public disaster affecting life, health, property or the public peace; and

**WHEREAS**, the Washington State Department of Health continues to maintain a Public Health Incident Management Team in coordination with the State Emergency Operations Center and other supporting state agencies to manage the public health aspects of the incident; and

**WHEREAS**, the Washington State Military Department Emergency Management Division, through the State Emergency Operations Center, continues coordinating resources across state government to support the Department of Health and local health officials in alleviating the impacts to people, property, and infrastructure, and continues coordinating with the state Department of Health in assessing the impacts and long-term effects of the incident on Washington State and its people; and

**NOW, THEREFORE**, I, Jay Inslee, Governor of the state of Washington, as a result of the above noted situation, and under Chapters 38.08, 38.52 and 43.06 RCW, do hereby proclaim and order that a State of Emergency continues to exist in all counties of Washington State, that Proclamation 20-05, as amended, remains in effect, and that, to help preserve and maintain life, health, property or the public peace pursuant to RCW 43.06.220(1)(h), and (3), I hereby prohibit, subject to the conditions, exceptions, and circumstances set forth below, the following activities:

1. <u>Prohibitions</u>.  This order prohibits the following:

    a. Any Worker from engaging in work for a State Agency after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19;

    b. Any State Agency from permitting any Worker to engage in work for the agency after October 18, 2021 if the Worker has not been fully vaccinated against COVID-19 and provided proof thereof to the agency;

    c. Any Health Care Provider from failing to be fully vaccinated against COVID-19 after October 18, 2021; and

    d. Any individual or entity that operates a Health Care Setting from permitting a Health Care Provider to engage in work for the individual or entity as an employee, contractor, or volunteer after October 18, 2021 if the Health Care Provider has not been fully vaccinated against COVID-19 and provided proof thereof to the individual or entity. Providers who do not work in a Health Care Setting must provide proof of vaccination to the operator of the facility in which the Provider works, if any, or, if requested, to a lawful authority. A lawful authority includes, but is not limited to, law enforcement, local health jurisdictions, and the state Department of Health.

2. <u>Exemptions from Vaccine Requirement</u>.

    a. Health Care Providers and Workers for State Agencies are not required to get vaccinated against COVID-19 if they are entitled under the Americans With Disabilities Act (ADA), Title VII of the Civil Rights Act of 1964 (Title VII), the Washington Law Against Discrimination (WLAD), or any other applicable law to a disability-related reasonable accommodation or a sincerely held religious belief accommodation to the requirements of this order. Nothing herein precludes individuals or entities for which Health Care Providers work as employees, contractors, or volunteers and State Agencies from providing disability-related reasonable accommodations and religious accommodations to the requirements of this order as required by the laws noted above. As provided in the ADA, Title VII, and the WLAD, individuals or entities for which Health Care Providers work as

employees, contractors, or volunteers and State Agencies are not required to provide such accommodations if they would cause undue hardship.

b. To the extent permitted by law, before providing a disability-related reasonable accommodation to the requirements of this order, individuals or entities for which Health Care Providers work as employees, contractors, or volunteers and State Agencies must obtain from the individual requesting the accommodation documentation from an appropriate health care or rehabilitation professional authorized to practice in the State of Washington stating that the individual has a disability that necessitates an accommodation and the probable duration of the need for the accommodation.

c. To the extent permitted by law, before providing a sincerely held religious belief accommodation to the requirements of this Order, individuals or entities for which Health Care Providers work as employees, contractors, or volunteers and State Agencies must document that the request for an accommodation has been made and the document must include a statement regarding the way in which the requirements of this order conflict with the religious observance, practice, or belief of the individual.

3. <u>Acceptable Proof of Full Vaccination Against COVID-19</u>: Where required above, Workers for State Agencies and Health Care Providers must provide proof of full vaccination against COVID-19 by providing one of the following:
   a. CDC COVID-19 Vaccination Record Card or photo of the card;
   b. Documentation of vaccination from a health care provider or electronic health record; or
   c. State immunization information system record.
Personal attestation is not an acceptable form of verification of COVID-19 vaccination.

4. <u>Public and Private Entities and Employers May Exceed These Requirements</u>:  Nothing in this order prohibits individuals or entities employing or using the services of Health Care Providers and State Agencies from implementing requirements that exceed the requirements of this Order.

5. <u>Definitions</u>.
   a. "Worker":
      - For purposes of this order, "worker" includes:
        ▪ A person engaged to work as an employee, independent contractor, service provider, volunteer, or through any other formal or informal agreement to provide goods or services, whether compensated or uncompensated, but does not include a visitor or patron;
        ▪ The director, secretary, or other executive officer of a State Agency;
        ▪ A person appointed to serve on a board, commission, or similar body that is an executive cabinet agency listed at https://www.governor.wa.gov/office-governor/office/executive-cabinet or

a small cabinet agency listed at https://www.governor.wa.gov/office-governor/office/small-cabinet.

- The following exceptions apply to the definition of "worker":
  - Independent contractors, and any of their workers, are exempt from this order unless any provision of the contract to provide goods or services requires work to be performed in person and on site, regardless of frequency, whether other workers are present, or any contingent nature of that requirement.
  - For any State Agency that is listed as an agency under the authority of a board, council, or commission at https://ofm.wa.gov/sites/default/files/public/publications/2021_State_Org_Chart.pdf and that is not also listed as an executive cabinet agency at https://www.governor.wa.gov/office-governor/office/executive-cabinet or a small cabinet agency at https://www.governor.wa.gov/office-governor/office/small-cabinet, only the State Agency's compensated employees are "workers" subject to the requirements of this proclamation.

b.  "Health Care Provider" includes:
  - Individuals with credentials listed in the Healthcare Professional Credentialing Requirements list;
  - Individuals who are permitted by law to provide health care services in a professional capacity without holding a credential;
  - Long-term care workers unless specifically excluded in this order; and
  - Workers in any Health Care Setting, as defined herein.

  "Health Care Provider" does not include, for purposes of this order:
  - Individual providers, as defined in RCW 74.39A.240;
  - Providers of personal care in a person's home, such as home care, home health or hospice care;
  - Providers who are not actively practicing or providing services; and
  - Providers who provide services only at one or more of the settings that are expressly excluded from the list of Health Care Settings under this order.

c.  "Health Care Setting" is any public or private setting that is primarily used for the delivery of in-person health care services to people, except as specifically exempted below. If located at a facility that is primarily used for the delivery of health-care services, such as a hospital, then the entire facility is a Health Care Setting. If located at a facility that is primarily used for another purpose, such as a pharmacy within a grocery store, school nurse's office, or vaccination clinic within a business establishment, the Health Care Setting includes only the areas that are primarily used for the delivery of health care and the areas regularly occupied by Health Care Providers and people seeking care, but not the other areas of the facility.

"Health Care Setting" includes, but is not limited to:
- Acute care facilities, including, but not limited to, hospitals;
- Long-term acute care facilities;
- Inpatient rehabilitation facilities;
- Inpatient behavioral health facilities, including, but not limited to, evaluation and treatment facilities, residential treatment facilities, secure detox facilities;
- Residential long-term care facilities, including, but not limited to, nursing homes, assisted living facilities, adult family homes, settings where certified community residential services and supports are provided, and enhanced services facilities;
- Mobile clinics or other vehicles where health care is delivered;
- Outpatient facilities, including, but not limited to, dialysis centers, physician offices, and behavioral health facilities (including offices of psychiatrists, mental health counselors, and substance use disorder professionals);
- Dental and dental specialty facilities;
- Pharmacies (not including the retail areas);
- Massage therapy offices (this includes designated areas where massage is administered within non-health care settings like spas and wellness/fitness centers);
- Chiropractic offices;
- Midwifery practices and stand-alone birth centers;
- Isolation and/or quarantine facilities;
- Ambulatory surgical facilities;
- Urgent care centers; and
- Hospice care centers.

"Health Care Setting" does not include:
- Settings where sports and spectator events or other gatherings are held (including when credentialed athletic trainers are providing care to players), other than areas primarily used for the delivery of health care services, such as designated first aid areas (which are Health Care Settings);
- Department of Children, Youth & Families (DCYF)-licensed foster homes that do not primarily provide health care services;
- Research facilities where no health care is delivered to people;
- Veterinary health care settings;
- Animal control agencies; and
- Non-profit humane societies.

d.  "State Agency" includes:
- Every agency listed at https://www.governor.wa.gov/office-governor/office/executive-cabinet;
- Every agency listed at https://www.governor.wa.gov/office-governor/office/small-cabinet; and

- Every agency under the authority of a board, council, or commission listed at https://ofm.wa.gov/sites/default/files/public/publications/2021_State_Org_Chart.pdf except the State Board for Community and Technical Colleges and the governing boards of four-year institutions of higher education.

e. "Fully Vaccinated against COVID-19": A person is fully vaccinated against COVID-19 two weeks after they have received the second dose in a two-dose series of a COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA (e.g., Pfizer-BioNTech or Moderna) or two weeks after they have received a single-dose COVID-19 vaccine authorized for emergency use, licensed, or otherwise approved by the FDA (e.g., Johnson & Johnson (J&J)/Janssen).

**ADDITIONALLY**, the specific prohibitions in this Proclamation are severable and do not apply to the extent that compliance with a prohibition would violate (1) any U.S. or Washington constitutional provision; (2) federal statutes or regulations; (3) any conditions that apply to the state's receipt of federal funding; (4) state statutes; or (5) applicable orders from any court of competent jurisdiction.

**ADDITIONALLY**, nothing in this Proclamation limits otherwise applicable requirements related to personal protective equipment, personnel training, and infection control policies and procedures.

I again direct that the plans and procedures of the *Washington State Comprehensive Emergency Management Plan* be implemented throughout state government. State agencies and departments are directed to continue utilizing state resources and doing everything reasonably possible to support implementation of the *Washington State Comprehensive Emergency Management Plan* and to assist affected political subdivisions in an effort to respond to and recover from the COVID-19 pandemic.

I continue to order into active state service the organized militia of Washington State to include the National Guard and the State Guard, or such part thereof as may be necessary in the opinion of The Adjutant General to address the circumstances described above, to perform such duties as directed by competent authority of the Washington State Military Department in addressing the outbreak. Additionally, I continue to direct the Department of Health, the Washington State Military Department Emergency Management Division, and other agencies to identify and provide appropriate personnel for conducting necessary and ongoing incident related assessments.

Violators of this order may be subject to criminal penalties pursuant to RCW 43.06.220(5). Further, if people fail to comply with the required facial coverings, social distancing and other protective measures while engaging in this phased reopening, I may be forced to reinstate the prohibitions established in earlier proclamations.

This order is effective immediately. Unless extended or amended, upon expiration or termination of this amendatory proclamation the provisions of Proclamation 20-25, et seq., will continue to be in

effect until the state of emergency, issued on February 29, 2020, pursuant to Proclamation 20-05, is rescinded.

Signed and sealed with the official seal of the state of Washington on this 9th day of August, A.D., Two Thousand and Twenty-One at Olympia, Washington.

By:

_____/s/_____
Jay Inslee, Governor

BY THE GOVERNOR:

_____/s/_____
Secretary of State



April 24, 2020

To:    Manufacturers of Face Masks;
       Health Care Personnel;
       Hospital Purchasing Departments and Distributors; and
       Any Other Stakeholders.

On April 18, 2020, in response to concerns relating to insufficient supply and availability of face masks,[1,2] the U.S. Food and Drug Administration (FDA) issued an Emergency Use Authorization (EUA) authorizing the use of face masks for use by members of the general public, including health care personnel (HCP)[3] in healthcare settings as personal protective equipment (PPE), to cover their noses and mouths, in accordance with Centers for Disease Control and Prevention (CDC) recommendations, to prevent the spread of the virus called severe acute respiratory syndrome coronavirus 2 (SARS-CoV-2) during the Coronavirus Disease 2019 (COVID-19) pandemic, pursuant to section 564 of the Federal, Food, Drug, and Cosmetic Act (the Act) (21 U.S.C. 360bbb-3).

On February 4, 2020, pursuant to Section 564(b)(1)(C) the Act, the Secretary of the Department of Health and Human Services (HHS) determined that there is a public health emergency that has a significant potential to affect national security or the health and security of United States

---

[1] A face mask is a device, with or without a face shield, that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. It includes cloth face coverings as a subset. It may be for single or multiple uses, and if for multiple uses it may be laundered or cleaned. There are many products marketed in the United States as "face masks" that offer a range of protection against potential health hazards. Face masks are regulated by FDA when they meet the definition of a "device" under section 201(h) of the Act. Generally, face masks fall within this definition when they are intended for a medical purpose. Face masks are regulated under 21 CFR 878.4040 as Class I 510(k)-exempt devices (non-surgical masks).

[2] Surgical masks are not covered within the scope of this authorization. Surgical masks are masks that cover the user's nose and mouth and provide a physical barrier to fluids and particulate materials and are regulated under 21 CFR 878.4040 as class II devices requiring premarket notification. Additionally, these masks meet certain fluid barrier protection standards and Class I or Class II flammability tests. More information on the distinction is provided in FDA guidance, titled "Enforcement Policy for Face Masks and Respirators During the Coronavirus Disease (COVID-19) Public Health Emergency" available at https://www.fda.gov/media/136449/download.

[3] HCP refers to all paid and unpaid persons serving in healthcare settings who have the potential for direct or indirect exposure to patients or infectious materials, including body substances (e.g., blood, tissue, and specific body fluids); contaminated medical supplies, devices, and equipment; contaminated environmental surfaces; or contaminated air. These HCP include, but are not limited to, emergency medical service personnel, nurses, nursing assistants, physicians, technicians, therapists, phlebotomists, pharmacists, dentists and dental hygienists, students and trainees, contractual staff not employed by the healthcare facility, and persons not directly involved in patient care, but who could be exposed to infectious agents that can be transmitted in the healthcare setting (e.g., clerical, dietary, environmental services, laundry, security, engineering and facilities management, administrative, billing, and volunteer personnel).

Page 2

citizens living abroad, and that involves the virus that causes COVID-19.[4]  Pursuant to Section 564 of the Act, and on the basis of such determination, the Secretary of HHS then declared on March 24, 2020, that circumstances exist justifying the authorization of emergency use of medical devices, including alternative products used as medical devices, due to shortages during the COVID-19 pandemic, subject to the terms of any authorization issued under that section.[5]

On April 24, 2020 in response to questions and concerns that have been received by FDA since issuance of the April 18, 2020 letter of authorization and having concluded that revising the April 18, 2020 EUA is appropriate to protect the public health or safety under section 564(g)(2)(c) of the Act (21 U.S.C. § 360bbb-3(g)(2)(c)), FDA is reissuing the April 18, 2020 letter in its entirety with amendments[6] incorporated. Specifically, FDA is clarifying through this re-issued letter that facemasks, including cloth face coverings, are authorized to be used by HCP only as source control[7,8] in accordance with CDC recommendations under this EUA.[9]  As stated in the April 18 letter, face masks are authorized for use by the general public to cover their noses and mouths, in accordance with CDC recommendations.

Having concluded that the criteria for issuance of this authorization under Section 564(c) of the Act are met, I am authorizing the emergency use of face masks for use in accordance with CDC recommendations, as described in the Scope of Authorization (Section II) and pursuant to the Conditions of Authorization (Section IV) of this letter.

For the most current CDC recommendations on the use of face masks by the general public during COVID-19, please visit CDC's webpage: Recommendation Regarding the Use of Cloth Face Coverings, Especially in Areas of Significant Community-Based Transmission For the most recent recommendations on use of face masks by HCPs in a healthcare setting, see: Strategies to Optimize the Supply of PPE and Equipment.

## I.     Criteria for Issuance of Authorization

I have concluded that the emergency use of face masks in accordance with CDC recommendations as source control as described in the Scope of Authorization (Section II) to

---

[4] U.S. Department of Health and Human Services, Determination of a Public Health Emergency and Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3. 85 FR 7316 (February 7, 2020)

[5] U.S. Department of Health and Human Services, *Declaration that Circumstances Exist Justifying Authorizations Pursuant to Section 564(b) of the Federal Food, Drug, and Cosmetic Act, 21 U.S.C. § 360bbb-3*, 85 FR 17335 (March 27, 2020).

[6] The amendments to the April 18, 2020 letter clarify that the eligible facemasks are to be used for source control only, and are not personal protective equipment, meaning they are not a substitute for filtering face piece respirators or for surgical face masks. This reissued EUA does not change any aspects of the April 18, 2020 letter with respect to the use of face masks by the general public.

[7] Source control refers to the use of a facemask or cloth face covering over the mouth and nose to contain that individual's respiratory secretions to help prevent transmission from infected individuals who may or may not have symptoms of COVID-19.

[8] https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-recommendations.html

[9] In addition, health care employers should refer to standards of the Occupational Safety and Health Administration (OSHA) that apply to PPE to protect workers and infectious disease hazards. *See* 29 CFR 1910 subpart I.

help prevent spread of the virus during the COVID-19 pandemic meets the criteria for issuance of an authorization under Section 564(c) of the Act, because I have concluded that:

1. SARS-CoV-2, the virus that causes COVID-19, can cause a serious or life-threatening disease or condition, including severe respiratory illness, to humans infected by this virus;

2. Based on the totality of scientific evidence available to FDA, it is reasonable to believe that the authorized face masks may be effective as source control to help prevent the spread of SARS-CoV-2 by infected individuals who may or may not have symptoms of COVID-19 during the COVID-19 pandemic, and that the known and potential benefits of face masks, when used in accordance with the scope of this authorization (Section II), outweigh the known and potential risks of such product; and

3. There is no adequate, approved, and available alternative to the emergency use of face masks for source control by the general public and for HCPs to help prevent the spread of the virus due to face mask shortages during the COVID-19 pandemic.[10],[11]

## II. Scope of Authorization

I have concluded, pursuant to Section 564(d)(1) of the Act, that the scope of this authorization is limited to the use of face masks, including cloth face coverings, as source control for use by members of the general public, as well as HCP in healthcare settings, to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of the SARS-CoV-2 during the COVID-19 pandemic. The facemasks are not intended to be used by HCPs as PPE, meaning they are neither substitutable for respiratory protective devices such as filtering face piece respirators, nor for surgical face masks. This use is consistent with face masks regulated as Class I 510(k)-exempt face masks under 21 CFR 878.4040.

## Authorized Face Masks

Face masks are authorized under this EUA when they are intended for use as source control, by members of the general public as well as HCPs in healthcare settings, to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic. Authorized face masks must meet the following requirements:

1. The product is labeled accurately to describe the product as a face mask and includes a list of the body contacting materials (which does not include any drugs or biologics);

---

[10] No other criteria of issuance have been prescribed by regulation under Section 564(c)(4) of the Act.

[11] Providing authorization for the introduction into interstate commerce of face masks by manufacturers that do not customarily engage in the manufacture of medical devices helps meet the needs of the healthcare system. In addition, increased availability of face masks helps meet the needs for source control for the general population, reserving FDA-cleared surgical masks and FDA-cleared or -authorized N95 and N95 equivalent Face Filtering Respirators for use by HCP. Providing HCP who are on the forefront of the COVID-19 response with sufficient PPE is necessary in order to help prevent HCP exposure to pathogenic biologic airborne particulates during the COVID-19 pandemic.

2. The product is labeled accurately so that it does not claim to be intended for use as a surgical mask or to provide liquid barrier protection;
3. The product labeling includes recommendations against use in a clinical setting where the infection risk level through inhalation exposure is high;
4. The product is not labeled in such a manner that would misrepresent the product's intended use; for example, the labeling must not state or imply that the product is intended for antimicrobial or antiviral protection or related uses or is for use such as infection prevention or reduction;
5. The product is not labeled as a respiratory protective device, and therefore should not be used for particulate filtration; and
6. The product is not labeled for use in high risk aerosol generating procedures.[12]

Manufacturers of face masks that are used as described above and meet the above requirements (i.e., are within this section (the Scope of Authorization, Section II)) do not need to take any action, other than complying with the Conditions of Authorization (Section IV) to be authorized under this EUA. FDA's posting and public announcement of this EUA at https://www.fda.gov/emergency-preparedness-and-response/mcm-legal-regulatory-and-policy-framework/emergency-use-authorization, serves as face mask manufacturers' notification of authorization.

I have concluded, pursuant to Section 564(d)(2) of the Act, that it is reasonable to believe that the known and potential benefits of face masks as described within this section (the Scope of Authorization, Section II), outweigh the known and potential risks of such products.

I have concluded, pursuant to Section 564(d)(3) of the Act, based on the totality of scientific evidence available to FDA, that it is reasonable to believe that face masks may be effective as described within this section (the Scope of Authorization, Section II) of this letter, pursuant to Section 564(c)(2)(A) of the Act.

FDA has reviewed the scientific information available to FDA, including the information supporting the conclusions described in Section I of this letter, and concludes that face masks (as described in this section, the Scope of Authorization, Section II), meet the criteria set forth in Section 564(c) of the Act concerning safety and potential effectiveness.

The emergency use of face masks must be consistent with, and may not exceed, the terms of this letter, including the Scope of Authorization (Section II) and the Conditions of Authorization (Section IV).  Subject to the terms and conditions of this EUA and under the circumstances set forth in the Secretary of HHS's determination under Section 564(b)(1)(C) described above and the Secretary of HHS's corresponding declaration under Section 564(b)(1), face masks, as source control, are authorized for use by members of the general public, as well as HCPs in healthcare settings, to cover their noses and mouths, in accordance with CDC recommendations, to help prevent the spread of SARS-CoV-2 during the COVID-19 pandemic.

---

[12] Examples of aerosol generating procedures in healthcare settings may be found at https://www.cdc.gov/coronavirus/2019-ncov/hcp/infection-control-faq.html

Page 5

## III. Waiver of Certain FDA Requirements

Pursuant to Section 564(e)(3) of the Act, with respect to the emergency use of a product for which an authorization under this section is issued, FDA may waive or limit, to the extent appropriate given the circumstances of the emergency, requirements regarding good manufacturing practice otherwise applicable to the manufacture, processing, packing, or holding of products subject to regulations under this Act, including such requirements established under sections 520(f)(1). FDA grants that waiver, including the quality system requirements under 21 CFR Part 820 and labeling requirements under the FD&C Act and FDA regulations, including unique device identification requirements in 21 CFR Part 830 and 21 CFR 801.20, except that face masks must include the labeling elements specified in the Conditions of Authorization (Section IV).

## IV. Conditions of Authorization

Pursuant to Section 564(e) of the Act, I am establishing the following conditions to this authorization:

### Manufacturers and Distributors of Authorized Products[13]

 A. Manufacturers and Distributors will make face masks available with labeling that includes a description of the product as a face mask, including a list of the body contacting materials (which does not include any drugs or biologics).

 B. Manufacturers and Distributors of authorized products shall not label the product: 1) as a surgical mask, to provide liquid barrier protection; 2) for use in a clinical setting where the infection risk level through inhalation exposure is high; 3) for antimicrobial or antiviral protection or related uses or uses for infection prevention or reduction or related uses; 4) as a respiratory protective device; or 5) for high risk aerosol-generating procedures.

 C. Manufacturers must make the required labeling available to each end user or end user facility (each hospital) in hard copy or in an alternative format (e.g., electronic labeling on the manufacturer's website).  Instructions on how to access the labeling if provided in an alternative format must be available to each end user or end user facility.

 D. Manufacturers and Distributors will include instructions for recommended cleaning and/or disinfection materials and processes, if applicable, for their authorized product(s). Manufacturers must provide these instructions, if applicable, to each end user or end user facility (e.g., each hospital) in hard copy or in an alternative format (e.g., electronic instructions). Instructions on how to access the labeling if provided in an alternative format must be available to each end user or end user facility.

---

[13] The requirements under 21 CFR Part 806 (Reports of Corrections and Removals) and 21 CFR Part 807 (Registration and Listing) do not apply to products authorized under an EUA. As such, compliance with these regulations are not required under this EUA.

E. Manufacturers will have a process in place for reporting adverse events of which they become aware to FDA under 21 CFR Part 803. Adverse events of which the manufacturer becomes aware will be reported to FDA. See FDA's webpage "Medical Device Reporting (MDR): How to Report Medical Device Problems"[14] for reporting requirements and procedures.[15]

F. Manufacturers and distributors will ensure that any records associated with this EUA are maintained until otherwise notified by FDA. Such records will be made available to FDA for inspection upon request.

G. Through a process of inventory control, manufacturers and distributors will maintain records of the entities to which they distribute the face masks and the numbers of each such product they distribute.

H. Manufacturers and distributors are authorized to make available additional information relating to the emergency use of the product that is consistent with, and does not exceed, the terms of this letter of authorization.

**Conditions Related to Advertising and Promotion**

I. All printed matter, including advertising and promotional materials, relating to the use of the authorized face mask shall be consistent with the labeling elements listed in Section II of this EUA, as well as the terms set forth in this EUA and the applicable requirements set forth in the Act and FDA regulations.

J. No printed matter, including advertising or promotional materials, relating to the use of the authorized face mask may represent or suggest that such product is safe or effective for the prevention or treatment of patients during the COVID-19 pandemic.

K. All advertising and promotional descriptive printed matter relating to the use of the product shall clearly and conspicuously state that

- The product has not been FDA cleared or approved

- The product has been authorized by FDA under an EUA for use as source control by the general public as well as by HCP in healthcare settings as to help prevent the spread of infection or illness during the COVID-19 pandemic.

- This product is authorized only for the duration of the declaration that circumstances exist justifying the authorization of the emergency use of medical devices, including alternative products used as medical devices,

---

[14] FDA guidance, titled "Medical Device Reporting (MDR): How to Report Medical Device Problems" is available at https://www.fda.gov/medical-devices/medical-device-safety/medical-device-reporting-mdr-how-report-medical-device-problems.
[15] Also refer to FDA guidance, titled "Postmarketing Adverse Event Reporting for Medical Products and Dietary Supplements During a Pandemic" available at https://www.fda.gov/media/72498/download.

Page 7

during the COVID-19 outbreak, under section 564(b)(1) of the Act, 21 U.S.C.
§ 360bbb-3(b)(1) unless the authorization is terminated or revoked sooner.

**V. Duration of Authorization**

This EUA will be effective until the declaration that circumstances exist justifying this
authorization is terminated under Section 564(b)(2) of the Act or the EUA is revoked under
Section 564(g) of the Act.

Sincerely,

/S/

_____
RADM Denise M. Hinton
Chief Scientist
Food and Drug Administration

**B7**

**000019**

**kurt benshoof <kurtbenshoof@gmail.com>**                    Mon, Feb 3, 8:07 PM
to Santiago, Adam, Courtney, urve, bgage702

Happy Tuesday!

Mr. Villanueva, this email constitutes Co-plaintiff Kurt Benshoof's ("Benshoof")
good faith effort to confer with you prior to the filing of motion for joinder and
supplemental pleading, pursuant to Fed.R.Civ.P. 19(a)(1)(A) and Fed.R.Civ.P. 15(d) to
include you, attorney Blair M. Russ ("Russ"), and Ms. Jessica R. Owen ("Owen"), as a
co-defendants.

As you have been previously served notice of, Russ and Owen conspired to commit
fraud upon the court in KCSC No. 22-2-15958-8 SEA (Dkt. #86-3, ¶¶185-280) to obtain
the Order Restricting Abusive Litigation by Kurt Benshoof ("ORAL"), and thereby violate
Benshoof's right to petition for redress on behalf of himself and his minor son,
A.R.W. For reasons of your own, or those you work for, you have chosen to become a
co-conspirator and accessory after-the-fact to their fraud.

Because your statements reveal your clear intention to use the fraudulent ORAL to deny
Benshoof's right to petition for redress, and this right is clearly established, there are
grounds for bringing a First Amendment claim against you under 42
U.S.C. §1983. Because Russ and Owen set in motion a series of events by which they
could reasonably expect that one or more attorneys working in the King County Office of
the Prosecuting Attorney would use the ORAL to deny my right to petition for redress,
they will be named as co-defendants.

In *Hernandez v. Skinner*, 969 F.3d 930, 941-42 (9th Cir. 2020), the Ninth Circuit
discussed, for the first time, the minimum level of involvement needed for § 1983 liability
under the integral-participant doctrine. An actor may be deemed to have caused a
constitutional violation under the "integral-participant doctrine," "only if (1) the defendant
knew about and acquiesced in the constitutionally defective conduct as part of a
common plan with those whose conduct constituted the violation, or (2) the defendant
set in motion a series of acts by others which the defendant knew or reasonably should
have known would cause others to inflict the constitutional injury." *Peck v. Montoya*, 51
F.4th 877, 891 (9th Cir. 2022).

Since you and Mr. Asher have both cited *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), you
cannot claim ignorance of the fact that the U.S. Supreme Court held:

A "well-pleaded, non-conclusory factual allegation of parallel behavior [will] determine
whether it gave rise to a "plausible suggestion of conspiracy." Id., at 565–566, 127 S.Ct.
1955. Acknowledging that parallel conduct was consistent with an unlawful agreement,
the Court nevertheless concluded that it did not plausibly suggest an illicit accord
because it was not only compatible with, but indeed was more likely explained by,
lawful, unchoreographed free-market behavior."
*Ashcroft v. Iqbal,* 556 U.S. 662, 680 (2009)

As you are an attorney, you are surely aware that malicious intent is not a required element for a cause of action under 42 U.S.C. §1983. Furthermore, because "parallel conduct" is "consistent with an unlawful agreement" Plaintiffs need not plead more than circumstantial evidence to survive a Fed.R.Civ.P. 12(b) motion:

"The existence or nonexistence of a conspiracy is essentially a factual issue that the jury, not the trial judge, should decide… The right to confront, cross-examine and impeach adverse witnesses is one of the most fundamental rights sought to be preserved by the Seventh Amendment provision for jury trials in civil cases. The advantages of trial before a live jury with live witnesses, and all the possibilities of considering the human factors, should not be eliminated by substituting trial by affidavit and the sterile bareness of summary judgment. "It is only when the witnesses are present and subject to cross-examination that their credibility and the weight to be given their testimony can be appraised. Trial by affidavit is no substitute for trial by jury which so long has been the hallmark of 'even handed justice.'" *Poller v. Columbia Broadcasting*, 368 U.S. 464, 473 (1962)."
*Adickes v. Kress Co.*, 398 U.S. 144, 176 (1970)

Additionally, your harassing threats to corruptly persuade Benshoof to dismiss his claims and your corrupt persuasions to the Court---intended to prevent Benshoof and others from testifying at trial by using the fraudulent ORAL as the misleading conduct in your witness tampering---constitute a violation of 18 U.S.C. §1962(c) by violating § 1512:

**(b)**Whoever knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person, with intent to—
**(1)**
influence, delay, or prevent the testimony of any person in an official proceeding;
**(d)**Whoever intentionally harasses another person and thereby hinders, delays, prevents, or dissuades any person from—
**(1)**
attending or testifying in an official proceeding;
You, Russ, and Owen will be named under 42 U.S.C. § 1985 for your conspiracy to use the ORAL to violate Benshoof's right to petition for redress.

Lastly, you will be named under 42 U.S.C. § 1986 for neglecting to prevent further violations of the First Amendment against Benshoof.

In other words, your attempts to bully Benshoof and to deceive the court require Benshoof to ensure due process and the equal protection of the law for all by holding you accountable for your malfeasance, pursuant to the tenets of his faith. *#FAFO*

# C2

## 000021

In Truth & Spirit,
Reverend Kurt Benshoof

**C3**



kurt benshoof <kurtbenshoof@gmail.com>                          Mar 6, 2024,
                                                                11:18 AM
to jainsworth-taylor, mking, tladwig,

Happy Wednesday!

I contacted your office last year regarding the violations of state and federal law which I
and my former fiance, Briana, ("Plaintiffs") were subjected to over the span of seven
months between September 2020 and April 2021.

If my memory is correct, it was Julie who called me.  As I told her at the time, I very
much appreciated the courtesy and respect of the phone call.

During the phone call, Julie asserted that the City of Shoreline was not responsible for
any violations of Plaintiffs' rights and the Civil Rights Act of 1964.  The reasoning given
was that the King County Sheriff's Office is contracted by the City of Shoreline.

Well, Plaintiffs download the **Interlocal Agreement Between King County and the
City of Shoreline Relating to Law Enforcement Services**, and read through it.

The City of Shoreline **policy** says one thing, yet the **practices** that Briana---an African
American woman---and I were subjected to were worse than anything she has ever
encountered in the Southern states.

Non Discrimination | City of Shoreline (shorelinewa.gov)

"The City of Shoreline recognizes and upholds the rights of individuals to be treated fairly and to
live their lives with dignity and respect and free from discrimination or targeting because of their
immigration status, faith, race, national origin, sexual orientation, gender or gender identity, age,
ability, ethnicity, housing status, economic status, or other social status. In 2017, the Shoreline City
Council unanimously adopted Resolution 401 declaring the City of Shoreline to be an inviting,
equitable, and safe community for all. The City Council passed this resolution as a way to restate
the practices and policies of the City and the values that the Shoreline community has supported.

The City is committed to ensuring that Shoreline remains a welcoming, inclusive, and safe
community for all who live, work and visit here. The City will continue to work, in cooperation with
our community partners, to ensure our services and programs are accessible and open to all
individuals."

From the City of Shoreline website, it appears that the City of Shoreline "will continue to
ensure Shoreline officers are trained" properly, paid for by the City of Shoreline.

Policies and Accountability | City of Shoreline (shorelinewa.gov)

# D1
## 000023

"Shoreline officers additionally go through eight hours of implicit bias training intended to make them aware of how to counter their own implicit biases and not let those biases impact their policing. The Shoreline Police command staff will continue to ensure Shoreline officers are trained in crisis intervention, de-escalation techniques, and implicit bias. The Shoreline City Council has supported these efforts through additional training funds."

The discrimination that we were subjected to was not an isolated incident: it was the policy, practice or widespread customs of Defendants. It went on for ***seven months.*** I was repeatedly physically assaulted, I received death threats from customers while store employees watched. Briana and I were shocked to return to our vehicle after one shopping trip, discovering to our horror that employees had laid forty to fifty shopping carts on their sides on the ground, surrounding our vehicle. Employees did everything but hang a noose from a lamp post.

For ***seven months*** Shoreline PD allowed, enabled, and facilitated this harassment, these threats, and these assaults. I will, however, personally commend Captain Ryan Abbot as a paragon of law enforcement integrity and ethical conduct. We could use more officers like him. It was Capt. Abbot who finally put a stop to this after he contacted him in April 2021.

Town & Country Markets has refused to even apologize, or return any of my phone calls.

As Plaintiffs' 3-year statute of limitation is nearing expiration, this email is to inform City of Shoreline that we will be filing suit in U.S. District Court for the Western District of Washington by 4:30pm Monday March 11, 2024, unless a tentative resolution of our claims is obtained by 12:00pm Monday March 11, 2024.

Plaintiffs have hours of video evidence of our claims.

Plaintiffs already have a lawsuit against the City of Seattle, Puget Consumers Co-Op, and other stores. WAWD No. 2:23-cv-1392-JNW First Amended Complaint (Dkt. #47)

You may wish to contact the City of Seattle lead attorney on this case, Dallas LePierre. His email is dallas.lepierre@seattle.gov, and his telephone is (206) 386-1041. Mr. LePierre can surely give your office his professional opinion of my legal acumen, integrity, and dedication to ensuring that violations of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment are dedicated passions of mine.

My suggestion would be for your office to contact the corporate offices of Town & Country Markets. Plaintiffs' claims can be resolved fairly and amicably for all parties, so long as there is *prompt,* sincere and forthright action. It would be most efficient for all parties if your office brings Town & Country to the negotiation table.

Attached is Plaintiffs' First Amended Complaint.  Plaintiffs will not be providing anyone an advance "negotiations" copy of our lawsuit naming City of Shoreline, Town & Country Markets, William C. Akers, Evan Fagan, etc.

If tentative resolution cannot be reached in a timely manner, Defendants will be served summons and complaint.

My cell phone is: (206) 460-4202.

Have a nice day.


In Truth & Spirit,
Reverend Kurt Benshoof

**D3**

**000025**

**Judge Melinda J. Young**
King County Superior Court Department 6
516 3rd Avenue Seattle, WA 98104
**Bailiff, Jennifer McBeth**

**FILED**
KING COUNTY WASHINGTON

SEP **06** 2024

SEA
SUPERIOR COURT CLERK

**King County**
Superior Court

Urve Maggitti
58 E Swedesford Road
Malvern, PA 19355

State of Washington v. Benshoof | 24-1-02680-7 SEA

To Whom it May Concern:

The court is in receipt of the enclosed Petition for Writ of Habeas Corpus and attached check for $5.00 made payable to King County Superior Court. These are being returned to you at the direction of Judge Young. Mr. Benshoof is representing himself. He is welcome to present any motions on his own behalf to the court by filing them in normal course. Only a licensed attorney who is representing Mr. Benshoof, or a defendant who is representing himself, may file a petition or motion with the court. Someone who files legal motions on behalf of another person may be committing the crime of Unauthorized Practice of Law, even if it is with the other person's permission. Regardless, we cannot accept the check for $5.00.

A copy of this letter will be given to the assigned prosecutor, Ms. Brennan, and to Mr. Benshoof. It will also be filed in the court file for the record.

Best regards,

Jennifer McBeth

enclosures

**E1**
**000026**

King County Superior Court:
516 Third Avenue, Room C-203, Seattle, WA 98104
Melinda Young   melinda.young@kingcounty.gov

## Petition for Writ of Habeas Corpus

# IN RE: KURT BENSHOOF

Comes now the undersigned URVE MAGGITTI (herein "Applicant"), on behalf of Kurt Benshoof ("Petitioner"), applying for a writ of habeas corpus from this Honorable Court, and asking that it be issued without delay, as contemplated by Wash. Rev. Code §7.36, and per the concurrent guarantees of Wash. Const. Art. I §13, and of US Const. Art. I. Sec. 9 Cl. 2, stating in support:

1. Petitioner is currently being restrained in his liberty: he has been incarcerated without cause.

2. Our laws require that there **must** be a preliminary hearing to determine probable cause to bind over a suspect to a particular court as an accused, regarding a particular crime, **before** this kind of restraint. *Gerstein v. Pugh*, 420 U.S. 103, 95 S. Ct. 854 (1975)

3. No magistrate or judicial officer held or purported to hold a probable cause determination hearing, as is absolutely and unambiguously required prior to restraint of Petitioner's liberty.

4. Various public officials, including Hon. Nicholas Straley ("Straley"), appear to have a vendetta or personal agenda to retaliate against Petitioner for having been a whistleblower previously.

5. Straley evidently has an extreme bias against Petitioner and conflict of interest.

6. Our constitutions guarantee that nobody will be deprived of their rights absent due process.

7. Straley appears to have intentionally circumvented due process to unduly harm Petitioner.

8. Applicant respectfully demands speedy relief and release from restraint of protected liberty.

9. According to RCW §7.36, a petition that "must be granted" specifies the following.

## BY WHOM LIBERTY IS RESTRAINED, AND WHERE

10. Sheriff Patricia Cole-Tindall ("Cole-Tindall") is physically confining Petitioner, without cause, in a King County, Washington jail.

## CAUSE OR PRETENSE

11. There is no lawful cause. Evidently there is nothing more than pretense and ugly prejudice.

---

*Petition for Writ of Habeas Corpus - Kurt Benshoof*  •  KB407 PHC1.4  •  Page 1 of 6

**E2**
**000027**

12. According to the best of my knowledge and belief, Cole-Tindall would presume (or maintain a naked pretense of presuming) that due process has been followed, namely, that:

   1. there had already been a hearing and judicial determination finding probable cause, and

   2. there has already been a bail-setting hearing and judicial determination, and

   3. Petitioner is, for some good cause shown, not entitled to constitutional bail, and

   4. Petitioner has no ownership interest in any property within the county that could be put up as collateral, and

   5. cash bonds demanded were legitimate and not unconstitutionally "excessive", even if in an amount exceeding double the value of the judge's home, and even if the alleged crime is actually no crime, nothing more than a rumor of non-violent wrongdoing, and

   6. incarceration is the least-restrictive bail option that would secure Petitioner's court attendance and protect society from some yet-to-be-expressed danger by Petitioner, and

   7. there has already been a magisterial/judicial order, accordingly, notifying the appropriate court of probable cause and denial of bail, and

   8. as a result of this order, and based on admissible evidence that would have to have been gathered during a probable cause hearing, a district attorney or other individual authorized by law to represent the state had brought lawfully-sufficient primary pleadings for at least one criminal cause of action before the court, thus vesting it with jurisdiction, and thereby commencing at least one criminal court case to await the court's adjudication, and

   9. a judicial order of commitment exists to hold Petitioner in custody until such proceedings can be held, as speedily as possible.

13. According to the best of my knowledge and belief, there is no evidence to support any of those false presumptions, and the only criminal case, if any exists, arises from the "fruit of the poisoned tree": patently-inadmissible evidence obtained by forcible entry and an exhaustive fishing expedition carried out by those who used unnecessary violence and excessive force to execute a defective search warrant that was unconstitutionally issued, being **unsupported** by any statements of fact, which, if true, would enable a magistrate or judge to "find" **probable cause,** and being **devoid of particularity** as to what to search for and where to search for it.

14. In other words, Straley's retaliatory simulation of due process can be the "cause or pretense".

## DETAILS OF THE ALLEGED ILLEGALITY OF CHALLENGED CONDUCT

15. On the contrary, there evidently has been

   1. **no** assertion of ultimate facts in support of the essential elements for a probable cause determination by a magistrate or judge, let alone any hearing or "finding" of such facts and identification of any specific offense, of a criminal nature or any other,

   2. **no** bail-setting hearing,

   3. **no** consideration of Petitioner's constitutionally-protected right to bail,

   4. **no** consideration of the least-restrictive bail options that would be effective to secure court attendance,

   5. **no** thought given to the reasonableness of the cash bond demanded, and

   6. **no** assertion of ultimate facts that, if true, could lead to a finding of Petitioner being either (a) a flight risk, or (b) a danger to society, and

   7. **no** magisterial or judicial order finding probable cause and denying bail, and

   8. **no** district attorney or grand jury has drawn up an information or indictment, which would have been based on the sworn complaints and other admissible evidence that would have been presented, and

   9. **no** magisterial or judicial order of commitment.

16. For any one of these, and certainly for all of these, it is plain for all to see that due process has been abrogated and the restraint of Petitioner's liberty is unlawful.

17. Straley evidently issued a search warrant which clearly does not pass constitutional muster, as it was not supported by a sworn (or affirmed) statement of facts showing probable cause.

18. Petitioner's home was invaded by a heavily-armed SWAT team who shot all the windows and fired a number of gaseous weapons to release toxic gasses that caused significant and undue destruction and harm and danger of harm, not only to Petitioner but to his neighbors.

19. None of this violence was necessary. To date, nobody has been able to show any reason for it. Both state and federal constitutions prohibit such unjustified intrusion on Petitioner's rights.

20. The invaders seized a variety of Petitioner's effects not identified on any search warrant, as is also explicitly forbidden by state and federal constitutions.

21. Petitioner was incarcerated on or about 7/3/2024. No judicial commitment order exists. Such rights violations are utterly repugnant to both state and federal constitutions.

22. Straley is holding Petitioner to answer for a criminal offense arising after-the-fact, based on the patently-inadmissible evidence, if any, of an unconstitutional "fishing expedition"; prior to this, Straley had no sworn statements of fact in support of the issuance of a search warrant.

23. Straley issued a search warrant without particularity, to simply invade Petitioner's home and seize anything that might be later construed as evidence to some as-yet-unknown crime.

24. Straley is apparently attempting to conflate Petitioner's unlawful incarceration with the patently-inadmissible "fruit of the poisoned tree", evidence obtained during an illegal raid.

25. No legal support has been proffered to Petitioner for this seemingly-nonsensical deprivation of liberty which our constitutions guarantee cannot happen absent the due process of law.

26. Straley appears to be intent on presiding over his own imagined criminal cause of action against Petitioner, absent any accuser, based on .

27. Straley is now tampering with the official court record by causing the court clerk to refuse to allow the public to see the public records and court records that are exculpatory to Petitioner and damning to Straley, in that they could confirm the lawlessness of Straley's arbitrary and capricious actions against Petitioner. The longer Straley prevents access to the public, the more suspicious documents are mysteriously appearing as retroactive support for his crimes.

   1. First came the issuance of a defective search warrant, which had neither the lawfully-requisite support nor the lawfully-requisite particularity and specificity.

   2. Multiple people went physically to inspect the warrant after its execution, and all were denied.

   3. After multiple people were turned away empty-handed, suddenly a new document mysteriously appeared in the record, dated as if filed at the same time as the warrant it supports (or purports to support). But once again, we the people were denied access, not allowed to see it.

   4. Now there are two new documents that mysteriously appeared: one being an email allegedly authorizing something, and the other being an inventory/return document. And now, the whole case is marked as "SEALED", even though evidently nobody has moved the court to do so, and there has been no hearing on such a motion, if any, as to whether or not to seal any particular public records, for good cause [not] shown.

## CONCLUSION

28. This Honorable Court is authorized to issue this writ, and has an administrative duty to do so.

> "Writs of habeas corpus **may** be granted by the **supreme court**, the **court of appeals**, or **superior court**, or by **any judge of such courts**, and upon application the writ **shall** be granted **without delay**." Wash. Rev. Code § 7.36.040

29. It would be appropriate, right and just for this court or judge to also order the return of all of the items taken from Petitioner's home by the invading SWAT team, and to order destruction of all electronic copies or forensic images made.

> "The **court or judge** may make **any** temporary orders in the cause or disposition of the party during the progress of the proceedings **that justice may require**. The custody of any party restrained may be changed from one person to another, by order of the court or judge." Wash. Rev. Code § 7.36.220

30. Applicant notes that If such an order is not issued, Petitioner, even with his liberty restored, would still suffer further undue harm by the loss of his property, including computer(s), phone(s), and external drive(s). Serious and extreme privacy concerns are clearly implicated.

31. This Honorable Court should promptly issue "The Great Writ" (of habeas corpus) to Straley.

32. Petitioner respectfully requests that a courtesy copy of said writ be sent to Petitioner as well.


RESPECTFULLY PRESENTED


September 3, 2024

URVE MAGGITTI on behalf of Petitioner KURT ALDEN BENSHOOF

## ACKNOWLEDGMENT
### AFFIDAVIT
#### (Verification)

STATE OF PENNSYLVANIA  )
COUNTY OF CHESTER  )

I, Urve Maggitti, the undersigned Affiant hereto, do hereby declare under penalties of perjury under the laws of the Commonwealth of Pennsylvania and the United States of America, that the foregoing accounting of facts are true and correct to the best of my current knowledge and belief.

I am over the age of 18 years of age, am a resident of the Commonwealth of Pennsylvania, have personal knowledge of the matters of this affidavit, and am capable of making such affidavit.

Pursuant to 28 U.S. Code § 1746 (1) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 13 /2024.

Signed: _____
Urve Maggitti

Notary as JURAT CERTIFICATE

State of Pennsylvania _Chester County_

BEFORE ME personally appeared Urve Maggitti who, being by me first duly sworn, executed the foregoing in my presence and stated to me that the facts alleged therein are true and correct according to her own personal knowledge.

_____

Notary Public,

My commission expires: Feb. 14th 2026

> Commonwealth of Pennsylvania - Notary Seal
> CLAUDIA COTHREN - Notary Public
> Chester County
> My Commission Expires February 14, 2026
> Commission Number 1416185

Page 6 of 6

E000032

URVE MAGGITTI
59 E SWEDESFORD RD UNIT 327
MALVERN PA 19355

130

Pay to the
Order of __KING COUNTY SUPERIOR COURT__ | $ 5.00

__Five dollars and 0 cents__ Dollars

**TD Bank**
America's Most Convenient Bank®

For __traffic infraction fee__

August 26, 2020

Memo __$5.00 for court services__

3190/250
175

Court, Young <young.court@kingcounty.gov>                    Mon, Sep 9, 2024,
                                                                    8:10 AM

to Stephanie, David, Parisien, Suzanne, DJ A, urve, Leesa, me

The court is taking no action on the attached document.  Mr. Benshoof is representing himself.  Only a
licensed attorney who is representing Mr. Benshoof, or a defendant who is representing himself, may file
a petition or motion with the court.  Someone who files legal motions on behalf of another person may be
committing the crime of Unauthorized Practice of Law, even if it is with the other person's permission.

A copy of this email will be filed in the court file for the record.

**Jennifer McBeth**
Bailiff to Judge Melinda J. Young
King County Superior Court

ØŠÒÖ

ŒGÍ ÁŮÒÚÆJ
SŒÕÁÔUWÞVŸ
ÙWÚÒÜ QÜÁÔUWÜVÁÔŠÒÜS

ÔŒÙÒÁ ÁŒ ŒGÍ Ì €EÍ ÁŮÒŒ

# IN THE SUPERIOR COURT OF THE STATE OF WASHINGTON
## IN AND FOR THE COUNTY OF KING

STATE OF WASHINGTON

                Plaintiff,

     v.

KURT BENSHOOF

                Defendant.

NO. 24-1-02680-7 SEA

Correspondence attached.

Judge Melinda J. Young
King County Superior Court
516 3rd Avenue Seattle, WA 98104
(206) 477-1361

**F2**
**000035**

## Court, Young

| | |
|---|---|
| **From:** | Court, Young |
| **Sent:** | Monday, September 9, 2024 8:10 AM |
| **To:** | 'urve maggitti'; Manion, Leesa; Brennan, Stephanie; Martin, David (PAO); Court, Parisien; Parisien, Suzanne; CustomerServiceEmail, DJA |
| **Cc:** | kurt benshoof |
| **Subject:** | RE: Kings County SUPERIOR COURT DEMAND FOR DISCOVERY |

The court is taking no action on the attached document. Mr. Benshoof is representing himself. Only a licensed attorney who is representing Mr. Benshoof, or a defendant who is representing himself, may file a petition or motion with the court. Someone who files legal motions on behalf of another person may be committing the crime of Unauthorized Practice of Law, even if it is with the other person's permission.

A copy of this email will be filed in the court file for the record.

Jennifer McBeth
Bailiff to Judge Melinda J. Young
King County Superior Court

**From:** urve maggitti <urve.maggitti@gmail.com>
**Sent:** Sunday, September 8, 2024 4:46 PM
**To:** Manion, Leesa <Leesa.Manion@kingcounty.gov>; Brennan, Stephanie <stephanie.brennan@kingcounty.gov>; Martin, David (PAO) <david.martin@kingcounty.gov>; Court, Young <young.court@kingcounty.gov>; Court, Parisien <parisien.court@kingcounty.gov>; Parisien, Suzanne <suzanne.parisien@kingcounty.gov>; CustomerServiceEmail, DJA <clerksofficecustomerservice@kingcounty.gov>
**Cc:** kurt benshoof <Kurtbenshoof@gmail.com>; urve maggitti <urve.maggitti@gmail.com>
**Subject:** Kings County SUPERIOR COURT DEMAND FOR DISCOVERY

[EXTERNAL Email Notice! ] External communication is important to us. Be cautious of phishing attempts. Do not click or open suspicious links or attachments.

### SUPERIOR COURT, KING COUNTY, WASHINGTON

STATE OF WASHINGTON
           *"Plaintiff"*             **CASE: 24-1-02680-7 SEA**

vs.
KURT BENSHOOF,
_____*"Defendant"*

-
TO: CLERK of the above-entitled court
TO: PROSECUTING ATTORNEY

### DEMAND FOR DISCOVERY

**F3**<sub></sub>**000036**

Kurt Benshoof, alleged "defendant" pursuant to **CRR 4.7** and **LCRR 4.5 J** United States Constitution amendments 4, 5. 6 and 14th, the Washington Constitution Article 1, Section 22 defendant demands that the PROSECUTING ATTORNEY provide immediately the following discovery:

1. Certified Copy of the final order of Domestic Violence issued against Mr. Kurt Benshoof, including Proof of service of the same.

2. Certified Copy of the final Restraining Order(s) issued against Mr. Kurt Benshoof, including Proof of service of the same.

- See attached signed Verified Document-

**F4** 2
**000037**

**Court, Young**

| | |
|---|---|
| **From:** | Court, Young |
| **Sent:** | Monday, September 9, 2024 8:10 AM |
| **To:** | urve maggitti; Manion, Leesa; Brennan, Stephanie; Martin, David (PAO); Court, Parisien; Parisien, Suzanne; CustomerServiceEmail, DJA |
| **Cc:** | kurt benshoof |
| **Subject:** | RE: DEFENDANT'S NOTICE OF MOTION for FRANKS HEARING AND MOTION TO DISAMISS King County Superior Court |

The court is taking no action on the attached document. Mr. Benshoof is representing himself. Only a licensed attorney who is representing Mr. Benshoof, or a defendant who is representing himself, may file a petition or motion with the court. Someone who files legal motions on behalf of another person may be committing the crime of Unauthorized Practice of Law, even if it is with the other person's permission.

A copy of this email will be filed in the court file for the record.

Jennifer McBeth
Bailiff to Judge Melinda J. Young
King County Superior Court

**From:** urve maggitti <urve.maggitti@gmail.com>
**Sent:** Saturday, September 7, 2024 11:13 AM
**To:** Manion, Leesa <Leesa.Manion@kingcounty.gov>; Brennan, Stephanie <stephanie.brennan@kingcounty.gov>; Martin, David (PAO) <david.martin@kingcounty.gov>; Court, Young <young.court@kingcounty.gov>; Court, Parisien <parisien.court@kingcounty.gov>; Parisien, Suzanne <suzanne.parisien@kingcounty.gov>; CustomerServiceEmail, DJA <clerksofficecustomerservice@kingcounty.gov>
**Cc:** kurt benshoof <Kurtbenshoof@gmail.com>; urve maggitti <urve.maggitti@gmail.com>
**Subject:** DEFENDANT'S NOTICE OF MOTION for FRANKS HEARING AND MOTION TO DISAMISS King County Superior Court

[EXTERNAL Email Notice! ] External communication is important to us. Be cautious of phishing attempts. Do not click or open suspicious links or attachments.

## SUPERIOR COURT, KING COUNTY, WASHINGTON

STATE OF WASHINGTON
               *"Plaintiff"*          **CASE: 24-1-02680-7 SEA**

vs.

KURT BENSHOOF,
_____*"Defendant"*_____

TO: CLERK of the above-entitled court

TO: THE STATE OF WASHINGTON AND ITS PROSECUTING ATTORNEY:

## DEFENDANT'S NOTICE OF MOTION for "*FRANKS* HEARING" AND MOTION TO VOID WARRANT, SUPPRESS EVIDENCE, AND DISMISS CHARGES FOR LACK OF PROBABLE CAUSE

PLEASE TAKE NOTICE that Defendant hereby moves the Court to suppress all evidence collected and derived from the unlawful search and seizure of the Defendant's home; hold that the warrant was not supported by probable cause; that the Defendant's arrest was unlawful and to suppress any statements made by Defendant subsequent to his arrest.

### The Search Warrant was Not Supported by Probable Cause

- See attached signed Verified Document -

## SUPERIOR COURT, KING COUNTY, WASHINGTON

STATE OF WASHINGTON
                    *"Plaintiff"*                    **CASE: 24-1-02680-7 SEA**
vs.
KURT BENSHOOF,
_____ *"Defendant"*

TO: CLERK of the above-entitled court
TO: PROSECUTING ATTORNEY

### DEMAND FOR DISCOVERY

Kurt Benshoof, alleged "defendant" pursuant to **CRR 4.7** and **LCRR 4.5 J** United States Constitution amendments 4, 5. 6 and 14th, the Washington Constitution Article 1, Section 22 defendant demands that the PROSECUTING ATTORNEY provide immediately the following discovery:

1. Certified Copy of the final order of Domestic Violence issued against Mr. Kurt Benshoof, including Proof of service of the same.

2. Certified Copy of the final Restraining Order(s) issued against Mr. Kurt Benshoof, including Proof of service of the same.

Respectfully Submitted by:

Signature:  for KURT BENSHOOF      Date:  September 3, 2024_____
            /KURT BENSHOOF /

The foregoing statements of fact were typed up by the undersigned, upon Mr. Benshoof's request and to the best of the undersigned's understanding.[1]

Signature: _____      Date: September 3, 2024
            /URVE MAGGITTI /  urve.maggitti@gmail.com

---

[1] See *Faretta v. California* and Section 35 of the **Judiciary Act of 1789, 1 Stat. 73, 92**

Page 1 of 4

**F7
000040**

## AFFIDAVIT

"DEFENDANT'S REQUEST FOR DISCOVERY PURSUANT TO CrR 4.7" in CASE: 24-1-0268-7 SEA - is drafted/dictated over phone by Mr. Kurt A. Benshoof with assistance of Urve Maggitti, who upon Mr. Benshoof's request typed up this word document to be signed by Mr. Kurt Benshoof. [2]

Federal and State Constitutions require that criminal prosecutions conform to prevailing notions of fundamental fairness and that criminal defendants be given a meaningful opportunity to present a complete defense. *State v. Wittenbarger, 124 Wn.2d 467, 474–75, 880 P.2d 517 (1994).*

Mr. Benshoof has been denied not only *meaningful opportunity* to present a *complete defense* in the malicious criminal prosecution and persecution brought against Mr. Benshoof, it is a FACT that Mr. Benshoof has been denied the most essential, elemental and basic resources to even attempt to present defense: access to pen, paper, computer, internet, email, and majority of the discovery. [3]

In 1975 in *Faretta v. California*, United States Supreme Court acknowledges an established historical fact: *"Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92, enacted by the First Congress and signed by President Washington one day before the Sixth Amendment *813 was proposed, provided that 'in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of such counsel . . . .' The right is currently codified in 28 U.S.C. s 1654."[4]*

The Court quoted from Section 35 of the **Judiciary Act of 1789, 1 Stat. 73, 92** which states as follows:

"SEC. 35. And be it further enacted, **That in all courts** of the United States**, the parties may plead and manage their own causes personally or by assistance of such counsel or attorneys at law**" [5]

**Judiciary Act of 1789** was passed before ratification of the Sixth Amendment in the Bill of Rights in 1791. The drafters of the Sixth Amendment had deliberately removed the word *attorneys at law* from the Sixth Amendment, and substantially amended the language to read: *"right to have the Assistance of Counsel."*

Signature: _____    Date: _September 3, 2024_

/URVE MAGGITTI / urve.maggitti@gmail.com

---

[2] See *Faretta v. California* and Section 35 of the **Judiciary Act of 1789, 1 Stat. 73, 92**
[3] Mr. Benshoof was provided few photocopies of the incident reports, from the Seattle Police Department which responded to Jessica Owen's and Magalie Lerman's calls, and police reports of three visits to Mr. Benshoof's home.
[4] Faretta v. California, 422 U.S. 806, 812–13, 95 S. Ct. 2525, 2530, 45 L. Ed. 2d 562 (1975)
[5] "The Judiciary Act; September 24, 1789, 1 Stat. 73. An Act to Establish the Judicial Courts of the United States." "APPROVED , September 24, 1789." https://avalon.law.yale.edu/18th_century/judiciary_act.asp

**F8**
**000041**

**ACKNOWLEDGMENT**

**AFFIDAVIT**

(Verification)

STATE OF PENNSYLVANIA  )
COUNTY OF CHESTER    )

I, Urve Maggitti, the undersigned Affiant hereto, do hereby declare under penalties of perjury under the laws of the Commonwealth of Pennsylvania and the United States of America, that the foregoing accounting of facts are true and correct to the best of my current knowledge and belief.

I am over the age of 18 years of age, am a resident of the Commonwealth of Pennsylvania, have personal knowledge of the matters of this affidavit, and am capable of making such affidavit.

Pursuant to 28 U.S. Code § 1746 (1) I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _September 3_ /2024.

Signed: _____
        Urve Maggitti

Notary as JURAT CERTIFICATE

State of Pennsylvania _Chester County_

BEFORE ME personally appeared Urve Maggitti who, being by me first duly sworn, executed the foregoing in my presence and stated to me that the facts alleged therein are true and correct according to her own personal knowledge.

_____

Commonwealth of Pennsylvania - Notary Seal
CLAUDIA COTHREN - Notary Public
Chester County
My Commission Expires Feb. 14, 2026
Commission Number    35

Notary Public,
My commission expires: _Feb. 14th 2026_

_Page 3 of 4_

<u>CERTIFICATE OF SERVICE</u>

**1. Leesa Manion**, Prosecuting Attorney
CRIMINAL DIVISION W554, King County Courthouse, 516 Third Avenue Seattle, Washington
98104-2385
PHONE: (206) 477-3742, FAX (206) 205-6104, **Leesa.Manion@kingcounty.gov**

**2. Stephanie R. Brennan,** WSBA No. 48979
Attorney(s) for the Plaintiff, State of Washington, Domestic Violence Unit, Seattle
W554 King County Courthouse, 516 Third Avenue, Seattle, WA 98104-2385
PHONE" (206) 296-9000, **stephanie.brennan@kingcounty.gov**

**3. David Martin,** Senior Deputy Prosecutor/ Chair Domestic Violence Unit
King County Prosecuting Attorney's Office (PAO), King County Courthouse 516 Third Avenue, W400,
Seattle, WA 98104
PHONE: 206-477-1200 **david.martin@kingcounty.gov**

**4. Hon. Melinda J. Young,** Chief, Criminal Judge - Superior Court
C/O King County Courthouse. 516 Third Ave Rm C-203, Seattle, WA 98104
Primary Phone: 206-477-1361 Email: **young.court@kingcounty.gov**
Bailiff: Jennifer McBeth (206) 477-1361

**5. Hon. Suzanne R. Parisien,**
c/o King County Superior Court, 16 Third Ave, C-203, Seattle, WA 98104
Phone: 206-477-1579
Email **parisien.court@kingcounty.gov, suzanne.parisien@kingcounty.gov**
**Bailiff: Julie Salle** Courtroom Number: W-355, Department: 42, Assignment: Criminal

**6. County Clerk**
516 3rd Ave, Rm E609, Seattle, WA 98104-2363
Phone: 206-296-9300, **clerksofficecustomerservice@kingcounty.gov**

**7. Mr. Kurt Benshoof**
Home Address: 1716 N 128th Street, Seattle, Washington 98133,
Phone: (206) 460-4202, **kurtbenshoof@gmail.com**

CURRENTLY HELD AT: Maleng Regional Justice Center – Kent, Phone: 206-296-1234, Address: 620
W. James St., Kent, WA 98032, Mr. Kurt Benshoof, UPN# 10518097

**8. Urve Maggitti,** "next friend" and "assistance of counsel" [6] to Mr. Kurt Benshoof under as per
Judiciary Act of 1789, 1 Stat. 73, 92.  **urve.maggitti@gmail.com**

*AS OF FRIDAY, September 6, 2024, MR. Benshoof WAS MOVED TO:*
*KING COUNTY CORRECTIONAL FACILITY-Seattle*
*500 Fifth Avenue, Seattle, WA 98104, Bush Eight, Lower Bravo*
*9/8/2024*

---

[6] *Faretta v. California,* 422 U.S. 806, 812–13, 95 S. Ct. 2525, 2530, 45 L. Ed. 2d 562 (1975)

**F10**

**000043**

**STATE OF WASHINGTON**

# DEPARTMENT OF HEALTH

*PO Box 47890 • Olympia, Washington 98504-7890*
*Tel: 360-236-4030 • 711 Washington Relay Service*

### ORDER OF THE SECRETARY OF HEALTH
### AMENDING ORDER 20-03

### 20-03.2

### Face Coverings - Statewide

**WHEREAS,** Washington State Governor Jay Inslee has issued Proclamation 20-05, subsequently amended and extended, proclaiming a statewide State of Emergency due to an outbreak of coronavirus disease 2019 (COVID-19) in the United States and community spread of COVID-19 in Washington State; and

**WHEREAS,** COVID-19 spreads mainly from person to person through respiratory droplets when infected people, many of whom do not exhibit COVID-19 symptoms, cough, sneeze, or talk, and evidence suggests that wearing a cloth face covering reduces an infected person's chance of spreading the infection to others and may protect uninfected persons from larger droplets from infected people around them; and

**WHEREAS,** the Washington State Department of Health, the United States Centers for Disease Control and Prevention (CDC), and the World Health Organization recommend that people wear cloth face coverings when they are gathered with non-household members or in public settings, given the substantial number of cases of COVID-19 infection, these precautions must be mandatory; and

**WHEREAS,** although many Washingtonians wear face coverings voluntarily when in public, requiring all Washingtonians to wear cloth face coverings in public, subject to certain exceptions, helps control and prevent the spread of COVID-19 in Washington State; and

**WHEREAS,** the worldwide COVID-19 pandemic and its progression in Washington State continue to constitute an emergency threatening the safety of the public health, demanding action by the Secretary of Health, and only a small number of Washington's local health officers have issued orders requiring the general public in their jurisdictions to wear cloth face coverings in public; and

**WHEREAS,** on June 24, 2020, Order of the Secretary of Health 20-03 was issued, directing every person in Washington State to wear a face covering when in any indoor or outdoor public setting, subject to certain exceptions; and

**WHEREAS,** on July 24, 2020, Order of the Secretary of Health 20-03.1 was issued, directing every person in Washington State to wear a face covering when outside of their dwelling unit, subject to certain exception; and

**G1**
**000044**

**WHEREAS**, for the same reasons stated above, requiring people to wear face coverings when in a place where non-household members are present or generally accessible to non-household members will help control and prevent the spread of COVID-19 in Washington State; and

**WHEREAS**, it is scientifically appropriate to amend the face covering order to incorporate new CDC guidance recommending that fully vaccinated people need not wear face coverings, except in certain limited settings.

**NOW, THEREFORE**, I, Umair A. Shah, MD, MPH, Washington State Secretary of Health, as a result of the above-noted situation, and under RCW 43.70.130, RCW 70.05.070, WAC 246-100-036, and any other applicable authority, do hereby amend Orders 20-03 and 20-03.1 and order as follows:

### General Face Covering Requirement

**Every person in Washington State must wear a face covering that covers their nose and mouth when they are in a place where people from outside their household are present or in a place that is generally accessible to people from outside their household, subject to the exceptions below and any face covering requirements and limitations on gatherings and activities imposed by the Governor or other legal authority.**
- If a person lives in a congregate living setting where they share living facilities with other residents, their household includes only the people who regularly reside in their bedroom. They must wear a face covering when they are outside their bedroom, including inside the building, subject to the exceptions below.
- Congregate living settings include, but are not limited to, fraternity, sorority, boarding, and other similar shared houses, dormitory buildings, nursing homes, assisted living facilities, adult family homes, other long-term care facilities, group care facilities, and other similar settings.
- Unless listed above, congregate living settings do not otherwise include houses, mobile homes, apartments, condominiums, hotel or motel rooms, supported living homes, state-operated living alternatives, state-owned psychiatric hospitals, or psychiatric residential treatment facilities.
- A bedroom includes any living space, bathroom, or facility attached to the bedroom that is not generally open to the other residents of the congregate living setting.

### Exceptions to General Face Covering Requirement

**People are not required to wear face coverings in any of the following situations:**
- When outdoors, provided that a distance of at least six feet is maintained from people from outside their household;
- At a small gathering in a place not generally open to the public that is attended only by people fully vaccinated against COVID-19 and by unvaccinated people from a single household in which no one is at increased risk for severe illness from COVID-19;
- While engaged in the act of eating or drinking, subject to sector-specific limitations issued by the Governor when in public settings or the social at home gathering limits in the Healthy Washington plan, both accessible at https://www.governor.wa.gov/issues/issues/covid-19-resources/covid-19-reopening-guidance;

**G2**

**000045**

- While showering, bathing, or engaging in other personal hygiene or grooming activities that require the removal of the face covering;
- When any party to a communication is deaf or hard of hearing and not wearing a face covering is essential to communication;
- While obtaining a service that requires temporary removal of the face covering;
- While sleeping;
- When necessary to confirm the person's identity;
- When federal or state law prohibits wearing a face covering or requires the removal of a face covering; or
- When unable to put on a face covering due to an emergency.

### People Exempt from General Face Covering Requirement

**The following people are exempt from the requirement to wear a face covering:**
- People who are fully vaccinated against COVID-19, except when in health care settings, correctional facilities, homeless shelters, or schools;
- Children younger than five years old; and
  - Children who are younger than two years old should never wear face coverings due to the risk of suffocation.
  - Children who are two, three, or four years old, with the assistance and close supervision of an adult, are strongly recommended to wear a face covering at all times in settings, like grocery stores or pharmacies, where it is likely that a distance of at least six feet cannot be maintained from non-household members and vulnerable people must go.
- People with a medical condition, mental health condition, developmental or cognitive condition, or disability that prevents wearing a face covering. This includes, but is not limited to, people with a medical condition for whom wearing a face covering could obstruct breathing or who are unconscious, incapacitated, or otherwise unable to remove a face covering without assistance.

### Additional Provisions

- Types of face coverings permitted
  - For purposes of this order, a face covering must:
    - Fit snugly against the sides of the face;
    - Completely cover the nose and mouth;
    - Be secured with ties, ear loops, elastic bands, or other equally effective method; and
    - Include at least one layer of tightly woven fabric without visible holes, although multiple layers are strongly recommended.
  - A face covering may also be a mask or face covering that provides a higher level of protection than a cloth face covering, such as a medical procedure/surgical mask, a KN95 mask, or an N95 mask.
  - Clear masks or cloth masks with a clear plastic panel may be used when interacting with people who are deaf or hard of hearing, young children or students learning to read, students learning a new language, people with disabilities, and people who need to see the proper shape of the mouth for making appropriate vowel sounds.
  - Children and staff in childcare facilities and K-12 public and private schools may use face shields with drapes or wraps as an alternative to cloth face coverings if authorized pursuant to an order of the Governor.

**G3**
**000046**

- A person is fully vaccinated against COVID-19 two weeks after they have received the second dose in a two-dose series (Pfizer-BioNTech or Moderna) or two weeks after they have received a single-dose vaccine (Johnson and Johnson (J&J)/Janssen).

- A person is at increased risk for severe illness from COVID-19 if they have any of the medical conditions identified by the CDC as making a person more likely to get severely ill from COVID-19. These conditions are currently listed on the following CDC website: https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html.

- This order does not apply to persons who are incarcerated. Correctional facilities have specific guidance on the wearing of face coverings or masks for both incarcerated individuals and staff.

- Face covering requirements imposed by other public agencies or officials
  o Face covering requirements lawfully imposed by another public agency or official are to be followed if they are more protective than the requirements in this order. If they are less protective, then this order must be followed.
    ▪ For example, this order allows fully vaccinated individuals to not wear face coverings, except when in health care settings, correctional facilities, homeless shelters, or schools. If a local health officer issues an order requiring people to wear face coverings in other settings not listed, then the local health officer's order must be followed.
  o Notwithstanding the foregoing, any face covering requirements imposed pursuant to an order of the Governor take precedence over this order.

This order shall take effect on May 15, 2021, and remain in effect until rescinded or superseded by a subsequent order of the Secretary of Health or until the Governor issues a proclamation declaring the termination of the State of Emergency declared by Proclamation 20-05, as amended and extended by subsequent amendatory proclamations, whichever is earlier.

Members of the public are required by law to comply with this order, and violators may be subject to enforcement action pursuant to RCW 43.70.130(7), RCW 70.05.120(4), and WAC 246-100-070(3).

Signed this __15th__ day of May, 2021.

Umair A. Shah, MD, MPH
Secretary of Health

Home › Courts › King County Superior Court › Get Help & Information › COVID-19 Court Operations

# Court Operations During the COVID-19 Pandemic

العربية            中文            Soomaali            Español            Tiếng Việt



## Is court open?

Yes, although we have modified some of our operations.  Courthouse locations are here.  Be sure to verify the location prior to coming to court as many hearings are offered remotely or in a different location than before.

## How will you keep everyone safe?

Please participate by phone or video if encouraged to do so by the judge, or your attorney, and you have the necessary equipment.  To make sure you receive instructions from the court, please update your contact information.  Email addresses for program staff, judges and their bailiffs are here.

If you do come to court, you will be required to wear a mask or facial covering.  The Court will have masks available for use free of charge.  You will not be required to wear a mask if:



- You need to keep your mouth and nose clear for medical or mental health reasons;
- You are a child aged two years of less;
- You need your mouth to be visible because you are deaf or hard of hearing or are communicating with someone who is deaf or hard of hearing; or
- A judge permits you to temporarily remove the mask so that you can be heard clearly in the courtroom.

The Court will be enforcing social distancing rules.  You may sit or stand only in designated spaces.  Do not enter the courthouse if you are sick or in quarantine.

Courthouse personnel are sanitizing surfaces regularly. The Court will have hand sanitizer and disinfecting cleaning supplies available to you in all public areas, including courtrooms and jury spaces.

# Shoreline City Clerk

# Receiving 1269

# I-00-015

# King County Sheriff's Office



Tracking # _I 000015_
*(Assigned by Purchasing)*

**CITY OF SHORELINE**

## CONTRACT REVIEW/APPROVAL ROUTING FORMS
### ~~PENDING~~

**INSTRUCTIONS:**

1. Complete and include the Routing Form/Contract Memorandum and the Contract Financial Information Worksheet.
2. Attach three (3) copies of the contract agreement document .
2. For amendments/change orders to agreements, include one (1) copy of the original agreement, along with  two (2) copies of the actual amendment/change order.
3. All copies of the agreement should be signed by the consultant/contractor after review by the City Attorney.
4. Include all data requested on the worksheet, including termination date.
5. Upon completion of the review process, distribute three (3) copies of the contract agreement as follows:  one to the department, who should then forward the copy back to the contractor and two copies forwarded to the City Clerk's Office.

---

## CONTRACT DESCRIPTION

Contract Originator: _Bob Deis_
Department/Division: _City Manager's Office_                  Date: _8/7/00_

Type of Contract:
- [ ] (C) Construction
- [ ] (P) Personal Services
- [ ] (A) Addendum
- [ ] (G) Purchase of Goods
- [ ] (L) Lease Agreement
- [ ] (W) Public Works
- [x] (I) Intergovernmental Agreement
- [ ] (O) Other
- [ ] (S) Purchase of Services *(all types)*
- [ ] (GR) Grants

Contract Modification: _This is a replacement contract for previous one_

Bid/RFP Number: _____   Escrow Acct. Set Up:  [ ] Yes   [ ] No

Brief Description: _Police Service Contract Between K.C. Sheriff and City_

Name of Contractor, Lessor, Vendor: _King County Sheriff's Office_

Employer ID or SS # *(required for Professional Services Contracts)*: _____

Effective Date: _1/1/2000_        Termination Date: _12/31/2002 initial term option to renew 12/31/2004_

Total Amount of Contract: _$5,752,984 / year_ Program # and Object: _Various Public Safety Coding_
*(including reimbursable expenses)*
Source of Funds: _General Fund_

Payment Terms *(monthly installments, progress payments, etc.)*: _____

Remarks: _The King County Clerk needs 1 copy without holes punched in it._

---

**SIGNATURE ROUTE:**
*(Determined by Purchasing Mgr)*

| | | Date |
|---|---|---|
| [x] 1. Department Head | _Deis_ | _8/14_ |
| [x] 2. Purchasing | _CMR_ | _8/18_ |
| [x] 3. Budget | | _8/16_ |
| [x] 4. City Attorney | | _8/21_ |
| [x] 5. Purchasing | | |

| | | Date |
|---|---|---|
| [x] 6. City Council | _apprd 6/12/2000_ | |
| | *(if required)* | |
| [x] 7. City Manager | _Deis_ | _8/22/00_ |
| [x] 8. City Clerk | _RAR_ | _8/22/00_ |

## 000050



KING COUNTY SHERIFF'S OFFICE
516 Third Avenue W-116
Seattle, WA 98104-2312
Tel: (206) 296-4155 • Fax: (206) 296-0168

*David G. Reichert*
*Sheriff*


March 11, 2004


Ms. Carol Shenk
City Clerk, City of Shoreline
17544 Midvale Ave. N
Shoreline, WA 98133-4921


RE:    Request for Contract Documents

Dear Ms. Shenk:
Per your conversation today with Captain Debbie Huntsinger, I am sending you an original of the interlocal agreement between the City of Shoreline and King County relating to law enforcement services. In addition, you will find copies of amendments relating to arson investigations and computer replacement, and a letter documenting the vote by the Oversight Committee to continue the contract.

If you have any questions or need additional documents, please contact me at 206-205-7610. Thank you.

Sincerely,

Rebecca C. Connolly
KCSO Contract Program Lead


Enclosures

**COPY**

CITY OF SHORELINE
Clerk's Receiving
No: _1269_
Date: _8/23/00_

## INTERLOCAL AGREEMENT BETWEEN
## KING COUNTY AND THE CITY OF SHORELINE
## RELATING TO LAW ENFORCEMENT SERVICES

**PENDING**

This is an Interlocal Agreement between King County, a home rule charter county, a political subdivision of the State of Washington, hereinafter referred to as the "County", and the City of Shoreline, a municipal corporation of the State of Washington, hereinafter referred to as the "City".

WHEREAS, a number of cities in King County contract with the County for the provision of law enforcement services within their City boundaries, and

WHEREAS, the County has adopted policies that support the development and continuation of these contracts to preserve the quality, depth and breadth of its law enforcement services, and

WHEREAS, the King County Sheriff's Office (KCSO) acts on behalf of the City, which is responsible for law enforcement services within its jurisdiction; and

WHEREAS, the County and the contract cities recently completed negotiating a new interlocal agreement for 2000 and beyond, which embodies the following principles adopted by County Council Motion 9540:

1. County law enforcement employees should feel responsibility toward and demonstrate responsiveness to cities with agreements for law enforcement services.
2. Each city should have the flexibility to determine the level and deployment of certain services and to identify service priorities, thereby controlling costs.
3. Each city should have the ability to choose unique police uniforms and markings for police vehicles assigned to the City.
4. County law enforcement employees should work cooperatively with city organizations in a problem-solving mode to improve the safety and welfare of city residents and visitors.
5. The County should provide at a reasonable and predictable cost, efficient, high-quality, appropriate law enforcement services supported by technology that furthers the goals of each city and the County.
6. The contracts and service agreements should maintain equity among the interests of city and unincorporated area residents.
7. The agreements should preserve, to the extent practical, the valuable law enforcement services provided by the KCSO, while providing a high level of local service and decision-making.

NOW, THEREFORE, pursuant to RCW 39.34, the County and the City hereby agree:

1. <u>Law Enforcement Services.</u> The County will make available to the City any of the law enforcement services listed in Exhibit A, "King County Sheriff's Services" (Exhibit A), which is incorporated herein by reference.

   1.1. <u>Precinct/City Services.</u> Precinct/city services consist of law enforcement and other related services provided by personnel assigned to a police precinct primarily for the benefit of the geographic areas within the boundaries of the precinct except as may be modified by Section 2. Precinct/city services include:

      1.1.1. Reactive patrol to enforce state law and City-adopted municipal, criminal, and traffic codes and to respond to residents' and business' calls for service;

      1.1.2. Proactive patrol to prevent and deter criminal activity;

      1.1.3. Traffic patrol to enforce applicable traffic codes;

      1.1.4. Precinct detectives to investigate local crimes such as burglary, vandalism and auto theft;

      1.1.5. Community service and community crime prevention deputies;

    1.1.6.   Drug Awareness Resistance Education (DARE) deputies;

    1.1.7.   Precinct command and support staff; and

    1.1.8.   Police reserves to perform a variety of routine police patrol functions.

    1.1.9.   For purposes of this agreement, precinct/city services shall be considered required or optional in accordance with Exhibit A, except that precinct command staff shall not be required if the City opts to provide its own precinct under Section 6.4.

1.2.    <u>Support Services.</u> Support services consist of:

    1.2.1.   Investigation services by deputies assigned to a central criminal investigation unit investigating such crimes as major crimes, drug offenses, fraud and such reports as missing persons, vice, and major accidents. These deputies are supported by crime scene analysis, crime laboratory, polygraph, identification, and evidence control.

    1.2.2.   Special operations services such as canine patrol, hostage negotiations, tactical unit, and bomb disposal; and

    1.2.3.   Communications services, including call receiving, dispatch, and reports.

    1.2.4.   For purposes of this agreement, precinct/city services shall be considered required or optional in accordance with Exhibit A, except that hostage negotiation and bomb disposal may be provided by City deputies under the city department model described herein.

1.3.    <u>Administrative Services.</u> Administrative services include legal advisor, planning and statistics, subpoena control, training, weapons permits, accounting, payroll, personnel, labor relations, media relations, fleet control, radio maintenance, purchasing, records, inspections/internal investigations, and other services provided by other County Agencies in support of the KCSO. Such services do not include legal services of the King County Prosecuting Attorney relating to enforcement of municipal criminal and traffic codes or prosecutions arising thereunder.

    1.3.1.   For purposes of this agreement, administrative services shall be required, except as otherwise noted in Exhibit A, which is incorporated herein by reference.

2.    <u>City Department, Shared Supervision and Flexible Services Models.</u> Law enforcement services provided to the City under this agreement shall be available to the City under a city department model, a shared supervision model, or a flexible services model, provided that the City must select any service that is required in accordance with Exhibit A.

2.1.    <u>City Department Model.</u> Under the city department model, the level, degree and type of precinct/city services and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee.

    2.1.1.   Such positions shall be assigned to the City and shall be dedicated to work within the City limits, subject to responses to assist another jurisdiction or County police precinct according to mutually agreed-upon written criteria.

    2.1.2.   The number of such positions assigned to the City will remain constant. The City recognizes that the number of personnel may vary to the extent that positions are vacant or positions are filled but not available for assignment, including Phase I and Phase II recruits and personnel on long-term disability leave, vacation leave, sick leave or other leave. In accordance with Section 6.9, the transfer of personnel will be coordinated by the KCSO, in consultation with the City Chief Executive Officer or designee, to minimize the impact of potential vacancies.

    2.1.3.   Support and administrative services shall be provided to the City at the level, degree and type as provided by the County in unincorporated King County, except as otherwise modified by Section 6.3.

2.1.4.  Additional support services may be purchased by the City and assigned for the sole benefit of the City, provided they are optional services as defined in Exhibit A.

2.2.  **Shared Supervision Model.** Under the shared supervision model, the level, degree and type of precinct/city direct services (e.g., reactive patrol, precinct detectives, and City administrative sergeants) and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee. Precinct command and supervision shall be shared by the County and the City.

2.2.1.  Such precinct/city direct services positions shall be assigned to the City and shall work within the City limits, subject to responses to assist another jurisdiction or County police precinct according to mutually agreed-upon written criteria.

2.2.2.  The number of such positions assigned to the City will remain constant. The City recognizes that the number of personnel may vary to the extent that positions are vacant or positions are filled but not available for assignment, including Phase I and Phase II recruits and personnel on long-term disability leave, vacation leave, sick leave or other leave. In accordance with Section 6.9, the transfer of personnel will be coordinated by the KCSO, in consultation with the City Chief Executive Officer or designee, to minimize the impact of potential vacancies.

2.2.3.  Support and administrative services shall be provided to the City at the level, degree and type as provided by the County in unincorporated King County, except as otherwise modified by Section 6.3.

2.2.4.  Additional support services may be purchased by the City and assigned for the sole benefit of the City, provided they are optional services as defined in Exhibit A.

2.3.  **Flexible Services Model.** Under the flexible services model, base level law enforcement services will be provided to the City in proportion to the City's share of workload, unless the City enhances services as provided for herein or unless the City opts to provide its own precinct under Section 6.4.

2.3.1.  Positions designated to provide precinct/city services to the City shall be dedicated to work within the precinct in which the City is located, subject to responses to assist another jurisdiction or KCSO precinct according to mutually agreed-upon written criteria.

2.3.2.  Additional precinct/city services may be purchased at the discretion of the City and will be used in accordance with mutually agreed-upon protocols.

2.3.3.  Additional support services may be purchased by the City for the sole benefit of the City, with the exception of any support service that is required in accordance with Exhibit A.

3.  **City Law Enforcement Services.**

3.1.  **2000 City Law Enforcement Services.** Beginning January 1, 2000, the County agrees to provide to the City the level, degree and type of precinct/city and support services in accordance with Exhibit B, "Financial Exhibit" (Exhibit B), along with related administrative services.

3.2.  **Revisions to City Law Enforcement Services.** In 2001 and thereafter, revisions to City law enforcement services shall be made in accordance with Section 4.

4.  **Compensation.**

4.1.  **Development of Service Costs.** The County shall develop service costs for each precinct/city, support, and administrative service provided by the KCSO .

4.1.1.  Service costs shall include, but not be limited to, salary, benefits and special pays, if any, for personnel providing the service, along with any associated clothing allowance, quartermaster, overtime, supplies, services, telephone, motor pool, lease cars, systems services, insurance, equipment and associated administrative costs. If not already included, costs shall include

adjustments for cost-of-living and inflation.

4.1.2.  Service costs shall not include the cost of services that are required by state law, provided only within unincorporated King County, or supported by a dedicated revenue source, and services excluded from cost allocation at the discretion of the County. For the purpose of the agreement, such services and their associated administrative costs shall be considered non-chargeable.

4.1.3.  Service costs shall reflect the deduction of revenues.

4.2.  <u>Development of Unit Costs.</u> The County shall develop unit costs for each precinct/city and support service based on service costs developed in accordance with Section 4.1. Unit costs are listed in Exhibit A.

4.3.  <u>Calculation of City's Estimated Agreement Amount.</u> Service costs and unit costs shall be the basis for calculating the City's estimated agreement amount. The City shall be charged for services on the basis of FTE's (full-time equivalents) or workload billing factors as outlined in Exhibit A.

4.4.  <u>City's Estimated Agreement Amount.</u> The estimated agreement amount is shown in Exhibit B. The County agrees to revise this amount annually following the King County Council's adoption of the Annual County budget. The County will provide the City by March of the year for which the budget has been adopted a revised estimated agreement amount, if it is less than the amount shown in Exhibit B.

4.5.  <u>Mid-year Adjustment.</u> Mid-year supplemental appropriations requested by the City will be reflected as adjustments in the current year estimated agreement amount.

4.6.  <u>Billing.</u> The estimated agreement amount shall be billed monthly in 12 equal amounts. Payments shall be due within 30 days after invoicing by the County.

4.7.  <u>Revisions to City Law Enforcement Services and Agreement Amount.</u> Beginning in 2000, by September 1, or the first working day thereafter, the County shall provide the City with an estimate of the subsequent year's unit costs and service data in the form of a revised Exhibit A and an estimate of the City's agreement amount for the same level of service for the subsequent year in the form of a revised Exhibit B. By September 15, or the first working day thereafter, the City shall notify the County of any changes in service or model for the subsequent year. By October 5, or the first working day thereafter, the County shall provide the City with the estimated agreement amount for the subsequent year based on the changes in service requested by the City, along with revisions to Exhibit B.

4.8.  <u>Limit on Annual Growth for Selected Expenditures.</u> A cap on growth in charges shall be in place for the sum of the following group of items: quartermaster, supplies, services, telephones, capital, system services, printing, central county support services, insurance, and motor pool, except for vehicle purchase and fuel. The annual growth in the sum of these costs per FTE shall not exceed the growth in the previous July to June Urban Wage and Clerical Workers Index for greater Seattle. All other charges, including but not limited to any costs related to existing contractual obligations or labor contracts currently in negotiations, binding arbitration requirements, federal or state court mandates, federal or state law requirements, recommendations of the Oversight Committee that have a fiscal impact and are approved by the County, or any other costs determined by the full Oversight Committee to be beyond the County's control, shall not be subject to this cap.

4.9.  <u>Reports.</u> The City will receive a monthly Overtime, Salary, Special Pay and Benefits Report that will include current and year-to-date expenditures for overtime, salary, special pay, and benefits. The report will provide a comparison between the actual expenditures and budgeted amounts based on the adopted March Cost Book and exhibits for the previous calendar year. The City will also receive monthly vacancy reports.

4.10.  <u>Application.</u> The City hereby agrees to pay for discretionary overtime expenses separately. Only

dedicated police and dedicated support staff overtime, salary, special pay, and benefit costs are covered by this section.

4.10.1. The City agrees to pay for actual overtime, salary, special pay, and benefit costs.

4.10.2. If the City has a population of under 20,000 and exceeds its budgeted amount for overtime, special pay, salaries, and benefits by more than five percent, it will have the option to pay the amount exceeding five percent over the subsequent two years. At least 50 percent of the balance must be paid in the second year after the overage occurs. The City is responsible for paying the overage that does not exceed five percent in the first year.

4.10.3. Upon termination of an Interlocal Agreement between the City and the County, the City is obligated to pay all incurred overtime, special pay, salaries, and benefits overage costs by the termination date.

4.11.  Reconciliation. Annual adjustments will be made in March of each year in such a way that if the City has a positive balance at year-end of the previous calendar year, it will receive a credit, and if the City has a deficit, it will receive a debit in the subsequent monthly billing. All computations will be based on actual overtime, salary, special pay, and benefits costs.

4.12.  Computation. The cost formula shall be calculated by totaling the actual costs of overtime, salary, special pay, and benefits of the City and reconciling that figure to the City's budgeted amount. The annual adjustment process would occur as described in Section 4.11.

4.13.  Discretionary Overtime. It is the intent of the City and the KCSO to provide operational overtime when requested for special events, dignitary protection and unusual occurrences. Overtime, when requested in these categories, will be billable at the actual overtime rate of the deputy(s) working. Responses to events listed below are treated as if the event were occurring in any other jurisdiction, with the responsibility falling on that jurisdiction.

4.13.1. If the City requests and utilizes KCSO deputies on overtime for special events within the City, the actual deputy overtime expenditure will be billed to the City following the event. This billing will occur with the standard monthly billing, in accordance with Section 4.6. Examples include, but are not limited to, park patrol, parades, and community events.

4.13.2. If the City experiences a disaster or unusual occurrence that is confined within its boundaries and officer overtime is requested by the City Police Chief to stabilize the situation, the actual overtime expenditures will be billed only if disaster relief reimbursement funds are not approved. Examples of this include, but are not limited to, a plane crash, riot, or union strike.

4.13.3. In the case of a County, State, or National declared disaster for which overtime is required to manage the event, the overtime expense will be billed to the appropriate agency (e.g., FEMA). If reimbursement for overtime is not granted, then the City will be responsible for the direct overtime expense, less any mutual aid provided. Examples of this include, but are not limited to, flooding, windstorms, and sink holes.

4.13.4. In the event a dignitary requiring federal, state, or local protection visits a City, the City will determine if additional police response is needed. The City Chief Executive Officer, in consultation with the City Police Chief, will establish the level of service to be provided.

4.13.5. The KCSO Special Operations Section provides dignitary protection when the dignitary arrives in the County and assists in escorting the dignitary to the City. If the dignitary detail includes the US Secret Service, other Federal Government Agencies, or KCSO Special Operations, then the City is not responsible for expenses related to that detail. City expense is confined to meeting the City's established level of service for the dignitary visit, if overtime is incurred. Examples of dignitary protection services include, but are not limited to, traffic and crowd control related to visits from the Office of the President of the United States and foreign dignitaries.

**000056**

4.13.6. Billing Process: The City Police Chief will accumulate and code all special event overtime forms. The original form will be routed to payroll and a copy forwarded to the Contract Unit for billing preparation.

5. Decisions and Policy-Making Authorities. The County will provide the services identified in Exhibit B in accordance with the following:

5.1. Operational Decisions and Policy-Making Authorities. The respective authorities of the City and the County to make operational decisions and develop and implement policies shall be governed by the guidelines contained in Exhibit C, "Roles and Responsibilities of Contract Service Personnel" (Exhibit C).

5.2. City Police Chief. The City may designate a county officer assigned to the City to act in the capacity of the police chief, consistent with the guidelines contained in Exhibit C.

6. Special Provisions.

6.1. Use of Non-Sworn Personnel. The City and the County intend to increase the use of non-sworn personnel, and the parties agree that the following functions and positions, among others, can be considered by the Oversight Committee for civilianization: parking enforcement; warrant service; court liaison; crime scene technician; evidence transport; background investigations; records management; crime prevention; accident scene traffic director; missing children services; lost property services; vacation house checks; business watch; permitting; fingerprinting; abandoned vehicle tagging; park patrol; and prisoner transport.

6.2. City Purchases. As an alternative to using the County's routine supplies and equipment, the City may purchase routine supplies or purchase or lease any equipment for its own use, provided that prior written approval is obtained from the County and the equipment can be integrated into applicable County systems. Routine supplies and equipment include, but are not limited to, paper, copying machines, cellular telephones, and office furnishings. In the event the City has received County approval to purchase and/or lease any of these or similar items for its own use, the County will delete from the City's contract amount the full county charge for any items that otherwise would have been provided by the County. The County will not approve items it can provide at an equal or lower cost or that are not standard issue.

6.3. Hourly Charges for Optional Support Services. To the extent the City does not select one or more support services designated as optional, the County will not charge the City for those services. In the event that any of these services are deployed at the request of the City's Police Chief or his/her designee with the appropriate authority, the City agrees to pay the County for the service based on the hourly charges contained in Exhibit E, "Hourly Costs For Selected Services" (Exhibit E). The County intends to apply these charges to other jurisdictions, regardless of whether the jurisdiction has an agreement with the County for law enforcement services.

6.4. City Police Facility. A City that selects either a city or shared supervision model department may purchase or lease its own facility and provide for the operation and maintenance of said facility. The facility must meet or exceed all applicable city, state and federal codes and requirements. The facility must also adequately meet the space and security needs of permanently assigned KCSO personnel. The City will be responsible for all charges associated with the planning, design, construction, and/or renovation of the facility and property.

6.4.1. If the City provides a full-function police precinct as defined in Exhibit F, "Glossary of Terms" (Exhibit F) for all precinct personnel serving the city, the County will delete all applicable support, facilities, operation, and maintenance costs for city-assigned personnel. If the City provides city police facilities that otherwise meet the full definition of a police precinct but house fewer than all precinct personnel serving the city, the County agrees to negotiate on a case-by-case basis an equitable reduction of charges to the City. This reduction

**000057**

of charges to the City shall equal the contract charges for facilities, support, operations and maintenance for the personnel housed in the city facility. In all cases, plans and cost adjustment for city police precincts, support and operations must be negotiated and agreed upon in writing in advance, and payment for police services must remain current within 30 days of billing by the County.

6.5. **Use of City Facility by County.** There may be situations when the County needs to lease space for personnel serving unincorporated King County from the City. When this situation occurs, the County and the City may choose to negotiate for the use of a city facility on a case-by-case basis.

6.6. **Refund of Accrued Replacement Reserves.** If the City has reimbursed the County for the initial purchase of any equipment prior to this agreement, or if the City has purchased equipment under the provisions of Section 6.2, and if the City chooses to terminate this agreement, the County agrees to refund to the City any accrued replacement reserves, and any accrued market rate interest, on such equipment, including vehicles, and transfer ownership of such equipment from the County to the City.

6.7. **Exclusion of Replacement Charges for 800 MHz Radios.** If the City or County chooses to terminate this agreement, the County agrees to transfer ownership of that number of radios determined to have been purchased by the 800 MHz Levy from the County to the City. The City agrees to assume responsibility for any service costs associated with continued use of the radios on the regional 800 MHz radio system, including the cost of subscriber access, reprogramming, and maintenance. All other police 800 MHz radios used in the City will revert to County ownership. The cost of additional radios shall be borne by the City.

6.8. **Observation of Labor Negotiations.** The City may participate with other cities that contract with the County for law enforcement services to select no more than two representatives to observe labor negotiations between the County and the collective bargaining units representing the employees of the KCSO, provided that such observers adhere to rules established by the County and the bargaining units for the negotiations.

6.9. **Stabilization of Personnel.** The County will coordinate transfers to minimize the time positions are vacant, as well as the impact of vacancies to cities.

6.9.1. Deputies who have been with the City for less than 24 months will not be granted a lateral transfer except with the concurrence of the City Chief Executive Officer.

6.9.2. Timing and replacement of city-assigned staff who are promoted to a position outside the city will be managed with the concurrence of the City Chief Executive Officer.

6.10. **Assignment of Detectives.** At the request of the City and to the extent feasible, as determined by the KCSO in consultation with the City members of the Oversight Committee, the County shall assign to the precinct incorporating the City detectives from the KCSO Criminal Investigation Division, with the exception of detectives in the Major Crimes Unit of the division.

6.11. **Additional Training.** The City may provide training for City precinct detectives to perform criminal investigations for any optional criminal investigation services. The cost of any such training shall be borne by the City.

6.12. **Cost Effect of Service Decisions.** The City's costs shall not be raised as a result of another city's decision regarding the level or makeup of services. The County reserves the right to eliminate services to fulfill this provision.

6.13. **Requests for Support Services.** The City Police Chief or his/her designee shall have the authority to request any support service provided to the City. If such request is denied, the commander in charge of the support service shall review the decision and provide a report to the City Chief Executive Officer regarding the final determination.

6.14. **City Identification.** The City may select unique insignia and/or colors for uniforms and/or vehicles used by the deputies assigned to the City, provided that some form of the KCSO logo is retained on

the uniforms and vehicles. To the extent that the annual quartermaster allowance exceeds the costs of routine replacement of uniform items, the allowance shall be applied to the costs of adding the insignia to the uniforms or replacing the uniforms with alternative uniforms. Additional costs related to the uniforms shall be borne by the City. However, whenever an officer leaves the City, either at the initiative of the County or of the officer, within 24 months or less after the assignment to the City, and the cost of outfitting the replacement officer in the City exceeds the City's annual quartermaster allocation, then the City and the County shall split the cost equally. The uniforms will be pooled by the KCSO quartermaster and reissued to new or existing City deputies. The City will retain items that were specially purchased by the City (e.g., bicycle uniforms). Each City is allocated a quartermaster budget calculated by multiplying the number of dedicated sworn personnel by the quartermaster cost per FTE as calculated in the costing book each year. If, at the end of the year, the City goes over its allocated quartermaster budget due to the additional cost of City-specific uniform items, those additional costs will be billed in the following year.

6.15. <u>Start-up Costs.</u> The City agrees to reimburse the County for any and all personnel costs incurred toward hiring deputies in the year prior to their being assigned to the City.. These costs, further described in Section 4.1 herein, shall be added to the total costs billed for year the deputies are assigned to the city and paid by the City according to this agreement.

6.16. <u>Asset seizure.</u> The KCSO Drug Enforcement (DEU) and Vice Units shall be the seizing entities for any asset seizure and forfeiture investigations involving drug-related offenses in violation of the Uniform Controlled Substances Act (RCW 69.50.505), violations of the Legend Drug Act (RCW 69.41), violations of the Money Laundering Act (RCW 9A.83), and/or any additional criminal or civil seizure statutes that may be applicable currently or in the future related, initiated by the City within its jurisdiction, or other cases initiated pursuant to asset seizure laws and under this agreement.

   6.16.1. The terms of this agreement apply to seizures and forfeitures that result from investigations initiated by, or with significant participation by, the City, regardless of whether the City contracts for DEU or Vice services.

   6.16.2. Seizures and forfeitures not initiated by, and without significant participation by, the City, are not covered by this agreement, and the City will not be provided a share of any forfeited funds.

   6.16.3. If there is a dispute as to the City's share of any forfeited funds, the person in charge of the DEU or Vice Unit and the City Police Chief will meet to attempt to resolve the matter. If this process does not result in a mutually-agreed upon resolution, the dispute will be handled in accordance with Sections 16 and 17 of this agreement.

   6.16.4. The KCSO will be responsible for gathering the proceeds from all relevant sales, for accounting for all seizures and forfeitures in conjunction with the personal and real property encompassed under the agreement, for submitting the 10 percent to the State of Washington in accordance with RCW 69.50.505 or making any other mandatory disbursement under the applicable statutes, and for distributing the remaining funds -- in equal shares -- to the parties. This distribution of remaining funds will occur after the KCSO has deducted any and all costs incurred related to the seizure and forfeiture. The final accounting of the seizure and distribution of funds will accompany the check the County writes to the City.

   6.16.5. Any properties, real or personal, forfeited to the KCSO pursuant to this agreement will be sold in accordance with RCW 69.50.505.

   6.16.6. Any funds distributed to the City will be used in accordance with RCW 69.50.505(i). By signing this agreement, the City acknowledges that it is solely responsible for familiarizing itself with the authorized use of forfeited funds as stated in the applicable RCW Chapter. If the City uses forfeited funds in a manner contrary to the seizure statutes, the County may terminate the asset forfeiture provisions of this agreement with 24 hours notice.

**000059**

6.16.7. The KCSO DEU has sole discretion over the manner in which cases will proceed, including the discretion to settle or dismiss a case if deemed appropriate, and whether assets forfeited will be sold or put into service.

6.16.8. Any and all property seized by and forfeited to the KCSO Drug Enforcement or Vice Unit, whether by order of the court, or accepted in settlement in conjunction with this agreement, will be divided in the same manner as indicated above.

6.16.9. The parties agree and acknowledge that the attorney assigned to the KCSO DEU does not have an attorney-client relationship with the City. If such an attorney-client relationship exists, it exists only between the KCSO and the attorney assigned to the KCSO Drug Enforcement Unit.

6.17. Business Plan Development (Strategic Plan): The KCSO will develop a multi-year police services business plan that includes the City in the process. This process would identify KCSO initiatives in advance of the budget year. The goals would be:
- Document the long-term vision for the KCSO (3 to 5 year time frame); departmental mission and core business(s).
- Identify strategic goals for accomplishing the vision; be action oriented with a strong emphasis on achieving practical outcomes.
- Identify how customers will be served consistent with the vision and with limited financial resources.
- Provide objectives, including performance measures, where available, that can be evaluated in the future.

6.18. Computers

6.18.1. The KCSO will provide a laptop and appropriate accessories or a desktop computer to every dedicated and flex sworn FTE purchased by the City.

6.18.2. The KCSO Computer Resources Unit will be responsible for the repair and maintenance of all equipment, software, and accessories that are used in conjunction with the mobile computing program.

6.18.3. Replacement computers will be furnished via the Computer Replacement Fund, approximately every three years. The City will be charged a monthly replacement fee based on the number of computers in the City. This annual cost will appear as a separate line in Exhibit B. If the City bought its own computers, it will receive the unspent balance of the replacement funds should the agreement be terminated.

6.18.4. Annually, the County will estimate the purchase price of replacement hardware, software, accessories and tax. The monthly computer replacement cost will be calculated on a useful life of three years.

6.19. Fire Investigation

6.19.1. For the year 2000, the City may purchase fire investigation services through this agreement. These services will be provided by the King County Department of Development and Environmental Services (DDES) Fire Marshall's Office by separate agreement with the KCSO. The cost for this service is shown on Exhibit B, and will be calculated in accordance with Exhibit G: "Arson Investigation Costing Model". Fire Investigation callouts will be in accordance with protocols outlined in Exhibit H: "Arson Investigation Call Out Protocols", unless superseded by new or revised protocols adopted by the Oversight Committee, DDES and affected fire agencies.

6.19.2. During the year 2000, the Oversight Committee will sponsor a series of discussions, to include the KCSO, DDES, the King County Executive, contract cities, Fire Agencies, and other cities receiving DDES Fire Investigation Services. The KCSO, in conjunction with

DDES, fire agencies and the cities will be responsible for developing a work plan for Oversight Committee approval. The purpose of this work plan will be to identify options for the long-term provision of fire investigation services to city customers. The work plan may consider the following issues: call-out protocols, costing methods, service delivery and organizational issues. The intent of these parties is that the Oversight Committee will make a recommendation for future service delivery by October 31, 2000.

6.19.3. Day-to-day fire investigation operational issues will be handled at the lowest practical organizational level. This may typically include staff from the city police, fire agencies and DDES.

6.20. Police Investigations Information. The KCSO Major Accident Response and Reconstruction Unit (MARR) and other police investigative services under this agreement shall include providing the City access to all records related to investigations of traffic collisions within the City, upon request, as the records are completed or become available, including but not limited to State Traffic Collision Reports, photographs, diagrams, witness statements and victim(s) statements in the possession of the KCSO. Distribution of toxicology reports and autopsy reports will be controlled by RCW 46.52.065 and 68.50.105. If victims or witnesses identified in any police report or statement have not been interviewed by County personnel, City representatives will coordinate their interviews of these persons with the KCSO prior to contact to avoid prejudice to ongoing criminal investigations, including discussion of scope, timing and value of joint interviews. The KCSO and the City will name representatives to implement this section.

7. Reporting.

7.1. Reporting Districts. Reporting districts coterminous with the City boundaries will be maintained to enable accurate data collection on law enforcement services provided and criminal activity.

7.2. Notification of Criminal Activity. The City Police Chief, if designated, or the precinct commander will notify the City in the event of a significant criminal occurrence within the City.

7.3. Quarterly Reports. The County will report quarterly on criminal activity and on law enforcement services provided by major category of service as listed in Exhibit B.

8. Personnel and Equipment. The County is acting hereunder as an independent contractor so that:

8.1. Control of Personnel. Control of personnel, standards of performance, discipline and all other aspects of performance shall be governed entirely by the County. Allegations of misconduct shall be investigated in accordance with Exhibit D, "Internal Investigations Protocol for Contract Cities" (Exhibit D).

8.2. Status of Employees. All persons rendering service hereunder shall be for all purposes employees of the County, except that the City may hire non-commissioned City employees to perform certain functions in conjunction with County police personnel.

8.3. Liabilities. All liabilities for salaries, wages, any other compensation, injury, sickness or liability to the public for negligent acts or omissions arising from performance of the law enforcement services by the County hereunder shall be that of the County.

8.4. Provision of Personnel. The County shall furnish all personnel and such resources and material deemed by the County as necessary to provide the level of law enforcement service herein described.

8.5. Municipal Violations. KCSO commissioned personnel shall cite violations of municipal ordinances into the City's municipal court.

9. City Responsibilities. In support of the County providing the services described in Exhibit B, the City promises the following.

9.1. Municipal Police Authority. The City promises to confer municipal police authority on such County deputies as might be engaged hereunder in enforcing City ordinances within City boundaries, for the

**000061**

purposes of carrying out this agreement.

9.2.    Municipal Criminal Code. The City promises to adopt a criminal municipal code that incorporates, at a minimum, any portion of the Washington State criminal code defining a crime or crimes, which falls within the jurisdiction of the district or municipal court. This includes all misdemeanors and gross misdemeanors. Provided, that if the City fails to adopt, chooses not to adopt, or repeals such criminal municipal code, the City shall be responsible for reimbursing the County for all expenses associated with prosecution, adjudication, sentencing, and incarceration in any criminal case involving a crime that could have been included within a City municipal code.

9.3.    Special Supplies. The City promises to supply at its own cost and expense any special supplies, stationary, notices, forms, and the like where such must be issued in the name of the City.

10. Duration. This agreement is effective upon authorization and signature by both parties, except that services and charges shall commence on January 1, 2000. The agreement period shall continue until December 31, 2002, and may be extended until December 31, 2004 by consensus of the Oversight Committee. After the original or extended agreement period has elapsed, the agreement shall renew automatically from year to year unless negotiations for a new contract are initiated by the Oversight Committee, those negotiations are completed and a new contract is adopted, or unless either party initiates the termination process outlined herein.

11. Termination Process. Either party may initiate a process to terminate this agreement as follows:

11.1.    Notice of Termination. The City may choose at some future time to provide law enforcement services other than through the County; similarly, the County may choose at some future time not to provide law enforcement services to the City. Any party wishing to terminate the agreement shall issue a written notice of intent not less than 45 days prior to issuing an 18-month written notice under section 11.2 of this agreement. Upon receipt of the written notice of intent, the City's Chief Executive Officer and the Sheriff shall hold a meeting, the purpose of which will be to understand the notice of intent including background of the reason(s), and a review of alternatives and impacts, among other matters. It is suggested that the Chair of the Oversight Committee be copied on any communication covered in this Section.

11.2.    Written Notice. After the 45-day period has run under Section 11.1 of this agreement, the party desiring to terminate the agreement shall provide at least 18 months written notice to the other party.

11.3.    Transition Plan. Within 120 days of the receipt of such written termination notice, the parties shall commence work on and complete a mutually agreed-upon transition plan providing for an orderly transition of responsibilities from the County to the City. The planning method should proceed along the lines of a project management approach to facilitate the joint planning process by the City and the County. The overarching goal of the transition plan will be to ensure there is not disruption in service to the community as the providers change. This plan would include desired outcomes, project phases (including a preliminary transition plan development) and timelines, and project roles and responsibilities. Each party shall bear its respective costs in developing the transition plan and each will work cooperatively with the other party in the coordination of efforts. The transition plan shall identify and address the continuity of professional and quality police services before, during and through the transition period. The transition plan shall also identify and address any personnel, capital equipment, workload and any other issues related to the transition. Each party shall bear its respective costs in developing the transition plan.

11.4.    Termination and/or Interest Charge. In the event the City fails to make a monthly payment within 60 days of billing, the County may charge an interest rate within two percentage points of the interest rate on the monthly County investment earnings. In addition, in the event the City fails to make a monthly payment within 120 days of billing, the County may terminate this agreement with 90 days written notice.

**000062**

11.4.1. If the City and County are in disagreement over a portion of the bill, the City can withhold the disputed portion of the bill by placing the amount in escrow and following the process outlined in Section 16.3 for resolution of agreement dispute issues.

11.4.2. The County will not charge interest on the disputed portion of the bill nor will it begin the termination process as outlined in section 11.4 so long as the City follows the process outlined in 11.4.1 and pays the non-disputed portion of the bill within 60 days of billing.

12. Indemnification.

12.1. City Held Harmless. The County shall indemnify and hold harmless the City and its officers, agents, and employees, or any of them from any and all claims, actions, suits, liability, loss, costs, expenses, and damages of any nature whatsoever, by any reason of or arising out of any negligent act or omission of the County, its officers, agents, and employees, or any of them relating to or arising out of performing services pursuant to this agreement. In the event that any such suit based upon such a claim, action, loss, or damages is brought against the City, the County shall defend the same at its sole cost and expense; provided that the City reserves the right to participate in said suit if any principle of governmental or public law is involved; and if final judgment in said suit be rendered against the City, and its officers, agents, and employees, or any of them, or jointly against the City and the County and their respective officers, agents, and employees, or any of them, the County shall satisfy the same.

12.2. County Held Harmless. The City shall indemnify and hold harmless the County and its officers, agents, and employees, or any of them from any and all claims, actions, suits, liability, loss, costs, expenses, and damages of any nature whatsoever, by any reason of or arising out of any negligent act or omission of the City, its officers, agents, and employees, or any of them relating to or arising out of performing services pursuant to this agreement. In the event that any suit based upon such a claim, action, loss, or damages is brought against the County, the City shall defend the same at its sole cost and expense; provided that the County reserves the right to participate in said suit if any principle of governmental or public law is involved; and if final judgment be rendered against the County, and its officers, agents, and employees, or any of them, or jointly against the County and the City and their respective officers, agents, and employees, or any of them, the City shall satisfy the same.

12.3. Liability Related to City Ordinances, Policies, Rules and Regulations. In executing this agreement, the County does not assume liability or responsibility for or in any way release the City from any liability or responsibility which arises in whole or in part from the existence or effect of City ordinances, policies, rules or regulations. If any cause, claim, suit, action or administrative proceeding is commenced in which the enforceability and/or validity of any such City ordinance, policy, rule or regulation is at issue, the City shall defend the same at its sole expense and, if judgment is entered or damages are awarded against the City, the County, or both, the City shall satisfy the same, including all chargeable costs and reasonable attorney's fees.

12.4. Waiver Under Washington Industrial Insurance Act. The foregoing indemnity is specifically intended to constitute a waiver of each party's immunity under Washington's Industrial Insurance Act, Chapter 51 RCW, as respects the other party only, and only to the extent necessary to provide the indemnified party with a full and complete indemnity of claims made by the indemnitor's employees. The parties acknowledge that these provisions were specifically negotiated and agreed upon by them.

13. Non-discrimination. The County and the City certify that they are Equal Opportunity Employers. The County has developed and implemented Affirmative Action Programs in accordance with the guidelines in Revised Order 4 of the United States Department of Labor. The City will develop and implement Affirmative Action Programs that meet the applicable federal standards.

14. Audits and Inspections. The records and documents with respect to all matters covered by this agreement shall be subject to inspection, review or audit by the County or City during the term of this agreement and three (3) years after termination.

**000063**

15. Amendments. This agreement may be amended at any time by mutual written agreement of the City, the King County Sheriff, and the King County Executive, provided that any such amendment must be approved by the Oversight Committee pursuant to section 17.2.4 of this agreement.

16. Agreement Administration.

16.1. Agreement Administrators. The City Chief Executive Officer and the City Police Chief, if designated, or the precinct commander shall serve as agreement administrators to review agreement performance and resolve operational problems. The agreement administrators will meet at least quarterly with either party authorized to call additional meetings with ten days written notice to the other.

16.2. Referral of Unresolved Problems. The City Chief Executive Officer shall refer any police service operational problem, which cannot be resolved, to the King County Sheriff. The Sheriff and City Chief Executive Officer shall meet as necessary to resolve such issues. Unresolved problems shall be referred to the Oversight Committee.

16.3. Agreement Dispute Issues. Agreement dispute issues involving agreement language interpretation, cost, and other non-operational matters shall be referred to the Sheriff, the Chair of the Oversight Committee, the King County Executive's representative to the Oversight Committee, and the affected party or parties to review and resolve. In the event that the dispute involves the city of the Oversight Committee Chair, the Oversight Committee will designate an alternate City Chief Executive Officer to serve as Chair of the Oversight Committee for the purpose of resolving the specific issue. Any unresolved problems shall be referred to the Oversight Committee as a whole.

17. Agreement Oversight.

17.1. Oversight Committee. The City and the County agree to establish an Oversight Committee consisting of the chief executive officers, or their designees, of the cities that contract with the County for law enforcement services, the King County Sheriff, one person designated by the County Executive, and one person designated by the chair of the King County Council's Law, Justice and Human Services Committee, or its successor.

17.2. Scope of Committee. The committee shall meet at least bi-monthly to ensure the parties comply with the provisions of this agreement, including the administration of the agreement and the management and delivery of police services under the agreement.

17.2.1. In addition, the committee shall establish performance measurements, standards, and benchmarks for evaluating the quality of the County's police services. These performance measures shall be developed in cooperation with the Cities that contract for police services. Focus of these measures shall be based on outcome measurements for effectiveness and efficiency as identified by the City Chief Executives and the Sheriff. The County shall work with the City, if desired, to develop a range of options by July 2000, or a later mutually agreed-upon date.

17.2.2. The City's member of the Oversight Committee may make recommendations on any issue affecting agreement costs and conditions, such as the budget for the KCSO, personnel recruitment, training and standards, and collective bargaining issues. These recommendations may reflect approval or disapproval of any County proposal relating to these issues and shall be submitted to the County Executive, County Council, and/or City Council as appropriate. The County shall provide a written report on the outcome of these recommendations.

17.2.3. If an operational problem or agreement dispute is referred to the Oversight Committee pursuant to sections 16.2 or 16.3 of this agreement, the Oversight Committee will meet and attempt to resolve the problem or dispute. If the Oversight Committee is unable to resolve the problem or dispute, this agreement shall be construed in accordance with the laws of the State of Washington.

**000064**

17.2.4.  The Oversight Committee is responsible for approving amendments to this agreement, which are first agreed to by the City, the King County Sheriff, and the King County Executive. A majority of a quorum of the Oversight Committee will constitute approval of a proposed amendment.

18.  <u>Entire Agreement/Waiver of Default.</u> The parties agree that this agreement is the complete expression of the terms hereto and any oral or written representations or understandings not incorporated herein are excluded. Both parties recognize that time is of the essence in the performance of the provisions of this agreement. Waiver of any default shall not be deemed to be a waiver of any subsequent default. Waiver or breach of any provision of the agreement shall not be deemed to be waiver of any other or subsequent breach and shall not be construed to be a modification of the terms of the agreement unless stated to be such through written approval by the County, which shall be attached to the original agreement.

IN WITNESS WHEREOF, the parties have executed this agreement.

KING COUNTY                                                      City of Shoreline

_____                    _____
King County Executive                                           Robert Deis, Chief Executive Officer

Approved as to Form                                              Approved as to Form

_____                    _____
Deputy Prosecuting Attorney                                  Ian Sievers, City Attorney
for NORM MALENG
King County Prosecuting Attorney

**000065**                                                              - 14 -

# PLACEHOLDER

for

## KING COUNTY SHERIFF'S OFFICE
## SERVICE NOTEBOOK

## 2000 PROPOSED – RED BOOK

## 2000 ADOPTED – CORAL BOOK

# King County Sheriff's Office

## 1998 DCFS

| 1998 DCFS | Total DCFS | % Precinct | % Precinct Flex | % Total |
|---|---|---|---|---|
| **Precinct Two (Patrol Districts)** | 46,930 | 100.00% | 100.00% | 34.75% |
| Carnation (R18) | 302 | 0.64% | 1.45% | 0.22% |
| Kenmore (E1-E5 was B1-B2) | 3,447 | 7.34% | 16.52% | 2.55% |
| North Bend (D1) | 1,720 | 3.67% | 0.00% | 1.27% |
| Sammamish (O1-O4 was C3-C5) | 4,045 | 8.62% | 19.38% | 2.99% |
| Shoreline (A1-A6) | 13,560 | 28.89% | 19.38% | 10.04% |
| Skykomish (W7) | 16 | 0.03% | 0.00% | 0.01% |
| Woodinville (W1) | 3,629 | 7.73% | 8.69% | 2.69% |
| Unincorporated Eastside | 8,948 | 19.07% | 8.69% | 6.62% |
| Unincorporated Westside | 11,263 | 24.00% | 53.96% | 8.34% |
| **Precinct Three (Patrol Districts)** | 43,889 | 100.00% | 100.00% | 32.49% |
| Beaux Arts Village (R11) | 44 | 0.10% | 0.10% | 0.03% |
| Covington (H3) | 3,793 | 8.64% | 8.64% | 2.81% |
| Maple Valley (H1) | 3,104 | 7.07% | 7.07% | 2.30% |
| Newcastle (H2) | 1,600 | 3.65% | 3.65% | 1.18% |
| Unincorporated | 35,348 | 80.54% | 80.54% | 26.17% |
| **Precinct Four (Patrol Districts)** | 44,246 | 100.00% | 100.00% | 32.76% |
| Burien (N1-N6) | 12,934 | 29.23% | 33.00% | 9.58% |
| SeaTac (L1-L4) | 11,881 | 26.85% | 30.37% | 8.80% |
| Vashon (V1) | 367 | 0.83% | 0.00% | 0.27% |
| Unincorporated Flex | 14,312 | 32.35% | 36.58% | 10.60% |
| Unincorporated | 19,431 | 43.92% | | |

## 1998 Workload and Staffing

### 1998 DCFS

| Precinct Two Patrol District | DCFS | Precinct Three Patrol District | DCFS | Precinct Four Patrol District | DCFS |
|---|---|---|---|---|---|
| A1 | 1,350 | F1 | 2,207 | K1 | 5,607 |
| A2 | 1,984 | F2 | 3,390 | K2 | 3,250 |
| A3 | 3,318 | F3 | 4,315 | K6 | 214 |
| A4 | 2,616 | F4 | 5,145 | K7 | 4,389 |
| A5 | 1,566 | F5 | 4,892 | K8 | 4,752 |
| A6 | 2,726 | F6 | 1,324 | K9 | 72 |
| A7 | 1,216 | F7 | 1,655 | K11 | 580 |
| B1 | 1,440 | F8 | 3,325 | L1 | 2,072 |
| B2 | 1,133 | F9 | 2,078 | L2 | 2,279 |
| B3 | 1,595 | F99 | 8 | L3 | 2,936 |
| B4 | 1,958 | G1 | 503 | L4 | 4,594 |
| B5 | 2,894 | G2 | 94 | N1 | 2,760 |
| B6 | 1,406 | G3 | 780 | N2 | 2,321 |
| B7 | 833 | G4 | 152 | N3 | 3,291 |
| B8 | 1,440 | G5 | 2,335 | N4 | 2,626 |
| C1 | 1,892 | G6 | 1,699 | N5 | 1,956 |
| C2 | 1,452 | G7 | 917 | V1 | 367 |
| C22 | 1 | H1 | 3,393 | | |
| C3 | 1,683 | H2 | 1,600 | | |
| C4 | 1,843 | H3 | 4,033 | | |
| C5 | 2,445 | R11 | 44 | | |
| C6 | 1,178 | | | | |
| C7 | 885 | | | | |
| C9 | 174 | | | | |
| D1 | 1,720 | | | | |
| E1 | 323 | | | | |
| E2 | 301 | | | | |
| E3 | 824 | | | | |
| E4 | 131 | | | | |
| E5 | 636 | | | | |
| R18 | 302 | | | | |
| W1 | 3,629 | | | | |
| W7 | 16 | | | | |
| **Total** | 46,930 | **Total** | 43,889 | **Total** | 44,246 |
| | | | | **KCSO Total** | 135,065 |

2000 EXHIBITS.xls

05/17/00

**000067**

## King County Sheriff's Office

| Precinct Two (Patrol District) | Part 1 Crimes | Part 2 Crimes | % Part 1 Crimes | Total Crimes | % Total Crimes |
|---|---|---|---|---|---|
| | 6,945 | 7,250 | 31.28% | 14,195 | 31.52% |
| Carnation (R18) | 78 | 124 | 0.35% | 202 | 0.45% |
| Kenmore (E1-E5 was B1-B2) | 691 | 721 | 3.11% | 1,412 | 3.14% |
| North Bend (D1) | 331 | 311 | 1.45% | 632 | 1.40% |
| Sammamish (O1-O4 was C3-C5) | 471 | 462 | 2.12% | 934 | 2.07% |
| Shoreline (A1-A6) | 2,117 | 2,227 | 9.54% | 4,344 | 9.65% |
| Skykomish (W7) | 7 | 8 | 0.03% | 15 | 0.03% |
| Woodinville (W1) | 550 | 446 | 2.48% | 996 | 2.21% |
| Unincorporated | 2,710 | 2,951 | 12.21% | 5,660 | 12.57% |
| **Precinct Three (Patrol District)** | **7,304** | **7,837** | **32.90%** | **15,141** | **33.62%** |
| Beaux Arts Village (R11) | 7 | 6 | 0.03% | 13 | 0.03% |
| Covington (H3) | 694 | 658 | 3.13% | 1,352 | 3.00% |
| Maple Valley (H1) | 487 | 579 | 2.19% | 1,066 | 2.37% |
| Newcastle (H2) | 228 | 372 | 1.03% | 600 | 1.33% |
| Unincorporated | 5,888 | 6,222 | 26.52% | 12,110 | 26.89% |
| **Precinct Four (Patrol District)** | **7,951** | **7,743** | **35.82%** | **15,694** | **34.85%** |
| Burien (N1-N6) | 2,395 | 2,377 | 10.79% | 4,772 | 10.60% |
| SeaTac (L1-L4) | 2,109 | 1,872 | 9.50% | 3,981 | 8.84% |
| Skyway (K8) | 738 | 731 | 3.32% | 1,469 | 3.26% |
| Unincorporated | 2,709 | 2,063 | 12.20% | 5,472 | 12.15% |
| **COUNTY TOTAL** | **22,200** | **22,830** | **100.00%** | **45,030** | **100.00%** |

## 1998 Workload and Staffing

### Precinct Two

| Patrol District | Part 1 Crimes | Part 2 Crimes |
|---|---|---|
| A1 | 142 | 215 |
| A2 | 324 | 266 |
| A3 | 580 | 528 |
| A4 | 465 | 502 |
| A5 | 248 | 231 |
| A6 | 538 | 485 |
| A7 | 177 | 179 |
| B1 | 367 | 315 |
| B2 | 156 | 215 |
| B3 | 132 | 176 |
| B4 | 286 | 349 |
| B5 | 417 | 498 |
| B6 | 137 | 224 |
| B7 | 92 | 111 |
| B8 | 166 | 199 |
| C1 | 439 | 408 |
| C2 | 209 | 224 |
| C22 | 3 | 2 |
| C3 | 205 | 211 |
| C5 | 295 | 310 |
| C6 | 115 | 156 |
| C7 | 82 | 152 |
| C9 | 233 | 55 |
| D1 | 321 | 311 |
| E1 | 23 | 32 |
| E2 | 24 | 44 |
| E3 | 81 | 55 |
| E4 | 11 | 11 |
| E5 | 29 | 49 |
| R18 | 78 | 124 |
| W1 | 550 | 446 |
| W7 | 7 | 8 |
| **Total** | **6,945** | **7,250** |

Total: 14,195

### Precinct Three

| Patrol District | Part 1 Crimes | Part 2 Crimes |
|---|---|---|
| F1 | 343 | 251 |
| F2 | 528 | 574 |
| F3 | 793 | 734 |
| F4 | 1,002 | 1,263 |
| F5 | 812 | 905 |
| F6 | 193 | 282 |
| F7 | 238 | 294 |
| F8 | 654 | 547 |
| F9 | 278 | 418 |
| F99 | 7 | 3 |
| G1 | 100 | 60 |
| G2 | 17 | 18 |
| G3 | 124 | 121 |
| G4 | 27 | 21 |
| G5 | 389 | 365 |
| G6 | 245 | 223 |
| G7 | 138 | 123 |
| H1 | 487 | 579 |
| H2 | 228 | 372 |
| H3 | 694 | 658 |
| R11 | 7 | 6 |
| **Total** | **7,304** | **7,837** |

Total: 15,141

### Precinct Four

| Patrol District | Part 1 Crimes | Part 2 Crimes |
|---|---|---|
| K1 | 860 | 815 |
| K11 | 123 | 112 |
| K2 | 497 | 577 |
| K6 | 61 | 25 |
| K7 | 788 | 804 |
| K8 | 738 | 731 |
| K9 | 7 | 3 |
| L1 | 366 | 345 |
| L2 | 439 | 372 |
| L3 | 588 | 450 |
| L4 | 716 | 705 |
| N1 | 387 | 477 |
| N2 | 447 | 404 |
| N3 | 396 | 569 |
| N4 | 492 | 592 |
| N5 | 473 | 335 |
| N6 | 58 | 50 |
| V1 | 315 | 377 |
| **Total** | **7,951** | **7,743** |

Total: 15,694

**000068**

# King County Sheriff's Office

## 1998 Workload and Staffing

### 1999 Precinct Staff Allocation

| 1999 Precinct Staff Allocation | Precinct 2 | Precinct 3 | Precinct 4 | Shoreline | Totals | P2% | P3% | P4% | Shoreline | Tot% |
|---|---|---|---|---|---|---|---|---|---|---|
| Major | 1 | 1 | 1 | 1 | 4 | 25.0% | 25.0% | 25.0% | 25.0% | 100.0% |
| Captain - City Chief | 1 | 0 | 1 | 0 | 2 | 50.0% | 0.0% | 50.0% | 0.0% | 100.0% |
| Captain - Precinct Ops | 2 | 2 | 2 | 1 | 7 | 28.6% | 28.6% | 28.6% | 14.3% | 100.0% |
| CPOs Flex | 0 | 0 | 0 | 0 | 0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| CPOs City (storefront deputies) | 1 | 0 | 0 | 2 | 3 | 33.3% | 0.0% | 0.0% | 66.7% | 100.0% |
| CPOs County (storefront deputies) | 4 | 3 | 4 | 0 | 11 | 36.4% | 27.3% | 36.4% | 0.0% | 100.0% |
| Crime Analysis | 1 | 1 | 1 | 0 | 3 | 33.3% | 33.3% | 33.3% | 0.0% | 100.0% |
| Crime Prevention | 0 | 1 | 1 | 0 | 2 | 0.0% | 50.0% | 50.0% | 0.0% | 100.0% |
| DARE | 0 | 0 | 1 | 0 | 1 | 0.0% | 0.0% | 100.0% | 0.0% | 100.0% |
| Detectives | 7 | 8 | 10 | 3 | 28 | 25.0% | 28.6% | 35.7% | 10.7% | 100.0% |
| Detective Sergeants | 1 | 1 | 1 | 1 | 4 | 25.0% | 25.0% | 25.0% | 25.0% | 100.0% |
| Proactive/Emphasis Team | 4 | 6 | 10 | 4 | 24 | 16.7% | 25.0% | 41.7% | 16.7% | 100.0% |
| Proactive/COP Sgts. | 0 | 2 | 1 | 0 | 3 | 0.0% | 66.7% | 33.3% | 0.0% | 100.0% |
| HUD Funded Deputies | 1 | 0 | 2 | 0 | 3 | 33.3% | 0.0% | 66.7% | 0.0% | 100.0% |
| School Officer | 0 | 0 | 2 | 3 | 5 | 0.0% | 0.0% | 0.0% | 60.0% | 100.0% |
| Traffic/Motorcycle | 1.5 | 1.5 | 2 | 0 | 5 | 30.0% | 0.0% | 0.0% | 0.0% | 100.0% |
| Anti-Crime Deputies | 0 | 0 | 5 | 0 | 5 | 0.0% | 0.0% | 0.0% | 0.0% | 100.0% |
| Admin. Sergeant | 1 | 2 | 0 | 0 | 3 | 33.3% | 66.7% | 0.0% | 0.0% | 100.0% |
| Patrol Sergeants City | 4 | 3 | 3 | 0 | 10 | 10.3% | 7.7% | 7.7% | 0.0% | 25.6% |
| Patrol Sergeants County only | 3.5 | 3 | 1 | 6 | 13.5 | 9.0% | 7.7% | 2.6% | 15.4% | 19.2% |
| Patrol Sergeants Flex | 5.5 | 5 | 5 | 0 | 15.5 | 14.1% | 12.8% | 12.8% | 0.0% | 47.4% |
| Patrol Sergeants Total | 13 | 11 | 9 | 6 | 39 | 33.3% | 28.2% | 23.1% | 15.4% | 100.0% |
| Patrol Deputies City | 36 | 22 | 45 | 23 | 126 | 12.6% | 7.7% | 15.7% | 8.0% | 44.1% |
| Patrol Deputies County only | 19 | 24 | 18 | 0 | 61 | 6.6% | 8.4% | 6.3% | 0.0% | 21.3% |
| Patrol Deputies Flex | 26 | 48 | 25 | 0 | 99 | 9.1% | 16.8% | 8.7% | 0.0% | 34.6% |
| Patrol Deputies Total | 81 | 94 | 88 | 23 | 286 | 28.3% | 32.9% | 30.8% | 8.0% | 100.0% |
| Precinct Sworn Total | 118.5 | 129.5 | 138 | 44 | 430 | 27.6% | 30.1% | 32.1% | 10.2% | 100.0% |
| COSs City | 0 | 0.5 | 2 | 1 | 3.5 | 0.0% | 14.3% | 57.1% | 28.6% | 100.0% |
| COSs Flex | 0 | 1 | 3 | 0 | 4 | 0.0% | 25.0% | 75.0% | 0.0% | 100.0% |
| Clerical - City | 0 | 0 | 0 | 1 | 1 | 0.0% | 0.0% | 0.0% | 100.0% | 100.0% |
| Clerical - County | 4 | 4 | 5 | 0 | 13 | 30.8% | 30.8% | 38.5% | 0.0% | 100.0% |
| Evidence Tech | 1 | 1 | 1 | 0 | 3 | 33.3% | 33.3% | 33.3% | 0.0% | 100.0% |
| Precinct Staff Total | 123.5 | 136 | 149 | 46 | 454.5 | 27.2% | 29.9% | 32.8% | 10.1% | 100.0% |

2000 EXHIBITS.xls

000069

# King County Sheriff's Office

## 1998 Workload and Staffing

Exhibit A, Part 3

Precinct Detectives' 1998 Workload

| Precinct Two & Five | Detective Cases | % Precinct Cases |
|---|---|---|
| Carnation | 1352 | 100.00% |
| Kenmore | 8 | 0.59% |
| North Bend | 144 | 10.65% |
| Sammamish | 27 | 2.00% |
| Shoreline | 93 | 6.88% |
| Skykomish | 560 | 41.42% |
| Woodinville | 0 | 0.00% |
| Unincorporated | 93 | 6.88% |
| | 427 | 31.58% |

| Precinct Three | Detective Cases | % Precinct Cases |
|---|---|---|
| Beaux Arts Village | 1139 | 100.00% |
| Covington | 1 | 0.09% |
| Maple Valley | 158 | 13.87% |
| Newcastle | 127 | 11.15% |
| Unincorporated | 42 | 3.69% |
| | 811 | 71.20% |

| Precinct Four | Detective Cases | % Precinct Cases |
|---|---|---|
| Burien | 1450 | 100.00% |
| SeaTac | 465 | 32.07% |
| Unincorporated | 409 | 28.21% |
| | 576 | 39.72% |

# King County Sheriff's Office

## 1998 Workload and Staffing

Exhibit A, Part 3

### 1996 Workload Indicators

| | Beaux Arts | Burien | Covington | Federal Way | Kenmore | Maple Valley | North Bend | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0 | 145 | 17 | 0 | 23 | 16 | 14 | 175 | 78 | - | 11 | 0 | 808 | 1,287 |
| Bomb Disposal Incidents | 0 | 10 | 8 | - | 4 | 1 | 2 | 1 | 15 | - | 4 | 19 | 94 | 182 |
| Canine Details | 0 | 211 | 6 | 308 | 130 | 29 | 14 | 224 | 197 | - | 82 | 0 | 1,138 | 2,339 |
| FPOC Caseload | 0 | 22 | 41 | 24 | 73 | 18 | 21 | 8 | 276 | - | 98 | 83 | 1,339 | 1,938 |
| Hostage Negotiation Incidents | 0 | 1 | 0 | 0 | 1 | 1 | 0 | 3 | 1 | - | 0 | 3 | 9 | 17 |
| Tactical Unit Incidents | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 3 | 1 | - | 0 | 3 | 4 | 12 |
| Vice Unit Arrests | 0 | 0 | 0 | 2 | 0 | 0 | 0 | 0 | 0 | - | 0 | 0 | 33 | 35 |
| Licensed Gambling Establishments | 0 | 18 | 0 | 0 | 0 | 7 | 9 | 11 | 21 | - | 6 | 0 | 97 | 169 |

### 1996 Workload Indicators %

| | Beaux Arts | Burien | Covington | Federal Way | Kenmore | Maple Valley | North Bend | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0.00% | 11.27% | 1.32% | 0.00% | 1.79% | 1.22% | 1.09% | 13.60% | 6.06% | 0.00% | 0.85% | 0.00% | 62.81% | 100.00% |
| Bomb Disposal Incidents | 0.00% | 5.49% | 4.40% | 0.00% | 2.20% | 0.55% | 1.10% | 0.55% | 8.24% | 0.00% | 2.20% | 10.44% | 51.65% | 100.00% |
| Canine Details | 0.00% | 9.02% | 0.26% | 13.17% | 5.56% | 1.24% | 0.60% | 9.58% | 8.42% | 0.00% | 3.51% | 0.00% | 48.65% | 100.00% |
| FPOC Caseload | 0.00% | 1.14% | 2.15% | 1.24% | 3.77% | 0.93% | 1.08% | 0.41% | 14.24% | 0.00% | 5.06% | 4.28% | 69.09% | 100.00% |
| Hostage Negotiation Incidents | 0.00% | 8.33% | 0.00% | 16.67% | 5.88% | 5.88% | 0.00% | 25.00% | 5.88% | 0.00% | 0.00% | 17.65% | 52.94% | 100.00% |
| Tactical Unit Incidents | 0.00% | 0.00% | 0.00% | 16.67% | 8.33% | 8.33% | 0.00% | 0.00% | 8.33% | 0.00% | 0.00% | 25.00% | 33.33% | 100.00% |
| Vice Unit Arrests | 0.00% | 0.00% | 0.00% | 11.76% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 17.65% | 0.00% | 0.00% | 94.29% | 100.00% |
| Licensed Gambling Establishments | 0.00% | 10.65% | 0.00% | 0.00% | 0.00% | 4.14% | 5.33% | 6.51% | 12.43% | 0.00% | 3.55% | 0.00% | 57.40% | 100.00% |

### 1997 Workload Indicators

| | Beaux Arts | Burien | Covington | Federal Way | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0 | 138 | 7 | 0 | 35 | 4 | 11 | 11 | 20 | 136 | 101 | 0 | 21 | 0 | 767 | 1,251 |
| Bomb Disposal Incidents | 0 | 10 | 0 | 0 | 15 | 0 | 0 | 2 | 12 | 7 | 13 | 0 | 5 | 43 | 62 | 170 |
| Canine Details | 0 | 277 | 41 | 0 | 169 | 47 | 21 | 31 | 197 | 213 | 244 | 1 | 120 | 0 | 1,310 | 2,598 |
| FPOC Caseload | 0 | 87 | 41 | 2 | 48 | 72 | 9 | 37 | 53 | 46 | 253 | 1 | 63 | 99 | 1,421 | 2,232 |
| Hostage Negotiation Incidents | 0 | 3 | 0 | 2 | 2 | 1 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 2 | 7 | 19 |
| Tactical Unit Incidents | 0 | 1 | 0 | 2 | 2 | 1 | 0 | 0 | 1 | 1 | 1 | 0 | 2 | 8 | 7 | 19 |
| Vice Unit Arrests | 0 | 2 | 0 | 2 | 1 | 0 | 0 | 0 | 1 | 3 | 1 | 3 | 0 | 0 | 54 | 84 |
| Licensed Gambling Establishments | 0 | 18 | 0 | 0 | 0 | 5 | 0 | 9 | 0 | 11 | 21 | 0 | 6 | 0 | 104 | 174 |

### 1997 Workload Indicators %

| | Beaux Arts | Burien | Covington | Federal Way | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0.00% | 11.03% | 0.56% | 0.00% | 2.80% | 0.32% | 0.88% | 0.88% | 1.60% | 10.87% | 8.07% | 0.00% | 1.68% | 0.00% | 61.31% | 100.00% |
| Bomb Disposal Incidents | 0.00% | 5.90% | 0.29% | 0.00% | 8.83% | 0.29% | 0.00% | 1.18% | 7.08% | 4.13% | 7.67% | 0.00% | 2.99% | 25.37% | 36.58% | 100.00% |
| Canine Details | 0.00% | 10.66% | 2.00% | 0.00% | 6.51% | 1.81% | 0.85% | 1.19% | 8.42% | 8.20% | 9.39% | 0.04% | 4.62% | 0.00% | 50.42% | 100.00% |
| FPOC Caseload | 0.00% | 3.90% | 1.84% | 0.47% | 2.15% | 3.23% | 0.47% | 1.66% | 2.38% | 2.06% | 11.34% | 0.04% | 2.82% | 4.31% | 63.68% | 100.00% |
| Hostage Negotiation Incidents | 0.00% | 17.65% | 0.00% | 10.53% | 10.53% | 5.26% | 0.00% | 0.00% | 5.26% | 5.88% | 5.88% | 0.00% | 0.00% | 11.76% | 36.84% | 100.00% |
| Tactical Unit Incidents | 0.00% | 5.26% | 0.00% | 11.76% | 11.76% | 5.26% | 0.00% | 0.00% | 5.26% | 5.88% | 5.88% | 0.00% | 11.76% | 47.06% | 36.84% | 100.00% |
| Vice Unit Arrests | 0.00% | 2.38% | 0.00% | 2.38% | 2.06% | 0.00% | 0.00% | 0.00% | 2.06% | 3.57% | 4.44% | 17.65% | 0.00% | 9.52% | 64.29% | 100.00% |
| Licensed Gambling Establishments | 0.00% | 10.34% | 0.00% | 0.00% | 0.00% | 2.87% | 0.00% | 5.17% | 0.00% | 6.32% | 12.07% | 0.00% | 3.45% | 0.00% | 59.77% | 100.00% |

2000 EXHIBITS.xls

05/17/00

# King County Sheriff's Office

## 1998 Workload and Staffing

Exhibit A, Part 3

### 1998 Workload Indicators

| | Beaux Arts | Burien | Carnation | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0 | 146 | 0 | 33 | 18 | 17 | 12 | 10 | 12 | 155 | 104 | 0 | 11 | 1 | 0 | 519 |
| Bomb Disposal Incidents | 0 | 9 | 0 | 0 | 3 | 5 | 0 | 2 | 16 | 3 | 14 | 0 | 0 | 1 | 78 | 131 |
| Canine Details | 0 | 220 | 0 | 28 | 88 | 82 | 4 | 12 | 23 | 128 | 162 | 1 | 60 | 25 | 915 | 1,741 |
| FFOC Caseload | 0 | 128 | 0 | 59 | 42 | 40 | 0 | 42 | 37 | 103 | 226 | 0 | 66 | 0 | 1,483 | 2,231 |
| Hostage Negotiation Incidents | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 2 | 16 | 22 |
| Tactical Unit Incidents | 0 | 3 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 4 | 0 | 0 | 0 | 0 | 20 | 28 |
| Vice Unit Arrests | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 125 | 130 |
| Licensed Gambling Establishments | 0 | 19 | 0 | 2 | 10 | 4 | 0 | 4 | 0 | 11 | 17 | 2 | 2 | 0 | 90 | 161 |

### 1998 Workload Indicators %

| | Beaux Arts | Burien | Carnation | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0.00% | 28.13% | 0.00% | 6.36% | 3.47% | 3.28% | 2.31% | 1.93% | 2.31% | 29.87% | 20.04% | 0.00% | 2.12% | 0.19% | 0.00% | 100.00% |
| Bomb Disposal Incidents | 0.00% | 6.87% | 0.00% | 0.00% | 2.29% | 3.82% | 0.00% | 1.53% | 12.21% | 2.29% | 10.69% | 0.00% | 0.00% | 0.76% | 59.54% | 100.00% |
| Canine Details | 0.00% | 12.64% | 0.00% | 1.61% | 5.05% | 4.69% | 0.18% | 0.69% | 1.32% | 7.35% | 9.30% | 0.04% | 3.45% | 1.44% | 52.61% | 100.00% |
| FFOC Caseload | 0.00% | 5.74% | 0.00% | 2.64% | 1.88% | 1.79% | 0.00% | 1.88% | 1.66% | 4.62% | 10.13% | 0.00% | 2.96% | 0.00% | 65.75% | 100.00% |
| Hostage Negotiation Incidents | 0.00% | 9.09% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 4.55% | 4.55% | 0.00% | 0.00% | 9.09% | 72.73% | 100.00% |
| Tactical Unit Incidents | 0.00% | 10.71% | 0.00% | 0.00% | 3.57% | 0.00% | 0.00% | 0.00% | 0.00% | 14.29% | 3.57% | 0.00% | 0.00% | 0.00% | 71.43% | 100.00% |
| Vice Unit Arrests | 0.00% | 0.00% | 0.00% | 0.00% | 0.77% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 96.15% | 100.00% |
| Licensed Gambling Establishments | 0.00% | 11.89% | 0.00% | 1.24% | 6.21% | 2.48% | 0.00% | 2.48% | 0.00% | 6.83% | 10.56% | 1.24% | 1.24% | 0.00% | 55.90% | 100.00% |

### 1996/97/98 Workload Indicator Average

| | Beaux Arts | Burien | Carnation | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0.00 | 143.00 | 0.00 | 19.00 | 25.33 | 17.33 | 11.50 | 11.67 | 16.00 | 155.33 | 94.33 | 0.00 | 14.33 | 0.33 | 525.11 | 1,028 |
| Bomb Disposal Incidents | 0.00 | 9.67 | 0.00 | 3.67 | 7.33 | 3.67 | 0.25 | 2.00 | 8.50 | 3.67 | 14.00 | 0.00 | 5.67 | 0.33 | 78.00 | 156 |
| Canine Details | 0.00 | 236.00 | 0.00 | 33.33 | 129.00 | 52.00 | 7.25 | 19.00 | 22.50 | 188.33 | 201.00 | 0.67 | 75.67 | 21.00 | 1,121.00 | 2,131 |
| FFOC Caseload | 0.00 | 79.00 | 0.00 | 7.25 | 54.33 | 43.33 | 0.00 | 33.33 | 45.00 | 52.33 | 251.67 | 0.00 | 60.67 | 45.67 | 1,414.33 | 2,151 |
| Hostage Negotiation Incidents | 0.00 | 2.00 | 0.00 | 0.00 | 1.00 | 0.33 | 0.00 | 0.00 | 0.50 | 1.67 | 0.67 | 0.00 | 0.00 | 1.33 | 9.33 | 17 |
| Tactical Unit Incidents | 0.00 | 1.33 | 0.00 | 0.00 | 1.00 | 0.00 | 0.00 | 0.00 | 1.00 | 1.67 | 0.67 | 0.00 | 0.00 | 0.00 | 12.00 | 21 |
| Vice Unit Arrests | 0.00 | 0.67 | 0.00 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 | 1.00 | 1.33 | 7.00 | 0.00 | 0.00 | 3.33 | 70.67 | 83 |
| Licensed Gambling Establishments | 0.00 | 18.33 | 0.00 | 0.67 | 3.33 | 5.33 | 0.00 | 7.33 | 0.00 | 11.00 | 19.67 | 0.67 | 4.67 | 0.00 | 97.00 | 168 |

### 1996/97/98 Workload Indicator Average %

| | Beaux Arts | Burien | Carnation | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0.00% | 13.91% | 0.00% | 1.85% | 2.46% | 1.69% | 1.12% | 1.13% | 1.56% | 15.11% | 9.17% | 0.00% | 1.39% | 0.03% | 51.07% | 100.00% |
| Bomb Disposal Incidents | 0.00% | 6.21% | 0.00% | 2.35% | 4.71% | 2.35% | 0.16% | 1.28% | 5.46% | 2.35% | 8.99% | 0.00% | 3.64% | 0.21% | 50.08% | 100.00% |
| Canine Details | 0.00% | 11.08% | 0.00% | 1.55% | 6.05% | 2.44% | 0.34% | 0.89% | 1.06% | 8.84% | 9.43% | 0.03% | 3.52% | 2.14% | 52.61% | 100.00% |
| FFOC Caseload | 0.00% | 3.67% | 0.00% | 0.34% | 2.53% | 2.01% | 0.00% | 1.55% | 2.09% | 2.43% | 11.70% | 0.00% | 2.82% | 2.82% | 65.75% | 100.00% |
| Hostage Negotiation Incidents | 0.00% | 12.12% | 0.00% | 0.00% | 5.88% | 1.89% | 0.00% | 0.00% | 3.03% | 10.10% | 4.04% | 0.00% | 0.00% | 8.08% | 56.57% | 100.00% |
| Tactical Unit Incidents | 0.00% | 6.35% | 0.00% | 0.00% | 4.76% | 0.00% | 0.00% | 0.00% | 4.76% | 6.35% | 3.17% | 0.00% | 0.00% | 0.00% | 57.14% | 100.00% |
| Vice Unit Arrests | 0.00% | 0.80% | 0.00% | 0.00% | 0.40% | 0.00% | 0.00% | 0.00% | 1.20% | 1.20% | 8.43% | 0.00% | 0.00% | 4.32% | 85.14% | 100.00% |
| Licensed Gambling Establishments | 0.00% | 10.91% | 0.00% | 0.40% | 1.98% | 3.17% | 0.00% | 4.37% | 0.00% | 6.55% | 11.71% | 0.40% | 2.78% | 0.00% | 57.74% | 100.00% |

000072

**Shoreline - 2000**

L:\BAKERJO\KCSO\CONTRACT\2000\[2000 EXHIBITS.xls]Workload

**UPDATED FOR 1996-98 WORKLOAD AND 2000 PROPOSED RED BOOK**
**CITY MODEL**

| *Precinct/City Services* | | City Model | | | |
|---|---|---|---|---|---|
| Title | R/O | Billing Factor | Amount | Cost | FTEs |
| Canine (city) | R | FTE | | | |
| Captain - Operations | O | FTE | 1.00 | 127,977 | 1.00 |
| Captain- Pct. Operations | R | % FTE | | - | - |
| Community Crime Prevention Unit | O | FTE | | - | - |
| Storefront Officers | O | FTE | 2.00 | 202,046 | 2.00 |
| Community Service Officers | O | FTE | 1.00 | 75,241 | 1.00 |
| Evidence and Supply Tech | O | FTE | | - | - |
| DARE | O | FTE | - | - | - |
| Pct. Facilities and Maintenance | | % Pct. FTE | N/A | - | N/A |
| Major - City Chief | O | FTE | 1.00 | 143,532 | 1.00 |
| Major - Pct. Commander | R | % FTE | | - | - |
| Motorcycle | O | FTE | 3.00 | 258,033 | 3.00 |
| Admin Spec II | O | FTE | | - | - |
| Admin Spec III | O | FTE | | - | - |
| Admin Spec IV | O | FTE | 1.00 | 66,892 | 1.00 |
| Pct. Crime Analysis | O | % FTE | | - | - |
| Pct. Detectives | R | FTE | 3.00 | 296,398 | 3.00 |
| Pct. Detective Sgt. | R | FTE | 1.00 | 108,129 | 1.00 |
| Pct. Pro-Active | O | FTE | 4.00 | 387,971 | 4.00 |
| Reactive Patrol | O | FTE | 23.00 | 2,323,525 | 23.00 |
| Reactive Patrol Sgts. | R | FTE | 6.00 | 681,146 | 6.00 |
| | | Subtotal | $ | 4,670,889 | 46.00 |

| *Support Services* | R/O | ? | Billing Factor | Amount | Service Cost | FTE |
|---|---|---|---|---|---|---|
| Air Support | O | N | % DCFS | 10.04% | - | - |
| Asset Forfeiture | O | | | | | |
| Bomb Disposal Unit | R/O | Y | % Incidents | 8.99% | 13,316 | 0.09 |
| Canine | R/O | Y | % Details | 9.43% | 94,164 | 0.75 |
| Communications-911 | R | Y | % DCFS | 10.04% | 553,605 | 7.13 |
| Drug Enforcement Unit | O | N | % Pt 1 Crime | 9.54% | - | - |
| DWI | O | N | FTE | | - | - |
| Fraud, Forgery, Organized Crime | O | Y | % Caseload | 11.70% | 105,282 | 0.82 |
| General Traffic | O | N | FTE | | - | - |
| Hostage Negotiation | R/O | Y | % Incidents | 4.04% | 234 | 0.00 |
| Major Crimes Detectives | R | Y | % Pt 1 Major Crime | 9.17% | 274,877 | 2.02 |
| Homicide Placeholder | | | % Pt 1 Major Crime | 9.17% | 33,616 | |
| Marine Patrol | O | N | NA | | - | - |
| MARR Unit | R/O | N | % Incidents | 10.16% | - | - |
| Tactical Unit | R | Y | % of Incidents | 3.17% | 8,953 | 0.05 |
| Vice | O | N | % Unit Arrests | 8.43% | - | - |
| Gambling | O | N | % Gambling Licenses | 11.71% | - | - |
| | | | Subtotal | | 1,084,046 | 10.86 |
| | | | Total | | 5,754,935 | 56.86 |
| | | | Less copier charges | | (2,837) | |
| | | | Less phone charges | | (20,056) | |
| | | | Revised Total | | 5,732,042 | |
| | | Computer Replacement Fund (37 Computers) | | | 45,942 | |
| | | COPS Universal Hiring Credit (1.0 FTE)[3] | | | (25,000) | |
| | | | **REVISED TOTAL CHARGE** | | **5,752,984** | **56.86** |

Note: Shoreline will pay for Air Support, the Drug Unit, and the MARR Unit on a per use basis at the prices shown in the updated Exhibit
   E. Asset forfeiture cases will be handled by the Asset Forfeiture Unit on a case by case basis with any proceeds shared on a 50/50 split
   between King County and the City of Shoreline.

1) The DARE officer will be replaced by a pilot SRO program. The costs of this program will be billed as discretionary overtime.

2) Letter dated 1/13/99 adds a patrol officer for a total of 22 dedicated officers.

3) COPS Universal Hiring Grant Credit will be received annually at $25,000 per FTE for three years.

000073

# Shoreline - 2000

Exhibit B
2000
Proposed

| Workload Indicators | City | % Prec | % Prec. Flex | %Total |
|---|---|---|---|---|
| Dispatched Calls | 13560 | 28.89% | 0.00% | 10.04% |
| Pct Detective Caseload | 560 | 41.42% | | |
| Comm. Crime Prev. Csld. | | 0.00% | | 0.00% |
| Part 1 Crimes | 2,117 | | | 9.54% |
| Part 2 Crimes | 2,227 | | | |
| Total Crimes | 4,344 | | | 9.65% |
| Part 1 Major Crimes | 94.33 | | | 9.17% |
| Bomb Disposal Incidents | 14.00 | | | 8.99% |
| Canine Details | 201.00 | | | 9.43% |
| FFOC Caseload | 251.67 | | | 11.70% |
| Hostage Negotiation Incidents | 0.67 | | | 4.04% |
| Tactical Unit Incidents | 0.67 | | | 3.17% |
| Vice Unit Arrests | 7.00 | | | 8.43% |
| Licensed Gambling Establishments | 19.67 | | | 11.71% |
| Precinct CPO Flex | - | | | |
| Precinct Crime Analysts | - | | | |
| Precinct Detectives | 3 | | | |
| Pct. Patrol Flex % | 0.00% | | | |
| React Patrol Sgts. % | 0.00% | | | |
| Captains - Precinct Ops | 1 | | | |
| Pct. Facilities and Maintenance cost | n/a | | | |
| Precinct Sworn Staff | 44 | | | |
| Precinct CCPU Staff | - | | | |

| | |
|---|---|
| Shoreline Precinct Staff | 46.00 |
| Telephone Cost per FTE | 436 |
| Total Shoreline Telephone Credit | 20,056 |
| Pct. 2 Copier Charges | 10,453 |
| # of FTE at Pct. 2 (inc. Shoreline) | 170 |
| Cost per FTE | 62 |
| Shoreline Precinct Staff | 46 |
| Shoreline Credit | 2,837 |



# EXHIBIT C
# ROLES AND RESPONSIBILITIES OF CONTRACT SERVICE PERSONNEL

**I.     ROLES AND RELATIONSHIPS**

A)  COMMISSIONED PERSONNEL
1) Contract service police chiefs, as well as other commissioned personnel, will be responsive to the public safety needs of the contracting entity, as well as its officials, residents, and/or population served.

B)  CONTRACT POLICE CHIEF (CITY POLICE CHIEF FOR CONTRACT CITIES)
1) Command Structure
(a) Reports directly to Precinct Commander
(i) If the contract police chief is a KCSO Major, then he or she shall report directly to Division Chief
(ii) Works at the direction of the City Chief Executive Officer or contract manager/administrator, and in compliance with KCSO policy, procedures, and directives.
2) Title/Insignia
(a) Police chiefs shall wear one star on each collar point signifying their role as "Police Chief" of a contracting entity . Regardless of KCSO rank, contract chiefs will be addressed as "Chief of Police" in public settings, such as city council meetings, public meetings, and contract service staff meetings.
3) Interaction with Contracting Entity
(a) The police chief shall interact with contract entity staff and officials in accordance   with   RCW 35.18.110
(b) The police chief shall discuss and agree upon protocols for routine, daily interactions with the contract service CEO or manager/administrator as deemed appropriate by the contracting entity.
(c) The police chief shall function as a department head within the contracting entity's organizational structure, and is expected to conduct himself or herself in a manner that supports and maintains trust in the contracting entity.
(d) At the direction of the contract service CEO or manager/administrator, and as needed, the police chief shall attend and participate in the contracting entity's staff and council meetings, and official functions, celebrations, and commissions. As requested by the CEO or manager/administrator and as needed, the police chief will also represent the contract service police department at community meetings and functions.
(e) The Police Chief is the City's Director of Police Services and represents the Chief Executive Officer of the City for all law enforcement matters in the community/City. This may include working with other relevant City departments and or other public agencies (e.g. courts, schools, etc.) on behalf of the City.
(f) The KCSO views the Contract Cities as customers and will maintain a customer service orientation to managing the contracts. Consistent with this philosophy Police Chiefs are expected to represent the City's point of view, consider City needs in carrying out their duties and advocate on behalf of their City similar to other City departmental directors.
4) Duties
(a) Supervision Received:
(i) KCSO command staff maintains authority and responsibility over police chiefs and the precinct.
(ii) In the event a contracting entity's procedure, policy, goal or operation differs from that of the KCSO, that entity shall negotiate with the KCSO to reach a final determination.
(iii) The entity's Chief Executive Officer or manager/administrator shall have the general duty and responsibility of providing the assigned police chief with general direction relative to the furnishing of law enforcement services to the contracting entity.
(iv) The police chief shall maintain communication between command structures to ensure that changes in the KCSO are agreeable to the contracting entity and that changes in the entity

are agreeable to the KCSO.
(b) Duties Include:
  (i)    Operations
  (ii)   The police chief shall direct overall Contract City service police operations, ensuring law enforcement services within the City.
  (iii)  The police chief shall analyze operations and develop plans to manage resources and ensure effective and efficient delivery of services.
  (iv)   The police chief shall oversee the implementation of all policies and procedures relating to police services that are established by the contracting entity, and shall provide to the KCSO any written information relative to police services created by the entity. The chief shall notify the KCSO of all procedures that differ from KCSO policies and procedures.
  (v)    The police chief shall utilize analysis of crime data to establish a plan for deploying resources to address identified needs.
  (vi)   The police chief shall coordinate police activities for the contracting entity, including hours of operation and contract-specific protocols and procedures.
  (vii)  The police chief shall prepare, in coordination with the King County Sheriff's Office Contract Unit, a budget for the contract police department.
  (viii) The police chief shall coordinate the response of support services used for law enforcement for the contracting entity (e.g., CID, Special Operations).
  (ix)   The police chief shall establish policies and protocols for the response of services that are not purchased by the entity in advance (e.g., optional services).
  (x)    The police chief shall notify the contracting entity's CEO or manager/administrator of any use of support services that were not purchased in advance upon their deployment for enforcing laws for the contracting entity.
  (xi)   The police chief shall notify the contracting entity's CEO or manager/administrator of all major crimes or incidents.

5) Goals, Objectives, and Performance Indicators
  (a) The police chief shall establish goals and objectives for contract police services in conjunction with the City Chief Executive Officer that reflect the specific needs of the contracting entity. The chief shall also identify performance indicators for the entity to measure the established goals and objectives.
  (b) The police chief shall oversee the implementation of all KCSO policies and procedures within the contract services, and maintain a copy of current police procedures on file at the entity's chosen central location for the entity's reference. The chief shall notify the entity's CEO or manager/administrator of any KCSO procedures or changes that either supplement or affect the entity's established goals and objectives for police services.
  (c) The police chief shall review the entity's performance indicators for police services against the stated goals and objectives, and shall report to the CEO or manager/administrator on progress of goal attainment.

6) Personnel Management and Training
  (a) The police chief shall establish standards of performance for officers assigned to the contracting entity.
  (b) The police chief shall identify areas of supplemental training for officers assigned to the entity, and make recommendations to the KCSO for supplemental training. The chief shall also make recommendations to the contracting entity's CEO or manager/administrator for training not provided by KCSO.
  (c) The police chief shall periodically review the performance of officers assigned to the contracting entity and report to entity's CEO or manager/administrator and precinct command staff or Division Chief any recommendations for performance improvement.
  (d) The police chief shall perform selected roll calls of contract-assigned officers.
  (e) The police chief shall coordinate and direct duties of officers assigned to the contracting entity as

specific needs arise, and as requested by entity's CEO or manager/administrator within the context of established policies and procedures. The chief shall report to the precinct any changes in duty of contract-assigned officers.

## C) CONTRACTING ENTITY POLICE MID-MANAGER
1) Command Structure
   (a) The mid-manager shall report directly to police chief
   (b) The mid-manager shall function as "Acting Police Chief" in the absence of the police chief
2) Title /Insignia
   (a) The mid-manager shall wears appropriate rank insignia on contract entity uniform consistent with KCSO rank
3) Interaction With Contracting Entity
   (a) The mid-manager shall interact with contracting entity staff and officials in accordance with RCW 35.18.110
   (b) The mid-manager shall function as a police department mid-manager within contracting entity structure and shall present himself or herself in the community in a manner that supports and maintains trust in the contracting entity.
4) Duties
   (a) The mid-manager shall directly assist police chief in carrying out duties outlined in I.B(4)

## D) FIRST LEVEL SUPERVISOR/LINE OFFICERS/DETECTIVES/STAFF
1) Command Structure
   (a) These individuals shall report directly to the police chief, mid-manager,    or    supervisor    as appropriate.
2) Title/Insignia
   (a) These individuals shall wear rank insignia on uniform consistent with KCSO rank
3) Interaction With Contracting Entity
   (a) These individuals shall interact with contracting entity staff and officials in accordance with RCW 35.18.110
   (b) These individuals shall present themselves in the community in a manner consistent with being a member of the entity's staff and in a manner that supports and maintains trust in the contracting entity.
4) Duties
   (a) Will be commensurate with other KCSO assignments

## II. AUTHORITY
A) The contracting entity police chief shall have authority commensurate with his or her responsibility, which is recognized internally and externally.

B) Issues that fall within the purview of the police chief of a contracting entity
   1) Prioritization of reactive patrol time
   2) Awards Program
   3) Travel and Expense Guidelines
   4) False Alarm Ordinances/Response
   5) Impound Procedures
   6) Community Policing
   7) Crime Prevention Standards
   8) Additional Training
   9) Supplemental Reports
   10) Incident Notification Policies
   11) Job Description of Supplemental full-time employees (FTE's)
   12) Expenditure of the contracting entity's police budget
   13) Direct access to department support services
   14) Staffing assignments and deployment within confines of dedicated City positions

    15) Prioritize meeting attendance (meetings for the contracting entity take priority over county meetings; county meetings will be kept to a minimum and conducted as efficiently as possible)
    16) Authorization of support services.
    17) Use of volunteers and volunteer programs (except reserve officer).

C) Issues that must have input and approval from the King County Sheriff's Office
    1) Accident Response Criteria
    2) Court Attendance Policies
    3) Call-out Procedures
    4) Uniform/Equipment/Vehicles (including appearance regulations)
    5) Reserve Program
    6) Communications Center Procedures
    7) Traffic Enforcement Policy and Procedures
    8) K-9 Response Policy
    9) Response Priorities
    10) Shift Hours
    11) Specialty Unit Personnel Selection (Street Crimes Units, Crime Prevention, D.A.R.E., etc.)
    12) Prioritization of Precinct Detective Unit Workload

D) Issues that fall within the purview of the KCSO and must be consistent between the King County Sheriff's Office and the contracting entities.
    1) Pursuit Policy
    2) Seized Property
    3) Basic Skills Training
       (a) Emergency Vehicle Operations; Firearms (Include Reviews)
    4) Use of Force
    5) Off-Duty Work
    6) Field Training Officer Program
    7) Personnel Evaluation System/Annual Performance Evaluation
    8) Internal Investigations Unit Policies & Procedures
    9) Reporting Forms
    10) Hostage Negotiations and Tactical Team Deployment
    11) Alternative Work Schedules
    12) Standards of Conduct
    13) Arrest Warrant Policies
    14) Labor Contracts (4)
    15) Supervisory Standards

E) Issues governed exclusively by KCSO policies & procedures:
    1) DV Response
    2) Search & Rescue
    3) Civil Process
    4) Landlord - Tenant Policies
    5) Abandoned/Unclaimed Property
    6) Training
    7) Basic Law Enforcement Training Academy
    8) BAC - State
    9) First Aid - L&I
    10) CPR - L&I
    11) Computer Info Access Training
    12) Airborne/Bloodborne Pathogens
    13) OSHA/WSHA/EPA Requirements
    14) King County Code of Ethics
    15) Public Disclosure and Records

16) Gun Permits and Concealed Pistol Licenses
17) Federal Labor Standards Act
18) Family Leave and Benefits Policies
19) Americans with Disabilities Act
20) Civil Service Rules
21) King County Career Service Rules
22) EEOC Guidelines/Requirements
23) Discipline

## III. INCENTIVES/REWARDS

A) Contracting entities may award incentives or other recognition within existing guidelines, ethics guidelines, department rules and contract language, interlocal agreements and the award systems of the entity, KCSO and county.

## IV. COMMITMENTS, TRANSFERS, and PROMOTIONS

A) KCSO staff requesting assignment to a contracting entity will make a two-year commitment to work as a member of the entity's police force, except in cases of promotion or other special circumstances. Such special circumstances require the concurrence of the entity's CEO or manager/administrator and applicable KCSO Division Chief.

B) The transfer of personnel affecting the entity's police force will be coordinated by the KCSO, in consultation with the entity's Police Chief, to minimize the impact of potential vacancies. The number of the entity's vacant positions will be managed with a goal of achieving proportionality with the total number of vacant positions in the KCSO.

C) Contracting entities may not make de facto promotions by their selection of personnel except in instances in which a pool of candidates is made available for selection by the KCSO.

## V. STATISTICAL REPORTS

A) Whenever possible, reports shall be generated by the Research, Planning, and Information Services Unit.

B) All reports will be routed through RP&IS Unit.

C) A courtesy copy of all unique reports that are generated by contract police departments will be sent to RP&IS Unit.

D) Reports will include footnotes identifying the source of the information.

E) Service enhancement proposals will be routed through RP&IS Unit.

## VI. SHARED SUPERVISION PROTOCOL

A) The City's Police Chief is responsible for police services within the City. If desired by the City, the City Police Chief, Precinct Commander and appropriate staff shall develop an agreement that addresses in-City Precinct directed field services.

B) Dedicated City officers will be assigned to respond to calls within the City in line with City protocols, and consistent with section II of this document.



# EXHIBIT D:
## INTERNAL INVESTIGATIONS UNIT PROTOCOLS

I.  POLICY STATEMENT
A)  It is the desire of the Internal Investigations Unit (IIU) to be responsive to the needs of the Contract Cities, be sensitive to the rights of the individuals involved, and to comply with statutes, case law, and collective bargaining agreements that govern internal investigations.

II.  COMPLAINTS OF PERSONNEL MISCONDUCT RECEIVED IN THE CONTRACT CITY
A)  Current KCSO policy requires that members refer the complainant to IIU or notify a supervisor. Supervisors who become aware of a complaint shall conduct a preliminary investigation and forward the results to their commander. IIU will ensure that the City Police Chief is made aware of complaints of significant misconduct in their City at the earliest practical time. The City Police Chief will ensure that the Chief Executive Officer is informed of all complaints of significant misconduct at the earliest practical time.

B)  City staff and councilmembers may receive complaints of Department personnel misconduct. These complaints should be referred to the Chief Executive Officer or designee who in turn will pass on to Precinct Commander/City Police Chief, an on duty supervisor, or IIU depending on the time of day, the availability of a supervisor, or the seriousness of the complaint.

III.  COMPLAINTS OF PERSONNEL MISCONDUCT RECEIVED IN IIU
A)  Complaints received in the Internal Investigations Unit concerning personnel assigned to a contract city or incidents that occur within the City, will be investigated according to current policy. The IIU Commander, or designee, shall notify the affected Precinct Commander/City Policy Chief of the complaint as soon as practical.
B)  The criteria for case assignment to the precinct/city for investigation shall be consistent with current KCSO Policy. General Order 10.40.135, identifies the following types of investigations that will remain with IIU for follow-up:
1)  When sustained, could result in termination or demotion
2)  Where criminal conduct is involved
3)  When there are controversial or newsworthy circumstances
4)  Any complaint the Commander deems appropriate to be investigated by IIU
5)  Any complaint the Sheriff directs IIU to investigate
C)  The Internal Investigations Unit reviews all "Use of Force Reports", and investigates complaints of excessive force.

IV.  INVESTIGATION OF PERSONNEL MISCONDUCT
A)  Investigations of alleged personnel misconduct shall be conducted in accordance with General Orders Manual, Section 10, Personnel Complaint Manual and General Orders Manual 3.01.000, Investigation of Personnel Misconduct.
B)  Completed investigations conducted at the Precinct or City level shall be reviewed by the Precinct Commander/City Police Chief and forwarded to IIU through the Chain of Command.

V.  INFORMATION PROVIDED TO THE CHIEF EXECUTIVE OFFICER
A)  Chief Executive Officers shall be notified of complaints of misconduct involving KCSO personnel assigned to the City or of incidents that occur within the City. This notification may come from either the Precinct Commander or the City Police Chief.

B)  Results of the investigation will be shared with the Chief Executive Officer, as soon as practical, but the investigative file may not be copied in accordance with case law. Specific discipline for sustained

complaints emanating from the member's assignment to the City will be disclosed to the Chief Executive Officer.

C) Written correspondence to the complainant will originate from the KCSO. City letterhead with the signature block, "Commander, Internal Investigations Unit" may be used rather than the KCSO letterhead. The City letterhead option is available for the City, but not required.

VI.    GRIEVANCE PROCEDURES

A) KCSO members may file a grievance concerning the findings or discipline as the result of a complaint investigation according to the current collective bargaining agreement.

B) Local, State, and Federal statues; case law; and the member's collective bargaining agreement govern the grievance procedure.

L:\BAKERLOW\CS3\CONTRACT\2000\2000 EXHIBITS.xls\Workload

# 2000 Hourly Costs for Selected Services–EXHIBIT E

| Service | 2000 Est. Cost | Hours | 2000 Hourly Cost | Minimum Charge | Notes |
|---|---|---|---|---|---|
| Air Support* | 532,194 | 617 (1996-98 Avg Flight Hours*) | 863 | 863 | Min. charge is 1 hour for off-duty calls. |
| Bomb Disposal Unit | 148,138 | 879 (1996-98 Avg Mission Hours*) | 168 | 674 | Min. charge is 2 hours for 2 officers. |
| Canine Unit | 998,246 | 14,016 (2000 Person Hours**) | 71 | 142 | Min. charge is 2 hours for 1 officer. |
| DARE Unit | 96,218 | 1,752 (2000 Person Hours**) | 55 | 1,922 | Typical class = 35 hours at $1,922. |
| Drug Lab Response Team | 962,831 | 15,768 (2000 Person Hours**) | 61 | 244 | Min. charge is 2 hours for 2 officers. |
| Drug Unit | 962,831 | 15,768 (2000 Person Hours**) | 61 | 122 | Min. charge is 2 hours for 1 officer. |
| Hostage Negotiation Team | 5,783 | 162.50 (1996-98 Avg Mission Hours*) | 36 | 285 | Min. charge is 2 hours for 4 officers. |
| Major Crimes | 2,995,962 | 51,684 (2000 Person Hours**) | 58 | 116 | Min. charge is 2 hours for 1 officer. |
| Marine Patrol | 838,712 | 38 (2000 Hourly Cost of Boat) / 61 (2000 Hourly Cost of Staff) | | 319 | Min. charge is 2 hours for 2 officers. |
| Marine Patrol - Dive Unit | see above | 38 (2000 Hourly Cost of Boat) / 61 (2000 Hourly Cost of Staff) | | 561 | Min. charge is 2 hours for 4 officers. |

Exhibit E

| Service | 2000 Est. Cost | 1998 Mission Hours* | 2000 Hourly Cost | Minimum Charge | Notes |
|---|---|---|---|---|---|
| MARR Unit | 392,919 | 3,889 | 101 | 404 | Min. charge is 2 hours for 2 officers. |

| Service | 2000 Est. Cost | 2000 Person Hours** | 2000 Hourly Cost | Minimum Charge | Notes |
|---|---|---|---|---|---|
| Polygraph Examiner | 94,910 | 1,752 | 54 | 54 | |

| Service | 2000 Est. Cost | 1996-98 Avg Mission Hours* | 2000 Hourly Cost | Minimum Charge | Notes |
|---|---|---|---|---|---|
| Tactical Unit | 282,012 | 1,240 | 227 | 3,184 | Min. charge is 2 hours for 7 officers. |

* AIR SUPPORT UNIT DETAILS

Search & Rescue ASU missions will be "no charge".

Pro Net (bank hold-up) tracking call-outs will be "no charge".

On-view activity made by the ASU will be at "no charge" to the jurisdiction.

On duty call-outs for ASU by non-contract cities will be billed based on the hourly rate, for the "exact mission time" (no longer a two hour minimum).

Off-duty call-outs for ASU will be billed at the minimum rate of "one hour" (no longer at the two-hour minimum).

** Based on 1,752 available hours per year

| Available Time | Days | Hours |
|---|---|---|
| Work Days | 261 | 2,088 |
| Sick Leave | (9) | (72) |
| Vacation | (15) | (120) |
| Military Leave | (1) | (5) |
| In-Service Training | (5) | (40) |
| Holidays | (12) | (96) |
| TOTAL | 219 | 1,752 |

000083

Speciality Unit Hours

| Unit | 1996 | 1997 | 1998 | 3 Yr Average |
|---|---|---|---|---|
| Air Support | 495.00 | 828.00 | 528.00 | 617.00 |
| Bomb Disposal | 1,672.00 | 563.50 | 402.00 | 879.17 |
| Hostage Negotiation | 75.25 | 208.50 | 203.75 | 162.50 |
| TAC-30 | 519.75 | 1,098.75 | 2,102.00 | 1,240.17 |

2000 EXHIBITS.xls Exhibit E

05/17/00 7:18 PM

Exhibit E

000084

# EXHIBIT F
## GLOSSARY OF TERMS

**Absence**
The state of being absent from one's assigned duties for a period of time though funds, in most cases, continue to be expended.

**Absent without leave**
Absent without authorization.

**Administrative Sergeant**
Reports directly to the City's Commanding Officer (Captain or Major) and assists in carrying out the commander's duties; functions as "Acting Police Chief" in the absence of the City Police Chief; wears appropriate rank insignia on city uniform consistent with KCSO rank; interacts with the city staff and city council members in accordance with RCW 35.18.110; and; is expected to present her/himself in the community in a manner that supports and maintains trust in the contract city government and staff.

**Alternative shift schedules**
Subject to negotiation, this includes flex time (an employee's shift starting time may vary up to 4 hours from normal).

**Audit**
A formal examination of the KCSO's accounts or financial situation; a methodical examination and review.

**Backfill**
Staffing a patrol district with some one other than the normally scheduled deputy due to a planned or unplanned absence.

**Benefits**
Medical, dental, unemployment, A & D and life insurance, retirement plans; and vacation, sick and holiday pays.

**Bereavement Leave**
Up to 3 days leave with pay that can be used when a member of one's immediate family passes away.

**BLET/BLEA**
Basic Law Enforcement Training/Academy (720 hours).

**Captain**
Appointed by the Sheriff from a certified eligibility list provided by the King County Civil Service Commission and subordinate to the rank of Major.

**Car Per Officer (CPO)**
Take home vehicles assigned to department members.

**Career Service Employee**
An employee who is appointed to a career service position as a result of a competitive examination process.

**Chief**
See "Contract City Police Chief" below.

**Chief (Division)**
Appointed by the Sheriff with the consent of the County Council and subordinate to the rank of Sheriff.

**City Department Model**
Under the city department model, the level, degree and type of precinct/city services and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee. For precinct level services, operates as a stand alone model.

**City Police Precinct**
To qualify as a City Police Precinct, the following minimum standards must be met:
- meet or exceed all applicable city, state and federal codes and requirements.
- provide sufficient secure office space to accommodate all personnel permanently assigned to the precinct.
- provide appropriate locker and shower/restroom facilities for all male and female assigned staff.
- provide adequate secure, fenced parking for police vehicles.
- provide at least two separate holding cells that meet all county, state and federal codes for temporarily segregating and detaining male/female and juvenile/adult prisoners.
- provide a private, secure entrance through which prisoners can be moved in and out of the holding cell area.
- provide two interview rooms and a meeting/roll-call room.
- provide a permanent evidence storage room and additional safe, secure storage for small arms ammunition, explosives, flammable materials and other hazardous substances.
- provide a secure area in which to air dry wet evidence prior to packaging.
- provide a connection to the county WAN and other applicable telecommunications systems infrastructure that meets or exceeds county standards.
- provide concealed pistol permit and other administrative services to the public at the city police precinct or other city facility.

**Civil Service Employee**
An employee who is appointed to a (government) civil *service* position as a result of a competitive examination process.

**Clothing Allowance**
Deputies not required to wear a uniform for at least one full month receive additional pay while so assigned.

**Commissioned**
Sworn officers/deputies.

**Communications Center**
Provides emergency telecommunications services between citizens and appropriate public safety agencies on a 24 hour a day basis including a Computer Assisted Dispatch (CAD) system that allows operators to dispatch sworn officers and non-sworn community service officers (CSO's) to calls for police services and take some types of incident reports via the telephone.

**Community Service Officer (CSO)**
Non-sworn, uniformed staff who do not have arrest authority.

**Compensatory time**
Time off that is granted with pay in lieu of pay to FLSA-overtime eligible employees for work performed either on an authorized overtime basis or on a holiday that is normally scheduled as a day off.

**Contract City Police Chief**
Reports directly to Precinct Commander (if Major, directly to Division Chief); works at the direction of city manager/administrator and in compliance with KCSO Policy, Procedures & Directives; Interacts with city staff and council members in accordance with RCW 35.18.110; Functions as a department head within the contract city structure. KCSO ranks that qualify for the chief's position are determined by city population: Sergeant – less

than 20,000: Captain – greater than 20,000: cities choosing the full city model department may select a Major as chief.

**Court overtime**
Deputies are compensated for court appearances, pre-trial hearings or conferences at the county overtime rate stated in the Collective Bargaining Agreement, Article 8, Section 3.

**Dedicated staff**
Personnel regularly assigned to a contract city.

**Deputy (Officer)**
Appointed by the Sheriff from a certified eligibility list provided by the King County Civil Service Commission and subordinate to the rank of Sergeant.

**Disability**
A person is considered to have a "disability" if s/he has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

**Discretionary training**
Training not mandated by federal, state or county regulations.

**Dispatched calls for service (DCFS)**
Police details that are initiated through the communications center.

**Educational incentive pay**
Additional pay commensurate with an employee's education.

**Fair Labor Standards Act (FLSA)**
A law governing compensation for hours worked/overtime.

**Family Leave**
Paid absence to care for a child, spouse or parent with a serious health condition (employees may receive up to 6 days paid leave per year to be used in lieu of sick leave for family care purposes).

**Family Medical Leave Act (FMLA)**

**Federal Emergency Management Agency (FEMA)**

**Field Training Officer (FTO)**
An experienced deputy with special training used to train and evaluate recruit officers.

**Field Training Program**
An organized training program and standardized evaluation process for recruit officers to ensure that each candidate has an equal opportunity to succeed.

**Field Training Sergeant**
Assists in the FTO selection process, monitors recruit and FTO performance; initiates, schedules, monitors and documents any special recruit training assignments; completes weekly evaluation reports of reach Phase II recruit, schedules and chairs Alternate Week Evaluation meetings.

**Flexible Services Model**
Under the flexible services model, base level law enforcement services will be provided to the city in proportion to the City's share of workload.

**Hazardous duty pay**
Additional pay given to a deputy while serving in one of the following assignments: helicopter, bomb disposal, motorcycle, scuba diver, K-9, TAC-30, patrol, clandestine drug lab team.

**Lateral Academy**
Recruit training for lateral entry officers.

**Lateral entry deputy/officer**
A deputy hired with prior law enforcement experience.

**Leaves of absence**
Governed by R.C.W. 41.14.160 and King County Ordinance 3.12.250.
1.  Precinct or Section Commanders may grant up to twenty-four (24) hours of leave without pay for their Department members under their command.

2.  Leaves without pay over twenty-four (24) hours may only be granted by the Sheriff.
    A)  Leaves without pay for periods of more than one (1) month shall also be approved in writing and in advance by the Director of the Office of Human Resource Management.

3.  Department members shall obtain the appropriate memorandum form from the Personnel Unit, and complete either:
    A)  Medical leave of absence (other than maternity); or
    B)  Medical leave of absence (maternity).

**Leave with pay**
Authorized time off with pay - examples include vacation, compensatory time, and parental leave.

**Leave without pay**
Any absence of an employee from duty without compensation.

**LEOFF 1**
Law Enforcement and Fire Fighters Retirement System (Prior to October 1, 1977).

**LEOFF 2**
Law Enforcement and Fire Fighters Retirement System (Since October 1, 1977).

**Limited commission (also called a special commission)**
Grants a deputy specific duties within a specified area.

**Longevity pay**
Additional pay given for length of service.

**Major**
Appointed by the Sheriff with the consent of the County Council and subordinate to the rank of Division Chief.

**Managing Patrol Performance (MPP)**
A computer based patrol staffing model.

**Mandatory training**
Training that is mandated by state or federal regulations (i.e., Firearms, EVOC, Hazmat, First Aid and CPR).

**Master Police Officer (MPO)**

A non-civil service position appointed by a Selection Committee BI-annually from an eligibility list meeting the criteria in KCSO General Orders Manual Section 1.06.000 and subordinate to the rank of Sergeant.

**Media Relations Officer (MRO)**
Deputy chosen to be responsible for organizing all media interactions.

**Military leave**
Leave of absence with pay for active military duty.

**Non-chargeable services**
Services generally deployed county-wide and not charged under the contract for legislative or policy reasons.

**Non-commissioned**
Non-sworn personnel.

**Officer**
See Deputy

**Parental leave**
Leave of absence to care for a newborn child, a newly adopted child or a newly placed foster child.

**Permanent (Regular) assignment**
Normal duty station.

**PERS 1**
Public Employees Retirement System (Prior to October 1, 1977).

**PERS 2**
Public Employees Retirement System (Since October 1,1977).

**Phase I Recruit**
A deputy who is attending the Basic Law Enforcement Academy or one of the Pre or Post BLEA courses.

**Phase II Recruit**
A deputy who, after successful completion of the Basic Academy, is assigned to a precinct for field training for three months with a series of three Field Training Officers (FTO's).

**Phase III Recruit**
A deputy who successfully completes Phase II will be assigned to a district as a one-person unit/car under the supervision of a MPO (recruits will have special training assignments and receive monthly observation reports).

**Phase IV Recruit**
A deputy who, after 12 months of employment, is working safely, skillfully and effectively as a "competent police officer" (the deputy is assigned a MPO mentor through the end of his/her probationary time, but no longer has monthly observation reports).

**Post BLET/BLEA**
Post Basic Law Enforcement Training/Academy.

**Pre BLET/BLEA**
Pre Basic Law Enforcement Training/Academy.

**Premium pay**
Aditional pay for specialty assignment.

**Promotion**
The movement of an employee to a higher rank.

**Quartermaster**
A sergeant who provides uniforms and equipment for department personnel.

**Retirement**
Completing employment/service as administered and in accordance with the provisions of RCW Chapter 41.40.

**School Resource Officer (SRO)**
A deputy who provides a school-based community policing presence at primary and secondary schools.

**Shared Supervision Model**
Under the shared supervision model, the level, degree and type of precinct/city direct services (such as reactive patrol, precinct detectives and city administrative sergeants, for example) and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee (Precinct command and supervision shall be shared by the County and the City). Patrol and other precinct staff may be dedicated to the City, but line supervision and other staff are shared with the rest of the precinct.

**Sheriff**
Elected Chief Executive of the King County Sheriff's Office.

**Sick leave**
Paid leave of absence from work due to employee or family member's illness.

**Transfer**
Movement of an employee from one position to another position that has the same or comparable job classification and salary.

**Temporary assignment/position**
An assignment/position that is not a regular assignment/position and includes probationary period or provisional appointment.

**Termination**
Separation of employment as a result of discharge, resignation, retirement, reduction in force, or death.

**Vacancy**
A position which is empty, unfilled, or unoccupied such that no funds are being expended.

**Washington State Criminal Justice Training Center (WSCJTC)**
Commonly referred to as the "Academy", the WSCJTC is located in the City of Burien, and serves as the primary training site for western Washington police recruits.

# EXHIBIT G
# ARSON INVESTIGATION COSTING MODEL

## ARSON SERVICE TO CITIES
## SUMMARY OF ESTIMATED COSTS FOR AVERAGE
## OF 3 CALCULATION METHODS
### Updated for Cities participating as of 03/03/00

| Jurisdiction | Percent Based on Hours Share | Percent Based on Value Share | Percent Based on Incident Share | $ Share Average of Three Methods | Percent Average of Three Methods |
|---|---|---|---|---|---|
| Black Diamond | 1.3% | 1.4% | 0.9% | $1,469 | 1.2% |
| Burien | 20.4% | 15.4% | 18.0% | $22,007 | 17.9% |
| Carnation | 0.2% | 0.2% | 0.4% | $349 | 0.3% |
| Covington | 9.5% | 4.3% | 9.9% | $9,703 | 7.9% |
| Des Moines | 3.2% | 4.1% | 1.6% | $3,666 | 3.0% |
| Duvall | 0.1% | 1.2% | 0.9% | $896 | 0.7% |
| Enumclaw | 1.0% | 7.4% | 1.8% | $4,208 | 3.4% |
| Kenmore | 7.5% | 8.9% | 12.4% | $11,783 | 9.6% |
| Maple Valley | 3.7% | 6.4% | 6.1% | $6,625 | 5.4% |
| North Bend | 1.9% | 2.9% | 2.2% | $2,849 | 2.3% |
| Pacific | 1.5% | 4.1% | 1.9% | $3,045 | 2.5% |
| Seatac | 15.3% | 19.0% | 15.5% | $20,360 | 16.6% |
| Sammamish | 5.1% | 0.0% | 4.9% | $4,095 | 3.3% |
| Shoreline | 25.7% | 21.4% | 18.5% | $26,888 | 21.9% |
| Woodinville | 3.7% | 3.4% | 5.1% | $4,985 | 4.1% |
| **Total** | **100.0%** | **100.0%** | **100.0%** | **$122,929** | **100.0%** |

# EXHIBIT H
## ARSON INVESTIGATION
## CALL OUT PROTOCOLS

Fire Investigation Unit - Call Out Protocols – Contract Cites          FINV-0012b

Department/Issuing Agency
Building Services Division

Effective Date
Apr 1, 2000

Approved by

Type of Action   Page Number
**Revision Page 1 of 3**

1.0 **SUBJECT TITLE:** Fire Investigation Unit - Call Out Protocols for contract cities

2.0 **PURPOSE:**

2.1    To outline the policies of the King County Fire Marshal's Office regarding the investigation of fires in cities having a contractual agreement for fire investigation with King County and to establish recommended procedures to be followed by the responsible fire suppression agency in determining when a King County fire investigator should be requested.

3.0 **ORGANIZATIONS AFFECTED:**

3.1    Department of Development and Environmental Services
3.2    King County Fire Marshal's Office
3.3    Fire Departments/Districts providing fire suppression to a city that has contracted with the King County Fire Marshal's Office for fire investigation services.
3.4    King County Sheriff's Office
3.5    Cities having contracts with King County for fire investigation services

4.0 **REFERENCES:**

4.1    Uniform Fire Code
4.2    R.C.W. Chapter Title 9 and 9A
4.3    R.C.W. 19.27.110
4.4    R.C.W. 52.12.031 (7)
4.5    R.C.W. 48.48.060
4.6    King County Administrative Policies and Procedures
4.7    King County Fire Marshal Operating instructions Manual
4.8    King County Fire Marshal Policy & Procedure Manual

**Number: FINV-0012b**

## Page 2 of 3

5.0  **PROCEDURE:**

5.1    The Fire Investigation Unit should be notified and respond to fires as follows:

a.  Fires where one or more deaths have occurred.

b.  Fires where one or more serious injuries have occurred, and those injuries have required or are expected to require hospitalization of the injured party(s).

c.    Fires that are suspected to be, or are known to be intentionally set and are not investigated by Fire Department personnel under one of the excepted categories in 6.2.

d.    Fires where the fire suppression agency has not determined a cause, except where the loss is minimal and there is no measurable value in determining the cause.

e.    All fires where there is evidence that an explosive device was used to initiate the fire or resulted in the fire occurring.

**Note:  This provision is not intended to include containers normally found at the fire scene that exploded as a result of the fire, such as propane bottles, compressed air bottles or aerosol containers.**

5.2    The King County Fire Marshal's Office will maintain an investigative program designed to collect, store and disseminate information relating to the prevention of fires, accidental or arson caused, to reduce loss of life, fire related injuries, incident frequency and monetary loss.

5.3    Every effort will be made to determine the cause of every investigated fire.

5.4    Where the cause has been determined to be arson, the Fire Investigation Unit of the King County Fire Marshal's Office shall perform the follow-up investigation and preparation of criminal charges where appropriate.

5.5    In incidents involving death or serious injury where hospitalization was or is expected to be required, all reports, evidence, and photographs will be properly secured by the fire investigation unit until the case has been resolved

5.6    The King County Fire Investigation Unit will compile and submit monthly UCR (Uniform Crime Reporting) data for the Federal Bureau of Investigation to the King County Sheriff's Office, for cities who contract with the King County Sheriff's Office for police services and to the City Police department for all cities that maintain their own Police Department if requested.

6.0  **RESPONSIBILITIES:**

6.1    The King County Fire Investigation Unit is responsible for the investigation of all fires that have been investigated by the Fire Investigation Unit as outlined in section 5.1 of this document.

**Number: FINV-0012b**

## Page 3 of 3

**000093**

6.2    Qualified Fire Department personnel in the responsible fire suppression agency may conduct fire investigations in the following categories:

    a.    Intentionally set fires in Dumpsters and other refuse/garbage containers.

    b.    Intentionally set fires in Newspaper collection containers

    c.    Intentionally set fires in Newspaper distribution structures (Times, P.I., etc.).

    d.    Intentionally set fires in Containers used for collection of clothing, etc.

    e.    Intentionally set fires in abandoned vehicles with a value less than $250.

    f.    And other such fires as the responsible fire department is qualified to investigate.

6.3    For investigations conducted by Fire Department personnel for the investigations noted in section 6.2 above the following recommended procedures may be followed:

    a.    Notification of the King County Fire Investigation Unit the following business day of all fire investigations conducted by the Fire Department in accordance with Section 6.2 for all fires that were determined to be intentionally set.

    b.    Examination of the fire scene to determine area, point of origin and cause

    c.    Identification, protection, preservation and collection of all physical evidence for all fires that were determined to be intentionally set.  Fire department personnel will assist the responsible police department patrol unit in packaging of evidence, which will then be transported by the patrol unit for storage.

    d.    Preparation of a comprehensive fire investigation report using the King County Fire Investigation Unit format and, where necessary, a fire scene sketch for all fires that were determined to be intentionally set.

    e.    Photographing of the fire scene should be accomplished in three (3) steps, 1) prior to disturbing any debris or other items at or near the point of origin, 2) once again during the examination and 3) at the conclusion of the examinations.  Any items considered to be evidence should be shown in photographs at the time and place they were discovered and identified.

    f.    Notification of the responsible police department via the police communications center where arson is suspected or confirmed.

    g.    Forwarding of the fire report along with all available information obtained during the investigation and transfer of the physical evidence, where appropriate, to the Fire Investigation Unit for all fires that were determined to be intentionally set.

    h.    Forwarding a copy of the photographs (or other acceptable photographic medium) and the negatives of the incident to the Fire Investigation Unit for all fires that were determined to be intentionally set.

> Note:    The proper documentation of fire incidents, accidental or arson, is critical.  The scene examination must provide factual information describing what, where, why, and how this fire occurred.  Photographs, properly taken, will provide a picture record of the conditions on arrival, during examination, and at the conclusion.  The combination will be the basis for re-construction of the fire scene, determination of important time factors and sequence of events prior to and at the time of the fire, including the fire tactics used in extinguishing the fire, an important consideration.

**COPY**

**PENDING**

CITY OF SHORELINE
Clerk's Receiving
No: _1269_
Date: _8/22/00_

# INTERLOCAL AGREEMENT BETWEEN KING COUNTY AND THE CITY OF SHORELINE RELATING TO LAW ENFORCEMENT SERVICES

This is an Interlocal Agreement between King County, a home rule charter county, a political subdivision of the State of Washington, hereinafter referred to as the "County", and the City of Shoreline, a municipal corporation of the State of Washington, hereinafter referred to as the "City".

WHEREAS, a number of cities in King County contract with the County for the provision of law enforcement services within their City boundaries, and

WHEREAS, the County has adopted policies that support the development and continuation of these contracts to preserve the quality, depth and breadth of its law enforcement services, and

WHEREAS, the King County Sheriff's Office (KCSO) acts on behalf of the City, which is responsible for law enforcement services within its jurisdiction; and

WHEREAS, the County and the contract cities recently completed negotiating a new interlocal agreement for 2000 and beyond, which embodies the following principles adopted by County Council Motion 9540:

1. County law enforcement employees should feel responsibility toward and demonstrate responsiveness to cities with agreements for law enforcement services.
2. Each city should have the flexibility to determine the level and deployment of certain services and to identify service priorities, thereby controlling costs.
3. Each city should have the ability to choose unique police uniforms and markings for police vehicles assigned to the City.
4. County law enforcement employees should work cooperatively with city organizations in a problem-solving mode to improve the safety and welfare of city residents and visitors.
5. The County should provide at a reasonable and predictable cost, efficient, high-quality, appropriate law enforcement services supported by technology that furthers the goals of each city and the County.
6. The contracts and service agreements should maintain equity among the interests of city and unincorporated area residents.
7. The agreements should preserve, to the extent practical, the valuable law enforcement services provided by the KCSO, while providing a high level of local service and decision-making.

NOW, THEREFORE, pursuant to RCW 39.34, the County and the City hereby agree:

1. Law Enforcement Services. The County will make available to the City any of the law enforcement services listed in Exhibit A, "King County Sheriff's Services" (Exhibit A), which is incorporated herein by reference.

   1.1. Precinct/City Services. Precinct/city services consist of law enforcement and other related services provided by personnel assigned to a police precinct primarily for the benefit of the geographic areas within the boundaries of the precinct except as may be modified by Section 2. Precinct/city services include:

      1.1.1. Reactive patrol to enforce state law and City-adopted municipal, criminal, and traffic codes and to respond to residents' and business' calls for service;

      1.1.2. Proactive patrol to prevent and deter criminal activity;

      1.1.3. Traffic patrol to enforce applicable traffic codes;

      1.1.4. Precinct detectives to investigate local crimes such as burglary, vandalism and auto theft;

      1.1.5. Community service and community crime prevention deputies;

**000095**

    1.1.6.  Drug Awareness Resistance Education (DARE) deputies;

    1.1.7.  Precinct command and support staff; and

    1.1.8.  Police reserves to perform a variety of routine police patrol functions.

    1.1.9.  For purposes of this agreement, precinct/city services shall be considered required or optional in accordance with Exhibit A, except that precinct command staff shall not be required if the City opts to provide its own precinct under Section 6.4.

1.2.    <u>Support Services.</u> Support services consist of:

    1.2.1.  Investigation services by deputies assigned to a central criminal investigation unit investigating such crimes as major crimes, drug offenses, fraud and such reports as missing persons, vice, and major accidents. These deputies are supported by crime scene analysis, crime laboratory, polygraph, identification, and evidence control.

    1.2.2.  Special operations services such as canine patrol, hostage negotiations, tactical unit, and bomb disposal; and

    1.2.3.  Communications services, including call receiving, dispatch, and reports.

    1.2.4.  For purposes of this agreement, precinct/city services shall be considered required or optional in accordance with Exhibit A, except that hostage negotiation and bomb disposal may be provided by City deputies under the city department model described herein.

1.3.    <u>Administrative Services.</u> Administrative services include legal advisor, planning and statistics, subpoena control, training, weapons permits, accounting, payroll, personnel, labor relations, media relations, fleet control, radio maintenance, purchasing, records, inspections/internal investigations, and other services provided by other County Agencies in support of the KCSO. Such services do not include legal services of the King County Prosecuting Attorney relating to enforcement of municipal criminal and traffic codes or prosecutions arising thereunder.

    1.3.1.  For purposes of this agreement, administrative services shall be required, except as otherwise noted in Exhibit A, which is incorporated herein by reference.

2.    <u>City Department, Shared Supervision and Flexible Services Models.</u> Law enforcement services provided to the City under this agreement shall be available to the City under a city department model, a shared supervision model, or a flexible services model, provided that the City must select any service that is required in accordance with Exhibit A.

2.1.    <u>City Department Model.</u> Under the city department model, the level, degree and type of precinct/city services and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee.

    2.1.1.  Such positions shall be assigned to the City and shall be dedicated to work within the City limits, subject to responses to assist another jurisdiction or County police precinct according to mutually agreed-upon written criteria.

    2.1.2.  The number of such positions assigned to the City will remain constant. The City recognizes that the number of personnel may vary to the extent that positions are vacant or positions are filled but not available for assignment, including Phase I and Phase II recruits and personnel on long-term disability leave, vacation leave, sick leave or other leave. In accordance with Section 6.9, the transfer of personnel will be coordinated by the KCSO, in consultation with the City Chief Executive Officer or designee, to minimize the impact of potential vacancies.

    2.1.3.  Support and administrative services shall be provided to the City at the level, degree and type as provided by the County in unincorporated King County, except as otherwise modified by Section 6.3.

2.1.4. Additional support services may be purchased by the City and assigned for the sole benefit of the City, provided they are optional services as defined in Exhibit A.

2.2. <u>Shared Supervision Model.</u> Under the shared supervision model, the level, degree and type of precinct/city direct services (e.g., reactive patrol, precinct detectives, and City administrative sergeants) and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee. Precinct command and supervision shall be shared by the County and the City.

2.2.1. Such precinct/city direct services positions shall be assigned to the City and shall work within the City limits, subject to responses to assist another jurisdiction or County police precinct according to mutually agreed-upon written criteria.

2.2.2. The number of such positions assigned to the City will remain constant. The City recognizes that the number of personnel may vary to the extent that positions are vacant or positions are filled but not available for assignment, including Phase I and Phase II recruits and personnel on long-term disability leave, vacation leave, sick leave or other leave. In accordance with Section 6.9, the transfer of personnel will be coordinated by the KCSO, in consultation with the City Chief Executive Officer or designee, to minimize the impact of potential vacancies.

2.2.3. Support and administrative services shall be provided to the City at the level, degree and type as provided by the County in unincorporated King County, except as otherwise modified by Section 6.3.

2.2.4. Additional support services may be purchased by the City and assigned for the sole benefit of the City, provided they are optional services as defined in Exhibit A.

2.3. <u>Flexible Services Model.</u> Under the flexible services model, base level law enforcement services will be provided to the City in proportion to the City's share of workload, unless the City enhances services as provided for herein or unless the City opts to provide its own precinct under Section 6.4.

2.3.1. Positions designated to provide precinct/city services to the City shall be dedicated to work within the precinct in which the City is located, subject to responses to assist another jurisdiction or KCSO precinct according to mutually agreed-upon written criteria.

2.3.2. Additional precinct/city services may be purchased at the discretion of the City and will be used in accordance with mutually agreed-upon protocols.

2.3.3. Additional support services may be purchased by the City for the sole benefit of the City, with the exception of any support service that is required in accordance with Exhibit A.

3. <u>City Law Enforcement Services.</u>

3.1. <u>2000 City Law Enforcement Services.</u> Beginning January 1, 2000, the County agrees to provide to the City the level, degree and type of precinct/city and support services in accordance with Exhibit B, "Financial Exhibit" (Exhibit B), along with related administrative services.

3.2. <u>Revisions to City Law Enforcement Services.</u> In 2001 and thereafter, revisions to City law enforcement services shall be made in accordance with Section 4.

4. <u>Compensation.</u>

4.1. <u>Development of Service Costs.</u> The County shall develop service costs for each precinct/city, support, and administrative service provided by the KCSO .

4.1.1. Service costs shall include, but not be limited to, salary, benefits and special pays, if any, for personnel providing the service, along with any associated clothing allowance, quartermaster, overtime, supplies, services, telephone, motor pool, lease cars, systems services, insurance, equipment and associated administrative costs. If not already included, costs shall include

**000097**

adjustments for cost-of-living and inflation.

4.1.2.  Service costs shall not include the cost of services that are required by state law, provided only within unincorporated King County, or supported by a dedicated revenue source, and services excluded from cost allocation at the discretion of the County. For the purpose of the agreement, such services and their associated administrative costs shall be considered non-chargeable.

4.1.3.  Service costs shall reflect the deduction of revenues.

4.2.  Development of Unit Costs. The County shall develop unit costs for each precinct/city and support service based on service costs developed in accordance with Section 4.1. Unit costs are listed in Exhibit A.

4.3.  Calculation of City's Estimated Agreement Amount. Service costs and unit costs shall be the basis for calculating the City's estimated agreement amount. The City shall be charged for services on the basis of FTE's (full-time equivalents) or workload billing factors as outlined in Exhibit A.

4.4.  City's Estimated Agreement Amount. The estimated agreement amount is shown in Exhibit B. The County agrees to revise this amount annually following the King County Council's adoption of the Annual County budget. The County will provide the City by March of the year for which the budget has been adopted a revised estimated agreement amount, if it is less than the amount shown in Exhibit B.

4.5.  Mid-year Adjustment. Mid-year supplemental appropriations requested by the City will be reflected as adjustments in the current year estimated agreement amount.

4.6.  Billing. The estimated agreement amount shall be billed monthly in 12 equal amounts. Payments shall be due within 30 days after invoicing by the County.

4.7.  Revisions to City Law Enforcement Services and Agreement Amount. Beginning in 2000, by September 1, or the first working day thereafter, the County shall provide the City with an estimate of the subsequent year's unit costs and service data in the form of a revised Exhibit A and an estimate of the City's agreement amount for the same level of service for the subsequent year in the form of a revised Exhibit B. By September 15, or the first working day thereafter, the City shall notify the County of any changes in service or model for the subsequent year. By October 5, or the first working day thereafter, the County shall provide the City with the estimated agreement amount for the subsequent year based on the changes in service requested by the City, along with revisions to Exhibit B.

4.8.  Limit on Annual Growth for Selected Expenditures. A cap on growth in charges shall be in place for the sum of the following group of items: quartermaster, supplies, services, telephones, capital, system services, printing, central county support services, insurance, and motor pool, except for vehicle purchase and fuel. The annual growth in the sum of these costs per FTE shall not exceed the growth in the previous July to June Urban Wage and Clerical Workers Index for greater Seattle. All other charges, including but not limited to any costs related to existing contractual obligations or labor contracts currently in negotiations, binding arbitration requirements, federal or state court mandates, federal or state law requirements, recommendations of the Oversight Committee that have a fiscal impact and are approved by the County, or any other costs determined by the full Oversight Committee to be beyond the County's control, shall not be subject to this cap.

4.9.  Reports. The City will receive a monthly Overtime, Salary, Special Pay and Benefits Report that will include current and year-to-date expenditures for overtime, salary, special pay, and benefits. The report will provide a comparison between the actual expenditures and budgeted amounts based on the adopted March Cost Book and exhibits for the previous calendar year. The City will also receive monthly vacancy reports.

4.10.  Application. The City hereby agrees to pay for discretionary overtime expenses separately. Only

dedicated police and dedicated support staff overtime, salary, special pay, and benefit costs are covered by this section.

4.10.1. The City agrees to pay for actual overtime, salary, special pay, and benefit costs.

4.10.2. If the City has a population of under 20,000 and exceeds its budgeted amount for overtime, special pay, salaries, and benefits by more than five percent, it will have the option to pay the amount exceeding five percent over the subsequent two years. At least 50 percent of the balance must be paid in the second year after the overage occurs. The City is responsible for paying the overage that does not exceed five percent in the first year.

4.10.3. Upon termination of an Interlocal Agreement between the City and the County, the City is obligated to pay all incurred overtime, special pay, salaries, and benefits overage costs by the termination date.

4.11. Reconciliation. Annual adjustments will be made in March of each year in such a way that if the City has a positive balance at year-end of the previous calendar year, it will receive a credit, and if the City has a deficit, it will receive a debit in the subsequent monthly billing. All computations will be based on actual overtime, salary, special pay, and benefits costs.

4.12. Computation. The cost formula shall be calculated by totaling the actual costs of overtime, salary, special pay, and benefits of the City and reconciling that figure to the City's budgeted amount. The annual adjustment process would occur as described in Section 4.11.

4.13. Discretionary Overtime. It is the intent of the City and the KCSO to provide operational overtime when requested for special events, dignitary protection and unusual occurrences. Overtime, when requested in these categories, will be billable at the actual overtime rate of the deputy(s) working. Responses to events listed below are treated as if the event were occurring in any other jurisdiction, with the responsibility falling on that jurisdiction.

4.13.1. If the City requests and utilizes KCSO deputies on overtime for special events within the City, the actual deputy overtime expenditure will be billed to the City following the event. This billing will occur with the standard monthly billing, in accordance with Section 4.6. Examples include, but are not limited to, park patrol, parades, and community events.

4.13.2. If the City experiences a disaster or unusual occurrence that is confined within its boundaries and officer overtime is requested by the City Police Chief to stabilize the situation, the actual overtime expenditures will be billed only if disaster relief reimbursement funds are not approved. Examples of this include, but are not limited to, a plane crash, riot, or union strike.

4.13.3. In the case of a County, State, or National declared disaster for which overtime is required to manage the event, the overtime expense will be billed to the appropriate agency (e.g., FEMA). If reimbursement for overtime is not granted, then the City will be responsible for the direct overtime expense, less any mutual aid provided. Examples of this include, but are not limited to, flooding, windstorms, and sink holes.

4.13.4. In the event a dignitary requiring federal, state, or local protection visits a City, the City will determine if additional police response is needed. The City Chief Executive Officer, in consultation with the City Police Chief, will establish the level of service to be provided.

4.13.5. The KCSO Special Operations Section provides dignitary protection when the dignitary arrives in the County and assists in escorting the dignitary to the City. If the dignitary detail includes the US Secret Service, other Federal Government Agencies, or KCSO Special Operations, then the City is not responsible for expenses related to that detail. City expense is confined to meeting the City's established level of service for the dignitary visit, if overtime is incurred. Examples of dignitary protection services include, but are not limited to, traffic and crowd control related to visits from the Office of the President of the United States and foreign dignitaries.

4.13.6. Billing Process: The City Police Chief will accumulate and code all special event overtime forms. The original form will be routed to payroll and a copy forwarded to the Contract Unit for billing preparation.

5. <u>Decisions and Policy-Making Authorities.</u> The County will provide the services identified in Exhibit B in accordance with the following:

   5.1. <u>Operational Decisions and Policy-Making Authorities.</u> The respective authorities of the City and the County to make operational decisions and develop and implement policies shall be governed by the guidelines contained in Exhibit C, "Roles and Responsibilities of Contract Service Personnel" (Exhibit C).

   5.2. <u>City Police Chief.</u> The City may designate a county officer assigned to the City to act in the capacity of the police chief, consistent with the guidelines contained in Exhibit C.

6. <u>Special Provisions.</u>

   6.1. <u>Use of Non-Sworn Personnel.</u> The City and the County intend to increase the use of non-sworn personnel, and the parties agree that the following functions and positions, among others, can be considered by the Oversight Committee for civilianization: parking enforcement; warrant service; court liaison; crime scene technician; evidence transport; background investigations; records management; crime prevention; accident scene traffic director; missing children services; lost property services; vacation house checks; business watch; permitting; fingerprinting; abandoned vehicle tagging; park patrol; and prisoner transport.

   6.2. <u>City Purchases.</u> As an alternative to using the County's routine supplies and equipment, the City may purchase routine supplies or purchase or lease any equipment for its own use, provided that prior written approval is obtained from the County and the equipment can be integrated into applicable County systems. Routine supplies and equipment include, but are not limited to, paper, copying machines, cellular telephones, and office furnishings. In the event the City has received County approval to purchase and/or lease any of these or similar items for its own use, the County will delete from the City's contract amount the full county charge for any items that otherwise would have been provided by the County. The County will not approve items it can provide at an equal or lower cost or that are not standard issue.

   6.3. <u>Hourly Charges for Optional Support Services.</u> To the extent the City does not select one or more support services designated as optional, the County will not charge the City for those services. In the event that any of these services are deployed at the request of the City's Police Chief or his/her designee with the appropriate authority, the City agrees to pay the County for the service based on the hourly charges contained in Exhibit E, "Hourly Costs For Selected Services" (Exhibit E). The County intends to apply these charges to other jurisdictions, regardless of whether the jurisdiction has an agreement with the County for law enforcement services.

   6.4. <u>City Police Facility.</u> A City that selects either a city or shared supervision model department may purchase or lease its own facility and provide for the operation and maintenance of said facility. The facility must meet or exceed all applicable city, state and federal codes and requirements. The facility must also adequately meet the space and security needs of permanently assigned KCSO personnel. The City will be responsible for all charges associated with the planning, design, construction, and/or renovation of the facility and property.

      6.4.1. If the City provides a full-function police precinct as defined in Exhibit F, "Glossary of Terms" (Exhibit F) for all precinct personnel serving the city, the County will delete all applicable support, facilities, operation, and maintenance costs for city-assigned personnel. If the City provides city police facilities that otherwise meet the full definition of a police precinct but house fewer than all precinct personnel serving the city, the County agrees to negotiate on a case-by-case basis an equitable reduction of charges to the City. This reduction

of charges to the City shall equal the contract charges for facilities, support, operations and maintenance for the personnel housed in the city facility. In all cases, plans and cost adjustment for city police precincts, support and operations must be negotiated and agreed upon in writing in advance, and payment for police services must remain current within 30 days of billing by the County.

6.5.   Use of City Facility by County. There may be situations when the County needs to lease space for personnel serving unincorporated King County from the City. When this situation occurs, the County and the City may choose to negotiate for the use of a city facility on a case-by-case basis.

6.6.   Refund of Accrued Replacement Reserves. If the City has reimbursed the County for the initial purchase of any equipment prior to this agreement, or if the City has purchased equipment under the provisions of Section 6.2, and if the City chooses to terminate this agreement, the County agrees to refund to the City any accrued replacement reserves, and any accrued market rate interest, on such equipment, including vehicles, and transfer ownership of such equipment from the County to the City.

6.7.   Exclusion of Replacement Charges for 800 MHz Radios. If the City or County chooses to terminate this agreement, the County agrees to transfer ownership of that number of radios determined to have been purchased by the 800 MHz Levy from the County to the City. The City agrees to assume responsibility for any service costs associated with continued use of the radios on the regional 800 MHz radio system, including the cost of subscriber access, reprogramming, and maintenance. All other police 800 MHz radios used in the City will revert to County ownership. The cost of additional radios shall be borne by the City.

6.8.   Observation of Labor Negotiations. The City may participate with other cities that contract with the County for law enforcement services to select no more than two representatives to observe labor negotiations between the County and the collective bargaining units representing the employees of the KCSO, provided that such observers adhere to rules established by the County and the bargaining units for the negotiations.

6.9.   Stabilization of Personnel. The County will coordinate transfers to minimize the time positions are vacant, as well as the impact of vacancies to cities.

   6.9.1.   Deputies who have been with the City for less than 24 months will not be granted a lateral transfer except with the concurrence of the City Chief Executive Officer.

   6.9.2.   Timing and replacement of city-assigned staff who are promoted to a position outside the city will be managed with the concurrence of the City Chief Executive Officer.

6.10.  Assignment of Detectives. At the request of the City and to the extent feasible, as determined by the KCSO in consultation with the City members of the Oversight Committee, the County shall assign to the precinct incorporating the City detectives from the KCSO Criminal Investigation Division, with the exception of detectives in the Major Crimes Unit of the division.

6.11.  Additional Training. The City may provide training for City precinct detectives to perform criminal investigations for any optional criminal investigation services. The cost of any such training shall be borne by the City.

6.12.  Cost Effect of Service Decisions. The City's costs shall not be raised as a result of another city's decision regarding the level or makeup of services. The County reserves the right to eliminate services to fulfill this provision.

6.13.  Requests for Support Services. The City Police Chief or his/her designee shall have the authority to request any support service provided to the City. If such request is denied, the commander in charge of the support service shall review the decision and provide a report to the City Chief Executive Officer regarding the final determination.

6.14.  City Identification. The City may select unique insignia and/or colors for uniforms and/or vehicles used by the deputies assigned to the City, provided that some form of the KCSO logo is retained on

the uniforms and vehicles. To the extent that the annual quartermaster allowance exceeds the costs of routine replacement of uniform items, the allowance shall be applied to the costs of adding the insignia to the uniforms or replacing the uniforms with alternative uniforms. Additional costs related to the uniforms shall be borne by the City. However, whenever an officer leaves the City, either at the initiative of the County or of the officer, within 24 months or less after the assignment to the City, and the cost of outfitting the replacement officer in the City exceeds the City's annual quartermaster allocation, then the City and the County shall split the cost equally. The uniforms will be pooled by the KCSO quartermaster and reissued to new or existing City deputies. The City will retain items that were specially purchased by the City (e.g., bicycle uniforms). Each City is allocated a quartermaster budget calculated by multiplying the number of dedicated sworn personnel by the quartermaster cost per FTE as calculated in the costing book each year. If, at the end of the year, the City goes over its allocated quartermaster budget due to the additional cost of City-specific uniform items, those additional costs will be billed in the following year.

6.15.   Start-up Costs. The City agrees to reimburse the County for any and all personnel costs incurred toward hiring deputies in the year prior to their being  assigned to the City.. These costs, further described in Section 4.1 herein, shall be added to the total costs billed for year the deputies are assigned to the city and paid by the City according to this agreement.

6.16.   Asset seizure. The KCSO Drug Enforcement (DEU) and Vice Units shall be the seizing entities for any asset seizure and forfeiture investigations involving drug-related offenses in violation of the Uniform Controlled Substances Act (RCW 69.50.505), violations of the Legend Drug Act (RCW 69.41), violations of the Money Laundering Act (RCW 9A.83), and/or any additional criminal or civil seizure statutes that may be applicable currently or in the future related, initiated by the City within its jurisdiction, or other cases initiated pursuant to asset seizure laws and under this agreement.

6.16.1.   The terms of this agreement apply to seizures and forfeitures that result from investigations initiated by, or with significant participation by, the City, regardless of whether the City contracts for DEU or Vice services.

6.16.2.   Seizures and forfeitures not initiated by, and without significant participation by, the City, are not covered by this agreement, and the City will not be provided a share of any forfeited funds.

6.16.3.   If there is a dispute as to the City's share of any forfeited funds, the person in charge of the DEU or Vice Unit and the City Police Chief will meet to attempt to resolve the matter. If this process does not result in a mutually-agreed upon resolution, the dispute will be handled in accordance with Sections 16 and 17 of this agreement.

6.16.4.   The KCSO will be responsible for gathering the proceeds from all relevant sales, for accounting for all seizures and forfeitures in conjunction with the personal and real property encompassed under the agreement, for submitting the 10 percent to the State of Washington in accordance with RCW 69.50.505 or making any other mandatory disbursement under the applicable statutes, and for distributing the remaining funds -- in equal shares -- to the parties. This distribution of remaining funds will occur after the KCSO has deducted any and all costs incurred related to the seizure and forfeiture. The final accounting of the seizure and distribution of funds will accompany the check the County writes to the City.

6.16.5.   Any properties, real or personal, forfeited to the KCSO pursuant to this agreement will be sold in accordance with RCW 69.50.505.

6.16.6.   Any funds distributed to the City will be used in accordance with RCW 69.50.505(i). By signing this agreement, the City acknowledges that it is solely responsible for familiarizing itself with the authorized use of forfeited funds as stated in the applicable RCW Chapter. If the City uses forfeited funds in a manner contrary to the seizure statutes, the County may terminate the asset forfeiture provisions of this agreement with 24 hours notice.

6.16.7. The KCSO DEU has sole discretion over the manner in which cases will proceed, including the discretion to settle or dismiss a case if deemed appropriate, and whether assets forfeited will be sold or put into service.

6.16.8. Any and all property seized by and forfeited to the KCSO Drug Enforcement or Vice Unit, whether by order of the court, or accepted in settlement in conjunction with this agreement, will be divided in the same manner as indicated above.

6.16.9. The parties agree and acknowledge that the attorney assigned to the KCSO DEU does not have an attorney-client relationship with the City. If such an attorney-client relationship exists, it exists only between the KCSO and the attorney assigned to the KCSO Drug Enforcement Unit.

6.17. <u>Business Plan Development (Strategic Plan):</u> The KCSO will develop a multi-year police services business plan that includes the City in the process. This process would identify KCSO initiatives in advance of the budget year. The goals would be:

- Document the long-term vision for the KCSO (3 to 5 year time frame); departmental mission and core business(s).
- Identify strategic goals for accomplishing the vision; be action oriented with a strong emphasis on achieving practical outcomes.
- Identify how customers will be served consistent with the vision and with limited financial resources.
- Provide objectives, including performance measures, where available, that can be evaluated in the future.

6.18. <u>Computers</u>

6.18.1. The KCSO will provide a laptop and appropriate accessories or a desktop computer to every dedicated and flex sworn FTE purchased by the City.

6.18.2. The KCSO Computer Resources Unit will be responsible for the repair and maintenance of all equipment, software, and accessories that are used in conjunction with the mobile computing program.

6.18.3. Replacement computers will be furnished via the Computer Replacement Fund, approximately every three years. The City will be charged a monthly replacement fee based on the number of computers in the City. This annual cost will appear as a separate line in Exhibit B. If the City bought its own computers, it will receive the unspent balance of the replacement funds should the agreement be terminated.

6.18.4. Annually, the County will estimate the purchase price of replacement hardware, software, accessories and tax. The monthly computer replacement cost will be calculated on a useful life of three years.

6.19. <u>Fire Investigation</u>

6.19.1. For the year 2000, the City may purchase fire investigation services through this agreement. These services will be provided by the King County Department of Development and Environmental Services (DDES) Fire Marshall's Office by separate agreement with the KCSO. The cost for this service is shown on Exhibit B, and will be calculated in accordance with Exhibit G: "Arson Investigation Costing Model". Fire Investigation callouts will be in accordance with protocols outlined in Exhibit H: "Arson Investigation Call Out Protocols", unless superseded by new or revised protocols adopted by the Oversight Committee, DDES and affected fire agencies.

6.19.2. During the year 2000, the Oversight Committee will sponsor a series of discussions, to include the KCSO, DDES, the King County Executive, contract cities, Fire Agencies, and other cities receiving DDES Fire Investigation Services. The KCSO, in conjunction with

**000103**

DDES, fire agencies and the cities will be responsible for developing a work plan for Oversight Committee approval. The purpose of this work plan will be to identify options for the long-term provision of fire investigation services to city customers. The work plan may consider the following issues: call-out protocols, costing methods, service delivery and organizational issues. The intent of these parties is that the Oversight Committee will make a recommendation for future service delivery by October 31, 2000.

6.19.3. Day-to-day fire investigation operational issues will be handled at the lowest practical organizational level. This may typically include staff from the city police, fire agencies and DDES.

6.20.  Police Investigations Information. The KCSO Major Accident Response and Reconstruction Unit (MARR) and other police investigative services under this agreement shall include providing the City access to all records related to investigations of traffic collisions within the City, upon request, as the records are completed or become available, including but not limited to State Traffic Collision Reports, photographs, diagrams, witness statements and victim(s) statements in the possession of the KCSO. Distribution of toxicology reports and autopsy reports will be controlled by RCW 46.52.065 and 68.50.105. If victims or witnesses identified in any police report or statement have not been interviewed by County personnel, City representatives will coordinate their interviews of these persons with the KCSO prior to contact to avoid prejudice to ongoing criminal investigations, including discussion of scope, timing and value of joint interviews. The KCSO and the City will name representatives to implement this section.

7.  Reporting.

7.1.  Reporting Districts. Reporting districts coterminous with the City boundaries will be maintained to enable accurate data collection on law enforcement services provided and criminal activity.

7.2.  Notification of Criminal Activity. The City Police Chief, if designated, or the precinct commander will notify the City in the event of a significant criminal occurrence within the City.

7.3.  Quarterly Reports. The County will report quarterly on criminal activity and on law enforcement services provided by major category of service as listed in Exhibit B.

8.  Personnel and Equipment. The County is acting hereunder as an independent contractor so that:

8.1.  Control of Personnel. Control of personnel, standards of performance, discipline and all other aspects of performance shall be governed entirely by the County. Allegations of misconduct shall be investigated in accordance with Exhibit D, "Internal Investigations Protocol for Contract Cities" (Exhibit D).

8.2.  Status of Employees. All persons rendering service hereunder shall be for all purposes employees of the County, except that the City may hire non-commissioned City employees to perform certain functions in conjunction with County police personnel.

8.3.  Liabilities. All liabilities for salaries, wages, any other compensation, injury, sickness or liability to the public for negligent acts or omissions arising from performance of the law enforcement services by the County hereunder shall be that of the County.

8.4.  Provision of Personnel. The County shall furnish all personnel and such resources and material deemed by the County as necessary to provide the level of law enforcement service herein described.

8.5.  Municipal Violations. KCSO commissioned personnel shall cite violations of municipal ordinances into the City's municipal court.

9.  City Responsibilities. In support of the County providing the services described in Exhibit B, the City promises the following.

9.1.  Municipal Police Authority. The City promises to confer municipal police authority on such County deputies as might be engaged hereunder in enforcing City ordinances within City boundaries, for the

purposes of carrying out this agreement.

9.2.   **Municipal Criminal Code.** The City promises to adopt a criminal municipal code that incorporates, at a minimum, any portion of the Washington State criminal code defining a crime or crimes, which falls within the jurisdiction of the district or municipal court. This includes all misdemeanors and gross misdemeanors. Provided, that if the City fails to adopt, chooses not to adopt, or repeals such criminal municipal code, the City shall be responsible for reimbursing the County for all expenses associated with prosecution, adjudication, sentencing, and incarceration in any criminal case involving a crime that could have been included within a City municipal code.

9.3.   **Special Supplies.** The City promises to supply at its own cost and expense any special supplies, stationary, notices, forms, and the like where such must be issued in the name of the City.

10. **Duration.** This agreement is effective upon authorization and signature by both parties, except that services and charges shall commence on January 1, 2000. The agreement period shall continue until December 31, 2002, and may be extended until December 31, 2004 by consensus of the Oversight Committee. After the original or extended agreement period has elapsed, the agreement shall renew automatically from year to year unless negotiations for a new contract are initiated by the Oversight Committee, those negotiations are completed and a new contract is adopted, or unless either party initiates the termination process outlined herein.

11. **Termination Process.** Either party may initiate a process to terminate this agreement as follows:

11.1.   **Notice of Termination.** The City may choose at some future time to provide law enforcement services other than through the County; similarly, the County may choose at some future time not to provide law enforcement services to the City. Any party wishing to terminate the agreement shall issue a written notice of intent not less than 45 days prior to issuing an 18-month written notice under section 11.2 of this agreement. Upon receipt of the written notice of intent, the City's Chief Executive Officer and the Sheriff shall hold a meeting, the purpose of which will be to understand the notice of intent including background of the reason(s), and a review of alternatives and impacts, among other matters. It is suggested that the Chair of the Oversight Committee be copied on any communication covered in this Section.

11.2.   **Written Notice.** After the 45-day period has run under Section 11.1 of this agreement, the party desiring to terminate the agreement shall provide at least 18 months written notice to the other party.

11.3.   **Transition Plan.** Within 120 days of the receipt of such written termination notice, the parties shall commence work on and complete a mutually agreed-upon transition plan providing for an orderly transition of responsibilities from the County to the City. The planning method should proceed along the lines of a project management approach to facilitate the joint planning process by the City and the County. The overarching goal of the transition plan will be to ensure there is not disruption in service to the community as the providers change. This plan would include desired outcomes, project phases (including a preliminary transition plan development) and timelines, and project roles and responsibilities. Each party shall bear its respective costs in developing the transition plan and each will work cooperatively with the other party in the coordination of efforts. The transition plan shall identify and address the continuity of professional and quality police services before, during and through the transition period. The transition plan shall also identify and address any personnel, capital equipment, workload and any other issues related to the transition. Each party shall bear its respective costs in developing the transition plan.

11.4.   **Termination and/or Interest Charge.** In the event the City fails to make a monthly payment within 60 days of billing, the County may charge an interest rate within two percentage points of the interest rate on the monthly County investment earnings. In addition, in the event the City fails to make a monthly payment within 120 days of billing, the County may terminate this agreement with 90 days written notice.

**000105**

11.4.1. If the City and County are in disagreement over a portion of the bill, the City can withhold the disputed portion of the bill by placing the amount in escrow and following the process outlined in Section 16.3 for resolution of agreement dispute issues.

11.4.2. The County will not charge interest on the disputed portion of the bill nor will it begin the termination process as outlined in section 11.4 so long as the City follows the process outlined in 11.4.1 and pays the non-disputed portion of the bill within 60 days of billing.

## 12. Indemnification.

12.1. <u>City Held Harmless.</u> The County shall indemnify and hold harmless the City and its officers, agents, and employees, or any of them from any and all claims, actions, suits, liability, loss, costs, expenses, and damages of any nature whatsoever, by any reason of or arising out of any negligent act or omission of the County, its officers, agents, and employees, or any of them relating to or arising out of performing services pursuant to this agreement. In the event that any such suit based upon such a claim, action, loss, or damages is brought against the City, the County shall defend the same at its sole cost and expense; provided that the City reserves the right to participate in said suit if any principle of governmental or public law is involved; and if final judgment in said suit be rendered against the City, and its officers, agents, and employees, or any of them, or jointly against the City and the County and their respective officers, agents, and employees, or any of them, the County shall satisfy the same.

12.2. <u>County Held Harmless.</u> The City shall indemnify and hold harmless the County and its officers, agents, and employees, or any of them from any and all claims, actions, suits, liability, loss, costs, expenses, and damages of any nature whatsoever, by any reason of or arising out of any negligent act or omission of the City, its officers, agents, and employees, or any of them relating to or arising out of performing services pursuant to this agreement. In the event that any suit based upon such a claim, action, loss, or damages is brought against the County, the City shall defend the same at its sole cost and expense; provided that the County reserves the right to participate in said suit if any principle of governmental or public law is involved; and if final judgment be rendered against the County, and its officers, agents, and employees, or any of them, or jointly against the County and the City and their respective officers, agents, and employees, or any of them, the City shall satisfy the same.

12.3. <u>Liability Related to City Ordinances, Policies, Rules and Regulations.</u> In executing this agreement, the County does not assume liability or responsibility for or in any way release the City from any liability or responsibility which arises in whole or in part from the existence or effect of City ordinances, policies, rules or regulations. If any cause, claim, suit, action or administrative proceeding is commenced in which the enforceability and/or validity of any such City ordinance, policy, rule or regulation is at issue, the City shall defend the same at its sole expense and, if judgment is entered or damages are awarded against the City, the County, or both, the City shall satisfy the same, including all chargeable costs and reasonable attorney's fees.

12.4. <u>Waiver Under Washington Industrial Insurance Act.</u> The foregoing indemnity is specifically intended to constitute a waiver of each party's immunity under Washington's Industrial Insurance Act, Chapter 51 RCW, as respects the other party only, and only to the extent necessary to provide the indemnified party with a full and complete indemnity of claims made by the indemnitor's employees. The parties acknowledge that these provisions were specifically negotiated and agreed upon by them.

13. <u>Non-discrimination.</u> The County and the City certify that they are Equal Opportunity Employers. The County has developed and implemented Affirmative Action Programs in accordance with the guidelines in Revised Order 4 of the United States Department of Labor. The City will develop and implement Affirmative Action Programs that meet the applicable federal standards.

14. <u>Audits and Inspections.</u> The records and documents with respect to all matters covered by this agreement shall be subject to inspection, review or audit by the County or City during the term of this agreement and three (3) years after termination.

15. <u>Amendments.</u> This agreement may be amended at any time by mutual written agreement of the City, the King County Sheriff, and the King County Executive, provided that any such amendment must be approved by the Oversight Committee pursuant to section 17.2.4 of this agreement.

16. <u>Agreement Administration.</u>

16.1. <u>Agreement Administrators.</u> The City Chief Executive Officer and the City Police Chief, if designated, or the precinct commander shall serve as agreement administrators to review agreement performance and resolve operational problems. The agreement administrators will meet at least quarterly with either party authorized to call additional meetings with ten days written notice to the other.

16.2. <u>Referral of Unresolved Problems.</u> The City Chief Executive Officer shall refer any police service operational problem, which cannot be resolved, to the King County Sheriff. The Sheriff and City Chief Executive Officer shall meet as necessary to resolve such issues. Unresolved problems shall be referred to the Oversight Committee.

16.3. <u>Agreement Dispute Issues.</u> Agreement dispute issues involving agreement language interpretation, cost, and other non-operational matters shall be referred to the Sheriff, the Chair of the Oversight Committee, the King County Executive's representative to the Oversight Committee, and the affected party or parties to review and resolve. In the event that the dispute involves the city of the Oversight Committee Chair, the Oversight Committee will designate an alternate City Chief Executive Officer to serve as Chair of the Oversight Committee for the purpose of resolving the specific issue. Any unresolved problems shall be referred to the Oversight Committee as a whole.

17. <u>Agreement Oversight.</u>

17.1. <u>Oversight Committee.</u> The City and the County agree to establish an Oversight Committee consisting of the chief executive officers, or their designees, of the cities that contract with the County for law enforcement services, the King County Sheriff, one person designated by the County Executive, and one person designated by the chair of the King County Council's Law, Justice and Human Services Committee, or its successor.

17.2. <u>Scope of Committee.</u> The committee shall meet at least bi-monthly to ensure the parties comply with the provisions of this agreement, including the administration of the agreement and the management and delivery of police services under the agreement.

17.2.1. In addition, the committee shall establish performance measurements, standards, and benchmarks for evaluating the quality of the County's police services. These performance measures shall be developed in cooperation with the Cities that contract for police services. Focus of these measures shall be based on outcome measurements for effectiveness and efficiency as identified by the City Chief Executives and the Sheriff. The County shall work with the City, if desired, to develop a range of options by July 2000, or a later mutually agreed-upon date.

17.2.2. The City's member of the Oversight Committee may make recommendations on any issue affecting agreement costs and conditions, such as the budget for the KCSO, personnel recruitment, training and standards, and collective bargaining issues. These recommendations may reflect approval or disapproval of any County proposal relating to these issues and shall be submitted to the County Executive, County Council, and/or City Council as appropriate. The County shall provide a written report on the outcome of these recommendations.

17.2.3. If an operational problem or agreement dispute is referred to the Oversight Committee pursuant to sections 16.2 or 16.3 of this agreement, the Oversight Committee will meet and attempt to resolve the problem or dispute. If the Oversight Committee is unable to resolve the problem or dispute, this agreement shall be construed in accordance with the laws of the State of Washington.

17.2.4. The Oversight Committee is responsible for approving amendments to this agreement, which are first agreed to by the City, the King County Sheriff, and the King County Executive. A majority of a quorum of the Oversight Committee will constitute approval of a proposed amendment.

18. <u>Entire Agreement/Waiver of Default.</u> The parties agree that this agreement is the complete expression of the terms hereto and any oral or written representations or understandings not incorporated herein are excluded. Both parties recognize that time is of the essence in the performance of the provisions of this agreement. Waiver of any default shall not be deemed to be a waiver of any subsequent default. Waiver or breach of any provision of the agreement shall not be deemed to be waiver of any other or subsequent breach and shall not be construed to be a modification of the terms of the agreement unless stated to be such through written approval by the County, which shall be attached to the original agreement.

IN WITNESS WHEREOF, the parties have executed this agreement.

KING COUNTY                                    City of Shoreline

_____                        _____
King County Executive                          Robert Deis, Chief Executive Officer

Approved as to Form                            Approved as to Form

_____                        _____
Deputy Prosecuting Attorney                     Ian Sievers, City Attorney
for NORM MALENG
King County Prosecuting Attorney

**000108**

- 14 -

# PLACEHOLDER

for

## KING COUNTY SHERIFF'S OFFICE
## SERVICE NOTEBOOK

## 2000 PROPOSED – RED BOOK

## 2000 ADOPTED – CORAL BOOK

**Shoreline - 2000**

Exhibit B
2000
Proposed

L:\BAKERJO\KCSO\CONTRACT\2000\[2000 EXHIBITS.xls]Workload

**UPDATED FOR 1996-98 WORKLOAD AND 2000 PROPOSED RED BOOK**
**CITY MODEL**

| *Precinct/City Services* | | City Model | | | |
|---|---|---|---|---|---|
| Title | R/O | Billing Factor | Amount | Cost | FTEs |
| Canine (city) | R | FTE | | | |
| Captain - Operations | O | FTE | 1.00 | 127,977 | 1.00 |
| Captain- Pct. Operations | R | % FTE | | - | - |
| Community Crime Prevention Unit | O | FTE | | - | - |
| Storefront Officers | O | FTE | 2.00 | 202,046 | 2.00 |
| Community Service Officers | O | FTE | 1.00 | 75,241 | 1.00 |
| Evidence and Supply Tech | O | FTE | - | - | - |
| DARE | O | FTE | - | - | - |
| Pct. Facilities and Maintenance | | % Pct. FTE | N/A | - | N/A |
| Major - City Chief | O | FTE | 1.00 | 143,532 | 1.00 |
| Major - Pct. Commander | R | % FTE | | - | - |
| Motorcycle | O | FTE | 3.00 | 258,033 | 3.00 |
| Admin Spec II | O | FTE | | - | - |
| Admin Spec III | O | FTE | | - | - |
| Admin Spec IV | O | FTE | 1.00 | 66,892 | 1.00 |
| Pct. Crime Analysis | O | % FTE | | - | - |
| Pct. Detectives | R | FTE | 3.00 | 296,398 | 3.00 |
| Pct. Detective Sgt. | R | FTE | 1.00 | 108,129 | 1.00 |
| Pct. Pro-Active | O | FTE | 4.00 | 387,971 | 4.00 |
| Reactive Patrol | O | FTE | 23.00 | 2,323,525 | 23.00 |
| Reactive Patrol Sgts. | R | FTE | 6.00 | 681,146 | 6.00 |
| | | Subtotal | $ | 4,670,889 | 46.00 |

| *Support Services* | R/O | ? | Billing Factor | Amount | Service Cost | FTE |
|---|---|---|---|---|---|---|
| Air Support | O | N | % DCFS | 10.04% | - | - |
| Asset Forfeiture | O | | | | | |
| Bomb Disposal Unit | R/O | Y | % Incidents | 8.99% | 13,316 | 0.09 |
| Canine | R/O | Y | % Details | 9.43% | 94,164 | 0.75 |
| Communications-911 | R | Y | % DCFS | 10.04% | 553,605 | 7.13 |
| Drug Enforcement Unit | O | N | % Pt 1 Crime | 9.54% | | |
| DWI | O | N | FTE | | - | - |
| Fraud, Forgery, Organized Crime | O | Y | % Caseload | 11.70% | 105,282 | 0.82 |
| General Traffic | O | N | FTE | | - | - |
| Hostage Negotiation | R/O | Y | % Incidents | 4.04% | 234 | 0.00 |
| Major Crimes Detectives | R | Y | % Pt 1 Major Crime | 9.17% | 274,877 | 2.02 |
| Homicide Placeholder | | | % Pt 1 Major Crime | 9.17% | 33,616 | |
| Marine Patrol | O | N | NA | | - | - |
| MARR Unit | R/O | N | % Incidents | 10.16% | - | - |
| Tactical Unit | R | Y | % of Incidents | 3.17% | 8,953 | 0.05 |
| Vice | O | N | % Unit Arrests | 8.43% | - | - |
| Gambling | O | N | % Gambling Licenses | 11.71% | - | - |
| | | | Subtotal | | 1,084,046 | 10.86 |
| | | | Total | | 5,754,935 | 56.86 |
| | | | Less copier charges | | (2,837) | |
| | | | Less phone charges | | (20,056) | |
| | | | Revised Total | | 5,732,042 | |
| | | | Computer Replacement Fund (37 Computers) | | 45,942 | |
| | | | COPS Universal Hiring Credit (1.0 FTE)[3] | | (25,000) | |
| | | | **REVISED TOTAL CHARGE** | | **5,752,984** | **56.86** |

Note: Shoreline will pay for Air Support, the Drug Unit, and the MARR Unit on a per use basis at the prices shown in the updated Exhibit E. Asset forfeiture cases will be handled by the Asset Forfeiture Unit on a case by case basis with any proceeds shared on a 50/50 split between King County and the City of Shoreline.

1) The DARE officer will be replaced by a pilot SRO program. The costs of this program will be billed as discretionary overtime.

2) Letter dated 1/13/99 adds a patrol officer for a total of 22 dedicated officers.

3) COPS Universal Hiring Grant Credit will be received annually at $25,000 per FTE for three years.

## Shoreline - 2000

Exhibit B
2000
Proposed

| Workload Indicators | City | % Prec | % Prec. Flex | %Total |
|---|---|---|---|---|
| Dispatched Calls | 13560 | 28.89% | 0.00% | 10.04% |
| Pct Detective Caseload | 560 | 41.42% | | |
| Comm. Crime Prev. Csld. | | 0.00% | | 0.00% |
| Part 1 Crimes | 2,117 | | | 9.54% |
| Part 2 Crimes | 2,227 | | | |
| Total Crimes | 4,344 | | | 9.65% |
| Part 1 Major Crimes | 94.33 | | | 9.17% |
| Bomb Disposal Incidents | 14.00 | | | 8.99% |
| Canine Details | 201.00 | | | 9.43% |
| FFOC Caseload | 251.67 | | | 11.70% |
| Hostage Negotiation Incidents | 0.67 | | | 4.04% |
| Tactical Unit Incidents | 0.67 | | | 3.17% |
| Vice Unit Arrests | 7.00 | | | 8.43% |
| Licensed Gambling  Establishments | 19.67 | | | 11.71% |
| Precinct CPO Flex | - | | | |
| Precinct Crime Analysts | - | | | |
| Precinct Detectives | 3 | | | |
| Pct. Patrol Flex % | 0.00% | | | |
| React Patrol Sgts. % | 0.00% | | | |
| Captains - Precinct Ops | 1 | | | |
| Pct. Facilities and Maintenance cost | n/a | | | |
| Precinct Sworn Staff | 44 | | | |
| Precinct CCPU Staff | - | | | |

| | |
|---|---|
| Shoreline Precinct Staff | 46.00 |
| Telephone Cost per FTE | 436 |
| Total Shoreline Telephone Credit | 20,056 |

| | |
|---|---|
| Pct. 2 Copier Charges | 10,453 |
| # of FTE at Pct. 2 (inc. Shoreline) | 170 |
| Cost per FTE | 62 |
| Shoreline Precinct Staff | 46 |
| Shoreline Credit | 2,837 |

Shoreline        Updated for 2000 Proposed Budget 1996-98 Workload Data Averages

# EXHIBIT C
## ROLES AND RESPONSIBILITIES OF CONTRACT SERVICE PERSONNEL

I.    **ROLES AND RELATIONSHIPS**
  A)  COMMISSIONED PERSONNEL
     1)  Contract service police chiefs, as well as other commissioned personnel, will be responsive to the public safety needs of the contracting entity, as well as its officials, residents, and/or population served.
  B)  CONTRACT POLICE CHIEF (CITY POLICE CHIEF FOR CONTRACT CITIES)
     1)  Command Structure
        (a)  Reports directly to Precinct Commander
           (i)  If the contract police chief is a KCSO Major, then he or she shall report directly to Division Chief
           (ii)  Works at the direction of the City Chief Executive Officer or contract manager/administrator, and in compliance with KCSO policy, procedures, and directives.
     2)  Title/Insignia
        (a)  Police chiefs shall wear one star on each collar point signifying their role as "Police Chief" of a contracting entity . Regardless of KCSO rank, contract chiefs will be addressed as "Chief of Police" in public settings, such as city council meetings, public meetings, and contract service staff meetings.
     3)  Interaction with Contracting Entity
        (a)  The police chief shall interact with contract entity staff and officials in accordance with RCW 35.18.110
        (b)  The police chief shall discuss and agree upon protocols for routine, daily interactions with the contract service CEO or manager/administrator as deemed appropriate by the contracting entity.
        (c)  The police chief shall function as a department head within the contracting entity's organizational structure, and is expected to conduct himself or herself in a manner that supports and maintains trust in the contracting entity.
        (d)  At the direction of the contract service CEO or manager/administrator, and as needed, the police chief shall attend and participate in the contracting entity's staff and council meetings, and official functions, celebrations, and commissions. As requested by the CEO or manager/administrator and as needed, the police chief will also represent the contract service police department at community meetings and functions.
        (e)  The Police Chief is the City's Director of Police Services and represents the Chief Executive Officer of the City for all law enforcement matters in the community/City. This may include working with other relevant City departments and or other public agencies (e.g. courts, schools, etc.) on behalf of the City.
        (f)  The KCSO views the Contract Cities as customers and will maintain a customer service orientation to managing the contracts. Consistent with this philosophy Police Chiefs are expected to represent the City's point of view, consider City needs in carrying out their duties and advocate on behalf of their City similar to other City departmental directors.
     4)  Duties
        (a)  Supervision Received:
           (i)  KCSO command staff maintains authority and responsibility over police chiefs and the precinct.
           (ii)  In the event a contracting entity's procedure, policy, goal or operation differs from that of the KCSO, that entity shall negotiate with the KCSO to reach a final determination.
           (iii) The entity's Chief Executive Officer or manager/administrator shall have the general duty and responsibility of providing the assigned police chief with general direction relative to the furnishing of law enforcement services to the contracting entity.
           (iv) The police chief shall maintain communication between command structures to ensure that changes in the KCSO are agreeable to the contracting entity and that changes in the entity

are agreeable to the KCSO.
(b) Duties Include:
- (i)   Operations
- (ii)   The police chief shall direct overall Contract City service police operations, ensuring law enforcement services within the City.
- (iii)   The police chief shall analyze operations and develop plans to manage resources and ensure effective and efficient delivery of services.
- (iv)   The police chief shall oversee the implementation of all policies and procedures relating to police services that are established by the contracting entity, and shall provide to the KCSO any written information relative to police services created by the entity. The chief shall notify the KCSO of all procedures that differ from KCSO policies and procedures.
- (v)   The police chief shall utilize analysis of crime data to establish a plan for deploying resources to address identified needs.
- (vi)   The police chief shall coordinate police activities for the contracting entity, including hours of operation and contract-specific protocols and procedures.
- (vii)   The police chief shall prepare, in coordination with the King County Sheriff's Office Contract Unit, a budget for the contract police department.
- (viii)   The police chief shall coordinate the response of support services used for law enforcement for the contracting entity (e.g., CID, Special Operations).
- (ix)   The police chief shall establish policies and protocols for the response of services that are not purchased by the entity in advance (e.g., optional services).
- (x)   The police chief shall notify the contracting entity's CEO or manager/administrator of any use of support services that were not purchased in advance upon their deployment for enforcing laws for the contracting entity.
- (xi)   The police chief shall notify the contracting entity's CEO or manager/administrator of all major crimes or incidents.

5)   Goals, Objectives, and Performance Indicators
- (a)   The police chief shall establish goals and objectives for contract police services in conjunction with the City Chief Executive Officer that reflect the specific needs of the contracting entity. The chief shall also identify performance indicators for the entity to measure the established goals and objectives.
- (b)   The police chief shall oversee the implementation of all KCSO policies and procedures within the contract services, and maintain a copy of current police procedures on file at the entity's chosen central location for the entity's reference. The chief shall notify the entity's CEO or manager/administrator of any KCSO procedures or changes that either supplement or affect the entity's established goals and objectives for police services.
- (c)   The police chief shall review the entity's performance indicators for police services against the stated goals and objectives, and shall report to the CEO or manager/administrator on progress of goal attainment.

6)   Personnel Management and Training
- (a)   The police chief shall establish standards of performance for officers assigned to the contracting entity.
- (b)   The police chief shall identify areas of supplemental training for officers assigned to the entity, and make recommendations to the KCSO for supplemental training. The chief shall also make recommendations to the contracting entity's CEO or manager/administrator for training not provided by KCSO.
- (c)   The police chief shall periodically review the performance of officers assigned to the contracting entity and report to entity's CEO or manager/administrator and precinct command staff or Division Chief any recommendations for performance improvement.
- (d)   The police chief shall perform selected roll calls of contract-assigned officers.
- (e)   The police chief shall coordinate and direct duties of officers assigned to the contracting entity as

specific needs arise, and as requested by entity's CEO or manager/administrator within the context of established policies and procedures. The chief shall report to the precinct any changes in duty of contract-assigned officers.

C) CONTRACTING ENTITY POLICE MID-MANAGER
  1) Command Structure
     (a) The mid-manager shall report directly to police chief
     (b) The mid-manager shall function as "Acting Police Chief" in the absence of the police chief
  2) Title /Insignia
     (a) The mid-manager shall wears appropriate rank insignia on contract entity uniform consistent with KCSO rank
  3) Interaction With Contracting Entity
     (a) The mid-manager shall interact with contracting entity staff and officials in accordance with RCW 35.18.110
     (b) The mid-manager shall function as a police department mid-manager within contracting entity structure and shall present himself or herself in the community in a manner that supports and maintains trust in the contracting entity.
  4) Duties
     (a) The mid-manager shall directly assist police chief in carrying out duties outlined in I.B(4)

D) FIRST LEVEL SUPERVISOR/LINE OFFICERS/DETECTIVES/STAFF
  1) Command Structure
     (a) These individuals shall report directly to the police chief, mid-manager,    or    supervisor as appropriate.
  2) Title/Insignia
     (a) These individuals shall wear rank insignia on uniform consistent with KCSO rank
  3) Interaction With Contracting Entity
     (a) These individuals shall interact with contracting entity staff and officials in accordance with RCW 35.18.110
     (b) These individuals shall present themselves in the community in a manner consistent with being a member of the entity's staff and in a manner that supports and maintains trust in the contracting entity.
  4) Duties
     (a) Will be commensurate with other KCSO assignments

## II. AUTHORITY
A) The contracting entity police chief shall have authority commensurate with his or her responsibility, which is recognized internally and externally.

B) Issues that fall within the purview of the police chief of a contracting entity
  1) Prioritization of reactive patrol time
  2) Awards Program
  3) Travel and Expense Guidelines
  4) False Alarm Ordinances/Response
  5) Impound Procedures
  6) Community Policing
  7) Crime Prevention Standards
  8) Additional Training
  9) Supplemental Reports
  10) Incident Notification Policies
  11) Job Description of Supplemental full-time employees (FTE's)
  12) Expenditure of the contracting entity's police budget
  13) Direct access to department support services
  14) Staffing assignments and deployment within confines of dedicated City positions

15) Prioritize meeting attendance (meetings for the contracting entity take priority over county meetings; county meetings will be kept to a minimum and conducted as efficiently as possible)
16) Authorization of support services.
17) Use of volunteers and volunteer programs (except reserve officer).

C) Issues that must have input and approval from the King County Sheriff's Office
    1) Accident Response Criteria
    2) Court Attendance Policies
    3) Call-out Procedures
    4) Uniform/Equipment/Vehicles (including appearance regulations)
    5) Reserve Program
    6) Communications Center Procedures
    7) Traffic Enforcement Policy and Procedures
    8) K-9 Response Policy
    9) Response Priorities
    10) Shift Hours
    11) Specialty Unit Personnel Selection (Street Crimes Units, Crime Prevention, D.A.R.E., etc.)
    12) Prioritization of Precinct Detective Unit Workload

D) Issues that fall within the purview of the KCSO and must be consistent between the King County Sheriff's Office and the contracting entities.
    1) Pursuit Policy
    2) Seized Property
    3) Basic Skills Training
       (a) Emergency Vehicle Operations; Firearms (Include Reviews)
    4) Use of Force
    5) Off-Duty Work
    6) Field Training Officer Program
    7) Personnel Evaluation System/Annual Performance Evaluation
    8) Internal Investigations Unit Policies & Procedures
    9) Reporting Forms
    10) Hostage Negotiations and Tactical Team Deployment
    11) Alternative Work Schedules
    12) Standards of Conduct
    13) Arrest Warrant Policies
    14) Labor Contracts (4)
    15) Supervisory Standards

E) Issues governed exclusively by KCSO policies & procedures:
    1) DV Response
    2) Search & Rescue
    3) Civil Process
    4) Landlord - Tenant Policies
    5) Abandoned/Unclaimed Property
    6) Training
    7) Basic Law Enforcement Training Academy
    8) BAC - State
    9) First Aid - L&I
    10) CPR - L&I
    11) Computer Info Access Training
    12) Airborne/Bloodborne Pathogens
    13) OSHA/WSHA/EPA Requirements
    14) King County Code of Ethics
    15) Public Disclosure and Records

16) Gun Permits and Concealed Pistol Licenses
17) Federal Labor Standards Act
18) Family Leave and Benefits Policies
19) Americans with Disabilities Act
20) Civil Service Rules
21) King County Career Service Rules
22) EEOC Guidelines/Requirements
23) Discipline

## III. INCENTIVES/REWARDS

A) Contracting entities may award incentives or other recognition within existing guidelines, ethics guidelines, department rules and contract language, interlocal agreements and the award systems of the entity, KCSO and county.

## IV. COMMITMENTS, TRANSFERS, and PROMOTIONS

A) KCSO staff requesting assignment to a contracting entity will make a two-year commitment to work as a member of the entity's police force, except in cases of promotion or other special circumstances. Such special circumstances require the concurrence of the entity's CEO or manager/administrator and applicable KCSO Division Chief.

B) The transfer of personnel affecting the entity's police force will be coordinated by the KCSO, in consultation with the entity's Police Chief, to minimize the impact of potential vacancies. The number of the entity's vacant positions will be managed with a goal of achieving proportionality with the total number of vacant positions in the KCSO.

C) Contracting entities may not make de facto promotions by their selection of personnel except in instances in which a pool of candidates is made available for selection by the KCSO.

## V. STATISTICAL REPORTS

A) Whenever possible, reports shall be generated by the Research, Planning, and Information Services Unit.

B) All reports will be routed through RP&IS Unit.

C) A courtesy copy of all unique reports that are generated by contract police departments will be sent to RP&IS Unit.

D) Reports will include footnotes identifying the source of the information.

E) Service enhancement proposals will be routed through RP&IS Unit.

## VI. SHARED SUPERVISION PROTOCOL

A) The City's Police Chief is responsible for police services within the City. If desired by the City, the City Police Chief, Precinct Commander and appropriate staff shall develop an agreement that addresses in-City Precinct directed field services.

B) Dedicated City officers will be assigned to respond to calls within the City in line with City protocols, and consistent with section II of this document.

# EXHIBIT D:
## INTERNAL INVESTIGATIONS UNIT PROTOCOLS

I.  POLICY STATEMENT
   A) It is the desire of the Internal Investigations Unit (IIU) to be responsive to the needs of the Contract Cities, be sensitive to the rights of the individuals involved, and to comply with statutes, case law, and collective bargaining agreements that govern internal investigations.

II. COMPLAINTS OF PERSONNEL MISCONDUCT RECEIVED IN THE CONTRACT CITY
   A) Current KCSO policy requires that members refer the complainant to IIU or notify a supervisor. Supervisors who become aware of a complaint shall conduct a preliminary investigation and forward the results to their commander. IIU will ensure that the City Police Chief is made aware of complaints of significant misconduct in their City at the earliest practical time. The City Police Chief will ensure that the Chief Executive Officer is informed of all complaints of significant misconduct at the earliest practical time.

   B) City staff and councilmembers may receive complaints of Department personnel misconduct. These complaints should be referred to the Chief Executive Officer or designee who in turn will pass on to Precinct Commander/City Police Chief, an on duty supervisor, or IIU depending on the time of day, the availability of a supervisor, or the seriousness of the complaint.

III. COMPLAINTS OF PERSONNEL MISCONDUCT RECEIVED IN IIU
   A) Complaints received in the Internal Investigations Unit concerning personnel assigned to a contract city or incidents that occur within the City, will be investigated according to current policy. The IIU Commander, or designee, shall notify the affected Precinct Commander/City Policy Chief of the complaint as soon as practical.
   B) The criteria for case assignment to the precinct/city for investigation shall be consistent with current KCSO Policy. General Order 10.40.135, identifies the following types of investigations that will remain with IIU for follow-up:
       1) When sustained, could result in termination or demotion
       2) Where criminal conduct is involved
       3) When there are controversial or newsworthy circumstances
       4) Any complaint the Commander deems appropriate to be investigated by IIU
       5) Any complaint the Sheriff directs IIU to investigate
   C) The Internal Investigations Unit reviews all "Use of Force Reports", and investigates complaints of excessive force.

IV. INVESTIGATION OF PERSONNEL MISCONDUCT
   A) Investigations of alleged personnel misconduct shall be conducted in accordance with General Orders Manual, Section 10, Personnel Complaint Manual and General Orders Manual 3.01.000, Investigation of Personnel Misconduct.
   B) Completed investigations conducted at the Precinct or City level shall be reviewed by the Precinct Commander/City Police Chief and forwarded to IIU through the Chain of Command.

V.  INFORMATION PROVIDED TO THE CHIEF EXECUTIVE OFFICER
   A) Chief Executive Officers shall be notified of complaints of misconduct involving KCSO personnel assigned to the City or of incidents that occur within the City. This notification may come from either the Precinct Commander or the City Police Chief.

   B) Results of the investigation will be shared with the Chief Executive Officer, as soon as practical, but the investigative file may not be copied in accordance with case law. Specific discipline for sustained

complaints emanating from the member's assignment to the City will be disclosed to the Chief Executive Officer.

C) Written correspondence to the complainant will originate from the KCSO. City letterhead with the signature block, "Commander, Internal Investigations Unit" may be used rather than the KCSO letterhead. The City letterhead option is available for the City, but not required.

VI.    GRIEVANCE PROCEDURES

A) KCSO members may file a grievance concerning the findings or discipline as the result of a complaint investigation according to the current collective bargaining agreement.

B) Local, State, and Federal statues; case law; and the member's collective bargaining agreement govern the grievance procedure.

L:\BAKER\DI\KC\S\CONTRACT\2000\2000 EXHIBITS.xls\Workload

2000 EXHIBITS.xls   Exhibit E

## 2000 Hourly Costs for Selected Services--EXHIBIT E

| Service | 2000 Est. Cost | Avg Hours | 2000 Hourly Cost | Minimum Charge | Notes |
|---|---|---|---|---|---|
| Air Support* | 532,194 | 617 (1996-98 Avg Flight Hours*) | 863 | 863 | Min. charge is 1 hour for off-duty calls. |
| Bomb Disposal Unit | 148,138 | 879 (1996-98 Avg Mission Hours*) | 168 | 674 | Min. charge is 2 hours for 2 officers. |
| Canine Unit | 998,246 | 14,016 (2000 Person Hours**) | 71 | 142 | Min. charge is 2 hours for 1 officer. |
| DARE Unit | 96,218 | 1,752 (2000 Person Hours**) | 55 | 1,922 | Typical class = 35 hours at $1,922. |
| Drug Lab Response Team | 962,831 | 15,768 (2000 Person Hours**) | 61 | 244 | Min. charge is 2 hours for 2 officers. |
| Drug Unit | 962,831 | 15,768 (2000 Person Hours**) | 61 | 122 | Min. charge is 2 hours for 1 officer. |
| Hostage Negotiation Team | 5,783 | 162.50 (1996-98 Avg Mission Hours*) | 36 | 285 | Min. charge is 2 hours for 4 officers. |
| Major Crimes | 2,995,962 | 51,684 (2000 Person Hours**) | 58 | 116 | Min. charge is 2 hours for 1 officer. |
| Marine Patrol | 838,712 | — | 38 (Hourly Cost of Boat) / 61 (Hourly Cost of Staff) | 319 | Min. charge is 2 hours for 2 officers. |
| Marine Patrol - Dive Unit | see above | — | 38 / 61 | 561 | Min. charge is 2 hours for 4 officers. |

Exhibit E

| Service | 2000 Est. Cost | 1998 Mission Hours* | 2000 Hourly Cost | Minimum Charge | Notes |
|---|---|---|---|---|---|
| **MARR Unit** | 392,919 | 3,889 | 101 | 404 | Min. charge is 2 hours for 2 officers. |

| Service | 2000 Est. Cost | 2000 Person Hours** | 2000 Hourly Cost | Minimum Charge | Notes |
|---|---|---|---|---|---|
| **Polygraph Examiner** | 94,910 | 1,752 | 54 | 54 | |

| Service | 2000 Est. Cost | 1996-98 Avg Mission Hours* | 2000 Hourly Cost | Minimum Charge | Notes |
|---|---|---|---|---|---|
| **Tactical Unit** | 282,012 | 1,240 | 227 | 3,184 | Min. charge is 2 hours for 7 officers. |

* AIR SUPPORT UNIT DETAILS

Search & Rescue ASU missions will be "no charge".

Pro Net (bank hold-up) tracking call-outs will be "no charge".

On-view activity made by the ASU will be at "no charge" to the jurisdiction.

On duty call-outs for ASU by non-contract cites will be billed based on the hourly rate, for the "exact mission time" (no longer a two hour minimum).

Off-duty call-outs for ASU will be billed at the minimum rate of "one hour" (no longer at the two-hour minimum).

** Based on 1,752 available hours per year

| Available Time | Days | Hours |
|---|---|---|
| Work Days | 261 | 2,088 |
| Sick Leave | (9) | (72) |
| Vacation | (15) | (120) |
| Military Leave | (1) | (5) |
| In-Service Training | (5) | (40) |
| Holidays | (12) | (96) |
| TOTAL | 219 | 1,752 |

2000 EXHIBITS.xls  Exhibit E

## Speciality Unit Hours

| Unit | 1996 | 1997 | 1998 | 3 Yr Average |
|---|---|---|---|---|
| Air Support | 495.00 | 828.00 | 528.00 | 617.00 |
| Bomb Disposal | 1,672.00 | 563.50 | 402.00 | 879.17 |
| Hostage Negotiation | 75.25 | 208.50 | 203.75 | 162.50 |
| TAC-30 | 519.75 | 1,098.75 | 2,102.00 | 1,240.17 |

Exhibit E

# King County Sheriff's Office

## 1998 Workload and Staffing

Exhibit A, Part 3

### 1998 Workload Indicators

| | Beaux Arts | Burien | Carnation | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part I Major Crimes | 9 | 146 | 0 | 33 | 18 | 17 | 12 | 10 | 12 | 155 | 104 | 0 | 11 | 1 | 78 | 519 |
| Bomb Disposal Incidents | 0 | 9 | 0 | 0 | 0 | 5 | 0 | 3 | 5 | 3 | 14 | 0 | 8 | 0 | | 131 |
| Canine Details | 0 | 220 | 0 | 28 | 88 | 80 | 0 | 12 | 23 | 128 | 162 | 1 | 60 | 25 | 915 | 1,741 |
| PFOC Caseload | 0 | 128 | 0 | 59 | 42 | 40 | 4 | 42 | 37 | 103 | 226 | 0 | 66 | | 1,483 | 2,231 |
| Postage Negotiation Incidents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | 16 | |
| Medical Unit Incidents | 0 | 3 | 0 | 0 | 1 | 4 | 0 | 4 | 1 | 4 | 1 | 0 | 2 | 2 | 20 | 28 |
| Vice Unit Arrests | 0 | 2 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 8 | 125 | 130 |
| Licensed Gambling Establishments | 0 | 19 | 0 | 2 | 10 | 4 | 0 | 0 | 0 | 11 | 17 | 2 | 2 | x | 90 | 161 |

### 1998 Workload Indicators %

| | Beaux Arts | Burien | Carnation | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part I Major Crimes | 0.00% | 28.13% | 0.00% | 6.36% | 3.47% | 3.28% | 2.31% | 1.93% | 2.31% | 29.87% | 20.04% | 0.00% | 2.12% | 0.19% | 15.11% | 100.00% |
| Bomb Disposal Incidents | 0.00% | 6.87% | 0.00% | 2.29% | 2.29% | 3.82% | 0.00% | 1.53% | 3.82% | 2.29% | 10.69% | 0.00% | 6.11% | 0.76% | | 100.00% |
| Canine Details | 0.00% | 12.64% | 0.00% | 1.61% | 5.05% | 4.60% | 0.00% | 0.69% | 1.32% | 7.35% | 9.30% | 0.04% | 3.45% | 1.44% | 52.56% | 100.00% |
| PFOC Caseload | 0.00% | 5.74% | 0.00% | 2.64% | 1.88% | 1.79% | 0.18% | 1.88% | 1.66% | 4.62% | 10.13% | 0.00% | 2.96% | | 66.47% | 100.00% |
| Postage Negotiation Incidents | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 9.09% | 72.73% | 100.00% |
| Medical Unit Incidents | 0.00% | 10.71% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 3.57% | 14.29% | 4.55% | 0.00% | 9.09% | 9.09% | 71.43% | 100.00% |
| Vice Unit Arrests | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 14.29% | 4.55% | 0.00% | 9.09% | 15.87% | 96.15% | 100.00% |
| Licensed Gambling Establishments | 0.00% | 11.80% | 0.00% | 1.24% | 6.21% | 2.48% | 0.00% | 2.48% | 0.00% | 6.83% | 10.56% | 1.24% | 1.24% | 0.00% | 55.90% | 100.00% |

### 1996/97/98 Workload Indicator Average

| | Beaux Arts | Burien | Carnation | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part I Major Crimes | 0.00 | 143.00 | 0.00 | 19.00 | 25.33 | 12.23 | 11.50 | 11.67 | 16.00 | 155.33 | 94.33 | 0.00 | 14.33 | 0.33 | 525.11 | 1,028 |
| Bomb Disposal Incidents | 0.00 | 9.67 | 0.00 | 3.67 | 7.33 | 2.00 | 0.25 | 2.00 | 5.00 | 3.67 | 14.00 | 0.00 | 1.67 | 0.33 | 14.00 | 156 |
| Canine Details | 0.00 | 236.00 | 0.00 | 28.67 | 129.00 | 52.00 | 0.00 | 19.00 | 22.50 | 188.33 | 201.00 | 0.33 | 87.33 | 21.00 | 78.00 | |
| PFOC Caseload | 0.00 | 79.00 | 0.00 | 33.33 | 54.33 | 43.33 | 7.25 | 33.33 | 45.00 | 52.33 | 251.67 | 0.67 | 45.67 | 45.67 | 1,121.00 | 2,131 |
| Postage Negotiation Incidents | 0.00 | 2.00 | 0.00 | 1.00 | 1.00 | 0.33 | 0.00 | 0.00 | 0.50 | 1.67 | 0.67 | 0.00 | 0.00 | 1.33 | 1,414.33 | 2,151 |
| Medical Unit Incidents | 0.00 | 1.33 | 0.00 | 0.00 | 1.00 | 0.33 | 0.00 | 0.00 | 1.00 | 1.33 | 0.67 | 0.00 | 0.00 | 1.33 | 9.33 | 17 |
| Vice Unit Arrests | 0.00 | 0.67 | 0.00 | 0.00 | 0.33 | 0.00 | 0.00 | 0.00 | 0.00 | 1.00 | 7.00 | 0.00 | 3.33 | 3.33 | 12.00 | 21 |
| Licensed Gambling Establishments | 0.00 | 18.33 | 0.00 | 0.67 | 3.33 | 5.33 | 0.00 | 7.33 | 0.00 | 11.00 | 19.67 | 0.67 | 4.67 | 0.00 | 76.67 | 83 |

### 1996/97/98 Workload Indicator Average %

| | Beaux Arts | Burien | Carnation | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part I Major Crimes | 0.00% | 13.91% | 0.00% | 1.85% | 2.46% | 1.19% | 1.12% | 1.13% | 1.56% | 15.11% | 9.17% | 0.00% | 1.39% | 0.03% | 51.07% | 100.00% |
| Bomb Disposal Incidents | 0.00% | 6.21% | 0.00% | 2.35% | 4.71% | 1.28% | 0.16% | 1.28% | 5.46% | 2.35% | 8.99% | 0.00% | 1.25% | 0.35% | | 100.00% |
| Canine Details | 0.00% | 11.08% | 0.00% | 1.35% | 6.05% | 2.44% | 0.00% | 0.89% | 1.06% | 8.84% | 9.43% | 0.02% | 4.10% | | 50.88% | 100.00% |
| PFOC Caseload | 0.00% | 3.67% | 0.00% | 1.55% | 2.53% | 2.01% | 0.34% | 1.55% | 2.09% | 2.43% | 11.70% | 0.03% | 3.52% | 2.14% | 52.61% | 100.00% |
| Postage Negotiation Incidents | 0.00% | 12.12% | 0.00% | 6.06% | 6.06% | 2.01% | 0.00% | 0.00% | 3.03% | 10.10% | 4.04% | 0.00% | 0.00% | 8.08% | 65.75% | 100.00% |
| Medical Unit Incidents | 0.00% | 6.35% | 0.00% | 0.00% | 4.76% | 1.59% | 0.00% | 0.00% | 4.76% | 6.35% | 3.17% | 0.00% | 0.00% | 2.82% | 56.57% | 100.00% |
| Vice Unit Arrests | 0.00% | 0.90% | 0.00% | 0.00% | 0.49% | 0.00% | 0.00% | 0.00% | 0.00% | 6.33% | 3.17% | 0.00% | 15.87% | 15.87% | 57.14% | 100.00% |
| Licensed Gambling Establishments | 10.91% | | 0.00% | 0.40% | 1.98% | 3.17% | 0.00% | 4.37% | 0.00% | 6.53% | 11.71% | 0.49% | 2.78% | 4.02% | 57.74% | 100.00% |

# King County Sheriff's Office

## 1998 Workload and Staffing

Exhibit A, Part 3

### 1996 Workload Indicators

| | Beaux Arts | Burien | Covington | Federal Way | Kenmore | Maple Valley | North Bend | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0 | 145 | 17 | 0 | 23 | 16 | 14 | 175 | 78 | - | 11 | 0 | 808 | 1,287 |
| Bomb Disposal Incidents | 0 | 10 | 8 | 24 | 4 | 2 | 1 | 1 | 15 | - | 4 | 19 | 94 | 182 |
| Canine Details | 0 | 211 | 6 | 308 | 130 | 29 | 14 | 224 | 197 | - | 82 | 0 | 1,138 | 2,339 |
| FPOC Caseload | 0 | 22 | - | - | 73 | 18 | 21 | 276 | - | - | 98 | 83 | 1,337 | 1,938 |
| Hostage Negotiation Incidents | 0 | 0 | 0 | 2 | 1 | 1 | 0 | 1 | 0 | - | 0 | 3 | 4 | 12 |
| Tactical Unit Incidents | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | - | 0 | 3 | 9 | 17 |
| Vice Unit Arrests | 0 | 0 | 0 | 2 | 2 | 0 | 0 | 0 | 1 | - | 0 | 0 | 9 | 17 |
| Licensed Gambling Establishments | 0 | 18 | 0 | - | 0 | 7 | 9 | 11 | 21 | - | 6 | 0 | 97 | 169 |

### 1996 Workload Indicators %

| | Beaux Arts | Burien | Covington | Federal Way | Kenmore | Maple Valley | North Bend | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0.00% | 11.27% | 1.32% | 0.00% | 1.79% | 1.22% | 1.09% | 13.60% | 6.06% | 0.00% | 0.85% | 0.00% | 62.81% | 100.00% |
| Bomb Disposal Incidents | 0.00% | 5.49% | 4.40% | 13.19% | 2.20% | 1.10% | 0.55% | 0.55% | 8.24% | 0.00% | 2.20% | 10.44% | 51.65% | 100.00% |
| Canine Details | 0.00% | 9.02% | 0.26% | 13.17% | 5.56% | 1.24% | 0.60% | 9.58% | 8.42% | 0.00% | 3.51% | 0.00% | 48.65% | 100.00% |
| FPOC Caseload | 0.00% | 1.14% | 0.00% | 0.00% | 3.77% | 0.93% | 1.08% | 14.24% | 0.00% | 0.00% | 5.06% | 4.28% | 69.00% | 100.00% |
| Hostage Negotiation Incidents | 0.00% | 0.00% | 0.00% | 16.67% | 8.33% | 8.33% | 0.00% | 8.33% | 0.00% | 0.00% | 0.00% | 25.00% | 33.33% | 100.00% |
| Tactical Unit Incidents | 0.00% | 0.00% | 0.00% | 11.76% | 11.76% | 5.88% | 0.00% | 0.00% | 5.88% | 0.00% | 0.00% | 17.65% | 52.94% | 100.00% |
| Vice Unit Arrests | 0.00% | 0.00% | 0.00% | 11.76% | 11.76% | 0.00% | 0.00% | 0.00% | 5.88% | 0.00% | 0.00% | 0.00% | 52.94% | 100.00% |
| Licensed Gambling Establishments | 0.00% | 10.65% | 0.00% | 0.00% | 0.00% | 4.14% | 5.33% | 6.51% | 12.43% | 0.00% | 3.55% | 0.00% | 57.40% | 100.00% |

### 1997 Workload Indicators

| | Beaux Arts | Burien | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0 | 138 | 7 | 35 | 4 | 11 | 11 | 20 | 136 | 101 | 0 | 21 | 0 | 767 | 1,251 |
| Bomb Disposal Incidents | 0 | 10 | 2 | 15 | 1 | 0.5 | 1 | 12 | 7 | 13 | 1 | 5 | 43 | 62 | 170 |
| Canine Details | 0 | 277 | 41 | 169 | 72 | 10 | 31 | 22 | 213 | 244 | 1 | 120 | 112 | 1,310 | 2,598 |
| FPOC Caseload | 0 | 87 | - | 48 | - | - | 37 | 53 | 46 | 253 | 0 | 63 | 99 | 1,421 | 2,232 |
| Hostage Negotiation Incidents | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 7 | 8 | 17 |
| Tactical Unit Incidents | 0 | 1 | 0 | 2 | 1 | 0 | 0 | 1 | 1 | 1 | 0 | 0 | 3 | 7 | 19 |
| Vice Unit Arrests | 0 | 2 | 0 | 2 | 0 | 0 | 0 | 0 | 3 | 17 | 0 | 6 | 8 | 54 | 84 |
| Licensed Gambling Establishments | 0 | 18 | 0 | 0 | 5 | 0 | 9 | 0 | 11 | 21 | 0 | 6 | 0 | 104 | 174 |

### 1997 Workload Indicators %

| | Beaux Arts | Burien | Covington | Kenmore | Maple Valley | Newcastle | North Bend | Sammamish | SeaTac | Shoreline | Skykomish | Woodinville | Non-Contract | Uninc. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Part 1 Major Crimes | 0.00% | 11.03% | 0.56% | 2.80% | 0.32% | 0.88% | 0.88% | 1.69% | 10.87% | 8.07% | 0.00% | 1.68% | 0.00% | 61.31% | 100.00% |
| Bomb Disposal Incidents | 0.00% | 5.90% | 0.00% | 8.85% | 0.00% | 0.29% | 1.18% | 7.08% | 4.13% | 7.65% | 0.00% | 2.95% | 25.37% | 36.58% | 100.00% |
| Canine Details | 0.00% | 10.66% | 2.00% | 6.51% | 2.00% | 0.00% | 1.19% | 6.83% | 8.20% | 9.39% | 0.04% | 4.62% | 4.31% | 50.42% | 100.00% |
| FPOC Caseload | 0.00% | 3.90% | 0.00% | 2.15% | 0.00% | 0.47% | 1.66% | 2.38% | 2.06% | 11.34% | 0.04% | 2.82% | 4.44% | 63.68% | 100.00% |
| Hostage Negotiation Incidents | 0.00% | 0.00% | 0.00% | 1.84% | 0.00% | 0.29% | 0.00% | 5.88% | 5.88% | 9.34% | 0.04% | 0.00% | 11.76% | 47.06% | 100.00% |
| Tactical Unit Incidents | 0.00% | 3.90% | 0.00% | 2.05% | 1.81% | 0.47% | 0.00% | 5.26% | 2.06% | 11.34% | 0.00% | 0.00% | 11.76% | 36.84% | 100.00% |
| Vice Unit Arrests | 0.00% | 5.26% | 0.00% | 5.26% | 0.00% | 0.00% | 0.00% | 5.26% | 5.83% | 20.24% | 0.00% | 5.26% | 9.52% | 64.29% | 100.00% |
| Licensed Gambling Establishments | 0.00% | 10.34% | 0.00% | 0.00% | 2.87% | 0.00% | 5.17% | 6.32% | 6.32% | 12.07% | 0.00% | 3.45% | 0.00% | 59.77% | 100.00% |

# King County Sheriff's Office

1998  Workload and Staffing

Exhibit A, Part 3

Precinct Detectives' 1998 Workload

| Precinct Two & Five | Detective Cases | % Precinct Cases |
|---|---|---|
| Precinct Two & Five | 1352 | 100.00% |
| Carnation | 8 | 0.59% |
| Kenmore | 144 | 10.65% |
| North Bend | 27 | 2.00% |
| Sammamish | 93 | 6.88% |
| Shoreline | 560 | 41.42% |
| Skykomish | 0 | 0.00% |
| Woodinville | 93 | 6.88% |
| Unincorporated | 427 | 31.58% |

| Precinct Three | Detective Cases | % Precinct Cases |
|---|---|---|
| Precinct Three | 1139 | 100.00% |
| Beaux Arts Village | 1 | 0.09% |
| Covington | 158 | 13.87% |
| Maple Valley | 127 | 11.15% |
| Newcastle | 42 | 3.69% |
| Unincorporated | 811 | 71.20% |

| Precinct Four | Detective Cases | % Precinct Cases |
|---|---|---|
| Precinct Four | 1450 | 100.00% |
| Burien | 465 | 32.07% |
| SeaTac | 409 | 28.21% |
| Unincorporated | 576 | 39.72% |

2000 EXHIBITS.xls

# King County Sheriff's Office

**1999 Precinct Staff Allocation**

**1998 Workload and Staffing**

Exhibit A, Part 3

| Major | Precinct2 | Precinct3 | Precinct4 | Shoreline | Totals | P2% | P3% | P4% | Shoreline | Tot% |
|---|---|---|---|---|---|---|---|---|---|---|
| Major | 1 | 1 | 1 | 1 | 4 | 25.0% | 25.0% | 25.0% | 25.0% | 100.0% |
| Captain -City Chief | 1 | 0 | 0 | 1 | 2 | 50.0% | 0.0% | 0.0% | 50.0% | 100.0% |
| Captains - Precinct Ops | 2 | 2 | 2 | 1 | 7 | 28.6% | 28.6% | 28.6% | 14.3% | 100.0% |
| CPOs Flex | 0 | 0 | 0 | 0 | 0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| CPOs City (storefront deputies) | 4 | 3 | 4 | 0 | 11 | 36.4% | 27.3% | 36.4% | 0.0% | 100.0% |
| CPOs County (storefront deputies) | 4 | 3 | 4 | 0 | 11 | 36.4% | 27.3% | 36.4% | 0.0% | 100.0% |
| Crime Analysis | 1 | 1 | 1 | 0 | 3 | 33.3% | 33.3% | 33.3% | 0.0% | 100.0% |
| Crime Prevention | 0 | 0 | 1 | 1 | 2 | 0.0% | 0.0% | 50.0% | 50.0% | 100.0% |
| DARE | 0 | 1 | 1 | 1 | 3 | 0.0% | 33.3% | 33.3% | 33.3% | 100.0% |
| Detective | 0 | 0 | 1 | 0 | 1 | 0.0% | 0.0% | 100.0% | 0.0% | 100.0% |
| Detectives | 7 | 8 | 10 | 3 | 28 | 25.0% | 28.6% | 35.7% | 10.7% | 100.0% |
| Proactive/Emphasis Team | 1 | 1 | 1 | 1 | 4 | 25.0% | 25.0% | 25.0% | 25.0% | 100.0% |
| Proactive/COP Sgts. | 4 | 6 | 10 | 4 | 24 | 16.7% | 25.0% | 41.7% | 16.7% | 100.0% |
| HUD Funded Deputies | 0 | 1 | 2 | 0 | 3 | 0.0% | 33.3% | 66.7% | 0.0% | 100.0% |
| School Officer | 0 | 0 | 0 | 0 | 0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Anti-Crime Deputies | 0 | 0 | 0 | 0 | 0 | 0.0% | 0.0% | 0.0% | 0.0% | 0.0% |
| Traffic/Motorcycle | 1.5 | 0.5 | 0 | 3 | 5 | 30.0% | 10.0% | 0.0% | 60.0% | 100.0% |
| Admin Sergeant | 2 | 1 | 1 | 1 | 5 | 40.0% | 20.0% | 20.0% | 20.0% | 100.0% |
| Patrol Sergeants City | 4 | 3 | 6 | 0 | 13 | 10.3% | 7.7% | 15.4% | 0.0% | 33.3% |
| Patrol Sergeants County only | 3.5 | 3 | 1 | 0 | 7.5 | 9.0% | 7.7% | 2.6% | 0.0% | 19.2% |
| Patrol Sergeants Flex | 5.5 | 5 | 2 | 6 | 18.5 | 14.1% | 12.8% | 5.1% | 15.4% | 47.4% |
| Patrol Sergeants Total | 13 | 11 | 9 | 6 | 39 | 33.3% | 28.2% | 23.1% | 15.4% | 100.0% |
| Patrol Deputies City | 36 | 22 | 45 | 23 | 126 | 12.6% | 7.7% | 15.7% | 8.0% | 44.1% |
| Patrol Deputies County only | 19 | 24 | 18 | 0 | 61 | 6.6% | 8.4% | 6.3% | 0.0% | 21.3% |
| Patrol Deputies Flex | 26 | 48 | 25 | 0 | 99 | 9.1% | 16.8% | 8.7% | 0.0% | 34.6% |
| Patrol Deputies Total | 81 | 94 | 88 | 23 | 286 | 28.3% | 32.9% | 30.8% | 8.0% | 100.0% |
| Precinct Sworn Total | 118.5 | 129.5 | 138 | 44 | 430 | 27.6% | 30.1% | 32.1% | 10.2% | 100.0% |
| CSOs City | 0 | 0.5 | 2 | 1 | 3.5 | 0.0% | 14.3% | 57.1% | 28.6% | 100.0% |
| CSOs Flex | 0 | 1 | 3 | 0 | 4 | 0.0% | 25.0% | 75.0% | 0.0% | 100.0% |
| Clerical - City | 0 | 0 | 0 | 1 | 1 | 0.0% | 0.0% | 0.0% | 100.0% | 100.0% |
| Clerical - County | 4 | 4 | 5 | 0 | 13 | 30.8% | 30.8% | 38.5% | 0.0% | 100.0% |
| Evidence Tech | 1 | 1 | 1 | 0 | 3 | 33.3% | 33.3% | 33.3% | 0.0% | 100.0% |
| Precinct Staff Total | 123.5 | 136 | 149 | 46 | 454.5 | 27.2% | 29.9% | 32.8% | 10.1% | 100.0% |

05/17/00

**000125**

2000 EXHIBITS.xls

# King County Sheriff's Office

| | Part 1 Crimes | Part 2 Crimes | % Part 1 Crimes | Total Crimes | % Total Crimes |
|---|---|---|---|---|---|
| **Precinct Two (Patrol Districts)** | 6,945 | 7,250 | 31.28% | 14,195 | 31.52% |
| Carnation (R18) | 78 | 124 | 0.35% | 202 | 0.45% |
| Kenmore (E1-E5 was B1-B2) | 691 | 721 | 3.11% | 1,412 | 3.14% |
| North Bend (D1) | 321 | 311 | 1.45% | 632 | 1.40% |
| Sammamish (O1-O4 was C3-C5) | 471 | 462 | 2.12% | 934 | 2.07% |
| Shoreline (A1-A6) | 2,117 | 2,227 | 9.54% | 4,344 | 9.65% |
| Skykomish (W7) | 7 | 8 | 0.03% | 15 | 0.03% |
| Woodinville (W1) | 550 | 446 | 2.48% | 996 | 2.21% |
| Unincorporated | 2,710 | 2,951 | 12.21% | 5,660 | 12.57% |
| **Precinct Three (Patrol Districts)** | 7,304 | 7,837 | 32.90% | 15,141 | 33.62% |
| Beaux Arts Village (R11) | 7 | 6 | 0.03% | 13 | 0.03% |
| Covington (F6) | 694 | 658 | 3.13% | 1,352 | 3.00% |
| Maple Valley (H1) | 487 | 579 | 2.19% | 1,066 | 2.37% |
| Newcastle (H2) | 228 | 372 | 1.03% | 600 | 1.33% |
| Unincorporated | 5,888 | 6,222 | 26.52% | 12,110 | 26.89% |
| **Precinct Four (Patrol Districts)** | 7,951 | 7,743 | 35.82% | 15,694 | 34.85% |
| Burien (N1-N6) | 2,395 | 2,377 | 10.79% | 4,772 | 10.60% |
| SeaTac (L1-L4) | 2,109 | 1,872 | 9.50% | 3,981 | 8.84% |
| Skyway (K8) | 738 | 731 | 3.32% | 1,469 | 3.26% |
| Unincorporated | 2,709 | 2,763 | 12.20% | 5,472 | 12.15% |
| **COUNTY TOTAL** | 22,200 | 22,830 | 100.00% | 45,030 | 100.00% |

# 1998 Workload and Staffing

| Precinct Two | | | Precinct Three | | | Precinct Four | | |
|---|---|---|---|---|---|---|---|---|
| Patrol District | Part 1 Crimes | Part 2 Crimes | Patrol District | Part 1 Crimes | Part 2 Crimes | Patrol District | Part 1 Crimes | Part 2 Crimes |
| A1 | 142 | 215 | F1 | 343 | 251 | K1 | 860 | 815 |
| A2 | 324 | 266 | F2 | 528 | 574 | K11 | 123 | 112 |
| A3 | 580 | 528 | F3 | 793 | 754 | K2 | 497 | 577 |
| A4 | 465 | 502 | F4 | 1,002 | 1,263 | K6 | 61 | 25 |
| A5 | 248 | 231 | F5 | 812 | 905 | K7 | 788 | 804 |
| A6 | 338 | 485 | F6 | 193 | 282 | K8 | 738 | 731 |
| A7 | 177 | 179 | F7 | 238 | 294 | K9 | 7 | 3 |
| B1 | 367 | 315 | F8 | 654 | 547 | L1 | 366 | 345 |
| B2 | 156 | 215 | F9 | 278 | 418 | L2 | 439 | 372 |
| B3 | 132 | 176 | F99 | 7 | 3 | L3 | 588 | 450 |
| B4 | 286 | 349 | G1 | 138 | 123 | L4 | 716 | 705 |
| B5 | 417 | 498 | G2 | 100 | 60 | N1 | 387 | 477 |
| B6 | 137 | 224 | G3 | 17 | 18 | N2 | 447 | 404 |
| B7 | 92 | 111 | G4 | 124 | 121 | N3 | 596 | 569 |
| B8 | 166 | 199 | G5 | 27 | 21 | N4 | 492 | 592 |
| C1 | 439 | 408 | G6 | 245 | 223 | N5 | 473 | 335 |
| C2 | 209 | 224 | G7 | 389 | 365 | N6 | 58 | 30 |
| C22 | 3 | 2 | H1 | 487 | 579 | V1 | 315 | 377 |
| C3 | 205 | 211 | H2 | 228 | 372 | | | |
| C4 | 193 | 159 | H3 | 694 | 658 | | | |
| C5 | 295 | 310 | R11 | 7 | 6 | | | |
| C6 | 115 | 156 | | | | | | |
| C7 | 82 | 152 | | | | | | |
| C9 | 233 | 55 | | | | | | |
| D1 | 321 | 311 | | | | | | |
| E1 | 23 | 32 | | | | | | |
| E2 | 24 | 44 | | | | | | |
| E3 | 81 | 55 | | | | | | |
| E4 | 11 | 11 | | | | | | |
| E5 | 29 | 49 | | | | | | |
| R18 | 78 | 124 | | | | | | |
| W1 | 550 | 446 | | | | | | |
| W7 | 7 | 8 | | | | | | |
| **Total** | 6,945 | 7,250 | **Total** | 7,304 | 7,837 | **Total** | 7,951 | 7,243 |

Exhibit A, Part 3

05/17/00

000126

2000 EXHIBITS.xls

## King County Sheriff's Office

### 1998 DCFS

| 1998 DCFS | Total DCFS | % Precinct | % Precinct Flex | % Total |
|---|---|---|---|---|
| **Precinct Two (Patrol District)** | | | | |
| Carnation (R18) | 302 | 0.64% | 1.45% | 0.22% |
| Kenmore (E1-E5 was B1-B2) | 3,447 | 7.34% | 16.52% | 2.55% |
| North Bend (O1) | 1,720 | 3.6% | 0.00% | 1.27% |
| Sammamish (O1-O4 was C3-C5) | 4,045 | 8.62% | 19.38% | 2.99% |
| Shoreline (A1-A6) | 13,560 | 28.89% | 0.00% | 10.04% |
| Skykomish (W7) | 16 | 0.03% | 0.00% | 0.01% |
| Woodinville (W1) | 3,629 | 7.73% | 8.69% | 2.69% |
| Unincorporated Eastside | 8,948 | 19.07% | 0.00% | 6.62% |
| Unincorporated Westside | 11,263 | 24.00% | 53.96% | 8.34% |
| | 46,930 | 100.00% | 100.00% | 34.75% |
| **Precinct Three (Patrol District)** | | | | |
| Beaux Arts Village (R11) | 44 | 0.10% | 0.10% | 0.03% |
| Covington (H5) | 3,793 | 8.64% | 8.64% | 2.81% |
| Maple Valley (H1) | 3,104 | 7.07% | 7.07% | 2.30% |
| Newcastle (H2) | 1,600 | 3.65% | 3.65% | 1.18% |
| Unincorporated | 35,348 | 80.54% | 80.54% | 26.17% |
| | 43,889 | 100.00% | 100.00% | 32.49% |
| **Precinct Four (Patrol District)** | | | | |
| Burien (N1-N6) | 12,934 | 29.23% | 33.06% | 9.58% |
| SeaTac (L1-L4) | 11,881 | 26.85% | 30.37% | 8.80% |
| Vashon (V1) | 367 | 0.83% | 0.00% | 0.27% |
| Unincorporated Flex | 14,312 | 32.35% | 0.00% | 10.60% |
| Unincorporated | 19,431 | 43.92% | 36.58% | |
| | 44,246 | 100.00% | 100.00% | 32.76% |

## 1998 Workload and Staffing

### 1998 DCFS

| Precinct Two | | Precinct Three | | Precinct Four | |
|---|---|---|---|---|---|
| Patrol District | DCFS | Patrol District | DCFS | Patrol District | DCFS |
| A1 | 1,350 | F1 | 2,207 | K1 | 5,607 |
| A2 | 1,984 | F2 | 3,390 | K2 | 3,230 |
| A3 | 3,318 | F3 | 4,315 | K6 | 214 |
| A4 | 2,616 | F4 | 5,145 | K7 | 4,589 |
| A5 | 1,566 | F5 | 4,892 | K8 | 4,752 |
| A6 | 2,726 | F6 | 1,324 | K9 | 72 |
| A7 | 1,216 | F7 | 1,655 | K11 | 580 |
| B1 | 1,440 | F8 | 3,325 | L1 | 2,072 |
| B2 | 1,133 | F9 | 8 | L2 | 2,279 |
| B3 | 1,595 | F99 | 2,078 | L3 | 2,956 |
| B4 | 1,958 | G1 | 503 | L4 | 4,594 |
| B5 | 2,894 | G2 | 94 | N1 | 2,760 |
| B6 | 1,406 | G3 | 780 | N2 | 2,321 |
| B7 | 853 | G4 | 152 | N3 | 3,291 |
| B8 | 1,440 | G5 | 2,335 | N4 | 2,626 |
| C1 | 1,892 | G6 | 1,699 | N5 | 1,936 |
| C2 | 1,452 | G7 | 917 | | |
| C22 | 1 | H1 | 3,393 | | |
| C3 | 1,683 | H2 | 1,600 | V1 | 367 |
| C4 | 1,943 | H3 | 4,033 | | |
| C5 | 2,445 | R11 | 44 | | |
| G6 | 1,178 | | | | |
| C7 | 855 | | | | |
| I74 | 174 | | | | |
| D1 | 1,720 | | | | |
| E1 | 323 | | | | |
| E2 | 301 | | | | |
| E3 | 824 | | | | |
| E4 | 131 | | | | |
| E5 | 656 | | | | |
| R18 | 302 | | | | |
| W1 | 3,629 | | | | |
| W7 | 16 | | | | |
| Total | 46,930 | Total | 43,889 | Total | 44,246 |

KCSO Total: 135,065

Exhibit A, Part 3

05/17/00

000127

# EXHIBIT F
# GLOSSARY OF TERMS

**Absence**
The state of being absent from one's assigned duties for a period of time though funds, in most cases, continue to be expended.

**Absent without leave**
Absent without authorization.

**Administrative Sergeant**
Reports directly to the City's Commanding Officer (Captain or Major) and assists in carrying out the commander's duties; functions as "Acting Police Chief" in the absence of the City Police Chief; wears appropriate rank insignia on city uniform consistent with KCSO rank; interacts with the city staff and city council members in accordance with RCW 35.18.110; and; is expected to present her/himself in the community in a manner that supports and maintains trust in the contract city government and staff.

**Alternative shift schedules**
Subject to negotiation, this includes flex time (an employee's shift starting time may vary up to 4 hours from normal).

**Audit**
A formal examination of the KCSO's accounts or financial situation; a methodical examination and review.

**Backfill**
Staffing a patrol district with some one other than the normally scheduled deputy due to a planned or unplanned absence.

**Benefits**
Medical, dental, unemployment, A & D and life insurance, retirement plans; and vacation, sick and holiday pays.

**Bereavement Leave**
Up to 3 days leave with pay that can be used when a member of one's immediate family passes away.

**BLET/BLEA**
Basic Law Enforcement Training/Academy (720 hours).

**Captain**
Appointed by the Sheriff from a certified eligibility list provided by the King County Civil Service Commission and subordinate to the rank of Major.

**Car Per Officer (CPO)**
Take home vehicles assigned to department members.

**Career Service Employee**
An employee who is appointed to a career service position as a result of a competitive examination process.

**Chief**
See "Contract City Police Chief" below.

**Chief (Division)**
Appointed by the Sheriff with the consent of the County Council and subordinate to the rank of Sheriff.

**City Department Model**
Under the city department model, the level, degree and type of precinct/city services and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee. For precinct level services, operates as a stand alone model.

**City Police Precinct**
To qualify as a City Police Precinct, the following minimum standards must be met:
- meet or exceed all applicable city, state and federal codes and requirements.
- provide sufficient secure office space to accommodate all personnel permanently assigned to the precinct.
- provide appropriate locker and shower/restroom facilities for all male and female assigned staff.
- provide adequate secure, fenced parking for police vehicles.
- provide at least two separate holding cells that meet all county, state and federal codes for temporarily segregating and detaining male/female and juvenile/adult prisoners.
- provide a private, secure entrance through which prisoners can be moved in and out of the holding cell area.
- provide two interview rooms and a meeting/roll-call room.
- provide a permanent evidence storage room and additional safe, secure storage for small arms ammunition, explosives, flammable materials and other hazardous substances.
- provide a secure area in which to air dry wet evidence prior to packaging.
- provide a connection to the county WAN and other applicable telecommunications systems infrastructure that meets or exceeds county standards.
- provide concealed pistol permit and other administrative services to the public at the city police precinct or other city facility.

**Civil Service Employee**
An employee who is appointed to a (government) civil *service* position as a result of a competitive examination process.

**Clothing Allowance**
Deputies not required to wear a uniform for at least one full month receive additional pay while so assigned.

**Commissioned**
Sworn officers/deputies.

**Communications Center**
Provides emergency telecommunications services between citizens and appropriate public safety agencies on a 24 hour a day basis including a Computer Assisted Dispatch (CAD) system that allows operators to dispatch sworn officers and non-sworn community service officers (CSO's) to calls for police services and take some types of incident reports via the telephone.

**Community Service Officer (CSO)**
Non-sworn, uniformed staff who do not have arrest authority.

**Compensatory time**
Time off that is granted with pay in lieu of pay to FLSA-overtime eligible employees for work performed either on an authorized overtime basis or on a holiday that is normally scheduled as a day off.

**Contract City Police Chief**
Reports directly to Precinct Commander (if Major, directly to Division Chief); works at the direction of city manager/administrator and in compliance with KCSO Policy, Procedures & Directives; Interacts with city staff and council members in accordance with RCW 35.18.110; Functions as a department head within the contract city structure. KCSO ranks that qualify for the chief's position are determined by city population: Sergeant – less

than 20,000: Captain – greater than 20,000: cities choosing the full city model department may select a Major as chief.

**Court overtime**
Deputies are compensated for court appearances, pre-trial hearings or conferences at the county overtime rate stated in the Collective Bargaining Agreement, Article 8, Section 3.

**Dedicated staff**
Personnel regularly assigned to a contract city.

**Deputy (Officer)**
Appointed by the Sheriff from a certified eligibility list provided by the King County Civil Service Commission and subordinate to the rank of Sergeant.

**Disability**
A person is considered to have a "disability" if s/he has a physical or mental impairment that substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment.

**Discretionary training**
Training not mandated by federal, state or county regulations.

**Dispatched calls for service (DCFS)**
Police details that are initiated through the communications center.

**Educational incentive pay**
Additional pay commensurate with an employee's education.

**Fair Labor Standards Act (FLSA)**
A law governing compensation for hours worked/overtime.

**Family Leave**
Paid absence to care for a child, spouse or parent with a serious health condition (employees may receive up to 6 days paid leave per year to be used in lieu of sick leave for family care purposes).

**Family Medical Leave Act (FMLA)**

**Federal Emergency Management Agency (FEMA)**

**Field Training Officer (FTO)**
An experienced deputy with special training used to train and evaluate recruit officers.

**Field Training Program**
An organized training program and standardized evaluation process for recruit officers to ensure that each candidate has an equal opportunity to succeed.

**Field Training Sergeant**
Assists in the FTO selection process, monitors recruit and FTO performance; initiates, schedules, monitors and documents any special recruit training assignments; completes weekly evaluation reports of reach Phase II recruit, schedules and chairs Alternate Week Evaluation meetings.

**Flexible Services Model**
Under the flexible services model, base level law enforcement services will be provided to the city in proportion to the City's share of workload.

**Hazardous duty pay**
Additional pay given to a deputy while serving in one of the following assignments: helicopter, bomb disposal, motorcycle, scuba diver, K-9, TAC-30, patrol, clandestine drug lab team.

**Lateral Academy**
Recruit training for lateral entry officers.

**Lateral entry deputy/officer**
A deputy hired with prior law enforcement experience.

**Leaves of absence**
Governed by R.C.W. 41.14.160 and King County Ordinance 3.12.250.
1. Precinct or Section Commanders may grant up to twenty-four (24) hours of leave without pay for their Department members under their command.

2. Leaves without pay over twenty-four (24) hours may only be granted by the Sheriff.
   A) Leaves without pay for periods of more than one (1) month shall also be approved in writing and in advance by the Director of the Office of Human Resource Management.

3. Department members shall obtain the appropriate memorandum form from the Personnel Unit, and complete either:
   A) Medical leave of absence (other than maternity); or
   B) Medical leave of absence (maternity).

**Leave with pay**
Authorized time off with pay - examples include vacation, compensatory time, and parental leave.

**Leave without pay**
Any absence of an employee from duty without compensation.

**LEOFF 1**
Law Enforcement and Fire Fighters Retirement System (Prior to October 1, 1977).

**LEOFF 2**
Law Enforcement and Fire Fighters Retirement System (Since October 1, 1977).

**Limited commission (also called a special commission)**
Grants a deputy specific duties within a specified area.

**Longevity pay**
Additional pay given for length of service.

**Major**
Appointed by the Sheriff with the consent of the County Council and subordinate to the rank of Division Chief.

**Managing Patrol Performance (MPP)**
A computer based patrol staffing model.

**Mandatory training**
Training that is mandated by state or federal regulations (i.e., Firearms, EVOC, Hazmat, First Aid and CPR).

**Master Police Officer (MPO)**

A non-civil service position appointed by a Selection Committee BI-annually from an eligibility list meeting the criteria in KCSO General Orders Manual Section 1.06.000 and subordinate to the rank of Sergeant.

**Media Relations Officer (MRO)**
Deputy chosen to be responsible for organizing all media interactions.

**Military leave**
Leave of absence with pay for active military duty.

**Non-chargeable services**
Services generally deployed county-wide and not charged under the contract for legislative or policy reasons.

**Non-commissioned**
Non-sworn personnel.

**Officer**
See Deputy

**Parental leave**
Leave of absence to care for a newborn child, a newly adopted child or a newly placed foster child.

**Permanent (Regular) assignment**
Normal duty station.

**PERS 1**
Public Employees Retirement System (Prior to October 1, 1977).

**PERS 2**
Public Employees Retirement System (Since October 1,1977).

**Phase I Recruit**
A deputy who is attending the Basic Law Enforcement Academy or one of the Pre or Post BLEA courses.

**Phase II Recruit**
A deputy who, after successful completion of the Basic Academy, is assigned to a precinct for field training for three months with a series of three Field Training Officers (FTO's).

**Phase III Recruit**
A deputy who successfully completes Phase II will be assigned to a district as a one-person unit/car under the supervision of a MPO (recruits will have special training assignments and receive monthly observation reports).

**Phase IV Recruit**
A deputy who, after 12 months of employment, is working safely, skillfully and effectively as a "competent police officer" (the deputy is assigned a MPO mentor through the end of his/her probationary time, but no longer has monthly observation reports).

**Post BLET/BLEA**
Post Basic Law Enforcement Training/Academy.

**Pre BLET/BLEA**
Pre Basic Law Enforcement Training/Academy.

**Premium pay**
Aditional pay for specialty assignment.

**Promotion**
The movement of an employee to a higher rank.

**Quartermaster**
A sergeant who provides uniforms and equipment for department personnel.

**Retirement**
Completing employment/service as administered and in accordance with the provisions of RCW Chapter 41.40.

**School Resource Officer (SRO)**
A deputy who provides a school-based community policing presence at primary and secondary schools.

**Shared Supervision Model**
Under the shared supervision model, the level, degree and type of precinct/city direct services (such as reactive patrol, precinct detectives and city administrative sergeants, for example) and the number of positions assigned to those services shall be determined by the City in consultation with the King County Sheriff or his/her designee (Precinct command and supervision shall be shared by the County and the City). Patrol and other precinct staff may be dedicated to the City, but line supervision and other staff are shared with the rest of the precinct.

**Sheriff**
Elected Chief Executive of the King County Sheriff's Office.

**Sick leave**
Paid leave of absence from work due to employee or family member's illness.

**Transfer**
Movement of an employee from one position to another position that has the same or comparable job classification and salary.

**Temporary assignment/position**
An assignment/position that is not a regular assignment/position and includes probationary period or provisional appointment.

**Termination**
Separation of employment as a result of discharge, resignation, retirement, reduction in force, or death.

**Vacancy**
A position which is empty, unfilled, or unoccupied such that no funds are being expended.

**Washington State Criminal Justice Training Center (WSCJTC)**
Commonly referred to as the "Academy", the WSCJTC is located in the City of Burien, and serves as the primary training site for western Washington police recruits.

# EXHIBIT G
## ARSON INVESTIGATION COSTING MODEL

### ARSON SERVICE TO CITIES
### SUMMARY OF ESTIMATED COSTS FOR AVERAGE
### OF 3 CALCULATION METHODS
#### Updated for Cities participating as of 03/03/00

| Jurisdiction | Percent Based on Hours Share | Percent Based on Value Share | Percent Based on Incident Share | $ Share Average of Three Methods | Percent Average of Three Methods |
|---|---|---|---|---|---|
| Black Diamond | 1.3% | 1.4% | 0.9% | $1,469 | 1.2% |
| Burien | 20.4% | 15.4% | 18.0% | $22,007 | 17.9% |
| Carnation | 0.2% | 0.2% | 0.4% | $349 | 0.3% |
| Covington | 9.5% | 4.3% | 9.9% | $9,703 | 7.9% |
| Des Moines | 3.2% | 4.1% | 1.6% | $3,666 | 3.0% |
| Duvall | 0.1% | 1.2% | 0.9% | $896 | 0.7% |
| Enumclaw | 1.0% | 7.4% | 1.8% | $4,208 | 3.4% |
| Kenmore | 7.5% | 8.9% | 12.4% | $11,783 | 9.6% |
| Maple Valley | 3.7% | 6.4% | 6.1% | $6,625 | 5.4% |
| North Bend | 1.9% | 2.9% | 2.2% | $2,849 | 2.3% |
| Pacific | 1.5% | 4.1% | 1.9% | $3,045 | 2.5% |
| Seatac | 15.3% | 19.0% | 15.5% | $20,360 | 16.6% |
| Sammamish | 5.1% | 0.0% | 4.9% | $4,095 | 3.3% |
| Shoreline | 25.7% | 21.4% | 18.5% | $26,888 | 21.9% |
| Woodinville | 3.7% | 3.4% | 5.1% | $4,985 | 4.1% |
| Total | 100.0% | 100.0% | 100.0% | $122,929 | 100.0% |

000134

# EXHIBIT H
# ARSON INVESTIGATION
# CALL OUT PROTOCOLS

Fire Investigation Unit - Call Out Protocols – Contract Cites          FINV-0012b

Department/Issuing Agency
Building Services Division                    Effective Date
                                              Apr 1, 2000

Approved by
                         Type of Action   Page Number
                         **Revision Page 1 of 3**

1.0  <u>**SUBJECT TITLE:**</u>  Fire Investigation Unit - Call Out Protocols for contract cities

2.0  <u>**PURPOSE:**</u>

    2.1    To outline the policies of the King County Fire Marshal's Office regarding the investigation of fires in cities having a contractual agreement for fire investigation with King County and to establish recommended procedures to be followed by the responsible fire suppression agency in determining when a King County fire investigator should be requested.

3.0  <u>**ORGANIZATIONS AFFECTED:**</u>

    3.1    Department of Development and Environmental Services
    3.2    King County Fire Marshal's Office
    3.3    Fire Departments/Districts providing fire suppression to a city that has contracted with the King County Fire Marshal's Office for fire investigation services.
    3.4    King County Sheriff's Office
    3.5   Cities having contracts with King County for fire investigation services

4.0  <u>**REFERENCES:**</u>

    4.1    Uniform Fire Code
    4.2    R.C.W. Chapter Title 9 and 9A
    4.3    R.C.W. 19.27.110
    4.4    R.C.W. 52.12.031 (7)
    4.5    R.C.W. 48.48.060
    4.6    King County Administrative Policies and Procedures
    4.7    King County Fire Marshal Operating instructions Manual
    4.8    King County Fire Marshal Policy & Procedure Manual

Number: FINV-0012b

## Page 2 of 3

5.0 **PROCEDURE:**

    5.1     The Fire Investigation Unit should be notified and respond to fires as follows:

           a.  Fires where one or more deaths have occurred.

    b.    Fires where one or more serious injuries have occurred, and those injuries have required or are expected to require hospitalization of the injured party(s).

           c.    Fires that are suspected to be, or are known to be intentionally set and are not investigated by Fire Department personnel under one of the excepted categories in 6.2.

           d.    Fires where the fire suppression agency has not determined a cause, except where the loss is minimal and there is no measurable value in determining the cause.

           e.    <u>All</u> fires where there is evidence that an explosive device was used to initiate the fire or resulted in the fire occurring.

**Note:  This provision is not intended to include containers normally found at the fire scene that exploded as a result of the fire, such as propane bottles, compressed air bottles or aerosol containers.**

    5.2     The King County Fire Marshal's Office will maintain an investigative program designed to collect, store and disseminate information relating to the prevention of fires, accidental or arson caused, to reduce loss of life, fire related injuries, incident frequency and monetary loss.

    5.3     Every effort will be made to determine the cause of every investigated fire.

    5.4     Where the cause has been determined to be arson, the Fire Investigation Unit of the King County Fire Marshal's Office shall perform the follow-up investigation and preparation of criminal charges where appropriate.

    5.5     In incidents involving death or serious injury where hospitalization was or is expected to be required, all reports, evidence, and photographs will be properly secured by the fire investigation unit until the case has been resolved

    5.6     The King County Fire Investigation Unit will compile and submit monthly UCR (Uniform Crime Reporting) data for the Federal Bureau of Investigation to the King County Sheriff's Office, for cities who contract with the King County Sheriff's Office for police services and to the City Police department for all cities that maintain their own Police Department if requested.

6.0 **RESPONSIBILITIES:**

    6.1     The King County Fire Investigation Unit is responsible for the investigation of all fires that have been investigated by the Fire Investigation Unit as outlined in section 5.1 of this document.

Number: FINV-0012b

## Page 3 of 3

**000136**

6.2    Qualified Fire Department personnel in the responsible fire suppression agency may conduct fire investigations in the following categories:

a.    Intentionally set fires in Dumpsters and other refuse/garbage containers.

b.    Intentionally set fires in Newspaper collection containers

c.    Intentionally set fires in Newspaper distribution structures (Times, P.I., etc.).

d.    Intentionally set fires in Containers used for collection of clothing, etc.

e.    Intentionally set fires in abandoned vehicles with a value less than $250.

f.    And other such fires as the responsible fire department is qualified to investigate.

6.3    For investigations conducted by Fire Department personnel for the investigations noted in section 6.2 above the following recommended procedures may be followed:

a.    Notification of the King County Fire Investigation Unit the following business day of all fire investigations conducted by the Fire Department in accordance with Section 6.2 for all fires that were determined to be intentionally set.

b.    Examination of the fire scene to determine area, point of origin and cause

c.    Identification, protection, preservation and collection of all physical evidence for all fires that were determined to be intentionally set. Fire department personnel will assist the responsible police department patrol unit in packaging of evidence, which will then be transported by the patrol unit for storage.

d.    Preparation of a comprehensive fire investigation report using the King County Fire Investigation Unit format and, where necessary, a fire scene sketch for all fires that were determined to be intentionally set.

e.    Photographing of the fire scene should be accomplished in three (3) steps, 1) prior to disturbing any debris or other items at or near the point of origin, 2) once again during the examination and 3) at the conclusion of the examinations. Any items considered to be evidence should be shown in photographs at the time and place they were discovered and identified.

f.    Notification of the responsible police department via the police communications center where arson is suspected or confirmed.

g.    Forwarding of the fire report along with all available information obtained during the investigation and transfer of the physical evidence, where appropriate, to the Fire Investigation Unit for all fires that were determined to be intentionally set.

h.    Forwarding a copy of the photographs (or other acceptable photographic medium) and the negatives of the incident to the Fire Investigation Unit for all fires that were determined to be intentionally set.

Note:    The proper documentation of fire incidents, accidental or arson, is critical. The scene examination must provide factual information describing what, where, why, and how this fire occurred. Photographs, properly taken, will provide a picture record of the conditions on arrival, during examination, and at the conclusion. The combination will be the basis for re-construction of the fire scene, determination of important time factors and sequence of events prior to and at the time of the fire, including the fire tactics used in extinguishing the fire, an important consideration.

**Shoreline - 2001**

Exhibit B
2001
Adopted

| Workload Indicators | City | % Prec | % Prec. Flex | %Total |
|---|---|---|---|---|
| Dispatched Calls | 13168 | 29.14% | 0.00% | 10.00% |
| Pct Detective Caseload | 645 | 49.58% | | |
| Comm. Crime Prev. Csld. | | 0.00% | | 0.00% |
| Part 1 Crimes | 2,033 | | | 10.00% |
| Part 2 Crimes | 2,006 | | | |
| Total Crimes | 4,039 | | | 9.87% |
| Part 1 Major Crimes | 99.00 | | | 8.38% |
| Bomb Disposal Incidents | 16.00 | | | 8.27% |
| Canine Details | 192.00 | | | 8.94% |
| FFOC Caseload | 215.00 | | | 9.36% |
| Hostage Negotiation Incidents | 0.67 | | | 3.39% |
| Tactical Unit Incidents | 0.67 | | | 3.17% |
| Vice Unit Arrests | 7.00 | | | 7.29% |
| Licensed Gambling Establishments | 12.67 | | | 8.88% |
| Precinct CPO Flex | n.a. | | | |
| Precinct Crime Analysts | - | | | |
| Precinct Detectives | 3 | | | |
| Pct. Patrol Flex % | n.a. | | | |
| React Patrol Sgts. % | n.a. | | | |
| Captains - Precinct Ops | 1 | | | |
| Pct. Facilities and Maintenance cost | n.a. | | | |
| Precinct Sworn Staff | 45 | | | |
| Precinct CCPU Staff | - | | | |

| | |
|---|---|
| Shoreline Precinct Staff | 47.00 |
| Telephone Cost per FTE | 436 |
| Total Shoreline Telephone Credit | 20,492 |
| Pct. 2 Copier Charges | 10,453 |
| # of FTE at Pct. 2 (inc. Shoreline) | 171 |
| Cost per FTE | 61 |
| Shoreline Precinct Staff | 47 |
| Shoreline Credit | 2,881 |

**000138**

King County Sheriff's Office

Exhibit A, Part 1

# Based on 2001 Adopted Cost Book (March 23, 2001 Pumpkin)

| Precinct Services | | Flex | | | City | | |
|---|---|---|---|---|---|---|---|
| | | Adj. FTE | Amount | Flex FTE Cost | FTEs | Amount | City FTE Cost |
| Captain - City Chief | O | 9.00 | $ 1,232,810 | $ 136,979 | 9.00 | $ 1,209,346 | $ 134,372 |
| Captain- Precinct Operations | R/O | 9.00 | $ 1,232,810 | $ 136,979 | 9.00 | $ 1,209,346 | $ 134,372 |
| Community Crime Prevention Unit | O | 2.00 | $ 215,099 | $ 107,550 | 2.00 | $ 209,885 | $ 104,943 |
| Community Service Officers | O | 6.00 | $ 504,524 | $ 84,087 | 6.00 | $ 488,881 | $ 81,480 |
| School Resource Officers | O | 11.00 | $ 1,216,782 | $ 110,617 | 11.00 | $ 1,185,497 | $ 107,772 |
| DARE | O | na | na | $ 105,733 | na | na | $ 105,733 |
| Evidence and Supply Tech | R/O | na | na | na | 1.00 | $ 66,961 | $ 66,961 |
| Major - City Chief | O | 4.00 | $ 617,550 | $ 154,388 | 4.00 | $ 607,122 | $ 151,781 |
| Major - Pct Commander | R/O | 4.00 | $ 617,550 | $ 154,388 | 4.00 | $ 607,122 | $ 151,781 |
| Motorcycle - precinct based | O | na | na | na | 6.00 | $ 107,709 | $ 107,709 |
| Administrative Specialist I | R/O | na | na | na | 1.00 | $ 62,796 | $ 62,796 |
| Administrative Specialist II | R/O | na | na | na | 1.00 | $ 64,637 | $ 64,637 |
| Administrative Specialist III | R/O | na | na | na | 1.00 | $ 69,643 | $ 69,643 |
| Administrative Specialist IV | R/O | na | na | na | 1.00 | $ 71,818 | $ 71,818 |
| Precinct Crime Analysis | O | 3.00 | $ 329,373 | $ 109,791 | 3.00 | $ 321,552 | $ 107,184 |
| Precinct Detectives | R | 28.00 | $ 3,543,873 | $ 126,567 | 3.00 | $ 104,066 | $ 104,066 |
| Precinct Det./Proactive Sgt. | R | na | na | na | 1.00 | $ 118,103 | $ 118,103 |
| Precinct Pro-Active | O | 25.00 | $ 3,125,362 | $ 125,014 | 25.00 | $ 2,574,736 | $ 102,989 |
| Reactive Patrol | R | 296.00 | $ 32,705,648 | $ 110,492 | 296.00 | $ 31,933,940 | $ 107,885 |
| Sergeant - City Chief | R/O | 7.00 | $ 924,706 | $ 132,101 | 7.00 | $ 906,456 | $ 129,494 |
| Reactive Patrol/City Admin. Sgts | R | 35.00 | $ 4,376,161 | $ 125,033 | 35.00 | $ 4,284,912 | $ 122,426 |
| Support Services | | All Cities | | | City | | |
| | | Adj. FTE | Amount | Flex FTE Cost | Adj. FTE | Amount | City FTE Cost |
| Air Support | O | 4.50 | $ 716,346 | $ 159,188 | 4.50 | $ 716,346 | $ 159,188 |
| Asset Forfeiture Unit | O | 3.00 | $ 363,268 | $ 121,089 | 3.00 | $ 363,268 | $ 121,089 |
| Bomb Disposal Unit* . | R/O | 1.00 | $ 167,367 | $ 167,367 | 1.00 | $ 167,367 | $ 167,367 |
| Canine (Special Ops) | R/O | 8.00 | $ 1,108,279 | $ 138,535 | 8.00 | $ 1,108,279 | $ 138,535 |
| Communications-911 | R | 71.00 | $ 6,023,961 | $ 84,845 | 71.00 | $ 6,023,961 | $ 84,845 |
| Domestic Violence Intervention | O | 6.00 | $ 1,022,600 | $ 170,433 | 6.00 | $ 1,022,600 | $ 170,433 |
| Drug Enforcement Unit | O | 7.00 | $ 925,671 | $ 132,239 | 7.00 | $ 925,671 | $ 132,239 |
| DWI | O | 5.00 | $ 622,961 | $ 124,592 | 5.00 | $ 622,961 | $ 124,592 |
| Fraud, Forgery, Organized Crime* | O | 7.00 | $ 981,154 | $ 140,165 | 7.00 | $ 981,154 | $ 140,165 |
| General Traffic | O | 7.00 | $ 871,898 | $ 124,557 | 7.00 | $ 871,898 | $ 124,557 |
| Hostage Negotiation | R/O | 0.01 | $ 1,243 | $ 124,300 | 0.01 | $ 1,243 | $ 124,300 |
| Major Crimes Detectives | R | 22.00 | $ 3,248,139 | $ 147,643 | 22.00 | $ 3,248,139 | $ 147,643 |
| Homicide Unit | | | $ 395,754 | | | | |
| Marine Patrol | O | 7.00 | $ 885,524 | $ 126,503 | 7.00 | $ 885,524 | $ 126,503 |
| MARR Unit | O | 6.00 | $ 449,852 | $ 74,975 | 6.00 | $ 449,852 | $ 74,975 |
| Motorcycle | O | 4.00 | $ 507,496 | $ 126,874 | 4.00 | $ 507,496 | $ 126,874 |
| Tactical Unit | R | 1.50 | $ 281,920 | $ 187,947 | 1.50 | $ 281,920 | $ 187,947 |
| Vice | O | 1.20 | $ 154,430 | $ 128,692 | 1.20 | $ 154,430 | $ 128,692 |
| Gambling | O | 0.80 | $ 102,954 | $ 128,692 | 0.80 | $ 102,954 | $ 128,692 |

Bob —

For future revisions:
— 4.4 deadline
for revised estimated
agreement amount can
be deleted in
favor of more timely
4.7 schedule

— 15 + 17.2.4
seems to improperly
delegate power to
amend to third parties
i.e. majority of the
Oversight Committee



**King County**
**Office of Budget**

King County Courthouse
516 Third Avenue, Room 420
Seattle, WA 98104

(206) 296-3434
FAX (206) 296-3462

*Exhibit B*
*to*
*1269*

CITY OF SHORELINE
Clerk's Receiving
No: 1269
Date: 6/7/01

Steven C. Burkett, City Manager
City of Shoreline
17544 Midvale Ave. N
Shoreline, WA 98133

June 6, 2001

Dear Mr. Burkett:

Enclosed please find a revised Exhibit B for the 2001 cost of police services provided by King County to the City of Shoreline. This exhibit reflects changes requested by the City of Shoreline including the conversion of a motorcycle officer to patrol and the upgrade of a detective to a detective-sergeant.

Due to the significant cost difference between motorcycle officers in the Proposed (Aqua) and Adopted (Pumpkin) books, converting one officer to patrol has resulted in the Adopted book being less expensive than the Proposed for Shoreline. In accordance with Section 4.4 of the Interlocal Agreement, if the Spring 2001 Adopted Cost Book, and resulting Exhibit B's, are lower than the Proposed charges, the lesser of the two prices will be charged. The attached Exhibit reflects the lower charge for 2001.

The other change reclasses a detective to a detective sergeant effective March 1, 2001. The increase for this adjustment was prorated for 10 months of the year. The rest of the Exhibit is based on identical staffing to the original sent to you on May 11, 2001, and is based on updated 1999 workload indicators and 2001 unit cost estimates from the 2001 Adopted (Pumpkin) Cost Book.

The attached Exhibit B becomes part of the official contract agreement between King County and Shoreline for 2000 police services for the amount of $6,212,875. If you have any questions or would like further information, please call me at 206-296-3461.

Sincerely,

*Jason King*

Jason King
King County Office of Budget

cc:    Debbie Tarry, Finance Director, City of Shoreline
       Chief Susan Rahr, Field Operations, Sheriff's Office
       Chief Rebecca Norton, Technical Services, Sheriff's Office
       Major Denise Pentony, Sheriff's Office
       Captain Bruce Kalin, Contracting Unit, Sheriff's Office
       Jon McCracken, Finance Director, Sheriff's Office

Attachment

RECEIVED

JUN 7 2001

FINANCE

FILED

JUL 2 5 2001

CITY CLERK
CITY OF SHORELINE

Receiving No 1269

**Shoreline - 2001**

Exhibit B
2001
Adopted

**UPDATED FOR 1997-99 WORKLOAD & 2001 ADOPTED (Pumpkin) BOOK - Final**
**CITY MODEL**

| Precinct/City Services | | City Model | | | |
|---|---|---|---|---|---|
| Title | R/O | Billing Factor | Amount | Cost | FTEs |
| Canine (city) | R | FTE | | - | - |
| Captain - Operations | O | FTE | 1.00 | 134,372 | 1.00 |
| Captain- Pct. Operations | R | % FTE | | - | - |
| Community Crime Prevention Unit | O | FTE | | - | - |
| Community Policing Specialists | O | FTE | 2.00 | 215,770 | 2.00 |
| Community Service Officers | O | FTE | 1.00 | 81,480 | 1.00 |
| School Resource Officer | O | Y | 1.00 | 107,772 | 1.00 |
| DARE | O | # of Classes | | | |
| Evidence and Supply Tech | O | FTE | | - | - |
| Pct. Facilities and Maintenance | | % Pct. FTE | N/A | | N/A |
| Major - City Chief | O | FTE | 1.00 | 151,781 | 1.00 |
| Major - Pct. Commander | R | % FTE | | - | - |
| Motorcycle | O | FTE | | - | - |
| Admin Spec II | O | FTE | 2.00 | 215,418 | 2.00 |
| Admin Spec III | O | FTE | | - | - |
| Admin Spec IV | O | FTE | 1.00 | 69,643 | 1.00 |
| Pct. Crime Analysis | O | % FTE | | - | - |
| Pct. Detectives | R | FTE | 3.00 | 329,542 | 3.00 |
| Pct. Detective Sgt. | R | FTE | 2.00 | 216,522 | 2.00 |
| Pct. Pro-Active[5] | O | FTE | 3.00 | 308,968 | 3.00 |
| Reactive Patrol[4] | O | FTE | 24.00 | 2,589,238 | 24.00 |
| Reactive Patrol Sgts. | R | FTE | 6.00 | 734,556 | 6.00 |
| | | Subtotal | $ | 5,155,063 | 47.00 |

| Support Services | R/O | ? | Billing Factor | Amount | Service Cost | FTE |
|---|---|---|---|---|---|---|
| Air Support | O | N | % DCFS | 10.00% | - | - |
| Asset Forfeiture | O | | | | | |
| Bomb Disposal Unit | R/O | Y | % Incidents | 8.27% | 13,839 | 0.08 |
| Canine | R/O | Y | % Details | 8.94% | 99,110 | 0.72 |
| Communications-911 | R | Y | % DCFS | 10.00% | 602,446 | 7.10 |
| Drug Enforcement Unit | O | N | % Pt 1 Crime | 10.00% | | |
| DWI | O | N | FTE | | - | - |
| Fraud, Forgery, Organized Crime | O | Y | % Caseload | 9.36% | 91,830 | 0.66 |
| General Traffic | O | N | FTE | | - | - |
| Hostage Negotiation | R/O | Y | % Incidents | 3.39% | 42 | 0.00 |
| Major Crimes Detectives | R | Y | % Pt 1 Major Crime | 8.38% | 272,052 | 1.84 |
| Homicide Placeholder | | | % Pt 1 Major Crime | 8.38% | 33,147 | |
| Marine Patrol | O | N | NA | | - | - |
| MARR Unit | R/O | N | % Incidents | 10.29% | | - |
| Motorcycle | | | | | | |
| Tactical Unit | R | Y | % of Incidents | 3.17% | 8,950 | 0.05 |
| Vice | O | N | % Unit Arrests | 7.29% | | |
| Gambling | O | N | % Gambling Licenses | 8.88% | | |
| | | | Subtotal | | 1,121,417 | 10.44 |
| | | | Total | | 6,276,480 | 57.44 |
| | | | Less copier charges | | (2,881) | |
| | | | Less phone charges | | (20,492) | |
| | | | Revised Total | | 6,253,106 | |
| | | Computer Replacement Charge (45.00 FTE) | | | 46,500 | |
| | | COPS Universal Hiring Credit (1.0 FTE)[1] | | | (25,000) | |
| | | Homicide Placeholder Credit[2] | | | (33,147) | |
| | | COPS School Resource Officer Credit (1.0 FTE)[3] | | | (41,667) | |
| | | **REVISED TOTAL CHARGE** | | | **6,199,793** | **57.44** |

| | | |
|---|---|---|
| FIRE INVESTIGATION SERVICES PASSTHROUGH | $ | 29,578 |
| CAP CREDIT | $ | (16,496) |
| SUMMARY TOTAL | $ | 6,212,875 |

1) COPS Universal Hiring Grant Credit will be received annually at $25,000 per FTE for three years.

2) Homicide Placeholder applied toward Fire Investigation services per letter of 9/14/00

3) School Resource Officer Grant is $125,000 over 3 years beginning 1/1/01. Position added per ltr of 9/14/00

4) Decreased one Motorcycle Officer and increased one Reactive Patrol effective 1/1/00.

5) Converted Precinct Detective to Sergeant per ltr of 2/27/01. Cost reflects effective date of 3/1/01

**000142**

## Shoreline - 2001

Exhibit B
2001
Adopted

| Workload Indicators | City | % Prec | % Prec. Flex | %Total |
|---|---|---|---|---|
| Dispatched Calls | 13168 | 29.14% | 0.00% | 10.00% |
| Pct Detective Caseload | 645 | 49.58% | | |
| Comm. Crime Prev. Csld. | | 0.00% | | 0.00% |
| Part 1 Crimes | 2,033 | | | 10.00% |
| Part 2 Crimes | 2,006 | | | |
| Total Crimes | 4,039 | | | 9.87% |
| Part 1 Major Crimes | 99.00 | | | 8.38% |
| Bomb Disposal Incidents | 16.00 | | | 8.27% |
| Canine Details | 192.00 | | | 8.94% |
| FFOC Caseload | 215.00 | | | 9.36% |
| Hostage Negotiation Incidents | 0.67 | | | 3.39% |
| Tactical Unit Incidents | 0.67 | | | 3.17% |
| Vice Unit Arrests | 7.00 | | | 7.29% |
| Licensed Gambling Establishments | 12.67 | | | 8.88% |
| Precinct CPO Flex | n.a. | | | |
| Precinct Crime Analysts | - | | | |
| Precinct Detectives | 3 | | | |
| Pct. Patrol Flex % | n.a. | | | |
| React Patrol Sgts. % | n.a. | | | |
| Captains - Precinct Ops | 1 | | | |
| Pct. Facilities and Maintenance cost | n.a. | | | |
| Precinct Sworn Staff | 45 | | | |
| Precinct CCPU Staff | - | | | |

| | |
|---|---|
| Shoreline Precinct Staff | 47.00 |
| Telephone Cost per FTE | 436 |
| Total Shoreline Telephone Credit | 20,492 |
| Pct. 2 Copier Charges | 10,453 |
| # of FTE at Pct. 2 (inc. Shoreline) | 171 |
| Cost per FTE | 61 |
| Shoreline Precinct Staff | 47 |
| Shoreline Credit | 2,881 |

**000143**

King County Sheriff's Office

Exhibit A, Part 1

# Based on 2001 Adopted Cost Book (March 23, 2001 Pumpkin)

| Precinct Services | | Flex | | | City | | |
|---|---|---|---|---|---|---|---|
| | | Adj. FTE | Amount | Flex FTE Cost | FTEs | Amount | City FTE Cost |
| Captain - City Chief | O | 9.00 | $ 1,232,810 | $ 136,979 | 9.00 | $ 1,209,346 | $ 134,372 |
| Captain- Precinct Operations | R/O | 9.00 | $ 1,232,810 | $ 136,979 | 9.00 | $ 1,209,346 | $ 134,372 |
| Community Crime Prevention Unit | O | 2.00 | $ 215,099 | $ 107,550 | 2.00 | $ 209,885 | $ 104,943 |
| Community Service Officers | O | 6.00 | $ 504,524 | $ 84,087 | 6.00 | $ 488,881 | $ 81,480 |
| School Resource Officers | O | 11.00 | $ 1,216,782 | $ 110,617 | 11.00 | $ 1,185,497 | $ 107,772 |
| DARE | O | na | na | $ 105,733 | na | na | $ 105,733 |
| Evidence and Supply Tech | R/O | na | na | na | 1.00 | $ 66,961 | $ 66,961 |
| Major - City Chief | O | 4.00 | $ 617,550 | $ 154,388 | 4.00 | $ 607,122 | $ 151,781 |
| Major - Pct Commander | R/O | 4.00 | $ 617,550 | $ 154,388 | 4.00 | $ 607,122 | $ 151,781 |
| Motorcycle - precinct based | O | na | na | na | 6.00 | $ 107,709 | $ 107,709 |
| Administrative Specialist I | R/O | na | na | na | 1.00 | $ 62,796 | $ 62,796 |
| Administrative Specialist II | R/O | na | na | na | 1.00 | $ 64,637 | $ 64,637 |
| Administrative Specialist III | R/O | na | na | na | 1.00 | $ 69,643 | $ 69,643 |
| Administrative Specialist IV | R/O | na | na | na | 1.00 | $ 71,818 | $ 71,818 |
| Precinct Crime Analysis | O | 3.00 | $ 329,373 | $ 109,791 | 3.00 | $ 321,552 | $ 107,184 |
| Precinct Detectives | R | 28.00 | $ 3,543,873 | $ 126,567 | 3.00 | $ 104,066 | $ 104,066 |
| Precinct Det./Proactive Sgt. | R | na | na | na | 1.00 | $ 118,103 | $ 118,103 |
| Precinct Pro-Active | O | 25.00 | $ 3,125,362 | $ 125,014 | 25.00 | $ 2,574,736 | $ 102,989 |
| Reactive Patrol | R | 296.00 | $ 32,705,648 | $ 110,492 | 296.00 | $ 31,933,940 | $ 107,885 |
| Sergeant - City Chief | R/O | 7.00 | $ 924,706 | $ 132,101 | 7.00 | $ 906,456 | $ 129,494 |
| Reactive Patrol/City Admin. Sgts | R | 35.00 | $ 4,376,161 | $ 125,033 | 35.00 | $ 4,284,912 | $ 122,426 |
| Support Services | | All Cities | | | City | | |
| | | Adj. FTE | Amount | Flex FTE Cost | Adj. FTE | Amount | City FTE Cost |
| Air Support | O | 4.50 | $ 716,346 | $ 159,188 | 4.50 | $ 716,346 | $ 159,188 |
| Asset Forfeiture Unit | O | 3.00 | $ 363,268 | $ 121,089 | 3.00 | $ 363,268 | $ 121,089 |
| Bomb Disposal Unit* . | R/O | 1.00 | $ 167,367 | $ 167,367 | 1.00 | $ 167,367 | $ 167,367 |
| Canine (Special Ops) | R/O | 8.00 | $ 1,108,279 | $ 138,535 | 8.00 | $ 1,108,279 | $ 138,535 |
| Communications-911 | R | 71.00 | $ 6,023,961 | $ 84,845 | 71.00 | $ 6,023,961 | $ 84,845 |
| Domestic Violence Intervention | O | 6.00 | $ 1,022,600 | $ 170,433 | 6.00 | $ 1,022,600 | $ 170,433 |
| Drug Enforcement Unit | O | 7.00 | $ 925,671 | $ 132,239 | 7.00 | $ 925,671 | $ 132,239 |
| DWI | O | 5.00 | $ 622,961 | $ 124,592 | 5.00 | $ 622,961 | $ 124,592 |
| Fraud, Forgery, Organized Crime* | O | 7.00 | $ 981,154 | $ 140,165 | 7.00 | $ 981,154 | $ 140,165 |
| General Traffic | O | 7.00 | $ 871,898 | $ 124,557 | 7.00 | $ 871,898 | $ 124,557 |
| Hostage Negotiation | R/O | 0.01 | $ 1,243 | $ 124,300 | 0.01 | $ 1,243 | $ 124,300 |
| Major Crimes Detectives | R | 22.00 | $ 3,248,139 | $ 147,643 | 22.00 | $ 3,248,139 | $ 147,643 |
| Homicide Unit | | | $ 395,754 | | | | |
| Marine Patrol | O | 7.00 | $ 885,524 | $ 126,503 | 7.00 | $ 885,524 | $ 126,503 |
| MARR Unit | O | 6.00 | $ 449,852 | $ 74,975 | 6.00 | $ 449,852 | $ 74,975 |
| Motorcycle | O | 4.00 | $ 507,496 | $ 126,874 | 4.00 | $ 507,496 | $ 126,874 |
| Tactical Unit | R | 1.50 | $ 281,920 | $ 187,947 | 1.50 | $ 281,920 | $ 187,947 |
| Vice | O | 1.20 | $ 154,430 | $ 128,692 | 1.20 | $ 154,430 | $ 128,692 |
| Gambling | O | 0.80 | $ 102,954 | $ 128,692 | 0.80 | $ 102,954 | $ 128,692 |



# The City Of Kenmore

P.O. Box 82607   •   Kenmore, Washington 98028-0607

*Leonard,*
*CC please to:*
*Chief Lee*
*Jon McCraken*
*Jason King*
*Rebecca Connolly*
*Michael Porter.*

December 4, 2002

The Honorable Ron Sims
King County Executive
King County Courthouse
516 Third Avenue
Seattle, WA 98140

Dear Executive Sims,

The Oversight Committee has directed me as chair to provide you written notice in conformance with Section 10 of the Inter-local Agreement for law enforcement services:

> With the exception of an outstanding issue concerning the optional arson investigation service, we have reached consensus to extend the law enforcement services contract for another two years, through December 31, 2004. The city members of the Oversight Committee respectfully request that the optional arson investigation service be clarified to enable the parties to reach mutual agreement regarding the option to pursue or withdraw from this particular service.

At the January 2002 Oversight Committee meeting, the cities designated four city managers to join with representatives from your staff to identify cost containment alternatives. This group was supported by a sub-committee of the finance directors' Oyster Team committee. Their task was to review the cost model to determine the basis for the high contract cost increases these past few years and recommend alternatives to bring those costs within the range contract cities are paying for other services.

We truly appreciate the opportunity of working together to better understand the contract cost issues and to identify possible solutions to increasing costs. This effort has educated the parities on the impacts of the individual contract city's decision related to cost increases, as well as identifying several Department operating efficiencies. The cost containment effort will continue into future years as we strive to improve this contract in the interest of both parties. It is of particular concern to contract cities that significant budget changes at King County and the Sheriff's Department not disproportionately impact the cities.

The contract cities are generally pleased with the quality of services, the professional conduct of the contract employees and our positive working relationship with the Sheriff Department. Under Sheriff Dave Reichert's leadership, we have come a long way together in improving both the contract terms and the services provided. We look forward to building onto this success.

Sincerely,

Stephen L. Anderson
City Manager

*Note:*
*This is the memo that refers to the Oversight Committee extending the contracts through December 31, 2004.*

C:   The Honorable Dave Reichert, King County Sheriff
     Contract City Oversight Committee Members

## Amendment to Interlocal Agreement

### Between King County and Cities of Burien, Carnation, Covington, Kenmore, Maple Valley, Newcastle, North Bend, Sammamish, SeaTac, Shoreline and Woodinville for Fire Investigation Services Conducted Pursuant to the 2000 Interlocal Agreement relating to Law Enforcement Services

6.19.1  Fire Investigation

~~For~~ Beginning in the year 2000, the City may purchase fire investigation services through this agreement.  These services will be provided by the King County Department of Development and Environmental Services (DDES) Fire Marshal's Office by separate agreement with the KCSO.  The cost for this service is shown on Exhibit B, and will be calculated in accordance with Exhibit G: "Arson Investigation Costing Model."  Fire Investigation callouts will be in accordance with protocols outlined in Exhibit H: "Arson Investigation Call Out Protocols," unless superseded by new or revised protocols adopted by the Oversight Committee, DDES and affected fire agencies.

IN WITNESS WHEREOF, the parties have executed this agreement.

KING COUNTY                                          City of _Shoreline_

_____         _____
King County Executive                                  Chief Executive Officer

Approved as to Form                                  Approved as to Form

_____         _____
Deputy Prosecuting Attorney                        City Attorney
for NORM MALENG
King County Prosecuting Attorney

**000146**

EXHIBIT G

ARSON INVESTIGATION COSTING MODEL

Pursuant to section 6.19 of the Interlocal Agreement Relating to Law Enforcement Services, the King County Department of Development and Environmental Services (DDES) will provide fire investigation services to cities contracting with the King County Sheriff's Office KCSO for police services. The extent to which contract cities use these fire investigation services is not likely to be uniform. This exhibit sets for the model by which costs of providing such service is to be allocated among the contracting cities.

A city will be charged in accordance with its percentage of historic usage of the service. The total cost to the County is reflected in Exhibit B, as updated by the County from year to year. A percentage of that total cost is assigned to each city based on its historic usage. The percentages of historic usage by cities are updated for each successive contract year. A three-year average is used with the most recent year being added and the oldest year being deleted. A summary table setting forth the current updated percentage assigned to each city is included in Exhibit B.

To determine the cost for each city, the total County cost identified in Exhibit B shall be multiplied by the city's average percentage of use indicated on the most current summary table (Exhibit B). Each city must pay the amount specified whether the service is used during the contract year or not. If a city does not use the services during the contract year, that city's percentage assignment for fire investigation services will drop due to the three-year averaging approach described above. There is no refund for low usage or non-usage.

In the event that cities utilize more hours than the previously established "share", and the total program cost accordingly exceeds the total cost to the County set forth in Exhibit B, those cities exceeding their assigned percentage shall be responsible for the additional cost. Additional costs shall be billed to cities at the DDES' hourly overtime rate set forth in Exhibit B.

## EXHIBIT H
## ARSON INVESTIGATION
## CALL OUT PROTOCOLS

1. **PURPOSE.** In accordance with section 6.19.1 of the Interlocal Agreement, this Exhibit specifies the protocols for the King County Fire Marshal's Office investigation of fires in cities that contract for fire investigation services with King County.

2. **SCOPE OF INVESTIGATION.** Upon request by the City or its designee, the Fire Investigation Unit of the King County Fire Marshal's Office shall respond to the following fires:
   a. Fires where one or more deaths have occurred;
   b. Fires where one or more serious injuries have occurred, and those injuries have required or are expected to require hospitalization of an injured party;
   c. Fires that are suspected to be, or are known to be intentionally set and any other fires not otherwise investigated;
   d. Fires where the fire suppression agency has not determined a cause, except where the loss is minimal and there is no measurable value in determining the cause;
   e. Fires where there is evidence that an explosive device was used to initiate the fire or resulted in the fire occurring; provided that, this fire type does not include instances where a container normally found a the fire scene (such as propane bottles, compressed air bottles or aerosol containers) exploded as a result of the fire.

3. **SERVICES PROVIDED.** Upon request by the City or its designee for services in response to a fire within the scope of fire types listed in section 2 above, the King County Fire Marshal's Office shall:
   a. Undertake reasonable efforts to investigate and determine the cause of the fire;
   b. Where the cause has been determined to be arson, perform the follow-up investigation and preparation of criminal charges where appropriate;
   c. In incidents involving death or serious injury where hospitalization was or is expected to be required, properly secure all reports, evidence, and photographs until the case has been resolved;
   d. Compile and submit monthly Uniform Crime Reporting (UCR) data for the Federal Bureau of Investigation to the King County Sheriff's Office.

## Amendment to Interlocal Agreement
## Between King County and the City of Shoreline
## Relating to Law Enforcement Services

WHEREAS King County, a home rule charter county, a political subdivision of the State of Washington, hereinafter referred to as the "County" and the City of Shoreline, a municipal corporation of the State of Washington, hereinafter referred to as the "City," entered into an Interlocal Agreement in 2000 relating to the provision of law enforcement services; and

WHEREAS, the County and the City desire to amend this Interlocal Agreement to show that computer replacement will take place on a four-year schedule;

NOW THEREFORE, the County and City hereby agree to the following amendments to the 2000 Interlocal Agreement related to Law Enforcement Services:

1.  Section 6.18.3 is amended to read:  Replacement computers will be furnished via the Computer Replacement Fund, approximately every ~~three~~ four years. The City will be charged a monthly replacement fee based on the number of computers in the City. This annual cost will appear as a separate line in Exhibit B. If the City bought its own computers, it will receive the unspent balance of the replacement funds should the agreement be terminated.

2.  Section 6.18.4 is amended to read: Annually, the County will estimate the purchase price of replacement hardware, software, accessories and tax. The monthly computer replacement cost will be calculated on a useful life of ~~three~~ four years.

IN WITNESS WHEREOF, the parties have executed this agreement.

**King County**

_____
King County Executive

12·11·2003
_____
Date

**City of Shoreline**

_____
Steven Burkett, City Manager

10/8/03
_____
Date

_Approved as to Form_

_____
Deputy Prosecuting Attorney

11/19/03
_____
Date

_Approved as to Form_

_____
City Attorney

10/8/03
_____
Date

Form Letters2

Case # C21010957



(no signature required)

☐ You are not under arrest. You are being advised that the Shoreline Police Department has been requested to enforce a no loitering/no trespassing policy by the property owners. If you are contacted at this location again, loitering or trespassing, you will be issued a trespass warning and will not be allowed to return for a period of one year.

(trespass admonishment/signature required)

☑ ## CITY OF SHORELINE TRESPASS PROGRAM
## CRIMINAL TRESPASS ORDER/ADMONISHMENT

I acknowledge that I have been advised of the Shoreline Criminal Code Trespass Law, SCC 9A.52.080. I know that I am subject to arrest for criminal trespass if I am found at this location again. I understand that my refusal to sign this form does not relieve me from criminal prosecution should I ignore this warning. I further acknowledge that I was given a copy of this order by a Shoreline Police Officer.

NOT OBTAINED
DUE TO COVID

| Subject's Signature | J. TSETEN | 102844 |
| --- | --- | --- |
| | Officer's Name | Officer's Serial # |

Date 04 / 09 / 21  Time 1052  Business Name CENTRAL MARKET

Address 15505 WESTMINSTER WAY                City SHORELINE  ZIP 98133

### SUBJECT DESCRIPTION

Name BENSHOFF, KURT A

Address ███████████████  City SEATTLE  Zip 98103

Race _____  Sex M  DOB ███████

Height 6.00  Weight 175  Hair _____  Eyes BLU

Other _____  DOL # ███████  Phone Number _____

**000150**